## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* WILLIAM "BILL" SMITH 814 Creek Road Severna Park, MD 21146 | : : : : : | |
| Plaintiff | : : | Civil Action No.: 1:17-cv-60 |
| v. | : : | |
| ATHENA CONSTRUCTION GROUP, INC. 18031 Dumfries Shopping Plaza Dumfries, VA 22026 | : : : : | |
| Defendant | : : | |

## AMENDED COMPLAINT

### I.    INTRODUCTION

1.      Relator William "Bill" Smith alleges that Athena Construction Group, Inc., (herein "Athena") and its owners and officers, Amber Peebles and Melissa Schneider, violated the False Claims Act by fraudulently obtaining various certifications from the U.S. Government.

2.      According to Relator Smith, Defendant falsified the qualifications of Athena so that the company could be certified under several Small Business Administration ("SBA") contracting programs, including but not limited to the 8(a) Business Development Program and the Historically Underutilized Business Zone program ("HUBZone").

3.      Athena knowingly and intentionally misrepresented its eligibility for these programs and submitted forged and false documents to the SBA to obtain certifications, under the above programs, so that it could obtain certain set-aside government contracts to claim money under those contracts.

4.      As a result of Defendants' fraud, from 2010 to 2016, Athena received over $22 million dollars in 8(a) and HUBZone set-aside contracts from various departments and agencies of the United States Government.

5.      Accordingly, Relator Smith, on behalf of the United States of America, pursuant to the False Claims Act, seeks all applicable damages and penalties from Defendants for knowingly submitting false claims in the amount of approximately $22 million.

## II.    PARTIES

6.      The Plaintiff is the United States of America, acting on behalf of the Department of Defense, Department of Interior, Department of Commerce, Department of Veterans Affairs, General Services Administration, and SBA.  The SBA, among other activities, oversees the 8(a), HUBZone, SDVOSBC or WOSB programs.

7.      Relator/Plaintiff William "Bill" Smith (herein "Mr. Smith") is an adult citizen of the State of Maryland residing at 814 Creek Road, Severna Park, Maryland 21146.

8.      Defendant Athena is a general construction contractor, with its main office presently located 17877 Old Triangle Road, Triangle, Virginia, 22172.  Defendant Athena was previously located at 18031 Dumfries Shopping Plaza, Dumfries, Virginia, 22026.

9.      According to its website, Athena is:

- 8(a)-certified;

- SBA-Certified HUBZone;

- VA-Certified Service-Disabled Veteran-Owned Small Business; and

- WBENC-Certified Woman-Owned Business.

2

10.     Amber Peeples is an owner and President of Defendant Athena.   Ms. Peeples is an adult citizen of the Commonwealth of Virginia residing at 615 Federal Street, Lynchburg, Virginia 24504.  Ms. Peeples oversees all aspects of the company affairs and operations.

11.     Melissa Schneider is the founder, owner and Vice-President of Defendant Athena. Ms. Schneider is an adult citizen of the Commonwealth of Virginia residing at 615 Federal Street, Lynchburg, Virginia 24504.

12.     Since Ms. Peeples and Ms. Schneider acted through Defendant Athena, Plaintiff will refer to all them collectively as "Defendant" or "Athena".

13.     Mr. Smith was employed by Athena from 2011 to 2016 as the Director of Operations and Project Superintendent.

**III.    JURISDICTION**

14.     This action is being brought on behalf of the United States under the Federal False Claims Act (herein "FCA") 31 U.S.C. §3729.

15.     Accordingly, the Court has subject matter jurisdiction under 28 U.S.C. §1331 (Federal Question) and §1345 (Plaintiff is the United States).

16.     As noted above, Plaintiffs are bringing this suit under the FCA, which states that "any action ... may be brought in any judicial district in which the defendant ... can be found, resides, transacts business, or in which any act ... occurred." 31 U.S.C. § 3732.  The FCA further states that "a summons ... shall be issued by the appropriate district court and served at any place within or outside of the United States." *Id.*

17.     Generally, this Court may exercise personal jurisdiction over any defendant that constitutionally sufficient "minimum contacts" with the forum and where subjecting the

3

defendant to the court's jurisdiction comports with "traditional notions" of fair play and substantial justice.

18.     Since the FCA authorizes nationwide service of process, the United States as a whole is the relevant forum for analyzing the extent of the Defendant's contacts.

19.     Accordingly, in assessing the sufficiency of Defendant's contacts with the forum, this Court should examine the extent to which the Defendant availed themselves of the privileges of American law and the extent to which they could reasonably anticipate being involved in litigation in the United States and/or Pennsylvania in particular.

20.     Here, the Court has personal jurisdiction because Athena has (1) bid on Government contracts involving Pennsylvania; (2) been awarded Government contracts involving Pennsylvania; and (3) challenged the awarding of Government contracts to Pennsylvania companies.

21.     For example, in 2009, Athena was awarded contract V529Q00129 relating to work in Butler, Pennsylvania.

22.     For example, in 2015, Athena bid on and was initially awarded contract HQ003414D0005 relating to work in Liberty Township, Pennsylvania.

23.     For example, according to the GAO, Athena objected to the awarding of a contract to Pennsylvania company R& R Construction for work in Louisiana.

24.     InsideGov.com, which is a website that reports the activities of Government Contractors, provides a snapshot of Athena's "Geographic Footprint" or "Place of Performance".

25.     According to InsideGov.com, Athena works in Texas, Illinois, Pennsylvania, Virginia, Maryland, Louisiana, and District of Columbia.



26.     Since 2007, Athena has bid and been awarded approximately $805,149.00 in Government contractual obligations for Pennsylvania related work.

27.     Accordingly to its website, under "Geographic Footprint", Athena affirms that it has "offices strategically located in the Washington DC metro area, New Orleans, and San Antonia, [and is] is capable of supporting projects throughout the Mid-Atlantic and Southern regions of the United States."  The Mid-Atlantic region includes New York, New Jersey, Pennsylvania, Delaware, Maryland, Washington, D.C., Virginia, and West Virginia.

28.     Finally, the exercise of personal jurisdiction over Athena does not offend "traditional notions" of fair play and substantial justice because the inconvenience of defending this suit in the Middle District of Pennsylvania does not render jurisdiction unreasonable and the national interest in furthering the policies of the FCA outweighs the burden on the Defendant.

29.     Similarly, venue lies in this District pursuant to 28 U.S.C. §1391(b)(2) and (3).

30.     Finally, in light of Athena's retaliatory conduct, which stems from the Court's action of unsealing the Relator's Complaint, this Court has jurisdiction over Mr. Smith's Retaliation claim.

**IV.     REGULATORY FRAMEWORK**

30.     The FCA imposes civil liability when a person "knowingly presents, or causes to be presented" to the government "a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1).

31.     As the Supreme Court has explained, in enacting the False Claims Act, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *Cook County, Illinois v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003).

32.     In other words, it reaches "all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). There are two categories of false claims under the FCA: a factually false claim and a legally false claim. *U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008).

33.     A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment. *Id.*

34.     A legally false FCA claim is based on a "false certification" theory of liability. A "false certification" is one of the many ways of establishing the "falsity" of a claim under the FCA. This was emphasized by Congress in the 1986 Amendments to the FCA stating "each and

every claim submitted under a contract, loan guarantee or other agreement which was originally obtained by means of false statements or other corrupt and fraudulent conduct, or in violation of any statute or appropriate regulation, constitutes a false claim." S.Rep. No. 99-345 at 9 (1986), reprinted in 1986 U.S.C.C.A.M. 5266, 5274.

35.     There is a further division of categories of "false certification" claims as the courts have recognized that there are two types of "false certifications", express and implied. Under the "express false certification" theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds.

36.     The Third Circuit and a number of other circuits have also adopted a more expansive version of the "false certification" theory called "implied false certification" liability, which attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment. *See U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 306 (3d Cir. 2011) (We adopt the implied false certification theory for liability for several reasons.).

37.     An "implied false certification" theory of liability is premised on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment. *Ab-Tec Construction, Inc. v. United States,* 31 Fed. Cl. 429 (Fed. Ct. 1994). In *Ab-Tec,* the court held that claims submitted by a contractor in violation of core program terms violated the FCA because submission of the claims "represented an implied certification . . . of defendant[s] continuing adherence to the requirements for participation in the ... program" *Id.* at 434. The contractor's deliberate withholding from the government knowledge of the violations not only dishonored the terms of its agreement with that

agency but, more importantly caused the government to pay out funds in the mistaken belief that it was furthering the aims of the 8(a) program." *Id.*

38.     As the cases on this topic have developed since *Ab-Tec*, the nexus between compliance with a statute or regulation and a claim for payment for purposes of false claims has been called a "condition of payment".  Courts have consistently held that the knowing submission of false claims resulting from violation of a condition of payment creates false claims liability.  The inquiry into whether a statutory or regulatory provision is a condition of payment is essentially an analysis of whether the violation issue was material to the claim as the 10th Circuit recently explained, in affirming applied certification liability:

> . . . claims under an implied-certification theory do not require courts to examine
> payee statements to the government. Rather, "the analysis focuses on the
> underlying contracts, statutes, or regulations themselves to ascertain whether they
> make compliance a prerequisite to the government's payment."

*See United States ex rel Conner v. Salina*, 543 F.3d 1211, 1218 (10th Cir. 2008).  Accordingly, whether the analysis is called "implied certification," "condition of payment," or "materiality," the analysis is the same.

## V.     BACKGROUND

39.     The U.S. Government is the world's largest buyer of services and goods. Purchases by military and civilian agencies amount to nearly $600 billion a year and include everything from complex space vehicles to the paving of parking lots.

40.     Recognizing that small businesses are the engine of economic growth in the U.S., the Government has adopted a policy of requiring its agencies to award prime and subcontracting opportunities to small businesses.

41.     Accordingly, the U.S. Government has enacted a government-wide prime contracting goal that at least 23 percent of all federal government contracting dollars should be awarded to small and disadvantaged businesses.

42.     Targeted sub-goals have also been established for women-owned small businesses, small disadvantaged businesses, firms located in HUBZones and service disabled veteran-owned small businesses.  These targeted sub-goals are 5 percent, 5 percent, 3 percent and 3 percent, respectively.

43.     It is the responsibility and mission of the Small Businesses Administration ("SBA") to help federal agencies ensure that small businesses get their fair share of federal contract dollars.

44.     The U.S. Government has created multiple programs and initiatives to help achieve its procurement goal, including contract set-asides and certification programs.

45.     As a matter of policy, any government contracts for either purchases or services that have an anticipated dollar value exceeding $3,000, but not over $150,000 are automatically reserved or set aside for small businesses.

46.     In addition to SBA set-asides, there are four certification programs that are administered by the SBA: the 8(a) Business Development Program, the HUBZone Program, Service-Disabled Veteran-Owned Small Business Concern Program, and Women-Owned Small Businesses Federal Contracting Program.

47.     Defendant Athena submitted and obtained the following SBA set-aside contracts:

|   |   |   |   |   |
|---|---|---|---|---|
| a. | 09/06/2011 | $60,500 | W91QV111P0266 | Dept. of Defense |
| b. | 09/23/2011 | $12,354 | ING11PX01600 | Dept. of Interior |
| c. | 06/13/2012 | $19,759 | W912DR10P0332 | Dept. of Army |
| d. | 09/11/2012 | $3,419 | ING12PX01825 | Dept. of Interior |
| e. | 07/15/2013 | $36,933 | ING13PX01133 | Dept. of Interior |
| f. | 03/23/2015 | $10,500 | ING15PX00418 | Dept. of Interior |

       g.  01/14/2016      $22,871      W912HQ16P0016     Dept. of Defense

**A.**    **8(a) Business Development Program**

48.    The 8(a) Business Development Program is designed to assist eligible socially and economically disadvantaged small businesses.

49.    The program provides qualified firms access to capital credit, business counseling and training, and contracting opportunities.

50.    To be eligible for participation in the 8(a) Business Development Program, the company must be:

    a.  owned by an American citizen, by birth or naturalization;

    b.  majority-owned (51 percent or more) and controlled/managed by a socially and economically disadvantaged individual(s); and

    c.  a small business.

51.    Under federal law, socially disadvantaged individuals are those that have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identification as members of groups without regard to their individual qualities.  Thus, for purposes of the 8(a) Business Development program, the following individuals are presumed socially disadvantaged (called "presumed groups"):

    a.  Black Americans;

    b.  Hispanic Americans;

    c.  Native Americans;

    d.  Asian Pacific Americans; and

    e.  Subcontinent Asian American.

52.    Other individuals may be found socially disadvantaged and eligible for the program on a case-by-case basis.  To do so, the individual must provide evidence to the SBA

proving that they are socially disadvantaged.  Evidence of individual social disadvantage must include:

   a.  At least one objective distinguishing feature such as race, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged;

   b.  Personal experiences of substantial and chronic social disadvantage in American society, not in other countries;

   c.  Negative impact on the individual's entrance into the business world or advancement in the business world because of the stated disadvantage(s); and

   d.  To prove social disadvantage, the individual(s) owners must ultimately show that such personal experiences had a negative impact on entry into or advancement in the business world.

53.    It should be noted that once the SBA has found that the applicant is socially disadvantaged it must then find that they are also economically disadvantaged before they can receive 8(a) certification.

54.    Thus, before the SBA can approve an application, the individuals claiming to be disadvantaged must submit supporting documents to prove that their assets:

   a.  assets do not exceed $4 million;

   b.  personal income does not exceed $250,000, averaged over 3 years, or

   c.  adjusted net worth is less than $250,000.

55.    To determine if an individual is economically disadvantaged, each socially disadvantaged individual must provide the following to SBA:

   a.  narrative statement of economic disadvantage;

   b.  personal financial information (including tax returns and certain SBA forms); and

      c.   in every case, when married, the socially disadvantaged individual must submit separate financial information to SBA for his or her spouse (including tax returns and certain SBA forms).

56.     In reviewing economic disadvantage, the SBA also reviews several factors to determine if a socially disadvantaged individual is economically disadvantaged.  These factors include:

      a.   all income for the past three years, including any unusual income levels;

      b.   fair market value of all assets;

      c.   personal net worth (assets and liabilities);

      d.   transfer of assets to an immediate family member, directly or via trust;

      e.   availability of individual retirement account (IRA) funds or other official retirement accounts;

      f.   income received from the firm when filing taxes as an S corporation or partnership;

      g.   reinvestments into the applicant firm; and

      h.   tax payments for the firm.

57.     The SBA has placed certain limitations on a contractor's ability to subcontract any portion of an 8(a) set-aside contract if the amount exceeds $150,000.

58.     For example, for general construction contracts, the prime contractor must perform at least 15 percent of the work, not including the cost of the materials, with its own employees.  For construction by special trade contractors, the prime contractor must perform at least 25 percent of the work, not including the cost of the materials, with its own employees.

59.     Violations of the applicable subcontracting limitation may result in a variety of significant penalties, including suspension, debarment, administrative remedies, fines and even

imprisonment.  If a fine is imposed as a result of a violation, the fine will be greater of either

$500,000 or the dollar amount spent in excess of the permitted levels for subcontracting.

60.     Defendant  submitted inaccurate and falsified information to the U.S. Government

in order to obtain 8(a) certification.

61.     For example, the owners of Athena are neither socially or economically

disadvantaged.

62.     Defendant obtained prime contracts and subcontracts from government agencies

and other contracts using its fraudulently obtained 8(a) certification.

63.     Further, Athena violated the limitations on subcontracting (13 C.F.R. §125(a)) of

8(a) set asides by generally subcontracting a 100% of the 8(a) contracts to other companies.

**B.      The HUBZone Program**

64.     Congress enacted the HUBZone program in 1997 to encourage small businesses

to locate in areas of the country that traditionally experienced difficulty in attracting business.

65.     The goal of the program is to spur investment and job growth in areas where both

were lacking. As Congress explained, the HUBZone program  'targets special Federal

government help to inner cities and rural counties that have low household incomes, high

unemployment, and whose communities have suffered from a lack of investment."  S. REP. NO.

105-62, at 25 (1997), 1997 U.S.C.C.A.N. 3076, 3098.

66.     Creating incentives for small businesses to locate in targeted communities is the

fundamental goal of the HUBZone program.  "[W]ithout businesses in these communities, we

don't create jobs, and without sources of new jobs, we are unlikely to have a successful

revitalization effort."  *Id.* at 3099.

13

67.     Towards that end, the HUBZone program gives preferences in government contracting to businesses that qualify as a HUBZone small business concern, including in some cases a 10 percent price evaluation preference. Among other options, agencies can designate a contract as a HUBZone set-aside, which restricts competition for the contract to only those companies that are HUBZone certified.

68.     The SBA has the authority to certify a company as a qualified HUBZone firm.  To qualify as a HUBZone small business concern, the applicant must meet four basic eligibility requirements:

     a.   the business must be owned and controlled by a U.S. citizen;

     b.   it must qualify as a small business;

     c.   the business's principal office must be located in a HUBZone designated as such by regulation; and

     d.   at least 35 percent of the business's employees must reside in a HUBZone.

69.     In designating a company as HUBZone certified the SBA relies on the information in the applicant's online submission.

70.     The definitions for the terms used in the certification and throughout the application are set forth in the Small Business Act, SBA regulations (13 C.F.R. Part 126), and also any statutory and regulatory provision referenced in those authorities.

71.     The Certification further states: "The undersigned has reviewed, verified and certifies that":

     a.     The applicant's principal office is located in a HUBZone.

     b.     All the statements and information provided in the applicant's online application, this form and any attachments are true, accurate and complete. If assistance was obtained in completing this form and the supporting documentation, I have personally reviewed the information and it is true and accurate. I understand that these

14

statements are made for the purpose of determining eligibility and continuing eligibility in the HUBZone Program. In addition, the applicant will immediately notify the SBA of any material change which could affect the applicant's HUBZone SBC eligibility.

c.   The certifications in this document are continuing in nature. Each HUBZone prime contract or subcontract for which the applicant submits an offer/quote or receives an award while a HUBZone SBC constitutes a restatement and reaffirmation of these certifications.

72.   Further, the Certification contains the following warning:

Warning: By signing this certification you are representing on your own behalf, and on behalf of the applicant, that the information provided in this certification, the application and any document or supplemental information submitted in connection with this application, is true and correct as of the date set forth opposite your signature. Any intentional or negligent misrepresentation of the information contain in this certification may result in ... civil ... sanctions including, but not limited to ... treble damages and civil penalties under the False Claims Act ...."

73.   The SBA has placed certain limitations on a contractor's ability to subcontract any portion of a HUBZone set-aside contract if the amount exceeds $150,000.

74.   For example, for general construction contracts, the prime contractor must perform at least 15 percent of the work, not including the cost of the materials, with its own employees.  For construction by special trade contractors, the prime contractor must perform at least 25% of the work, not including the cost of the materials, with its own employees.

75.   Violations of the applicable subcontracting limitation may result in a variety of significant penalties, including suspension, debarment, administrative remedies, fines and even imprisonment.  If a fine is imposed as a result of a violation, the fine will be greater of either $500,000 or the dollar amount spent in excess of the permitted levels for subcontracting.

76.   Defendant  submitted inaccurate and falsified information to the U.S. Government in order to obtain HUBZone certification.

77.     For example, in order to meet the 35 percent HUBZone employee threshold, the owners of Athena have paid individuals nominals sums money so that they could be identified on fake employee rosters.  These alleged employees do not actually do any work for Athena, they are paid solely so that Athena can meet the 35 percent threshold.

78.     When the Relator asked about the people on the rosters whom he had never seen or met he was told to not worry about it.  As time went on, the Relator came to understand that the certain individuals on the roster were not really employees but were listed solely to meet the HUBZone requirements.

79.     Defendant obtained numerous prime contracts and subcontracts from government agencies and other contracts using its fraudulently obtained HUBZone certification.

80.     Using its fraudulently obtained HUBZone certification, Athena submitted bids and was awarded the following contracts:

|    |            |             |               |                        |
|----|------------|-------------|---------------|------------------------|
| a. | 03/22/2011 | $50,423     | ING11PX00408  | Department of Interior |
| b. | 04/27/2011 | $3,575      | ING11PX00408  | Department of Interior |
| c. | 05/18/2011 | $11,956     | ING11PX00891  | Department of Interior |
| d. | 09/17/2011 | $40,719     | ING11PX02171  | Department of Interior |
| e. | 09/21/2012 | $460,184    | ING12PC00063  | Department of Interior |
| f. | 03/20/2014 | $10,000     | HQ003414D0005 | Department of Defense  |
| g. | 06/24/2014 | $20,999     | W912HQ14P0070 | Department of Defense  |
| h. | 09/30/2014 | $2,401,200  |               | Department of Defense  |
| i. | 04/29/2015 | $2,112      | DOC0006       | Department of Commerce |
| j. | 04/29/2015 | $8,661      | DOC0007       | Department of Commerce |
| k. | 05/21/2015 | $2,684      | DOC0008       | Department of Commerce |
| l. | 05/22/2015 | $9,628      | DOC0009       | Department of Commerce |
| m. | 05/22/2015 | $13,366     | DOC0010       | Department of Commerce |
| n. | 06/03/2015 | $4,396      | DOC0011       | Department of Commerce |
| o. | 06/11/2015 | $22,438     | DOC0012       | Department of Commerce |
| p. | 06/25/2015 | $24,983     | INP15PC00316  | Department of Interior |
| q. | 07/17/2015 | $6,597      | DOC0013       | Department of Commerce |
| r. | 07/23/2015 | $366,983    | HQ003414D0005 | Department of Defense  |
| s. | 07/30/2015 | $292,314    | HQ003414D0005 | Department of Defense  |
| t. | 07/30/2015 | $12,338     | DOC0014       | Department of Commerce |
| u. | 09/29/2015 | $802,009    | HQ003414D0005 | Department of Defense  |
| v. | 10/22/2015 | $2,625      | DOC0015       | Department of Commerce |

16

| w. | 12/11/2015 | $42,648 | HQ003414D0005 | Department of Defense |
| x. | 08/10/2016 | $96,407 | INP16PX02649 | Department of Interior |

81.      Further, Athena violated the limitations on subcontracting (13 C.F.R. §125(a) and §121.600) of HUBZone set asides by generally subcontracting a 100 percent of the above HUBZone contracts to other companies.

**C.      Service-Disabled Veteran-Owned Business Concern Procurement Program and Women Owned Small Business Program.**

82.      The Veterans Entrepreneurship and Small Business Development Act of 1999 established an annual government-wide goal of not less than three (3) percent of the total value of all prime contract and subcontract awards for participation by small business concerns owned and controlled by service-disabled veterans.

83.      On December 16, 2003, the Veterans Benefits Act of 2003 was passed by Congress.  Section 308 of the Act established a procurement program for Service-Disabled Veteran-Owned Small Business Concerns ("SDVOSBC").

84.      The purpose of the Service-Disabled Veteran-Owned Small Business Concerns ("SDVOSBC")  is to provide procuring agencies with the authority to set acquisitions aside for exclusive competition among service-disabled veteran-owned small business concerns, as well as the authority to make sole source awards to service-disabled veteran-owned small business concerns if certain conditions are met.

85.      Similarly, five (5) percent of the total value of all prime contracts and five (5) percent of all subcontracts are to be awarded to women-owned small businesses ("WOSB").

86.      Athena, pursuant to the Government's SDVOSBC and WOSB program, was awarded the following contracts:

| a. | 09/23/2011 | $10,565 | VA786AC0441 | Dept. of Veterans Affairs |
| b. | 03/28/2013 | $1,795,000 | VA25713C0083 | Dept. of Veterans Affairs |

17

|   |            |             |              |                          |
|---|------------|-------------|--------------|--------------------------|
| c. | 05/30/2013 | $4,395,000  | VA25713C0084 | Veterans Affairs         |
| d. | 09/26/2014 | $96,485     | W9115114P1004| Department of Defense    |
| e. | 12/11/2015 | $2,190,338  | VA24616C0006 | Dept. of Veterans Affairs|
| f. | 02/09/2016 | $1,207,093  | VA25713C0084 | Dept. of Veterans Affairs|
| g. | 09/12/2016 | $224,768    | VA25016P2337 | Dept. of Veterans Affairs|

87.     The SBA has placed certain limitations on a contractor's ability to subcontract any portion of a SDVOSBC and WOSB set-aside contracts if the amount exceeds $150,000.

88.     For example, for general construction contracts, the prime contractor must perform at least 15 percent of the work, not including the cost of the materials, with its own employees.  For construction by special trade contractors, the prime contractor must perform at least 25 percent of the work, not including the cost of the materials, with its own employees.

89.     Violations of the applicable subcontracting limitation may result in a variety of significant penalties, including suspension, debarment, administrative remedies, fines and even imprisonment.  If a fine is imposed as a result of a violation, the fine will be greater of either $500,000 or the dollar amount spent in excess of the permitted levels for subcontracting.

90.     Further, Athena violated the limitations on subcontracting of SDVOSBC and WOSB set asides by generally subcontracting 100 percent of the above contracts to other companies.

**D.     SBA Subcontracting Opportunities**

91.     An alternative to seeking prime contracts is to explore subcontracting opportunities.  Subcontracting with a prime contractor can be a profitable experience as well as a growth opportunity for a small business.  The SBA maintains a database of subcontracting opportunities called SUB-Net.

92.     Prime contractors receiving contracts greater than the simplified acquisition threshold ($1.5 million for construction contracts) must agree in the contract that small

18

businesses, women-owned small businesses, HUBZone small businesses and small disadvantaged businesses will have the maximum practical opportunity to participate as subcontractors.

93.    As such, prime contractors are required to establish subcontracting plans describing who and how small businesses will participate as subcontractors.  Government-wide numerical subcontracting goals are established by statute for small disadvantaged businesses (5 percent), women-owned small businesses (5 percent), service disabled veteran owned small businesses (3 percent) and HUBZone certified small businesses (3 percent).

94.    Although subcontracting goals are established government-wide, subcontracting requirements for individual contracts vary because they are negotiated between the respective government agency and the prime contractor.

95.    Using its fraudulently obtained 8(a) and HUBZone certifications, Athena was able to deceive various prime contractors into awarding Athena the following subcontracts:

| | | | | |
|---|---|---|---|---|
| a. | 02/04/2011 | $907,000 | 2010065-0920000 | Dept. of the Army |
| b. | 06/22/2011 | $67,323 | 2010065.0920000 | Dept. of the Army |
| c. | 08/26/2011 | $32,000 | 2010065.0920000 | Dept. of the Army |
| d. | 09/12/2011 | $1,279,888 | 11076000 | Public Buildings Service |
| e. | 10/07/2011 | $5,886,907 | 2011074-1601000 | Dept. of the Navy |
| f. | 10/07/2011 | $775,159 | 2011074-1500200 | Dept. of the Navy |
| g. | 10/07/2011 | $3,758,231 | 2011074-1400100 | Dept. of the Navy |
| h. | 12/07/2011 | $396,907 | 2011074-1600100 | Dept. of the Navy |
| i. | 12/07/2011 | $105,231 | 2011074-1500100 | Dept. of the Navy |
| j. | 04/06/2012 | $28,656 | 2011074-1500100 | Dept. of the Navy |
| k. | 04/06/2012 | $189,180 | 2011074-1500100 | Dept. of the Navy |
| l. | 05/08/2012 | $316,000 | 2011070-1200300 | Public Buildings Service |
| m. | 06/18/2012 | $65,659 | 2011074-1600100 | Dept. of the Navy |
| n. | 07/27/2012 | $70,393 | 2011074-1600100 | Dept. of the Navy |
| o. | 08/08/2012 | $156,149 | 2011074-1600100 | Dept. of the Navy |
| p. | 10/04/2012 | $49,000 | 2011074-1600100 | Dept. of the Navy |
| q. | 11/01/2013 | $44,171 | 2012076.0920100 | Public Buildings Service |
| r. | 12/06/2013 | $127,635 | 2012076.0920100 | Public Buildings Service |
| s. | 07/02/2014 | $33,600 | 2012076.0920100 | Public Buildings Service |
| t. | 07/28/2014 | $36,347 | 2012076.0920100 | Public Buildings Service |

## VI.     COUNTS

### COUNT I
#### U.S.A. ex Relator William "Bill" Smith v. Athena Construction Group, Inc.
#### False Claims Act (31 U.S.C. §3729)

96.     Paragraphs 1 through 96 are incorporated as though fully set forth herein.

97.     Defendant Athena had a rough start as a residential construction company when it was founded in 2003 and due to significant financial losses it almost went bankrupt.

98.     Despite the fact the entire country was in the midst of what would later be known as the housing bubble and that the residential construction sector was booming, Defendant Athena could not make money in the residential sector.

99.     Defendant Athena decided to get out of the residential construction sector and turn into a government contractor.

100.    In order to obtain government contracts, Athena engaged in a scheme to fraudulently obtain numerous SBA certifications to help it secure lucrative Government contracts.

101.     Through its scheme Athena has been able to grow through the recession, ninety percent of its revenues are generated through Government contracts, and its revenues have increased by approximately 20% every year.

102.    For example, Athena submitted inaccurate and falsified information to the U.S. Government in order to obtain 8(a) certification.  It is undisputed that the owners of Athena are neither socially nor economically disadvantaged.  The owners of Athena lied on their 8(a) application and hid assets in their offices in order to have Athena qualify as an 8(a) company.

103.    Athena obtained prime contracts and subcontracts from government agencies and other contracts using its fraudulently obtained 8(a) certification.

104.    For example, Athena falsely certified that it was a HUBZone company.  In order to meet the 35 percent HUBZone employee threshold, Athena paid individuals nominals sums of money so that they could be identified on fake employee rosters as working for Athena.  These alleged employees did not actually do any work for Athena, they are paid solely so that Athena can meet the 35 percent threshold.

105.    The Relator was Athena's Director of Operations for approximately 5 years. During that time the Relator noticed the names of individuals on the employee roster that he never saw at worksites or in the office.

106.    When the Relator asked about these individuals, whom he had never met, he was told by Ms. Peebles and/or Ms. Schneider that they were on the roster so that Athena could keep its HUBZone certification.

107.    For example, Athena claimed that Mary Dumfries was a company employee when in reality she was the property manager for the shopping plaza where Athena's offices were located.  Ms. Dumfries did not do any actual work for Athena, instead she worked for the owner of the shopping plaza.  Despite this Athena added her to the employee roster and paid her since she lived in the HUBZone and her inclusion allowed Athena to pass itself off as a HUBZone company.

108.    Using its fraudulently obtained HUBZone certification Athena obtained numerous prime contracts and subcontracts from government agencies and other prime contractors. Including but not limited to the following contracts:

|   |            |          |             |                        |
|---|------------|----------|-------------|------------------------|
| y. | 03/22/2011 | $50,423  | ING11PX00408 | Department of Interior |
| z. | 04/27/2011 | $3,575   | ING11PX00408 | Department of Interior |

21

| | | | |
|---|---|---|---|
| aa. 05/18/2011 | $11,956 | ING11PX00891 | Department of Interior |
| bb. 09/17/2011 | $40,719 | ING11PX02171 | Department of Interior |
| cc. 09/21/2012 | $460,184 | ING12PC00063 | Department of Interior |
| dd. 03/20/2014 | $10,000 | HQ003414D0005 | Department of Defense |
| ee. 06/24/2014 | $20,999 | W912HQ14P0070 | Department of Defense |
| ff. 09/30/2014 | $2,401,200 | | Department of Defense |
| gg. 04/29/2015 | $2,112 | DOC0006 | Department of Commerce |
| hh. 04/29/2015 | $8,661 | DOC0007 | Department of Commerce |
| ii. 05/21/2015 | $2,684 | DOC0008 | Department of Commerce |
| jj. 05/22/2015 | $9,628 | DOC0009 | Department of Commerce |
| kk. 05/22/2015 | $13,366 | DOC0010 | Department of Commerce |
| ll. 06/03/2015 | $4,396 | DOC0011 | Department of Commerce |
| mm. 06/11/2015 | $22,438 | DOC0012 | Department of Commerce |
| nn. 06/25/2015 | $24,983 | INP15PC00316 | Department of Interior |
| oo. 07/17/2015 | $6,597 | DOC0013 | Department of Commerce |
| pp. 07/23/2015 | $366,983 | HQ003414D0005 | Department of Defense |
| qq. 07/30/2015 | $292,314 | HQ003414D0005 | Department of Defense |
| rr. 07/30/2015 | $12,338 | DOC0014 | Department of Commerce |
| ss. 09/29/2015 | $802,009 | HQ003414D0005 | Department of Defense |
| tt. 10/22/2015 | $2,625 | DOC0015 | Department of Commerce |
| uu. 12/11/2015 | $42,648 | HQ003414D0005 | Department of Defense |
| vv. 08/10/2016 | $96,407 | INP16PX02649 | Department of Interior |

109.    Further, Athena violated the limitations on subcontracting of set asides by generally subcontracting a 100 percent of its contracts to other companies.

110.    For example, Athena did not do any work on subcontracts 2010065-0920000 ($907,000.00); 11076000.TUNNEL.50990000.42040 ($1,279,888.00); 2011074-1400100; 2011074-1601000; and 2011074-1500200 ($10,420,297.00).  Instead, Athena would place an unexperienced employee to sit at the job site.

WHEREFORE, Plaintiff, the United States, demands judgment against Defendant Athena reimbursement for all false claims paid by the United States, trebled as required by law, plus such civil penalties as are required by law, together with all such further relief as may be just and proper.

## COUNT II

### William "Bill" Smith v. Athena Construction Group, Inc.
### Retaliation

111.     Paragraphs 1 through 110 are incorporated as though fully set forth herein.

112.     The FCA, 31 U.S.C. § 3730(h), created "a private cause of action for an

individual retaliated against by his employer for assisting an FCA investigation or proceeding."

113.     The anti-retaliation provision of the FCA provides in relevant part:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in
any other manner discriminated against in the terms and conditions of
employment by his or her employer because of lawful acts done by the employee
on behalf of the employee or others in furtherance of an action under this section,
including investigation for, initiation of, testimony for, or assistance in an action
filed or to be filed under this section, shall be entitled to all relief necessary to
make the employee whole. Such relief shall include reinstatement with the same
seniority status such employee would have had but for the discrimination, 2 times
the amount of back pay, interest on the back pay, and compensation for any
special damages sustained as a result of the discrimination, including litigation
costs and reasonable attorneys' fees.

31 U.S.C. § 3730(h).

114.     Congress enacted § 3730(h) to encourage any individuals knowing of

Government fraud to bring that information forward, and §3730(h) broadly protects employees

who assist the government in prosecuting and investigating False Claims Act violations from

harassment, demotion, loss of employment, and any other form of retaliation. *See Hutchins v.*

*Wilentz, Goldman & Spitzer,* 253 F.3d 176, 186 (3d Cir. 2001) (citation omitted).

115.     To state a claim under § 3730(h), a plaintiff must show that (1) he engaged in

protected conduct and (2) that he was discriminated against because of his protected conduct.

116.     The language of the statute itself encompasses a diverse array of conduct and

23

prohibits retaliation in any of its varied forms, including discharge, demotion, suspension, threat, harassment, and "any other manner." The statute also protects a wide variety of conduct, "including investigation for, initiation of, testimony for, or assistance in" an FCA claim, and "[d]etermining what activities constitute 'protected conduct' is a fact specific inquiry". *Hutchins*, 253 F.3d at 187.

117.   Here, on January 10, 2017, Mr. Smith reported to the Attorney General of the United States, via sealed Complaint, that Defendant Athena had fraudulently obtained certain SBA certifications and had used those certifications to obtain millions of dollars in Government contacts.

118.   Mr. Smith's report was made in good faith and is protected by the absolute judicial privilege under Pennsylvania and Virginia law.

119.   Under Pennsylvania law, pursuant to the judicial privilege, a person is entitled to absolute immunity for "communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought." *Bochetto v. Gibson*, 580 Pa. 245, 251, 860 A.2d 67, 71 (2004) *citing Post v. Mendel,* 510 Pa. 213, 507 A.2d 351, 355 (1986) (emphasis in original). This privilege is based on the "public policy which permits all suiters, however bold and wicked, however virtuous and timid, to secure access to the courts of justice to present whatever claims, true or false, real or fictitious, they seek to adjudicate." *Id.* As the Pennsylvania Supreme Court explained in *Post*, "[t]o assure that such claims are justly resolved, it is essential that pertinent issues be aired in a manner that is unfettered by the threat of libel or slander suits being filed." *Id.*

120.   Similarly under Virginia law, the judicial privilege, is broad in scope and applies to communications made in proceedings pending in a court or before a quasi-judicial body.

*Lindeman v. Lesnick*, 268 Va. 532, 537, 604 S.E.2d 55, 58 (2004) *citing Penick v. Ratcliffe*, 149

Va. 618, 628, 140 S.E. 664, 667 (1927). If the communication is made in such a judicial

proceeding, it need only be relevant and pertinent to the case to be protected by the privilege.

*Donohoe Construction Co. v. Mount Vernon Assocs.*, 235 Va. 531, 539, 369 S.E.2d 857, 861

(1988). "The reason for the rule of absolute privilege in judicial proceedings is to encourage

unrestricted speech in litigation." *Id.* at 537, 369 S.E.2d at 860.

121.    Accordingly, Mr. Smith's statements, made in the instant FCA Complaint, are

protected by the judicial privilege and are immune to collateral attack regardless of the whether

they paint Athena in a negative light.

122.    Despite the above and in a clear attempt to harass and intimidate Mr. Smith into

silence and withdrawing of the instant Complaint, Defendant Athena filed a frivolous lawsuit in

the Circuit Court for the County of Prince William in Virginia seeking at least $106,153.84 in

damages.

123.    Defendant Athena's Virginia lawsuit alleges that Mr. Smith breached his

severance agreement by making "derogatory remarks by filing" the Complaint.

124.    Defendant Athena's Virginia lawsuit is clearly barred by the judicial privilege and

was clearly filed to retaliate against Mr. Smith for his reporting of fraud to the Government.

125.    Defendant Athena's retaliation violates the FCA, 31 U.S.C. § 3730(h), and has

caused Relator Mr. Smith to spend money to defend himself against this frivolous lawsuit.

WHEREFORE, Relator Mr. Smith seeks any and all damages allowed under the law.

FREIWALD LAW, P.C.

By: _____

AARON J. FREIWALD, ESQUIRE
GLENN A. ELLIS, ESQUIRE

Dated:  November 21, 2017

## <u>CERTIFICATE OF SERVICE</u>

I Glenn A. Ellis, Esquire hereby certify that a copy of Plaintiff's Amended Complaint has

been served via electronic filing as follows:

> Stephen G. Rhoads, Esquire
> Gawthrop Greenwood, P.C.
> 17 E. Gay Street, Suite 100
> West Chester, PA 19381

**FREIWALD LAW, P.C.**

By: _____
GLENN A. ELLIS, ESQUIRE

Dated:  November 21, 2017

27