## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | : | |
| **UNITED STATES OF AMERICA** *ex rel.* | : | |
| **WILLIAM "BILL" SMITH** | : | |
| **814 Creek Road** | : | |
| **Severna Park, Maryland 21146** | : | |
| | : | |
| *Plaintiff,* | : | **Civil Action: 1:18-cv-02080-APM** |
| **v.** | : | |
| | : | |
| **Athena Construction Group, Inc.** | : | |
| **17877 Old Triangle Road** | : | |
| **Triangle, Virginia, 22172** | : | |
| | : | **SECOND AMENDED** |
| **Clark/Balfour Beatty - NCE, A Joint Venture** | : | **COMPLAINT** |
| **7500 Old Georgetown Road** | : | |
| **Bethesda, Maryland 20814** | : | |
| | : | |
| **Balfour Beatty Construction Company, Inc.** | : | |
| **3100 McKinnon Street, Floor 10** | : | |
| **Dallas, Texas 75201** | : | |
| | : | |
| **Clark Construction Company** | : | **FILED UNDER SEAL** |
| **7500 Old Georgetown Road** | : | **PURSUANT TO** |
| **Bethesda, Maryland 20814** | : | **COURT ORDER** |
| | : | **AND 31 U.S.C. § 3730(b)(2)** |
| **Hensel Phelps Construction Company** | : | |
| **420 6th Avenue** | : | |
| **Greeley, Colorado 80631** | : | |
| | : | |
| **Barton Malow Company** | : | |
| **26500 American Drive** | : | |
| **Southfield, Michigan 48034** | : | |
| | : | |
| **CDM Smith/Coakley Williams JV** | : | |
| **16 South Summit Avenue** | : | |
| **Gaithersburg, Maryland 20877** | : | |
| | : | |
| **CDM Smith Inc.** | : | |
| **75 State Street** | : | |
| **Boston, Massachusetts** | : | |

i

|  | : |
|---|---|
| **Coakley & Williams Construction, Inc.** | : |
| **7475 Wisconsin Avenue** | : |
| **Bethesda, Maryland 20814** | : |
|  | : |
| **Turner/Gilbane JV** | : |
| **3865 Wilson Boulevard, Suite 300** | : |
| **Arlington, Virginia 22203** | : |
|  | : |
| **Gilbane Building Company** | : |
| **7 Jackson Walkway** | : |
| **Providence, Rhode Island 02903** | : |
|  | : |
| **Turner Construction Company** | : |
| **375 Hudson Street** | : |
| **New York, New York 10014** | : |
|  | : |
| **Component Assembly Systems, Inc.** | : |
| **620 Fifth Avenue** | : |
| **Pelham, New York 10803** | : |
|  | : |
| **Commonwealth Wall Systems LLC** | : |
| **5520 Cherokee Avenue, Suite #215** | : |
| **Alexandria, Virginia 22312** | : |
|  | : |
| **and** | : |
|  | : |
| **John Does #1-50, Fictitious Names,** | : |
|  | : |
| ***Defendants.*** | : |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE ........................................................................4

III.    PARTIES ............................................................................................................4

      A.      Plaintiff/Relator ......................................................................................4

      B.      Defendants ...............................................................................................5

            1.      Athena Construction Group, Inc. ................................................5

            2.      Clark/Balfour Beatty - NCE, A Joint Venture ...........................5

            3.      Clark Construction Group, LLC .................................................6

            4.      Balfour Beatty Construction Company, Inc. ..............................6

            5.      Hensel Phelps Construction Company ........................................6

            6.      Barton Malow Company ..............................................................7

            7.      CDM Smith/Coakley Williams JV ...............................................7

            8.      CDM Smith, Inc. .........................................................................7

            9.      Coakley & Williams Construction, Inc. .....................................7

            10.     Turner/Gilbane JV ......................................................................8

            11.     Gilbane Building Company .........................................................8

            12.     Turner Construction Company ....................................................8

            13.     Component Assembly Systems, Inc. ............................................8

            14.     Commonwealth Wall Systems LLC .............................................9

            15.     John Does Nos. 1-50, Fictitious Names ....................................9

IV.     GENERAL BACKGROUND ............................................................................9

      A.      Federal Contracting Process for Construction Projects .......................10

      B.      Federal Small Business Subcontracting ...............................................11

            1.      Qualifications for Historically Underutilized Business Zone
                  ("HUBZone") Status ................................................................13

            2.      Service-Disabled Veteran-Owned Business Concern Procurement
                  Program and Women Owned Small Business Program ..........16

            3.      Certification Requirements ......................................................17

            4.      Affiliation Principles for Small Businesses .............................18

      C.      Post-Award Subcontracting Plans .......................................................20

            1.      Duty to Comply in Good Faith with a Subcontracting Plan ....22

|  |  | 2. | Duty to Submit Truthful Reports ........................................................... | 24 |

|  |  | 3. | Certifications Made in Progress Payment Requests Include Certification of Good Faith Compliance with the Subcontracting Plan ................................................................................................ | 24 |

|  | D. | First-tier Subcontractors Who Do Not Add Value To the Prime Contract Are Illegal Pass Through Entities ........................................................ | 25 |

|  | E. | The "Presumed Loss Rule" Under the Small Business Act of 2010 ................... | 26 |

|  | F. | The False Claims Act ......................................................................... | 27 |

|  | G. | The Anti-Kickback Act of 1986 ........................................................ | 29 |

| V. | BACKGROUND OF DEFENDANT ATHENA ............................................ | 32 |

| VI. | ATHENA FALSELY CERTIFIED IT QUALIFIED AS A HUBZONE BUSINESS ..................................................................................... | 33 |

| VII. | DEFENDANTS' PASS-THROUGH SCHEME .......................................... | 40 |

|  | A. | Balfour Beatty ................................................................................ | 41 |

|  |  | 1. | The St. Elizabeths Tunnel Project ......................................... | 41 |

|  |  | 2. | Richard H. Poff Federal Building .......................................... | 47 |

|  | B. | Clark/Balfour Beatty JV .................................................................. | 49 |

|  | C. | Clark Construction Company ............................................................ | 51 |

|  | D. | Hensel Phelps Construction Company ................................................ | 54 |

|  |  | 1. | Social Security Administration – Woodlawn, Maryland ("SSA") ........... | 54 |

|  |  | 2. | BRAC 132 ................................................................... | 56 |

|  |  | 3. | Camp Pendleton Naval Hospital ("CPNH") .............................. | 59 |

|  |  | 4. | Russell Knox Building - DSS Facility Addition Project ("DSS") ........... | 60 |

|  |  | 5. | Fort Belvoir Nolan Parking Garage—Fort Belvoir ...................... | 62 |

|  | E. | Barton Malow Company ................................................................... | 64 |

|  | F. | CDM Smith/Coakley Williams JV ..................................................... | 66 |

|  | G. | Turner/Gilbane JV .......................................................................... | 67 |

|  | H. | Athena Acted as a Pass-Through Adding "Little or No Value to the Procurement" .............................................................................. | 70 |

| VIII. | DEFENDANTS' FRAUDULENT SUBMISSION OF FALSE CLAIMS TO FEDERAL PROGRAMS ................................................................. | 73 |

| IX. | DEFENDANTS IMPROPERLY SOLICITED/PAID /RECEIVED KICKBACKS IN VIOLATION OF THE AKA ............................................................... | 75 |

| X. | DEFENDANTS CONSPIRED WITH OTHER AFFILIATED ENTITIES TO DEFRAUD THE UNITED STATES .................................................... | 76 |

XI.    DEFENDANT ATHENA'S UNLAWFUL RETALIATION AGAINST RELATOR ................................................................................... 78

COUNT I  (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) ........................ 79

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)) ........................ 80

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C)) ....................... 80

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)) ...................... 81

COUNT V (Violation of False Claims Act, 31 U.S.C. § 3730(h)) ................................ 81

XII.   PRAYER FOR RELIEF ............................................................................ 82

XIII.  JURY TRIAL DEMAND ......................................................................... 83

**SECOND AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
UNDER 31 U.S.C. § 3729**

This is an action brought on behalf of the United States of America by Relator William "Bill" Smith, by and through his attorneys, against Defendant Athena Construction Group, Inc. ("Athena") and Co-Defendants Clark/Balfour Beatty—NCE, A Joint Venture ("Clark/Balfour Beatty JV"); Clark Construction Company ("Clark"); Balfour Beatty Construction Company, Inc. ("Balfour Beatty"); Hensel Phelps Construction Co. ("Hensel Phelps"); Barton Malow Company ("Barton Malow"); CDM Smith/Coakley Williams JV ("CDMS/CW"); CDM Smith, Inc. ("CDM Smith"); Coakley & Williams Construction, Inc. ("Coakley & Williams"); Turner/Gilbane JV ("Turner/Gilbane"); Turner Construction, Inc. ("Turner"); Gilbane Building Company ("Gilbane"); Component Assembly Systems, Inc. ("CAS"); Commonwealth Wall Systems LLC ("Commonwealth"); and John Does #1-50, Fictitious Names, pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA") (all but Athena referred to herein as "Co-Defendants").

I.    **INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of the United States arising from false statements and claims that Defendants knowingly presented, or caused to be presented, to the United States in violation of the FCA.

2.      At issue in this case is Defendants' fraudulent course of conduct related to several large and important government projects, including, but not limited to, the Walter Reed Department of Veterans Affairs ("VA") Hospital, the Intelligence Community Campus, the Audie Murphy VA Hospital, the United States Marine Corps University, the Fort Belvoir VA Hospital, the St. Elizabeths Tunnel, the Richard H. Poff Federal Building, the National Geospatial-

1

Intelligence Agency, the Social Security Administration Headquarters and the Camp Pendleton Naval Hospital.

3.     The fraudulent conduct at issue arises from two schemes.  *First*, Defendant Athena fraudulently obtained HUBZone certification from the Small Business Administration ("SBA") by falsely representing its eligibility to participate in that program, which limits competition for certain government contracts to businesses in historically underutilized business zones.  Athena then used its fraudulently obtained HUBZone certification to obtain lucrative contracting opportunities reserved for legitimate HUBZone businesses.  *Second*, Defendant Athena and Co-Defendants conspired to use Athena's collection of SBA small business classifications—*i.e.*, woman-owned small business ("WOSB") and service-disabled veteran owned small business ("SDVOSB"), along with its fraudulent HUBZone certification—as part of an illegal pass-through scheme.

4.     The pass-through scheme allowed Co-Defendants to falsely claim credit for awarding millions of dollars in subcontracts to a small business that was, in fact, controlled by large business contractors, in violation of the ostensible subcontractor rule.

5.     In perpetration of its fraudulent conduct, Defendants made numerous materially false statements and certifications to the government relating to the contracts awarded to Defendant Athena.  For example, despite knowing that Defendant Athena was merely a pass-through and was not actually performing any material work on these projects, each Co-Defendant:

(a)  falsely certified and represented to the government that it intended to comply in good faith with the terms of its Subcontracting Plan;

(b)  submitted monthly progress payment requests certifying and representing to the government that it was fulfilling its material obligations to comply in good faith with its Subcontracting Plan; and

(c) filed false Interim Subcontracting Reports ("ISRs") concerning the progress toward meeting its Subcontracting Plan.

6.      Co-Defendants also paid Defendant Athena illegal "fees" (also referred to as "small business fees" or "administrative fees") for the use of Athena's various small business classifications.  These unlawful payments violated the terms of the Anti-Kickback Act ("AKA"), 41 U.S.C. §§ 8701–8708, by providing and/or receiving any "thing of value … that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee to improperly obtain or reward favorable treatment in connection with a prime contract or a subcontract relating to a prime contract." *Id.* § 8701(2).

7.      As a direct, proximate and foreseeable result of Defendants' fraudulent course of conduct set forth herein, from at least 2011 through the present, Defendants have knowingly made numerous false express and implied certifications and/or caused the submission of thousands of false or fraudulent statements and false claims to government programs for payment for their services.

8.      Defendants agreed to enter into this scheme to present these false claims and statements to the United States, and these false claims and statements were made in furtherance of conspiracies to defraud the United States.  The purpose of the scheme has, at all relevant times, been to receive payment under false pretenses for claims submitted to the United States.

9.      As a result of these false certifications, reports, and claims, the government was falsely and/or fraudulently induced to conduct hundreds of transactions with Defendants, in the form of greater transfers and dollars fraudulently paid.  Because the United States was falsely and/or fraudulently induced to complete these transactions with Defendants, each claim for payment under the contracts was a false claim.

10.     Among other misconduct, Defendants conspired amongst themselves as well as with numerous co-conspirators to deceive the government as to the small business status of Defendant Athena.

11.     Accordingly, Relator Smith, on behalf of the United States, pursuant to the FCA, seeks all applicable damages and penalties from Defendants for knowingly submitting false claims.

## II.     JURISDICTION AND VENUE

12.     On August 29, 2018, this action was transferred to this Court by Order of the Honorable Judge Sylvia Rambo of the United States District Court for the Middle District of Pennsylvania.

13.     This Court has subject matter jurisdiction over claims brought on behalf of the United States under the FCA, pursuant to 31 U.S.C. §§ 3730, 3732.

14.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because they transact business and are found in this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

15.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because acts that form the basis of this Second Amended Complaint occurred in this judicial district.

16.     The causes of action alleged herein are timely brought because of, among other things, efforts by Defendants to conceal their wrongdoing.

## III.    PARTIES

### A.     PLAINTIFF/RELATOR

17.     Relator/Plaintiff William "Bill" Smith (herein "Mr. Smith") is an adult citizen of the State of Maryland, residing at 814 Creek Road, Severna Park, Maryland 21146.  Mr. Smith

4

was employed by Defendant Athena from 2011 to 2016 as the Director of Operations and Project Superintendent.

18.     Mr. Smith has direct knowledge of the conduct alleged in this Second Amended Complaint and conducted an independent investigation based on his experience and knowledge to uncover and report the fraud alleged herein.

19.     Accordingly, Mr. Smith is the "original source" of the non-public information alleged in this Second Amended Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(A)–(B).

20.     Prior to the filing of this Second Amended Complaint, Relator provided the government with written disclosure of substantially all material evidence and information that Relator possessed, in accordance with 31 U.S.C. § 3730(b)(2).

**B.     DEFENDANTS**

**1.     Athena Construction Group, Inc.**

21.      Defendant Athena Construction Group, Inc. ("Athena," formerly known as Athena Remodelers, Inc.) is a Virginia corporation with its principal place of business at 17877 Old Triangle Road, Triangle, Virginia 22172.

22.     Defendant Athena is owned and operated by Amber Peebles (President) and Melissa Schneider (Vice-President).  Ms. Peebles and Ms. Schneider are adult citizens of the Commonwealth of Virginia and reside at 3201 Riverview Drive, Triangle, Virginia 22172.

**2.     Clark/Balfour Beatty - NCE, A Joint Venture**

23.     Defendant Clark/Balfour Beatty JV is a joint venture in which Clark and Balfour Beatty are the joint venturers.  Clark/Balfour Beatty JV is a Maryland corporation with its principal place of business at 7500 Old Georgetown Road, Bethesda, Maryland 20814.  Clark/Balfour Beatty JV is in the business of construction as a general contractor.

### 3.    Clark Construction Group, LLC

24.    Defendant Clark Construction Group, LLC ("Clark Construction") is a Maryland limited liability company with its principal place of business at 7500 Old Georgetown Road, Bethesda, Maryland 20814.   As the flagship subsidiary of Clark Enterprises, Inc., Clark Construction is one of the largest private general contractors in the country, providing construction management, design/build, and consulting services.   Clark Construction maintains regional headquarters throughout the United States.

### 4.    Balfour Beatty Construction Company, Inc.

25.    Defendant Balfour Beatty Construction Company, Inc. ("Balfour Beatty") is a Texas corporation with its principal place of business at 3100 McKinnon Street, Floor 10, Dallas, Texas 75201.  Balfour Beatty is the U.S. subsidiary of Balfour Beatty PLC, a U.K. multinational infrastructure group with capabilities in construction services, support services and infrastructure investments.  According to its website, Balfour Beatty is an industry-leading provider of general contracting, at-risk construction management and design-build services for public and private sector clients across the nation.

### 5.    Hensel Phelps Construction Company

26.    Defendant Hensel Phelps Construction Company ("Hensel Phelps") is a Colorado corporation with its principal place of business at 420 6th Avenue, Greeley, Colorado 80631. Hensel Phelps is one of the largest general contractors and construction managers in the United States, ranking consistently among Engineering News Record's top 20 Contractors.  Founded in 1937 as a small, local builder in Greeley, Colorado, Hensel Phelps has grown into a multibillion-dollar national contractor.

### 6. Barton Malow Company

27. Defendant Barton Malow Company ("Barton Malow") is a Michigan corporation and is headquartered at 26500 American Drive, Southfield, Michigan 48034. With more than 2,000 employees and sixteen offices, Barton Malow serves the North America market in specialties that include commercial, industrial, education, energy, healthcare, manufacturing, sports, and entertainment facilities.

### 7. CDM Smith/Coakley Williams JV

28. Defendant CDM Smith/Coakley Williams JV ("CDMS/CW") is a joint venture in which CDM Smith Inc. and Coakley & Williams Construction Inc. are the joint venturers. CDMS/CW is a corporation with its principal place of business at 16 S. Summit Avenue, Gaithersburg, Maryland 20877. CDMS/CW is in the business of construction as a general contractor.

### 8. CDM Smith, Inc.

29. Defendant CDM Smith, Inc. ("CDM Smith") is a Massachusetts corporation with its principal office at 75 State Street, Boston, Massachusetts. CDM Smith is an engineering and construction company which provides solutions in water, environmental, transportation, energy, and facilities projects for public and private clients. The company has approximately 5000 employees and was ranked 22nd on the 2015 Top 500 Design Firms list and 13th on the 2015 Top 200 Environmental Firms list.

### 9. Coakley & Williams Construction, Inc.

30. Defendant Coakley & Williams Construction, Inc. ("Coakley & Williams") is a Maryland corporation, with its principal office at 7475 Wisconsin Avenue, Bethesda, Maryland 20814. It describes itself as one of the "preeminent contractors in the greater Washington metropolitan area providing CM-R, Design-Build and General Contracting services."

7

### 10. Turner/Gilbane JV

31.     Defendant Turner/Gilbane JV ("Turner/Gilbane") is a joint venture, in which Turner and Gilbane are the joint venturers.  Turner/Gilbane is a Virginia corporation with its principal place of business at 3865 Wilson Boulevard, Suite 300, Arlington, Virginia 22203-1764.

### 11. Gilbane Building Company

32.     Defendant Gilbane Building Company ("Gilbane") is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business located at 7 Jackson Walkway, Providence, Rhode Island 02903.  Gilbane is a national construction and facility management company, which operates as a subsidiary of Gilbane, Inc., a Rhode Island corporation with its principal place of business at 7 Jackson Walkway, Providence, Rhode Island 02903.

### 12. Turner Construction Company

33.     Defendant Turner Construction Company ("Turner") is a general contractor in the construction industry organized and existing under the laws of the State of New York, with its principal place of business located at 375 Hudson Street, 6th Floor, New York, New York 10014. Turner is one of the largest construction management companies in the United States of America, with a construction volume of $10 billion in 2014.  It is a subsidiary of the German company Hochtief, a German construction company based in Essen, North Rhine-Westphalia, Germany.

### 13. Component Assembly Systems, Inc.

34.     Defendant Component Assembly Systems ("CAS") is a New York corporation with its principal place of business at 620 Fifth Avenue, Pelham, New York 10803.  CAS is one of the premier drywall and acoustical specialty contractors in the United States.  The firm has offices in

metropolitan New York, Boston, Central New Jersey, Washington, Philadelphia, Las Vegas and Southern California.

### 14.  Commonwealth Wall Systems LLC

35.    Defendant Commonwealth Wall Systems LLC ("Commonwealth") is a Delaware corporation with its principal place of business at 2711 Centerville Road, Wilmington, Delaware 19808.  A subsidiary of CAS, Commonwealth's line of business includes lightweight steel framing (metal stud) installation.

### 15.  John Does Nos. 1-50, Fictitious Names

36.    John Does Nos. 1-50, Fictitious Names, are individuals, corporations, limited liability companies, partnerships, trusts, or other lawful business entities through which Defendants do business, and who are unknown co-conspirators who conspired with Defendants to perpetuate the scheme alleged herein.

37.    To the extent that any of the conduct or activities described in this Second Amended Complaint was not performed by Defendants, but by the individuals or entities alleged herein as John Does Nos. 1-50, Fictitious Names, any reference herein to "the Defendants" or "Defendants" under such circumstances, and only under such circumstances, refers also to John Does Nos. 1-50, Fictitious Names, and/or other co-conspirators who conspired with Defendants to perpetrate the scheme alleged herein.

38.    As a result of Defendants' actions, the United States has suffered financial harm.

39.    Defendants' conduct is ongoing.

## IV.  GENERAL BACKGROUND

40.    The government is the world's largest buyer of services and goods.  Purchases by military and civilian agencies amount to nearly $600 billion a year and include everything from complex space vehicles to the paving of parking lots.

41.     Recognizing that small businesses are the engine of economic growth in the United States, the government has adopted a policy of requiring its agencies to award prime and subcontracting opportunities to small and disadvantaged businesses.

42.     Accordingly, the government has enacted a government-wide prime contracting goal that at least 23% of all federal government contracting dollars should be awarded to small and disadvantaged businesses.

43.     The government has also set targeted sub-goals for WOSBs (5%), small disadvantaged businesses (5%), firms located in HUBZones (3%), and SDVOSBs (3%).

44.     It is the responsibility and mission of the Small Businesses Administration ("SBA") to help federal agencies ensure that the above goals are met and that small businesses get their fair share of federal contracting dollars.

A.     FEDERAL CONTRACTING PROCESS FOR CONSTRUCTION PROJECTS

45.     The government generally obtains contracts for large construction projects through a competitive negotiation process that involves two phases.   The process begins when the contracting officer issues a solicitation that delineates the scope of work and states the government's requirements, including, but not limited to, design criteria, budget parameters, and schedule.  *See* FAR § 36.302.3.

46.     In Phase I, the solicitation typically covers the technical aspects of the project. *See id*. § 36.303-1.  General contractors submit proposals for the project.  The government evaluates each offeror's technical competencies and other non-price/cost-related factors against stated evaluation criteria.   The government then selects the most highly qualified offerors, which generally does not exceed a maximum number specified in the solicitation and, in any case, does not exceed five offerors.  *See id*.

47.     In Phase II, the selected offerors submit proposals that expound upon the technical aspects and include cost proposal data.  *See* FAR §§ 15.304; 36.303-2.  If the amount of the contract is expected to exceed $1.5 million, the offeror's Phase II proposal must include a Subcontracting Plan detailing the extent of participation of small business concerns, which constitutes the "socioeconomic evaluation factor" of the offeror's proposal.  *See id.* §§ 15.304(c)(4); 19.702. Subcontracting Plans require large businesses to state the amount of planned subcontracting dollars that will go to specified categories of small businesses.

48.     In awarding these large construction contracts, the government does not seek the lowest possible bidder to perform the work.  Instead, the government seeks the contractor that can best deliver the full continuum of final product, consistent with all goals, laws, rules, and regulations applicable to the product, which include certain requirements for the participation of Small and/or Disadvantaged Business Enterprises through the requisite Small Business Subcontracting Plan.  *See* FAR § 15.101.  As established in various federal statutes and regulations, these include business concerns that are a Small Business ("SB"), WOSB, Veteran Owned Small Business ("VOSB"), SDVOSB, qualified HUBZone small business, and a small business owned and controlled by socially and economically disadvantaged individuals ("DBE").

### B.     FEDERAL SMALL BUSINESS SUBCONTRACTING

49.     The Small Business Act encourages prime contractors to award subcontracts to small companies, including those with various special socioeconomic designations recognized by the SBA, so that they will have the "maximum practicable opportunity to participate in the performance" of Federal contracts.  Section 2 of the Small Business Act states:

> The essence of the American economic system of private enterprise is free competition.  Only through full and free competition can free markets, free entry into business, and opportunities for the expression and growth of personal initiative and individual judgment be assured. The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this

Nation. Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed. It is the declared policy of the Congress that the government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.

15 U.S.C. § 631(a).

50.     The Small Business Act provides that in order to be considered a small business, an entity must be independently owned and operated and not dominant in its field.  *Id.* § 632(a)(1).

51.     Section 632 also authorizes the SBA to promulgate more specific standards by which a business may be deemed a small business concern.  Pursuant to that authority, the SBA has issued specific size standards that determine whether a business qualifies as a small business concern.

52.     A Small Business "size standard" is numerical and represents the largest a concern can be and still be considered a small business.  *See* 13 C.F.R. §§ 121.101–102.  Depending on the industry, size standard eligibility is based on the average number of employees for the preceding twelve months or on average annual receipts.  Receipts are averaged over a concern's latest three completed fiscal years to determine its average annual receipts.  For concerns that have been in business for less than three fiscal years, the average annual receipts are the total receipts for the period the concern has been in business divided by the number of weeks in business, multiplied by 52.  *See id.* § 121.104(c).

53.     The SBA size standard limitation to qualify as a "Small Business Concern" for businesses in the Specialty Trade Contractors, Masonry Contractors subsector, is $14 million in average annual receipts. *See* U.S. Small Bus. Admin., Table of Small Business Size Standards

Matched to North American Industry Classification System Codes 6 (Feb. 26, 2016), *available at* http://www.sba.gov/sites/default/files/files/Size_Standards_Table.pdf (last visited July 31, 2018); *see also* 13 C.F.R. § 121.201.

54.     In determining whether an entity qualifies as a small business concern, the SBA counts the receipts of all of the entity's domestic and foreign affiliates, regardless of whether those affiliates are organized for profit. *See* 13 C.F.R. § 121.103(a)(6).

### 1.     Qualifications for Historically Underutilized Business Zone ("HUBZone") Status

55.     The Small Business Reauthorization Act of 1997 created the HUBZone program, whereby a subcontract set aside for a HUBZone small business can be awarded only to a contractor who qualifies as a HUBZone contractor. 13 C.F.R. § 126.200.

56.     Congress enacted the HUBZone program to encourage small businesses to locate in areas of the country that traditionally experienced difficulty in attracting business.

57.     The goal of the program is to spur investment and job growth in areas where both were lacking. As Congress explained, the HUBZone program "targets special Federal government help to inner cities and rural counties that have low household incomes, high unemployment, and whose communities have suffered from a lack of investment." S. Rep. No. 105-62, at 25 (1997), *reprinted in* 1997 U.S.C.C.A.N. 3076, 3098.

58.     Creating incentives for small businesses to locate in targeted communities is the fundamental goal of the HUBZone program. "[W]ithout businesses in these communities, we don't create jobs, and without sources of new jobs, we are unlikely to have a successful revitalization effort." *Id.* at 26, 1997 U.S.C.C.A.N. at 3099.

59.     Toward that end, the HUBZone program gives preferences in government contracting to businesses that qualify as a HUBZone small business concern. 15 U.S.C. § 657a.

Among other options, agencies can designate a contract as a HUBZone set-aside, which restricts competition for the contract to only those companies that are HUBZone certified. *Id*. § 657a(b)(2)(B).

60.     The SBA has the authority to certify a company as a qualified HUBZone firm. 13 C.F.R. § 126.300.  To qualify as a HUBZone small business concern, the applicant must meet four eligibility requirements:

- o   The business must be owned and controlled by a U.S. citizen.
- o   The business must be small within its industry.
- o   The business's principal office must be located in a HUBZone.
- o   At least 35% of the business's employees must reside in a HUBZone.

*Id*. § 126.200(b)(1)(i)-(b)(4).

61.     To be included in the 35% residency requirement, an employee must reside in a primary residence located in a HUBZone for at least 180 days, or as a currently registered voter, and with intent to live there indefinitely. *See* 13 C.F.R. §§ 126.200(b)(4), 126.103.

62.     The SBA relies on the information in the applicant's online submission before designating a company as HUBZone certified.

63.     Among the application materials is a HUBZone Program Certification ("Certification") form, which contains certification statements regarding an applicant's qualifications as a HUBZone small business concern.  U.S. Small Bus. Admin., *HUBZone Program Certification for Applicants Owned by U.S. Citizens, ANCs or CDCs* ("*Certification*"), https://www.tinyurl.com/yaz8e8je (last visited Oct. 19, 2018).

64.     The definitions for the terms used in the Certification and throughout the application are set forth in the Small Business Act, SBA regulations (13 C.F.R. Part 126), and any statutory and regulatory provision referenced in those authorities.

65.     The Certification further states: "The undersigned has reviewed, verified and certifies that":

o   The applicant's principal office is located in a HUBZone.

o   All the statements and information provided in the applicant's online application, this form and any attachments are true, accurate and complete. If assistance was obtained in completing this form and the supporting documentation, I have personally reviewed the information and it is true and accurate. I understand that these statements are made for the purpose of determining eligibility and continuing eligibility in the HUBZone Program. In addition, the applicant will immediately notify the SBA of any material change which could affect the applicant's HUBZone eligibility.

o   The certifications in this document are continuing in nature. Each HUBZone prime contract or subcontract for which the applicant submits an offer/quote or receives an award while a HUBZone constitutes a restatement and reaffirmation of these certifications.

U.S. Small Bus. Admin., *Certification*, *supra*.

66.     Further, the Certification contains the following warning:

Warning: By signing this certification you are representing on your own behalf, and on behalf of the applicant, that the information provided in this certification, the application and any document or supplemental information submitted in connection with this application, is true and correct as of the date set forth opposite your signature. Any intentional or negligent misrepresentation of the information contain in this certification may result in ... civil ... sanctions including, but not limited to ... treble damages and civil penalties under the False Claims Act ...."

*Id*.

67.     Even after the SBA certifies a business as a HUBZone small business, the SBA places certain limitations on a contractor's ability to subcontract any portion of a HUBZone set-aside contract if the amount exceeds $150,000.

68.     For example, for general construction contracts, the HUBZone small business prime contractor must perform at least 15% of the work, not including the cost of the materials, with its own employees.  For construction by specialty trade contractors, the HUBZone small

15

business prime contractor must perform at least 25% of the work, not including the cost of the materials, with its own employees.

69. Violations of the applicable subcontracting limitation may result in a variety of significant penalties, including suspension, debarment, administrative remedies, fines and even imprisonment. If a fine is imposed for a violation, the fine will be greater of either $500,000 or the dollar amount spent in excess of the permitted levels for subcontracting.

### 2. Service-Disabled Veteran-Owned Business Concern Procurement Program and Women Owned Small Business Program

70. The Veterans Entrepreneurship and Small Business Development Act of 1999 established an annual government-wide goal of not less than 3% of the total value of all prime contract and subcontract awards for participation by small business concerns owned and controlled by service-disabled veterans.

71. On December 16, 2003, Congress passed the Veterans Benefits Act of 2003. Section 308 of the Act established a procurement program for SDVOSBs.

72. The purpose of the SDVOSB program is to provide procuring agencies with the authority to set acquisitions aside for exclusive competition among service-disabled veteran-owned small business concerns, as well as the authority to make sole source awards to service-disabled veteran-owned small business concerns if certain conditions are met.

73. Similarly, 5% of the total value of all prime contracts and 5% of all subcontracts are to be awarded to WOSBs.

74. The SBA has placed limitations on a contractor's ability to subcontract any portion of a SDVOSB or WOSB set-aside contract if the amount exceeds $150,000.

75. For example, for general construction contracts, the small business prime contractor, like Athena, must perform at least 15% of the work, not including the cost of the

materials, with its own employees.  For construction by special trade contractors, like Athena, the small business prime contractor must perform at least 25% of the work, not including the cost of the materials, with its own employees.

76.     Violations of the applicable subcontracting limitation may result in a variety of significant penalties, including suspension, debarment, administrative remedies, fines and even imprisonment.  If a fine is imposed for a violation, the fine will be greater of either $500,000 or the dollar amount spent in excess of the permitted levels for subcontracting.

### 3.     Certification Requirements

77.     Contractors must complete annual electronic representations and self-certifications in the System for Award Management ("SAM") database—a Government-owned and operated website used by businesses who register to do business with the government.

78.     Contractors are required to update the representations and certifications submitted to SAM as necessary, but at least annually, to ensure that they are kept current, accurate, and complete.

79.     The representations and self-certifications are effective for one year from the date of submission or update to SAM.  Pursuant to FAR § 52.212-3, contractors represent whether they meet the status requirements for various small business categories.

80.     For the purposes of federal procurement programs for which status as a small business is required, a concern must not exceed the size standard under the applicable North American Industry Classification System ("NAICS") code specified in the solicitation, whether the threshold is based upon number of employees or annual revenues. 13 C.F.R. §§ 121.401–121.413.

81.     Each NAICS industry code has a corresponding size standard, and the table is published annually in the Federal Register. *Id*. § 121.101.

82.     Both submissions of bids set aside for small businesses and registrations in the SAM.gov database for the purpose of being considered for an award as a small business concern are deemed "affirmative, willful and intentional certifications of small business size and status." 15 U.S.C. § 632(w)(2).

83.     Each time a business enters into a set-aside contract with the government and each time it files its annual SAM.gov certification, it becomes subject to a stiff sanctions regime intended to deter small business fraud.

84.     In addition to other laws that may be applicable, section 16(d) of the Small Business Act provides severe criminal penalties for knowingly misrepresenting the small business size status of a concern in connection with procurement programs. 15 U.S.C. § 645(d).

85.     Section 16(a) of the Act also provides, in part, for criminal penalties for knowingly making false statements or misrepresentations to SBA for influencing in any way the actions of the Agency.  15 U.S.C. § 645(a); *see also* 13 C.F.R. § 121.108.

86.     These and other penalties are set forth in the certifications made by each business concern bidding under a small business set-aside: "any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act." 15 U.S.C. § 645(d).

### 4.     Affiliation Principles for Small Businesses

87.     The affiliation concept is important to government contractors because it can have a significant impact on whether a business is deemed large or small.  Small businesses are eligible to participate in numerous beneficial government programs.  The SBA determines the size of a

business by examining a company's average annual revenue or number of employees. When two companies are affiliated, the SBA combines the revenue or number of employees of both companies. Thus, each company is less likely to fall below the SBA's applicable limit and is less likely to be eligible for preferred contracting status.

88.     "Affiliation" exists between businesses when one business, directly or indirectly, controls or has the power to control another business, or when a third party, directly or indirectly, controls or has the power to control both businesses. *See* 13 C.F.R. § 121.103(a); FAR § 19.101; U.S. Small Bus. Admin., *A Handbook for Small Business Liaison Officers* (*"SBLO Handbook"*) 16 (June 2010), *available at* https://www.sba.gov/sites/default/files/articles/ Small_Business_Liaison_Officer_(SBLO)_Handbook_6_2010.pdf. Control may arise through ownership, management, or other relationships or interactions between the parties. *See* 13 C.F.R. § 121.103(a). If one or more officers, directors, managing members, or general partners of a business control the Board of Directors and/or the management of another business, the businesses are affiliates. *See id*. § 121.103(e).

89.     The ostensible subcontractor rule prohibits a prime contractor, such as Athena, from being unusually reliant upon its subcontractor, or a subcontractor to perform primary or vital responsibilities of the contract. *Id*. § 121.104(h)(4). The rule is intended to prevent other than small firms from forming relationships with small firms to evade SBA's size requirements.

90.     In determining a violation of this rule, the SBA considers all aspects of the relationship, including the terms of the proposal, SBA limitations on subcontracting, project management, division of work, the percentage of the prime contract work the subcontractor will perform, relative experience and profit sharing. *Id*.

### C.       POST-AWARD SUBCONTRACTING PLANS

91.      As articulated in then-Senator Mary Landrieu's September 29, 2010 Committee report on the Small Business Contracting Revitalization Act of 2010, prime contractors are awarded lucrative construction projects based, in large part, on promises made to meet or exceed small business goals, and serious changes were required to hold them accountable:

> To prevent prime contractors from taking advantage of small business subcontractors through bait-and-switch fraud, the bill requires large prime contractors to certify that they will use small business subcontractors in the amount and quality used in preparing their winning bid or proposal, unless such firms no longer are in business or can no longer meet the quality, quantity or delivery date. The Committee expects that Federal agencies will use all appropriate legal and contractual remedies to deter, punish, and recover the proceeds of such fraud.

S. Rep. No. 111-343, at 7 (2010).

92.      The Small Business Act reflects a policy "that small business concerns, small business concerns owned and controlled by veterans, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women, shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems."  15 U.S.C. § 637(d)(1).

93.      The Small Business Act also requires that the language quoted in paragraph 92 be inserted into every federal prime contract (other than certain specified contracts not relevant here), and further requires that every Federal prime contract include a clause stating that "[t]he contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with the efficient performance of this contract."  *Id.* § 637(d)(3).

20

94.     The Small Business Act further emphasizes the importance of ensuring that small and other disadvantaged contractors participate in the performance of subcontracts by requiring prime contractors to submit subcontracting plans to the procuring agencies showing "percentage goals for the utilization" of these companies in performing the contract.  *Id*. § 637(d)(4), (d)(6).

95.     The Small Business Act provides: "The Subcontracting Plan shall be included in and made a material part of the contract."  *Id*. § 637(d)(4)(B)(iv).   Further, the Subcontracting Plan must contain assurances that each offeror or bidder will submit "periodic reports … in order to determine the extent of compliance by the offeror or bidder with the subcontracting plan."  *Id*. § 637(d)(6)(E).

96.     The Small Business Act further states:

> No contract shall be awarded to any offeror unless the procurement authority determines that the plan to be negotiated by the offeror pursuant to this paragraph provides the maximum practicable opportunity for small business concerns, qualified HUBZone small business concerns, small business concerns owned and controlled by veterans, small business concerns owned and controlled by service-disabled veterans, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women to participate in the performance of the contract.

*Id*. § 637(d)(4)(D).

97.     Accordingly, the Small Business Act makes a prime contractor's representation that it is in compliance with its small business Subcontracting Plan, and will remain in compliance with the Plan, a material condition of the award and continuing performance.  *Id*. § 637(d)(4)(B), (D).

98.     The Small Business Act further provides that a prime contractor or subcontractor's failure to comply in good faith with a Subcontracting Plan and the policy encouraging the greatest possible participation of disadvantaged small businesses including HUBZones, constitutes a "material breach" of the contract or subcontract.  *Id*. § 637(d)(9).

99.     The Small Business Act also states that any small business concern that misrepresents its small business status shall be subject to penalties under the FCA. *Id.* § 637(m)(5)(C).

### 1.     Duty to Comply in Good Faith with a Subcontracting Plan

100.    Each successful prime contractor with a Subcontracting Plan is required to make "a good faith effort to achieve the dollar and percentage goals and other elements in its Subcontracting Plan." 13 C.F.R. § 125.3.

101.    A contractor which fails to comply in good faith with its Subcontracting Plan, including the goals stated therein, or with FAR § 52.219-8 ("Utilization of Small Business Concerns") is in material breach of its contract. *See* 15 U.S.C. § 637(d)(8); FAR § 19.702(c).

102.    This good faith obligation is expressly incorporated into all construction contracts requiring a Subcontracting Plan. *See* FAR § 52.219-9, 52.219-9(k) ("As prescribed in 19.708(b), insert the following clause: … The failure of the Contractor or subcontractor to comply in good faith with— (1) The clause of this contract entitled 'Utilization of Small Business Concerns;' or (2) An approved plan required by this clause, shall be a material breach of the contract.").

103.    Section 19.705-7(a) of the FAR provides: "Maximum practicable utilization of small business, veteran-owned small business, service-disabled veteran owned small business, HUBZone small business, small disadvantaged business and women-owned small business concerns as subcontractors in government contracts is a matter of national interest with both social and economic benefits.  When a contractor fails to make a good faith effort to comply with a Subcontracting Plan, these objectives are not achieved, and 15 U.S.C. § 637(d)(4)(F) directs that liquidated damages shall be paid by the contractor."

104.   "Failure to make a good faith effort to comply with the Subcontracting Plan means willful or intentional failure to perform in accordance with the requirements of the Subcontracting Plan, or willful or intentional action to frustrate the plan." FAR § 19.701.

105.   The liquidated damages provision provides a specific, agreed-upon measure for determining the damage to the government when a contractor fails to comply in good faith with its Subcontracting Plan.  Specifically, "[t]he amount of damages attributable to the contractor's failure to comply shall be an amount equal to the actual dollar amount by which the contractor failed to achieve each subcontracting goal." *Id.* § 19.705-7(b).

106.   The liquidated damages provision, including the measure of damages stated therein, is required to be incorporated into solicitations and contracts with the government.  *See id.* §§ 19.708(b) & 52.219-16.  Further, "[l]iquidated damages shall be in addition to any other remedies that the government may have." *Id.* § 19.705-7(g).

107.   Thus, pursuant to the above-referenced statutes and regulations, "[a]n other-than-small contractor that fails to make a good faith effort to achieve the goals in its Subcontracting Plan may be found in material breach of contract and terminated for default, or liquidated damages may be imposed." U.S. Small Bus. Admin., *SBLO Handbook*, *supra*, at 30.

108.   The use of a pass-through arrangement—whereby a prime contractor subcontracts with a small business entity which then subcontracts all of the work under the contract to a large business—is not good faith compliance with a Subcontracting Plan.

109.   As stated by the SBA: "[A] pass-through . . . adds little or no value to the procurement.  It does not comport with the spirit or intent of the subcontracting program." *Id*. at 77.

### 2.    Duty to Submit Truthful Reports

110.    Throughout the lifetime of the contract, contractors must "[s]ubmit periodic reports so that the government can determine the extent of compliance by the offeror with the subcontracting plan." FAR § 19.704(a)(10)(ii).    A prime contractor is responsible for submitting "timely, accurate, and complete" reports.  13 C.F.R. § 125.3.  For example, prime contractors must electronically submit the Individual Subcontracting Report ("ISR") and Summary Subcontracting Report ("SSR").  *See* FAR §§ 19.704(a)(10)(iv)(A)-(B), 52.219-9(l)(1)-(2).

111.    The ISR "collects prime contractor and subcontractor subcontract award data" and is required to be submitted by the prime contractor twice a year (by April 30 and October 30 of each year). General Servs. Admin., *Electronic Subcontracting Reporting System (eSRS) Quick Reference Recommendation for Federal Government Contractors: Submitting an Individual Subcontracting Report (ISR)* 2-3 (Sept. 29, 2015), *available* at https://www.esrs.gov/documents/eSRS_Quick_Reference_for_Subcontractors_filing_an_ISR_R eport.pdf.    In the ISR, the prime contractor must provide data showing its small business subcontracting goals compared to its actual performance.  *See id.* at 13-20.

112.    If the prime contractor fails to meet the goals in its Subcontracting Plan, the contractor must "explain the reason for any shortfalls" in the "Remarks" section of the ISR.  *Id.* at 20.  When submitting the ISR, the contractor must certify that "the data being submitted on the report is accurate and that the dollars and percentages reported do not include lower tier subcontracts" or the report will be rejected.  *Id.*

### 3.    Certifications Made in Progress Payment Requests Include
### Certification of Good Faith Compliance with the Subcontracting Plan

113.    In a fixed-price construction contract, the government makes progress payments to the contractor on a monthly basis as the work proceeds.  *See* FAR § 52.232-5(b). Each time a

contractor makes a request for progress payments, the contractor must make "the following certification, or payment shall not be made: "I hereby certify, to the best of my knowledge and belief, that . . . [t]he amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract." *Id.* § 52.232-5(c). This certification provision is required to be included in the contract. *See id*.

114.    By making such a certification, the contractor attests that the amount of money requested is only for performance in accordance with the material contractual obligation to comply in good faith with its Subcontracting Plan and the goals therein.

115.    If the agency discovers that a "contractor's request for … progress payments under a contract awarded by that agency is based on fraud," the agency head may "reduce or suspend further payments to the contractor." FAR § 32.6-4. "Such reduction or suspension shall be reasonably commensurate with the anticipated loss to the government resulting from the fraud." *Id*. The "[a]uthority to reduce or suspend payments … is in addition to other government rights, remedies, and procedures." *Id.* § 32.6-1.

116.    Additionally, a contractor must timely disclose to the agency when the contractor's principal, employee, agent, or subcontractor has committed a violation of the FCA. *See* FAR § 52.203-13.

### D.    FIRST-TIER SUBCONTRACTORS WHO DO NOT ADD VALUE TO THE PRIME CONTRACT ARE ILLEGAL PASS THROUGH ENTITIES

117.    The Small Business Revitalization Act of 2010 sought to "prevent prime contractors from taking advantage of small business subcontractors through bait-and-switch fraud." Accordingly, "the bill requires large prime contractors to certify that they will use small business subcontractors in the amount and quality used in preparing their winning bid or proposal

…. The Committee expects that Federal agencies will use all appropriate legal and contractual remedies to deter, punish, and recover the proceeds of such fraud."

118.     According to FAR 52.236-1, "Performance of Work by Contractor", a first-tier subcontractor, like Athena, is to self-perform at least 15% of the work on the subcontract.  This self-perform figure is increased to 25% for specialty trade subcontractors, which Athena was subject to under the various specialty trade subcontracts it received from Co-Defendants.

119.     According to the SBA, it is impermissible for a firm with various federal small business certifications—*e.g.*, HUBZone, WOSB, etc.—to seek and obtain subcontracts that the firm would in turn hand over to another company for performance.  U.S. Small Bus. Admin., *SBLO Handbook*, *supra*, at 77.  According to the SBA, "[t]his arrangement is <u>merely a pass-through which adds little or no value to the procurement</u>.  It does not comport with the spirit or intent of the subcontracting program." *Id.* (Emphasis added).

### E.     THE "PRESUMED LOSS RULE" UNDER THE SMALL BUSINESS ACT OF 2010

120.     The Small Business Act of 2010 codified the calculation of damages for misrepresentation under the FCA, which significantly increases the ante for prosecutions both by the government and *qui tam* relators.

121.     Section 1341 of the Jobs Act, also called the "Presumed Loss Rule," provides a presumption of loss to the government equal to the total amount expended on the contract.  15 U.S.C. § 632(w)(1).  The offender may not discount the measure of damages by crediting the value of services or goods provided to the government under the contract.  *Id.*

122.     Through this Act, Congress established that the government's damages calculation shall use an intended beneficiary analysis.  That is, where the government intended the contract to benefit an eligible small business, and an ineligible business received the benefit of that contract, the entire amount paid to the ineligible contractor becomes the loss to the government.

123.    This codification is significant because contractors are liable for three times the total amount of money received under the contract, plus penalties and fees.  31 U.S.C. § 3729.

124.    The new law also changes the certification process for small businesses.  As part of a bid or proposal, small businesses have historically needed to self-certify that they are an eligible small business.  Under the Small Business Act, businesses must both initially register as a small business and annually update their status in the SAM database.  These self-certifications are based on the honor system enforced by significant legal exposure if not accurate.

125.    The Small Business Act also includes a Deemed Certification provision.  Under this provision, a proposal or bid for a federal contract or subcontract "intended for award to small business concerns" constitutes an "affirmative, willful, and intentional certification[] of small business size and status." 15 U.S.C. § 632(w)(2)(A)-(B).  A contractor also makes such a certification by registering as a small business concern "on any Federal electronic database for the purpose of being considered for award of a Federal … contract [or] subcontract."  *Id.* § 632(w)(2)(C).

F.    THE FALSE CLAIMS ACT

126.    Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the FCA, 31 U.S.C. §§ 3729-3733, is the primary tool with which the United States combats fraud against the government and protects the federal Treasury.  The Supreme Court has held that the FCA's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the government." *United States v. Neifert-White*, 390 U.S. 228, 232 (1968).

127.    The FCA provides that a person is liable to the United States for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the

United States government … a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).

128.    The FCA establishes liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government."  *Id.* § 3729(a)(2).  The FCA further establishes liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  *Id.* § 3729(a)(1)(B).

129.    The FCA defines "knowingly" to mean that a person, with respect to information, "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information," and further provides that no proof of specific intent to defraud is required.  *Id.* § 3729(b).

130.    The FCA defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or, (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the government's behalf or to advance a government program or interest, and if the United States government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  *Id.* § 3729(b)(2)(A).

131.    Any person who violates the FCA is liable to the United States for a civil penalty of not less than ten thousand nine hundred fifty-seven dollars ($10,957) and not more than twenty-one thousand nine hundred sixteen dollars ($21,916), plus three times the amount of damages

which the government sustains because of the act of that person.  *Id*. § 3729(a); 15 C.F.R. § 63(a)(3).

### G.    THE ANTI-KICKBACK ACT OF 1986

132.    The Anti-Kickback Act ("AKA"), 41 U.S.C. §§ 8701–8708, modernized and closed the loopholes of previous statutes applying to government contractors.  The AKA applies to a broad range of persons involved in government subcontracting.

133.    The AKA prohibits attempted as well as completed "kickbacks," *id*. § 8702, which include any money, fees, commission, credit, gift, gratuity, thing of value, or compensation of any kind, *id*. § 8701(2).  The Act also prohibits the inclusion of kickback amounts in contract prices is prohibited conduct in itself.  *Id*. § 8702(3).

134.    The AKA requires only that the purpose of the kickback was for improperly obtaining or rewarding favorable treatment in connection with a contract.  *Id.* § 8701(2).  It is intended to embrace the full range of government contracting.

135.    The AKA prohibits the payment, solicitation and receipt of kickbacks by prime contractors, prime contractor employees, subcontractors, and subcontractor employees. These terms are defined in the Act.  *Id.* § 8701(5)-(9).

136.    The AKA defines "kickbacks" to include payments under any government contract. *Id.* § 8701(2).

137.    The AKA imposes criminal sanctions for knowing and willful violations.

138.    The AKA requires each contracting agency to include in each prime contract exceeding $100,000 for other than commercial products or services, a requirement that the prime contractor shall "have in place and follow reasonable procedures designed to prevent and detect violations of section 8702 of this title in its own operations and direct business relationships," and

29

"cooperate fully with a Federal Government agency investigating a violation of section 8702 of this title." *Id.* § 8703(a)(1)-(2).

139. Section 3.502-2(i)(1) of the FAR interprets the "reasonable procedures" required by the AKA to include, for example: "company ethics rules prohibiting kickbacks by employees, agents, or subcontractors; education programs for new employees and subcontractors, explaining policies about kickbacks, related company procedures and the consequences of detection; procurement procedures to minimize the opportunity for kickbacks; audit procedures designed to detect kickbacks; periodic surveys of subcontractors to elicit information about kickbacks; procedures to report kickbacks to law enforcement officials; annual declarations by employees of gifts or gratuities received from subcontractors; annual employee declarations that they have violated no company ethics rules; [and] personnel practices that document unethical or illegal behavior and make such information available to prospective employers."

140. Both prime contractors and subcontractors, either of government-unique or commercial items, are required to submit a written report to the government if they have "reasonable grounds to believe that a violation of [the Act] may have occurred." 41 U.S.C. § 8703(c)(1).

141. Moreover, FAR contract clause § 52.203-7, "Anti-Kickback Procedures," requires that essentially all of the prohibitions and requirements applicable to prime contractors must be flowed-down to subcontractors "in all subcontracts under this contract which exceed $100,000."

142. Each time a large business misrepresents in its self-certifications that it has entered into a legitimate subcontract with a "small business" in order to win a contract bid, the large business has won a bid that should have been awarded to a legitimate small business instead.  The

large business that has misrepresented its size has gained an unfair advantage over honest businesses that have not made such misrepresentations.

143.    The SBA has identified such firms as "bad actors," who are "taking intentional and often fraudulent advantage" of SBA programs. *Helping Small Businesses Compete: Challenges Within Programs Designed to Assist Small Contractors: Hearing Before the Subcomm. On Contracting & Workforce of the H. Small Bus. Comm.* ("*Helping Small Businesses*"), 112th Cong. 4 (2011) (statement of Joseph G. Jordan, Associate Administrator for Government Contracting and Business Development, U.S. Small Business Administration), *available at* https://smallbusiness.house.gov/uploadedfiles/jordan_testimony.pdf.

144.    The SBA "has no tolerance for a firm found to be acting fraudulently," adding that, where appropriate, the agency "will act decisively to oust them from our programs and from doing business with the government generally." *Id.*

145.    Further, the SBA is continuing to take action and make referrals to the Department of Justice "against any firm attempting to 'game the system'" with SBA programs. *Small Business Contracts: How Oversight Failures and Regulatory Loopholes Allow Large Businesses to Get and Keep Small Business Contracts: Hearing Before the Ad Hoc Subcomm. On Contracting Oversight of the S. Comm. On Homeland Security and Gov'tl Affairs*, 112th Cong. 2 (2011) (statement of Joseph G. Jordan, Associate Administrator for Government Contracting and Business Development, U.S. Small Business Administration), *available at* https://www.gpo.gov/fdsys/pkg/CHRG-112shrg68018/pdf/CHRG-112shrg68018.pdf.

146.    The SBA has stated that it "will come down hard on those who seek to take unfair advantage of our programs and services to the detriment of the many honest small businesses that depend upon those programs and services." *Helping Small Businesses*, *supra*, at 5.

## V.      BACKGROUND OF DEFENDANT ATHENA

147.    Defendant Athena was established in 2003 as a residential remodeling contractor. Melissa Schneider co-owns Athena with Amber Peebles.  Prior to joining Athena in 2008, Peebles had been a paralegal.

148.    In approximately 2010, Athena began to seek small business contracts either directly from the federal government or working with a large contractor under a small business subcontracting plan.   Athena received its SDVOSB certification in 2010 and its HUBZone certification in 2011.

149.    The following table lists Athena's small business contracts:

| Funding Agency | Prime / Sub Contractor | Contract Number | Contract Dates | NAICS Code | Total Contract Value | Statement of Work |
|---|---|---|---|---|---|---|
| GSA/Public Buildings Service | Balfour Beatty | GS11P10MKC0059 (Prime Contract)[1] | 9/23/10 – 3/15/13 | 237990 | $32,486,046 | n/a |
| (see above) | Athena | 11076000.TUNNEL.509900 00.42040 (subcontract) | 9/12/11 | 237990 | $1,279,888 | Concrete & Caulking |
| GSA/Public Buildings Service | Balfour Beatty | GS03P10CDC0061 (Prime Contract)[2] | 11/6/09 – 10/1/15 | 236220 | $46,250,549 | n/a |
| (see above) | Athena | | | | | |
| DoD | Clark/Balfour Beatty JV | N4008008C0007 (Prime Contract)[3] | 3/3/08 – 12/31/20 | 236220 | $753,732,157 | n/a |
| (see above) | Athena | | | | | |
| DoD (US Army Corps of Engineers) | Clark | W912DR11C0026 (Prime Contract)[4] | 7/22/11 – 4/14/14 | 236220 | $44,0105,000 | |
| (see above) | Athena | | | | | |
| Social Security Administration | Hensel Phelps | GS03P12CD0002 (Prime Contract)[5] | 1/13/12 – 10/1/15 | 236220 | $209,025,585 | n/a |
| (see above) | Athena | 2012076.0920100 CO #9 (subcontract) | 11/1/13 | 236220 | $44,171 | Misc. Items |
| (see above) | Athena | 2012076.0920100 CO #8 (subcontract) | 12/6/13 | 236220 | $127,635 | Misc. Items |
| (see above) | Athena | 2012076.0920100 CO 19 (subcontract) | 7/2/14 | 236220 | $33,600 | Material |
| (see above) | Athena | 2012076.0920100 CO 20 (subcontract) | 7/28/14 | 236220 | $36,347 | Material |
| DoD (US Army Corps of Engineers) | Hensel Phelps | W912DR10C0091 (Prime Contract)[6] | 9/14/10 – 9/13/20 | 236220 | $24,802,963 | n/a |

[1] St. Elizabeths Campus Tunnel
[2] Richard H. Poff Federal Building
[3] Walter Reed Naval Military Medical Center
[4] ICC-B North Campus
[5] Social Security Administration in Woodlawn, Maryland
[6] BRAC 132 Project at Fort Belvoir, VA

| (see above) | Athena | 2010065-0920000 (subcontract) | 2/4/11 | 236220 | $907,000 | Framing and Drywall |
| (see above) | Athena | 2010065-0920000 Change Order #2 (Various Changes) | 6/22/11 | 236220 | $67,323 | Framing and Drywall |
| (see above) | Athena | 2010065-0920000 Change Order #3 (Various Costs) | 8/26/11 | 236220 | $32,000 | Framing and Drywall |
| DoD (Naval Facilities Engineering Command) | Hensel Phelps | N4008013C0155 (Prime Contract)[7] | 3/29/13 – 9/9/15 | 236220 | $33,348,863 | |
| (see above) | Athena | | | | | |
| DoD (US Army Corps of Engineers) | Hensel Phelps | W912DR13C0035 (Prime Contract)[8] | 7/22/13 – 6/30/16 | 236220 | $44,967,941 | n/a |
| (see above) | Athena | | | | | |
| Department of Veterans Affairs | Athena | VA25713C0084 (Prime Contract)[9] | 5/30/13 – 3/2/16 | 236220 | $5,618,796 | |
| DoD (Naval Facilities Engineering Command) | CDMS/CW JV | N4008012C0006 (Prime Contract)[10] | 9/25/12 – 8/17/15 | 236220 | $88,484,498 | n/a |
| (see above) | Athena | | | | | |
| DoD (US Army Corps of Engineers) | Turner / Gilbane JV | W9123607C0053 (Prime Contract)[11] | 9/28/07 – 12/12/14 | 236210 | $955,046,621 (Current Value of $324,197,210) | n/a |
| (see above) | Athena | | | | | |
| Smithsonian Institution | Clark/Smoot/ Russell JV | F11CC10359 (Prime Contract)[12] | 7/8/11 – 2/28/17 | 236220 | $417,969,490 (Current Value of $300,209,067) | n/a |
| (see above) | Athena | 30864 (Subcontract) | 1/16/12 | | $124,000 | |
| | Clark | P12PC20333 (Prime Contract)[13] | | | | |
| (see above) | Athena | 32717 (Subcontract) | 10/26/12 | | $150,941 | |
| | Clark/ Christman JV | AOC13C2002 (Prime Contract)[14] | | | | |
| (see above) | Athena | 34719 (Subcontract) | 10/14/13 | | $16,365 | |

# VI.   ATHENA FALSELY CERTIFIED IT QUALIFIED AS A HUBZONE BUSINESS

150.   Defendant Athena sought certification as a HUBZone contractor to: (1) compete for federal contracts set aside for HUBZone companies; and (2) sell its HUBZone classification as part of an illegal pass-through scheme with its Co-Defendants.

151.   Athena's certification in its HUBZone application contained the following statement:

---

[7] Russell Knox – P646 DSS Facility Addition Project
[8] Nolan Building Parking Garage
[9] Audie Murphy VA Hospital (Barton Malow)
[10] USMC University
[11] Hospital at Fort Belvoir, VA
[12] National Museum of African American History and Culture
[13] World War II Memorial
[14] Cannon House Office Building

The U.S. Small Business Administration (SBA) relies on the information in the applicant's online submission, this form and any documents or supplemental information submitted in connection with this application to determine whether the applicant qualifies as a HUBZone small business concern (SBC). The definitions for the terms used in this certification and throughout this application are set forth in the Small Business Act (15 U.S.C. § 632), SBA regulations (13 C.F.R. Part 126), and also any statutory and regulatory provision referenced in those authorities.

152.    The Certification further states: "The undersigned has reviewed, verified and certifies that":

All the statements and information provided in the applicant's online application, this form and any attachments are true, accurate and complete. If assistance was obtained in completing this form and the supporting documentation, I have personally reviewed the information and it is true and accurate. I understand that these statements are made for the purpose of determining eligibility and continuing eligibility in the HUBZone Program. In addition, the applicant will immediately notify the SBA of any material change which could affect the applicant's HUBZone SBC eligibility.

.... [C]ertifications in this document are continuing in nature. Each HUBZone prime contract or subcontract for which the applicant submits an offer/quote or receives an award while a HUBZone SBC constitutes a restatement and reaffirmation of these certifications.

153.    Above the signature line, the Certification contained the following warning:

Warning: By signing this certification you are representing on your own behalf, and on behalf of the applicant, that the information provided in this certification, the application and any document or supplemental information submitted in connection with this application, is true and correct as of the date set forth opposite your signature. Any intentional or negligent misrepresentation of the information contain in this certification may result in . . . civil . . . sanctions including, but not limited to . . . treble damages and civil penalties under the False Claims Act . . . .

154.    To meet the requirement that at least 35% of its employees reside in a HUBZone, Athena fraudulently included on its employee roster individuals who are either not employees under the relevant regulations and/or do not reside in a HUBZone.

155.    For example, the Athena "Employee List" identifies Amber Peebles and Melissa Schneider's residence as being in a HUBZone in Lynchburg, Virginia—160 miles from Athena's

headquarters in Dumfries, Virginia.  In fact, at all times material hereto, Peebles and Schneider's

actual residence has been located at 3201 Riverview Drive in Triangle, Virginia—which is not in

a HUBZone and is located approximately one mile from the company's headquarters.

156.    In addition, Athena falsely certified that Mary Frezza and Sarah Anderson were

"employees" of the company when, in fact, they were not.  Rather:

- o  Mary Frezza was the manager for the office park where Athena had its Dumfries

    offices, but at no time did she serve as a full-time Athena employee working at least

    40 hours a month as required by the SBA.

- o  Sarah Anderson at various times has lived in Lynchburg, Virginia (some 160 miles

    from Athena's offices in Dumfries, Virginia) and in Tampa, Florida, but at no time

    did she serve as a full-time Athena employee working at least 40 hours a month.

157.    Accordingly, when accurately represented, Athena did not satisfy the HUBZone

35% residency requirement at any time from 2011 through 2017[15]:

- o  2011: of its seven employees, only one resided in a HUBZone = 14%.

- o  2012: of its fourteen employees, only one resided in a HUBZone = 7%.

- o  2013: of its twenty-two employees, only resided in a HUBZone = 14%.

- o  2014: of its twenty-one employees, only four resided in a HUBZone = 19%.

- o  2015: of its seventeen employees, only four resided in a HUBZone = 23%.

- o  2016: of its thirteen employees, only two resided in a HUBZone = 12%.

- o  2017: of its nine employees, only one resided in a HUBZone = 11%.

---

[15] These figures include as "employees" even those individuals whose employment status and/or addresses Relator has not been able to confirm.

158.   As a direct result of Athena's false representations that at least 35% of its employees resided in a HUBZone, it was granted HUBZone certification in 2011.   Athena's certification in 2011 and re-certifications each year from 2012 through 2017 were knowingly false.

159.   Once Athena became a HUBZone certified business, it received numerous benefits, including access to government contracts set aside specifically for HUBZone businesses. As a HUBZone business, Athena also received a 10% price evaluation preference for government contracts.   In other words, the price offered by a qualified HUBZone business is deemed to be lower than the price offered by a non-HUBZone business if the price offered by the qualified HUBZone business is not more than 10% higher than the price offered by the otherwise lowest bidder.

160.   Defendant Athena certified in its Online Representations and Certifications Application ("ORCA") that it was a qualified HUBZone business, and then represented as part of its bids on government contracts that this certification was current and accurate.

161.   Defendant Athena submitted, or caused to be submitted, the company's ORCA, which states: "It is a HUBZone small business concern listed, on the date of this representation, on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration, and no material change in ownership and control, principal office, or HUBZone employee percentage has occurred since it was certified in accordance with 13 CFR part 126."

162.   This representation in the ORCA was false, and Athena knew that it was false when made.  Athena appeared on SBA's list of HUBZone concerns only because it obtained that listing through the false statements it made as part of the HUBZone application process.

163.   Defendant Athena knowingly misrepresented its eligibility for the HUBZone program to fraudulently obtain contracts set aside for HUBZone businesses.  As a result of its

misconduct, Athena undercut one of the central purposes of the HUBZone program, which is to support small businesses located in geographic areas that have historically been unable to attract businesses and jobs.  Accordingly, the United States did not receive the intended benefits of a qualified HUBZone company receiving and performing federal contracts.

164.   Using its fraudulent HUBZone certification, Athena received at least 31 contracts totaling $87,646,677.06:

| Contract Number | Contracting Title | Contract Start Date | Contracting Agency | Contracting Bureau | Contracting Office Level 3 | Transaction Value | Sum of Contract's Trans. |
|---|---|---|---|---|---|---|---|
| 140G0118D0003 | MULTIPLE AWARD IDIQ CONTRACTS FOR CONSTR. SERV. (ATHENA) "OTHER FUNCTION" | 5/25/18 | Dept of the Interior (DOI) | Water and Science - Assistance Sec'y (WS) | Geological Survey (USGS) | $25,000 | $25,000 |
| DOCSA130114BU0004 | CARPET REPAIR AND INSTALLATION SERVICES. | 10/31/14 | Dept of Commerce (DOC) | Office of the Sec'y (OS) | Office of Acquisition Mgmt. (OAM)/Washington DC (1331J7) | ($258.98) | $392,539 |
| HQ003414D0005 | Washington Headquarters Serv. (WHS) Constr.  FY14 | 3/20/14 | Dept of Defense (DOD) | Other Defense Agencies | WHS | ($10,000.) | $6,360,013 |
| HQ003414D0005 | WHS Constr.  FY14 | 3/20/14 | DOD | Other Defense Agencies | WHS | $2,362,900 | $6,360,013 |
| INP16PX02649 | G:CPGRE, G:BIOBA, G:OTHER, MINOR CONSTRUCTION TITLE: RENOVATE THE COMFORT STATIONS AT THE FRENCH QUARTER VISITOR CENTER PMIS: 177247LOCATION: JEAN LAFITTE NATIONAL HISTORICAL PARK AND PRESERVE, 419 DECATUR STREET, NEW ORLEANS, LA. 70130 | 8/10/16 | DOI | Fish and Wildlife and Parks - Assistant Sec'y (FWP) | Nat'l Park Service (NPS) | $96,407 | $96,407 |
| HQ003414D0005 | WHS Constr.  FY14 | 3/20/14 | DOD | Other Defense Agencies | WHS | $91,959 | $6,360,013 |
| HQ003414D0005 | WHS Constr.  FY14 | 3/20/14 | DOD | Other Defense Agencies | WHS | $0 | $6,360,013 |

| HQ003414D0005 | WHS Constr.  FY14 | 3/20/14 | DOD | Other Defense Agencies | WHS | $0 | $6,360,013 |
| HQ003414D0005 | WHS Constr.  FY14 | 3/20/14 | DOD | Other Defense Agencies | WHS | $42,648 | $6,360,013 |
| HQ003414D0005 | WHS Constr.  FY14 | 3/20/14 | DOD | Other Defense Agencies | WHS | $0 | $6,360,013 |
| DOCSA130114BU0004 | CARPET REPAIR AND INSTALLATION SERVICES. | 10/31/14 | DOC | OS | OAM/Washington DC (1331J7) | $2,625 | $392,539 |
| HQ003414D0005 | WHS Constr.  FY14 | 3/20/14 | DOD | Other Defense Agencies | WHS | $802,009 | $6,360,013 |
| HQ003414D0005 | WHS Constr.  FY14 | 3/20/14 | DOD | Other Defense Agencies | WHS | $292,314 | $6,360,013 |
| DOCSA130114BU0004 | CARPET REPAIR AND INSTALLATION SERVICES. | 10/31/14 | DOC | OS | OAM/Washington DC (1331J7) | $12,3370 | $392,539.9 |
| HQ003414D0005 | WHS Constr.  FY14 | 3/20/14 | DOD | Other Defense Agencies | WHS | $366,983 | $6,360,013 |
| DOCSA130114BU0004 | CARPET REPAIR AND INSTALLATION SERVICES. | 10/31/14 | DOC | OS | OAM/Washington DC (1331J7) | $6,596 | $392,539 |
| INP15PC00316 | REPLACE FRONT ROYAL ENTRANCE STATION ROOF REPLACEMENT | 6/25/15 | DOI | Fish and Wildlife and Parks - Assistant Sec'y (FWP) | NPS | $24,983 | $24,983 |
| DOCSA130114BU0004 | CARPET REPAIR AND INSTALLATION SERVICES. | 10/31/14 | DOC | OS | OAM/Washington DC (1331J7) | $22,4380 | $392,539.9 |
| DOCSA130114BU0004 | CARPET REPAIR AND INSTALLATION SERVICES. | 10/31/14 | DOC | OS | OAM/Washington DC (1331J7) | $4,396 | $392,539 |
| DOCSA130114BU0004 | CARPET REPAIR AND INSTALLATION SERVICES. | 10/31/14 | DOC | OS | OAM/Washington DC (1331J7) | $9,628 | $392,539 |

| DOCSA130114BU0004 | CARPET REPAIR AND INSTALLATION SERVICES. | 10/31/14 | DOC | OS | OAM/Washington DC (1331J7) | $13,3665 | $392,539 |
|---|---|---|---|---|---|---|---|
| DOCSA130114BU0004 | CARPET REPAIR AND INSTALLATION SERVICES. | 10/31/14 | DOC | OS | OAM/Washington DC (1331J7) | $2,683 | $392,539 |
| DOCSA130114BU0004 | CARPET REPAIR AND INSTALLATION SERVICES. | 10/31/14 | DOC | OS | OAM/Washington DC (1331J7) | $2,112 | $392,539 |
| DOCSA130114BU0004 | CARPET REPAIR AND INSTALLATION SERVICES. | 10/31/14 | DOC | OS | OAM/Washington DC (1331J7) | $8,661 | $392,539 |
| HQ003414D0005 | WHS Constr.  FY14 | 3/20/14 | DOD | Other Defense Agencies | WHS | $0 | $6,360,013 |
| HQ003414D0005 | WHS Constr.  FY14 | 3/20/14 | DOD | Other Defense Agencies | WHS | $2,401,200 | $6,360,013 |
| ING12PC00063 | REPLACE HOT WATER LINES TO FAN COILS | 9/21/12 | DOI | Water and Science - Assistance Sec'y (WS) | USGS | ($0.11) | $460,183 |
| W912HQ14P0070 | BLDG 2593- MATERIAL STORAGE ROOF UPGRADE | 6/24/14 | DOD | Dept of the Army (USA) | U.S. Army Corps of Engineers (USACE) | $0 | $20,999 |
| W912HQ14P0070 | BLDG 2593- MATERIAL STORAGE ROOF UPGRADE | 6/24/14 | DOD | Dept of the Army (USA) | USACE | $20,999 | $20,999 |
| HQ003414D0005 | WHS Constr.  FY14 | 3/20/14 | DOD | Other Defense Agencies | WHS | $10,000 | $6,360,013 |

165.    Defendant Athena submitted and/or caused to be submitted to the United States false and/or fraudulent claims and false statements regarding its HUBZone eligibility when it filed its original HUBZone application, bid on the government contracts, and submitted claims for over $87 million in payments under those contracts.   These claims and statements falsely and/or fraudulently implied and/or expressly represented that at least 35% of Athena's employees resided in a designated HUBZone, that Athena was qualified for and remained qualified for the HUBZone

program, and that Athena was eligible for the government contracts.  None of these things was true.

## VII.    DEFENDANTS' PASS-THROUGH SCHEME

166.    Defendant Athena was founded by two individuals who do not have a construction or engineering background.  In fact, Athena has very little full-time staff, little expertise in construction or engineering, no real workforce, and virtually no heavy construction equipment. Despite these limitations, Athena has generated millions of dollars in revenue from government issued construction contracts.

167.    Defendant Athena's business model is not construction or even construction management.  Instead, Athena and its owners make money by selling its small business certifications to larger non-SBA companies that need to meet subcontracting goals and/or want to gain preferential treatment in the government contracting process.

168.    Defendants' scheme works as follows:

    (a)    Co-Defendants would approach Athena about a government project they wanted or needed Athena to be attached to in order to help meet the obligations under their subcontracting plans;

    (b)    Athena would be paid[16] a so-called "small business fee" or "administrative fee" in exchange for Athena "carrying the contract" on its books;

    (c)    Athena would assign a project manager ("PM"), who was usually an inexperienced recent college graduate, to the project.  The PM's only job was to be present or to check in periodically;

    (d)    Co-Defendants would cover all of Athena's costs, including the salary of the PM; and

---

[16] On government projects, contractors typically add between 5% to 10% for profit and an additional 10% for overhead. An example of a traditional submittal is attached as Exhibit 83.  Further, the profit and overhead are also always disclosed to the government.  The fee being accepted by Defendant Athena is not a reference to profit and overhead and it is never disclosed to the government.  Here, the profit and overhead passes through to the second-tier subcontractor.  Obviously, the profit is being impacted by Athena taking a fee.  However, if it was not for Athena serving as a pass-through the subcontractor would have received nothing and may not even have been allowed to serve as a first-tier subcontractor for the project.

(e)    It was understood by all the parties that Athena would not be doing any actual work on the project.  Instead, all of the actual work would pass through to a second-tier subcontractor, which usually had already been selected by one of the Co-Defendants.  The subcontractor would not qualify as a small business or any of the 8(a), HUBZone, SDVOSB or WOSB programs.

169.    As alleged below, Co-Defendants engaged in fraud by falsely representing to the government that it was performing small business eligible services when, in fact, it acted as a pass-through organization utilized by large contractors to circumvent the regulations and the law in order to obtain and keep the prime contract that required small business subcontracting.

A.    BALFOUR BEATTY

1.    The St. Elizabeths Tunnel Project

170.    In September 23, 2010, Defendant Balfour Beatty was awarded a $24.6 million contract relating to the Tunnel/Site Infrastructure Project at St. Elizabeths ("St. Elizabeths").  This project is part of the first phase in a multiphase construction project that will construct a new office and research campus for the Department of Homeland Security at St. Elizabeths.  The site, located one mile east of DC on Martin Luther King Boulevard, is the former St. Elizabeths Hospital site in Anacostia, Washington, DC.

171.    The project Solicitation (GS11P10MKC0059) stated the following:

This negotiated solicitation is open to both small and large business firms.  The firm (if not a small business concern) shall be required to present an acceptable small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and woman-owned small business Subcontracting Plan in accordance with Public Law 95-507, as part of its proposal.  Consideration is open to established, qualified firms (including subcontractors), which currently have active, properly staffed offices within the continental United States.

172.    Accordingly, the contract's Subcontracting Plan required that "30% total planned subcontracting dollars under this contract [had to] go to subcontractors who are small business

concerns."[17]  In addition, of the 30% total, 6% of the subcontracting dollars had to go to 8(a) subcontractors, 5% to WOSB and 3% both to HUBZone and SDVOSB subcontractors.[18]

173.    To help meet these subcontracting goals—because it could meet several goals through the use of a single subcontractor—Defendant Balfour Beatty's Director of Purchasing, Robert Robidoux, approached Athena in early February of 2011 about serving as a first-tier subcontractor on the St. Elizabeths project.  According to Relator's February 4, 2011 email[19] to Ms. Peebles:

> I had a good meeting with Bob Robidoux and Brian Clark [of Balfour Beatty] discussing the upcoming work at St. Elizabeths.  Bob would like you to call him to discuss our management fee and bonding.  He would like us to manage approximately 1.3 million worth of work over a 12-month period in 2011.

174.    On February 4, 2011, Relator emailed Mr. Robidoux to let him know that he had spoken to "Amber about [the] management fees and bonding, . . . she would like to visit you on Monday to discuss."[20]

175.    Two weeks later, on February 15, 2011, Mr. Robidoux emailed Relator and replied that "if it's not too late and you're still open, we can meet Friday. . . I was going to open up all of the bid folders to show you what we have."[21]  Mr. Robidoux also attached the scopes of work for the tunnel project, which included concrete, asphalt, paint and joint caulking.[22]

176.    Mr. Robidoux and Defendant Athena met to the discuss the project on Friday February 18, 2011.[23]  At that meeting, which Relator attended, Defendants Balfour Beatty and

---

[17] "Balfour Beatty Certifications for Subcontractors," attached as Exhibit 1, at 60.
[18] Id.
[19] "Email dated Feb. 4, 2011 from Relator to Amber Peebles re Meeting with Robidoux to Discuss Management Fee," attached as Exhibit 2.
[20] "Email dated Feb. 4, 2011 from Bob Robidoux to Relator re meeting with Amber Peebles," attached as Exhibit 3.
[21] "Email dated Feb. 15, 2011 from Bob Robidoux to Relator re Athena subcontract bid and fees," attached as Exhibit 4.
[22] Id.
[23] "Email dated Feb. 18, 2011 from Bob Robidoux to Relator re Athena subcontract bid and fees," attached as Exhibit 5.

Athena agreed to deceive the government by having Athena serve as a pass-through on the St. Elizabeths project in exchange for an illegal kickback in the form of a 6% "administrative fee" on all the subcontracted work that was passed through Athena.

177.   On May 5, 2011, Mr. Robidoux emailed Relator the following update[24]:

Good morning, Bill.
Trying to finalize contracts for the Tunnel.  I will be issuing you a contract for :
Furnish & install Fire Extinguisher cabinets              $     630
Furnish & install painting per scope                          $ 15,524
Furnish & install caulking (Caulking Applicators)      $ 42,202
(you will need to issue a subcontract to them for $42,202)
**6% administrative fee on subcontracted work         $  2,532**
TOTAL AMOUNT OF ATHENA SUBCONTRACT          $ 60,888

I am attaching the scope of work that was previously provided.  A formal subcontract is being prepared & will be emailed to you shortly.  I am still working on the asphalt (awaiting boiler plate comments from Aggregate Industries) and the concrete pavement.  Those would be added to your contract via change order once I get everything settled with those vendors.

(emphasis added)

178.   Two weeks later, on May 19, 2011, Mr. Robidoux emailed Ms. Peebles the following[25]:

---

[24] "Email dated May 5, 2011 from Bob Robidoux to Relator re Athena subcontract value for St. Elizabeth's Project," attached as Exhibit 6.
[25] "Email dated May 19, 2011 from Bob Robidoux to Amber Peebles re Chevy Chase as Second Tier Sub," attached as Exhibit 7.

Just an update….

First, I want to apologize to both of you for taking so long with this.  The situation with Chevy Chase certainly did not help matters.  Thanks for your patience.  My goal is to square away Carlos on scope/price  & have the contract out before I go on vacation on the 27th.

Spoke to Chevy Chase's bonding agent last night.  She assured me that CC can get bonds in the $1.1M range.

Spoke to Carlos [Fernandes of Chevy Chase Contractors Inc.] a few minutes ago.  **He is OK with working under Athena** & is also agreeable to joint checks to his major suppliers (that would protect both of us).

I think it would be in our collective best interests that we not pursue putting asphalt under Athena.  They are more bureaucratic than we are and I think you will end up pulling your hair out dealing with them. (e.g. they were suppose[d] to call you last week when I asked you if I could give them your cell phone #...they are probably great people but ….).  I don't think you want or need the hassle.  I also spoke to Aggregate Industries today and they will proceed on their own accordingly.

Carlos still has to review the Attachment 1 scope of work that I sent him a month ago and asked if he could get back to me by Monday.  I agreed to this.  I am attaching the scope of work for Athena as it would currently stand.

The price would be as follows:

| | |
|---|---|
| FEC | $630 |
| Painting | $15,524 |
| Caulking (Caulking Applicators) | $42,202 |
| Fee on Caulking @ 6% | $2,532 |
| Concrete work  (Chevy Chase) | $1,135,411 **** (approx. Carlos to review scope) |
| **Fee on Concrete @ 6%** | **$68,125** |
| | |
| Total contract to Athena | $1,264,424 (subject to Chevy Chase) |

179.    As shown above, Defendant Balfour Beatty intentionally and knowingly created a pass-through for the St. Elizabeths project to meet its obligations under the contract's Subcontracting Plan.  Nearly 90% of the total contract (including the impermissible 6% fee) was being billed by a large business, Chevy Chase Contractors, Inc. (located at 8750 Brookville Road, Silver Spring, Maryland 20910), not by Athena.  Chevy Chase does not qualify as a small business under any SBA program.

180.    Critical to the scheme, Mr. Robidoux had to convince Chevy Chase to serve as a second-tier subcontractor even though they were doing all the work.  Chevy Chase agreed to participate in this deception.

181.    In addition, Mr. Robidoux decided that they needed to avoid involving Aggregate Industries in the scheme because they are too "bureaucratic."   In other words, Balfour Beatty conspired with the willing and avoided those who would be likely to report its illegal activities.

182.    The above emails also demonstrate that Defendant Balfour Beatty selected all of the second-tier contractors that would do all the actual work: Chevy Chase Contractors (concrete) and Caulking Applicators, Inc. (caulking).[26]

183.    On May 25, 2011, Mr. Robidoux emailed Ms. Peebles to let her know that he "made a deal with Carlos [Fernandez from Chevy Chase Contractors] . . . [for] $1,150,000 including payment [for the concrete work] & performance bonds."[27]

184.    On May 26, 2011, Defendant Balfour Beatty sent Defendant Athena the Subcontract Agreement.[28]   As submitted to the government contracting officer, Balfour Beatty fraudulently represented it was complying with the Subcontracting Plan by awarding Athena a $1,279,888 subcontract.[29]

185.    According to the Subcontract submitted to the government, Defendant Athena "agree[d] to furnish all labor, services, materials, installation, hoisting, supplies, insurance, equipment, scaffolding, tools and other facilities of every kind and description required for the prompt and efficient execution of painting, site concrete, & caulking."[30]

186.    Not only did the Subcontract deceptively make it appear that Athena was undertaking substantial responsibilities when in fact it was only a pass-through, the Subcontract

---

[26] *See* "Caulking Applicators, Inc. proposal submitted to Balfour Beatty," attached as Exhibit 8; *see also* Ex. 6.
[27] "Email dated May 25, 2011 from Bob Robidoux to Relator re Subcontract Agreement with Carlos [Chevy Chase]," attached as Exhibit 9.
[28] "Athena Subcontract for St. Elizabeth's Project," attached as Exhibit 10.
[29] *Id.*
[30] *Id.*

did not disclose the impermissible 6% administrative fee being paid to Athena for passing through the work to the second-tier subcontractors Balfour Beatty had selected for the project.

187.    The fee was hidden from the government and not included in the Subcontract because Defendants wanted it to appear that Balfour Beatty was meeting its subcontracting goals by hiring a SDVOSB, WOSB, HUBZone-certified construction company that actually performed work on the project.

188.    Defendant Athena did not perform any of the actual work on the St. Elizabeths project.  Additionally, Defendant Balfour Beatty did not expect Defendant Athena to perform any of the work, except for the hanging of a few fire extinguishers.  In exchange for carrying the Subcontract, Athena was paid a kickback of approximately $100,000.

189.    On November 2, 2011, Balfour Beatty's Senior Project Engineer Oya White, who seemed to be unaware of the above scheme, informed Athena that the Government was buying back a portion of the Subcontract and would "be expecting a credit from Athena for this work."[31]

190.    Ms. Schneider emailed Relator to complain that "BB [Balfour Beatty] contacts us asking for help with their small business goals…. [T]hey cut our scope by 66%, and now we are going to lose whatever we were making in fee up to having to provide this credit.  Unbelievable."[32]

191.    On May 9, 2012, Defendant Athena submitted a $20,000 change order to help make up for the lost fee.  Ms. White expressed concern over the late change order and demanded that "someone needs to call me ASAP!!"[33]

---

[31] "Emails dated Nov. 2, 2011 between Oya White, Relator, and Melissa Schneider re credit from Athena," attached as Exhibit 11.
[32] *Id*.
[33] "Email dated May 9, 2012 from Oya White to Amber Peebles and Relator re change order," attached as Exhibit 12.

192.    On June 12, 2012, Mr. Robidoux spoke to Dave Convis, Balfour Beatty Senior Project Manager, on behalf of Athena to get the change order approved.   The following day, Mr. Robidoux emailed Ms. Peebles to relay his conversation with Mr. Convis.   According to Mr. Robidoux: "by the time I was done, I think he saw the light at the end of the tunnel."  Ms. Peebles forwarded Mr. Robidoux's email and added "we owe him one…."[34]

193.    With regard to the painting work, Defendant Athena subcontracted the project to Hunt & Walsh, Inc. ("Hunt & Walsh")—a large Manassas, Virginia-based commercial painting company with revenue between $20 to $50 million, which was well above the applicable NAICS code threshold for small businesses.    Hunt & Walsh performed the painting portion of the Subcontract and charged Athena $18,150 for the work.[35]

194.    The change order was approved and the government unwittingly paid Defendant Athena an additional $20,000.

195.    Defendants Athena and Balfour Beatty had previously engaged in similar illegal practices and, on information and belief, have continued to engage in such practices up until the present.

### 2.    Richard H. Poff Federal Building

196.    At the same time that the parties were negotiating the St. Elizabeths project subcontract, Defendants Balfour Beatty and Athena engaged in a similar scheme involving a $43.9 million contract for the renovation of the Richard H. Poff Federal Building, 250 Franklin Road SW, Roanoke, Virginia (the "POFF Project").[36]  The building is located on a 1.3-acre lot at the western end of the central business area of Roanoke, Virginia.

---

[34] "Emails dated June 13, 2012 re Athena change order approval," attached as Exhibit 13.
[35] "Email dated June 29, 2012 from Stacey Walsh to Relator re Hunt and Walsh, Inc. proposal," attached as Exhibit 14 and "Hunt & Walsh, Inc. Cost Proposal," attached as Exhibit 15.
[36] "Email dated Mar. 10, 2011 from Amy Su to Relator re Poff Federal Building Bid," attached as Exhibit 16.

197.    The Poff Federal Building, which is fourteen stories tall and contains 254,670 rentable square feet of office and courtroom space, was originally constructed in 1975 and was in desperate need of modernization.  The purpose of the POFF project was to update the building systems as well as improve its energy efficiency by incorporating "greening" elements.  Specifically, the Poff Project included window curtain wall, installation of HVAC systems, renovation of the bathrooms, upgrades to the lighting fixtures, and the installation of a new green roof with a solar energy system.

198.    Defendant Balfour Beatty awarded Athena a $1,933,184 subcontract for the POFF project to provide doors, frames, paint and ceramic tile.  In exchange for carrying the contract, similar to the St. Elizabeths project, Defendant Athena was paid a kickback in the amount of approximately $100,000.

199.    The Subcontract does not disclose the impermissible 6% administrative fee being paid to Athena on work passed through to the second-tier subcontractors Balfour Beatty had selected for the project.

200.    The fee was hidden from the government and not included in the Subcontract because Defendants wanted it to appear that Balfour Beatty was trying to meet its subcontracting goals on this project by hiring a SDVOSB, WOSB, HUBZone construction company that would actually work on the project.

201.    Except for the installing of some doors, Defendant Athena did not perform any of the work on the POFF Project.  Additionally, Defendant Balfour Beatty did not expect Defendant Athena to perform any of the work in the scope of the Subcontract.

202.     Defendants Balfour Beatty and Athena engaged in a similar scheme involving subcontracts at Walter Reed National Military Medical Center and National Geospatial-Intelligence Agency.

B.      CLARK/BALFOUR BEATTY JV

The Walter Reed National Military Medical Center

203.     The Walter Reed National Military Medical Center renovation project was a joint venture between Defendants Balfour Beatty and Clark.[37] In May of 2008, the Naval Facilities Engineering Command awarded Clark/Balfour Beatty JV a design and build contract relating to the establishment of the new Walter Reed National Military Medical Center at the National Naval Medical Center in Bethesda ("Walter Reed").

204.     The contract award totaled over $640 million and was to be completed over a period of 40 months.  The contract scope involved new construction and renovation of existing facilities, including approximately 667,000 square feet of new medical office, emergency room and patient care construction; more than 20,000 square feet of new utility and material handling tunnels and circulation corridors; more than 400,000 square feet of renovation in areas of Buildings 1 through 10; and a patient parking garage.

205.     Defendant Clark/Balfour Beatty JV awarded Defendant Athena a $2,200,000 subcontract to provide doors, frames, hardware, and numerous medical suites.  In exchange for carrying the contract, similar to the arrangements it had entered into with Balfour Beatty on the St. Elizabeths Tunnel and the POFF Project, Athena was paid a kickback in exchange for its small business certifications.

---

[37] "Email dated Feb. 23, 2011 from Tim Stroud to Relator re Athena manpower projections," attached as Exhibit 17.

206.    In the case of the Walter Reed project, Athena's fee was 3% of the work that was passed through Athena to the second-tier subcontractor.  To internally track the work and its fee, Athena created Scope of Work spreadsheets.[38] The spreadsheets detail the subcontracts awarded to Athena and how much it was paid in impermissible fees, for example:

| | |
|---|---|
| [1461] #11 Unit - $178,425.00 | 3% fee ($4,381.00) |
| [1462] Medical Surgery - $394,616.09 | fee ($9,157.65) |
| [1463] Cardiology/Radiology - $150,577.00 | fee ($3,552.68) |
| [1464] Nephrology - $31,444.00 | fee ($733.66) |
| [1465] Behavioral Healthcare - $105,193.00 | fee ($2,567.94) |

207.    The Walter Reed Subcontract does not disclose the 3% fee being paid to Athena on work passed through to the second-tier subcontractor.

208.    The fee was hidden from the government and not included in the Walter Reed Subcontract because Defendants wanted it to appear that the Clark/Balfour Beatty JV had met its subcontracting goals on this project by hiring a SDVOSB, WOSB, HUBZone construction company that would actually work on the project.

209.    Defendant Athena did not perform any of the actual work on the Walter Reed project.  Additionally, Defendants Balfour Beatty and Clark did not expect Defendant Athena to perform any of the work in the scope of the subcontract.

210.    At all times material to this Second Amended Complaint Clark/Balfour Beatty JV had actual knowledge both that Athena misrepresented its status and served simply a pass-through— *i.e.*, bringing no value—to the Walter Reed project.

---

[38] "Email dated Feb. 23, 2011 from Melissa Schneider to Relator attaching scopes of work for Walter Reed," attached as Exhibit 18. The five scopes of work are attached as Exhibits 19–23.

C.    CLARK CONSTRUCTION COMPANY

**Intelligence Community Campus North Campus ("ICCB")**

211.    Defendant Clark was awarded a $300 million contract for the design and build of the new Intelligence Community Campus-Bethesda (ICCB). The ICCB project is a design-build construction of a parking garage and two support buildings (the VCC and the VIS) on the ICCB campus.[39]

212.    The ICCB garage is six stories, precast, and largely open.[40] The VCC is a one-story building with an envelope consisting of curtainwall and metal panels up with metal framing.[41] The VIS is a small masonry building with a large metal-framed canopy.[42]

213.    To help meet the contract's subcontracting goals,[43] on October 18, 2016, Defendant Clark's Project Manager Doug Fox met with Ms. Peebles regarding Athena's potential involvement in the ICCB project.[44]

214.    Ultimately, Defendant Clark awarded Defendant Athena a $2,720,000 subcontract relating to the frames, doors and hardware. As submitted to the government contracting officer, Defendant Clark met some of its small business subcontracting goals—*i.e.*, WOSB/HUBZone/SDVOSB, by awarding Athena the ICCB subcontract.

215.    On December 19, 2011, Clark emailed[45] Ms. Peebles the revised exhibits to the Subcontract titled Exhibit B[46] and B-1.[47]

---

[39] "Athena Summary of ICC-B Project," attached as Exhibit 24.
[40] *Id*.
[41] *Id*.
[42] *Id*.
[43] "Exhibit B-1 to Athena Subcontract re Mentor Protege Provision," attached as Exhibit 25.
[44] "Email dated Dec. 16, 2011 between Clark and Athena re Scope of Work for Athena on ICC-B Project," attached as Exhibit 26.
[45] "Email dated Dec. 19, 2011 from Kattya Via to Amber Peebles re ICC-B Revised Exhibit B and B-1 to Athena Subcontract," attached as Exhibit 27.
[46] "Exhibit B to Athena Subcontract," attached as Exhibit 28.
[47] *See* Ex. 25.

216.     According to Exhibit B-1 of the Subcontract, which is marked *For Internal Use Only*, Clark was to conduct an "initial assessment of the proposed skills [Athena] is able to provide at the time of entering into the Project" and will conduct periodic evaluations.[48]     Such an assessment would have revealed that Athena had virtually no workforce or equipment.

217.     In addition, Athena agreed to work "as a first-tier subcontractor to Clark and … provide general contracting services to manage the construction of the VCC and VIS buildings."[49] Accordingly, as the first-tier subcontractor, Athena agreed to be responsible for the overall management of the trades within these two structures.[50]

218.     Despite the above provisions, Exhibit B-1 also strikes language from the Subcontract that allowed Athena to control the work in the VCC and VIS buildings, confirming that Clark's knowledge and approval were required before Athena could subcontract any scope of the work to another company.   Exhibit B-1 replaced Article 19 of the Subcontract with the following language:

> Subcontractor shall not assign, subcontract, or transfer this Subcontract, or funds due hereunder, without the prior written consent of Subcontractor's surety and Clark.  Clark shall not unreasonably withhold its consent to the assignment of funds due hereunder.  Lower-tier subcontracts are subject to the provisions of this Subcontract, and Subcontractor shall insert in Subcontractor's subcontracts all provisions required by the Contract Documents or necessary to enable the lower-tier subcontractor to comply with the terms hereof. Subcontracting by Subcontractor shall not abrogate any obligation of Subcontractor under this Subcontract.

219.     In addition to the above language, Exhibit B-1 also details what Defendant Athena would be paid to carry this contract.  Similar to the arrangement it had with Defendant Balfour Beatty, Athena was paid a fee and its costs were covered.

---

[48] *Id.*
[49] *Id.*
[50] *Id.*

220.    According to Exhibit B-1 of the Subcontract[51]:

## SUBCONTRACT AMOUNT:

For accounting purposes only, this Subcontract amount is broken down as follows:

| | | |
|---|---|---|
| Temporary Rough Carpentry | $ | 23,480 Lump Sum |
| Project Engineer (General Conditions) | $ | 90,000 Lump Sum[2] |
| Fee & Overhead | $ | 104,620 Lump Sum |
| Allowances | $2,502,000 | |
| Subcontract Total | $2,720,100 | |

221.    And despite being awarded the Subcontract, Defendant Athena agreed to relinquish all aspects of the project back to Clark.  As noted in the above documents[52], Athena:

. . . shall not proceed with any work associated the following allowances without prior written direction from an officer of Clark, and receipt of an executed change order(s) to this Subcontract reconciling any difference between the allowance amount and the amount of the lower-tier subcontract (or purchase order) to the lower-tier subcontractor (or supplier) that will be performing the work for each trade.  Any resulting savings or loss will accrue to Clark.

222.    Consistent with the above language, Defendant Athena did none of the work mentioned in the subcontracting scope.  Instead, all of the work was completed by second-tier subcontractors selected, controlled, and supervised by Defendant Clark.

223.    For example, on March 8, 2012, Athena, at the direction of Clark, issued a $1,574,000 subcontract to the Limbach Company, LLC for the mechanical work.[53]  Limbach is a large national mechanical contractor and is a subsidiary of Limbach Holdings, Inc., which had revenues of $485.7 million in 2017.

---

[51] *See id.*; *see also* "Athena Summary of Contract Structure with Fees," attached as Exhibit 29.
[52] *Id.*
[53] "Athena Weekly Summary for 03.09.2012," attached as Exhibit 30; "Athena Subcontract with Limbach for ICC-B Project," attached as Exhibit 31.

224.     In creating the subcontract for Limbach, Athena simply replaced Clark's logo for its logo on Exhibit A, which laid out the scope of Athena's subcontract.[54]

225.     In addition to Limbach, Defendant Athena issued subcontracts to a number of large contractors including The Berlin Steel Construction Company ($660,000) and Gordon Contractors ($347,000).[55]

226.     By September 8, 2013, the value of Athena's subcontract for this project had increased to $4,412,949 as the direct result of its issuing various change orders, and Athena's fee had increased to more than $150,000.

227.     Other than building a temporary deck around the construction trailers, Defendant Athena did not perform any work on this project, nor did it provide any supervision or oversight of the second-tier subcontractors.  Athena's contribution to this project is reflected only on paper, rather than at the site.

228.     Defendants Clark and Athena engaged in a similar scheme involving contracts at National Museum of African American History and Culture,[56] Cannon House Office Building Renewal Project,[57] and Repairs to the Failed Slurrywall/Pool Membrane and Drawing System at WWII Memorial.[58]

**D.     HENSEL PHELPS CONSTRUCTION COMPANY**

**1.     Social Security Administration – Woodlawn, Maryland ("SSA")**

229.     Occasionally, Athena would be approached by a large company and asked to serve as a pass-through by bidding on a government project as a first-tier subcontractor, and then passing

---

[54] Compare Ex. 31 with "Exhibit A to Athena Subcontract with Clark for ICC-B Project," attached as Exhibit 32.
[55] *See* Ex. 29.
[56] "Athena Subcontract for National Museum of African American History and Culture," attached as Exhibit 33.
[57] "Athena Subcontract for Cannon House Office Building Project," attached as Exhibit 34.
[58] "Athena Subcontract for World War II Memorial," attached as Exhibit 35.

along all of the work in exchange for an administrative fee.[59]  Athena would submit its bid knowing that it would only be receiving its administrative fee and that all of the work would be done by the other company that on paper would be identified only as a downstream subcontractor.

230.    Defendant CAS was one such company with which Athena had the above relationship.  According to one informant, Athena and CAS have a "special relationship," which originally developed among Ms. Peebles, CAS Vice President Dave Prosida, and CAS Assistant Vice President Ali Khosravi.  The two companies developed a scheme whereby Athena would use its small business certifications to secure government contracts and then pass through to CAS all the underlying work for those contracts.

231.    For example, on February 11, 2013, Athena's Ms. Schneider emailed CAS Vice President Richard Unger and Mr. Khosravi, thanking them for lunch and expressing her agreement to "carry [a] contract for you guys."[60] The subcontract that she was referring to concerned $2,000,000 worth of work to be done at the Social Security Administration ("SSA") headquarters building in Woodlawn, Maryland.[61]

232.    According to Ms. Schneider, the "TOTAL COST to carry contract" was $9,812 and "assumes 52 weeks."  Ms. Schneider's cost analysis confirms Athena would trade its small business certifications for an administrative fee[62]:

---

[59] "Email dated Mar. 28, 2013 from David Garrett to Relator re Shreveport VA Hospital," attached as Exhibit 36.
[60] "Emails dated Feb. and Mar. 2013 between Athena and CWS re Cost Savings Arrangement," attached as Exhibit 37.
[61] *Id.*
[62] *Id.*

Karen-contract admin (pay applications, POs, bill entry, project start up documents, etc.) I have estimated 2 hrs/week. I also assumed a one year long project. 2*31*52=$3224.00

Bill- participation in on-site meetings (safety, QC, start up, etc.) I assumed 4 hours/month for 12 months. 4*51*12=$2448.00

Business License Tax: ( $2,000,000/100)* .13 = $2600.00

G/L Insurance: $1210.00 (Assumes $1M in subcontracted work)

Travel: 50 miles/trip*12 trips*.55/mile=$330.00

233.    Ms. Schneider ends the email by stating that "if the contract can cover these costs (i.e. they don't come out of our fee), then the fee plus the shared cost savings arrangement is very doable."[63]

234.    The cost savings arrangement is the part of the special arrangement that Athena had with CAS wherein the they shared the profits on the projects that were passed through Athena.

235.    Later that afternoon at 3:06 pm, Mr. Unger responded that he could "only go to 25,000 including the items shown below.  The hope would [b]e that a savings situation would occur, similar to BRAC."[64]

## 2.    BRAC 132

236.    BRAC is a reference to the BRAC 132 project, a $24,802,963 project site located within the Fort Belvoir Post in Fairfax, Virginia.  The BRAC 132 project was for an Administration Building, a multi-story Command and Control Building for the Office of the Chief Army Reserves ("OCAR"), consisting of approximately 100,000 square feet of administrative space, emergency operations center, secure and non-secure conference rooms, video teleconference centers data processing center, general officer/senior executive service office suites, storage, administrative support areas, building support spaces, surface parking, loading and service areas, and a multi-level parking structure containing 304 spaces.  Hensel Phelps was the Prime Contractor.

---

[63] *Id.*
[64] *Id.*

237.    As he had with the SSA project (*see supra* ¶¶ 229-35), in January of 2011, CAS Vice President Mr. Unger reached out to Athena to propose it serve as a pass-through first-tier subcontractor with CAS acting as the second-tier subcontractor.

238.    On February 4, 2011, Defendant Athena was awarded a $907,000 subcontract for carpentry and drywall for the BRAC 132 project.[65]  The first-tier subcontract was awarded subject to a Mentor/Protégé Agreement ("M/P Agreement") between Athena (ostensibly a small business entity) and CAS.[66]  According to the M/P Agreement[67]:

> Prime Contractor or Construction Manager:  Enlists the services of an experienced contractor – Component Assembly Systems, Inc. – to ensure the project is executed properly with respect to both quality and schedule:
>
> a.      Allows for meaningful PARTICIPATION – both financial and "hands on" by a qualified small business – SBE, mentored throughout the process
>
> b.      Provides 100% small business participation that meets or exceeds the intent of federal acquisition requirements with regard to "SMALL BUSINESS/ MINORITY BUSINESS PARTICIPATION"

239.    Contrary to the above requirements, Defendants Hensel Phelps and CAS understood and expected that Athena would not be doing any actual work and would instead serve as an illegal pass-through.  For example:

> o   Regarding Athena's attendance at the scope review meeting, which was critically important for carrying out the project's work, Mr. Unger informed Athena that it was "not essential that [they] attend."[68]
>
> o   Only the Relator attended the pre-mobilization meeting on behalf of Athena.[69]  In contrast, CAS sent three representatives, including their Executive Vice President Mr. Khosravi.[70]

---

[65] "Letter dated Feb. 21, 2011 from Hensel Phelps to Athena confirming Subcontract Number and Value," attached as Exhibit 38.
[66] "Athena Change Order dated Feb. 3, 2011 Reflecting Athena's Mentor-Protege Arrangement with CAS," attached as Exhibit 39.
[67] "Mentor-Protege Agreement between Athena and CAS," attached as Exhibit 40.
[68] "Email dated Jan. 31, 2011 from Richard Unger of CWS to Amber Peebles re Scope Review Meeting," attached as Exhibit 41.
[69] "Pre-Mobilization Meeting Agenda and Attendance List dated Mar. 7, 2011," attached as Exhibit 42.
[70] *Id.*

> - CAS subcontracted all of the material, which included drywall, steel, accessories, to another contractor (Pro-Build, a large business).[71]  Athena was not involved in the materials bidding process or in the awarding the materials contract.[72]

240.    Relator was Athena's Project Manager on the BRAC 132 project.  Defendant Athena did not do any work on the BRAC 132 project and instead passed all of the work through to CAS.

241.    In March of 2011, Defendant Hensel Phelps asked Athena for a bid for the Cold Formed Metal Framing on the BRAC 132 campus.  Athena passed on the request to CAS, which prepared the bid[73] and letter.[74]  CAS Executive Vice President Mr. Khosravi emailed the bid back to Athena's Ms. Schneider and instructed her to "send the attached proposal to H.P. [Hensel Phelps] on your letter head and with the backup."[75]  According to their standard practice, Defendants CAS and Athena changed the letterhead on the documents to make it appear that Athena was something more than a pass-through.[76]

242.    Defendant Hensel Phelps's Office Engineer for this project, Colleen O'Sullivan, who was unaware that Athena was serving just as a pass-through, would often complain to CAS that Athena was not submitting the requisite paperwork.  For example:

> a.  On April 23, 201, Ms. O'Sullivan complained that "we have not received any safety meeting reports or equipment reports."[77] According

---

[71] "Email dated Feb. 14, 2011 from Ken Varney of ProBuild re Project Submittals for BRAC 132 Project," attached as Exhibit 43.

[72] *Id*.

[73] "Component Assembly Systems, Inc. Bid Summary," attached as Exhibit 44.

[74] "Draft of Letter from Athena to CAS, prepared by Hensel Phelps," attached as Exhibit 45.

[75] "Email dated Mar. 1, 2011 from Ali Khosravi of Capital Interiors re Proposal on Athena Letterhead," attached as Exhibit 46.

[76] "Email dated Feb. 4, 2011 from Relator to Richard Tinsley of CAS re Placing CAS Submittals on Athena Letterhead Prior to Submission," attached as Exhibit 47.

[77] "Email dated May 2, 2011 from Colleen O'Sullivan to Relator and Ali Khosravi of CAS Requesting Athena Paperwork," attached as Exhibit 48.

to Ms. O'Sullivan, "Athena has been onsite for weeks now, so there is quite a bit of paperwork that Blaine[78] needs to fill out to get up to date."[79]

b.  On June 26, 2011, Ms. O'Sullivan emailed Athena that "your field staff has not been submitting weekly toolbox talks and daily reports on a regular basis and are currently behind for the month of June."[80]

243.  Defendant Athena was not completing this paperwork because it was not on site for this project.

244.  Notwithstanding the fact that it did no work on the project, over the life of the project and through the issuance of various change orders, the value of the Athena subcontract was increased to $1,020,330.[81]

245.  In exchange for carrying the contract, Defendant CAS paid Defendant Athena its $15,000 fee and costs.[82]

246.  Similar to the arrangement identified in Mr. Unger's email relating to the SSA project, Defendants CAS and Athena split the cost savings on the BRAC 132 job.[83]

### 3.  Camp Pendleton Naval Hospital ("CPNH")

247.  Defendant Athena's special relationship with CAS extended to the Camp Pendleton Naval Hospital ("CPNH") project with Defendant CAS's west coast subsidiary, Component West Inc. ("Component West").

---

[78] Athena misrepresented that Blaine Johnson was an Athena employee.  In truth, Mr. Johnson was a foreman employed by CAS.

[79] *Id.*

[80] "Email dated June 26, 2011 from Colleen O'Sullivan to Smith and Ali Khosravi of CAS re Lack of Athena Daily and Weekly Reports," attached as Exhibit 49.

[81] "Athena Change Order #2 Dated 02.03.2011," attached as Exhibit 50; "Athena Change Order #3 Dated 02.03.2011," attached as Exhibit 51; and "Request from Hensel Phelps to Athena dated Nov. 16, 2011 for Closeout Items Before Final Payment," attached as Exhibit 52.

[82] "Email dated June 22, 2011 from Karen Papa to Colleen O'Sullivan re June 2011 Pay Applications and Athena LEED Documentation," attached as Exhibit 53; "Attached Pay Application #7 Dated 06.20.2011," attached as Exhibit 54; and "Attached Pay Application #8 Dated 06.20.2011," attached as Exhibit 55.

[83] *See* Ex. 37.

248.    The CPNH project involved a $17.8 million subcontract that was awarded to Defendant Athena for which it was supposed to perform framing, drywall and acoustical tile work.

249.    As was standard in their "special relationship," the entire scope of the subcontract was passed through to Component West.

250.    In exchange for carrying the CPNH contract, Athena received a substantial fee, which by August 3, 2012 amounted to $249,445.69.[84]

### 4.    Russell Knox Building - DSS Facility Addition Project ("DSS")

251.    In the spring of 2013, Defendant Hensel Phelps was awarded a $32.5 million design and build contract for the Russell Knox Building—P646 DSS Facility Addition Project ("DSS")—located at the Marine Corps base in Quantico, Virginia.

252.    The DDS project consisted of a 40,000 square foot secure facility, which is an addition to the existing Military Department Investigative Agencies ("MDIA") Headquarters that was completed by the Hensel Phelps/Fentress team in 2010.  The project scope included design and construction of the addition and an elevated parking garage.

253.    According to the Subcontracting Plan, the subcontracting goals were 77% small business, including the following subcontracting goals: 17% DBE, 17.25% WOSB, 3.5% VOSB, 3.5% SDVOSB, and 15.2% HUBZone.[85]

254.    To meet its subcontracting goals, Defendant Hensel Phelps approached Athena about serving as the first-tier subcontractor, since it could meet all of the goals through the use of one subcontractor.

---

[84] "Athena Job Profitability Summary for January 1 through August 3, 2012," attached as Exhibit 56.
[85] "Athena Subcontract with Hensel Phelps for DSS Facility Addition Dated 07.02.2013," attached as Exhibit 57, at ¶ 23.

255.     After their discussions, Defendant Hensel Phelps awarded Defendant Athena several subcontracts totaling nearly $8 million for this project.

256.     For example, on July 2, 2013, Athena was awarded a subcontract worth $166,000 to design, furnish and install the fire protection system for the DSS project.[86]

257.     According to the subcontract, "it is understood that small business participation is a requirement of the prime contract and therefore also a requirement of this subcontract agreement."[87]   "This subcontractor therefore agrees to provide the following small business participation at the first-tier level of this subcontract agreement:" 100% each for small business, SDB, WOSB, HUBZone, VOSB and SDVOSB.[88]   All of the subcontracts issued on the DSS project had similar language.

258.     Defendant Athena had no experience or expertise in designing and installing a fire protection system.

259.     Despite the subcontract's requirements, Athena subcontracted the entire scope of the fire protection system project to a large business, National Fire Protection LLC ("NFP"), located at 515 Dover Rd, Rockville, Maryland 20850.[89]   NFP is not qualified under any of the SBA's small business programs.  Rather, NFP is a subsidiary of the Kirin Group, LLC, which is a private national construction company with annual revenues of approximately $250 million.

260.     In addition to NFP, Athena was awarded electrical ($4,684,000) and mechanical ($3,117,000) subcontracts totaling more than $7.8 million.  Athena had no expertise, personnel, tools, or equipment required to perform electrical or mechanical work.

---

[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] "Athena Request for Periodic Payment Dated 05.30.2014," attached as Exhibit 58; "Athena Spreadsheet for Russell Knox Project with contacts," attached as Exhibit 59.

261.     Defendant Hensel Phelps never expected Athena to do any work relating to these subcontracts.  The electrical scope was subcontracted to MC Dean, a large business located at 1765 Greensboro Station Place in Tysons, Virginia, and the mechanical scope was subcontracted to Southland Industries, another large business located in Garden Grove, California.  Neither MC Dean nor Southland qualify as small businesses under any SBA program.

262.     In exchange for its agreement to carry these contracts, Defendant Hensel Phelps paid Athena a $37,500 fee and $66,500 for the salary of the Project Manager.[90]

263.     In addition, Athena was paid a 2% fee on all approved change orders.[91]   For example, MC Dean had $1,158,000 in approved change orders.[92]  Accordingly, Defendant Athena received an additional $23,160 kickback for carrying this subcontract.[93]

264.     By the time the DSS project was finished, Defendant Athena had been paid hundreds of thousands of dollars in impermissible fees despite not performing any actual work or management of these subcontracts.

265.     And as submitted to the government contracting officer, Defendant Hensel Phelps falsely represented that it exceeded its small business subcontracting goals—*i.e.*, WOSB/HUBZone/SDVOSB, by awarding Athena the DSS subcontract.

**5.     Fort Belvoir Nolan Parking Garage—Fort Belvoir**

266.     While work was commencing on the DSS project, Defendant Hensel Phelps was awarded a design and build contract with the U.S. Army Corps of Engineers (USACE) – Baltimore District for the Nolan Building Parking Garage ("Nolan").

---

[90] "Athena Request for Periodic Payment Dated 03.31.2014," attached as Exhibit 60; "Athena Subcontract Amendment No. 1," attached as Exhibit 61.
[91] "Athena Change Order Request #5 Dated 10.31.2013," attached as Exhibit 62.
[92] *See* Ex. 59.
[93] *See* Ex. 60.

267.    The Nolan project consisted of a five-level, 534,000 square foot parking garage with a total of 1,420 parking spaces, a 12,000 square feet central utility building along with standby generators.

268.    To meet its subcontracting goals, Defendant Hensel Phelps went back to Athena to serve as the first-tier subcontractor, since it could meet all of the goals through the use of one subcontractor.

269.    After subsequent discussions, Defendant Hensel Phelps awarded Defendant Athena small business subcontracts totaling $5,545,090 for this project.[94]

270.    Consistent with its past projects, Defendant Hensel Phelps never expected Athena to do any work relating to these subcontracts.  The electrical work (valued at $3,510,990) was subcontracted to Bergelectric, a large business located in Escondido, California, and the mechanical scope (valued at $1,849,100) was subcontracted to large business Southland Industries. Neither Bergelectric nor Southland qualified as small businesses under any SBA program.[95]

271.    In exchange for Athena's agreement to carry these contracts, Defendant Phelps paid Athena a 2.5% fee worth approximately $130,000 and an additional $87,800 for the salary of Athena's Project Manager.[96]

272.    By the time this project was finished, Defendant Athena had been paid hundreds of thousands of dollars in impermissible fees despite not performing any actual work or management of the Nolan subcontracts.

---

[94] "Athena Spreadsheet for Nolan Project with contacts," attached as Exhibit 63.
[95] Id.
[96] Id.

E.    **BARTON MALOW COMPANY**

**Audie Murphy VA Hospital**

273.    Athena was also involved in the renovation of the Audie Murphy VA Hospital in San Antonio, Texas.  While Athena's pass-through scheme at the Audie Murphy facility was similar to other federal projects, Athena documented its fraudulent conduct differently.

274.    On March 12, 2013, Defendant Athena bid on the Audie Murphy VA Hospital Ward Upgrades/Expansion-4B.[97]   Athena's total bid for the project was $5,145,350, which included a 1% bond fee.[98]

275.    On March 13, 2013, Athena submitted its bid to be the prime contractor (not the first-tier subcontractor)[99] for the Ceilings and Lighting Phase 2 in the amount of $2,190,700.[100]

276.    Defendant Athena was awarded both contracts by the VA.[101]  According to Ms. Peebles, "these 2 projects are Athena's #1 priority.  They are the stepping stone to much more work and prosperity."[102]

277.    Defendant Athena had neither the ability nor the interest to serve as the prime contractor for this project.

278.    Unbeknownst to the government, Defendant Athena had already agreed to allow Defendant Barton Malow to serve as its subcontractor on this contract.  To achieve this deception, it claimed that two of Defendant Barton Malow's senior project executives, David Garrett and

---

[97] "Email dated Mar. 12, 2013 from Karen Papa to Amber Peebles requesting permission to submit Athena Bid on Audie Murphy VA Hospital Project," attached as Exhibit 64; "Letter to Jay Roberson at VA with Athena's Bid on Audie Murphy VA Hospital Project," attached as Exhibit 65.
[98] *Id*.
[99] "Athena Bid for Phase 2 of Ceiling and Lighting at Audie Murphy," attached as Exhibit 66.
[100] "Email dated Mar. 3, 2013 from Amber Peebles to Jaye Roberson at VA re Ceiling and Lighting Job at Audie Murphy VA Hospital," attached as Exhibit 67; "Letter from Amber Peebles to Jaye Roberson at VA re Phase 2 of Ceiling and Lighting Job at Audie Murphy VA Hospital," attached as Exhibit 68.
[101] *See* Ex. 66.
[102] "Email dated July 10, 2013 from Melissa Schneider to Amber Peebles, Karen Papa, Relator, and David Garrett re importance of Audie Murphy VA Hospital Project," attached as Exhibit 69.

David Moody, worked for Athena.[103] According to Athena's site-specific Safety Manual, which is submitted to the government: "It is the responsibility of David Moody, Athena Construction Group Superintendent/Safety Officer to implement this Fall Protection Plan for this project."[104]

279.    In addition, on June 21, 2013, Ms. Schneider emailed the VA and identified "David Moody [as] our superintendent."[105]   At all relevant times, Mr. Moody worked for Barton Malow and was never an employee or superintendent for Athena.

280.    Similar to the schemes outlined above, Defendant Barton Malow (not Athena) selected all of the second-tier subcontractors that would actually perform all of the work.[106]   For example, on June 21, 2013, Athena emailed the VA's Jeff Torres and informed him that the subcontracts for the Ceiling and Lighting Phase were being awarded to the following companies[107]:

>  Demolition & Abatement: KMAC
>  Mechanical: Great America Customer Builders
>  Electrical: CEC Electrical
>  Sprinkler:  Sun Automatic Fire Sprinkler
>  Acoustical Ceiling: A-1 Total Interiors[108]

281.    A few days later, Mr. Torres emailed Athena and stated that he "made a mistake in recommending KMAC" for the demolition and abatement work because KMAC was not performing as expected on a different VA project.[109]   Instead of selecting a new contractor to replace KMAC, Athena forwarded the email to Barton Malow's Mr. Garrett.[110]   In response, Mr.

---

[103] "Statement and Acknowledgment of Prime and Subcontractors with David Garrett listed as Athena Project Manager," attached as Exhibit 70.
[104] "Athena Safety Manual for Audie Murphy VA Hospital Site which lists David Garrett as Project Manager," attached as Exhibit 71, at 4, 28, 34.
[105] "Email dated June 21, 2013 from Melissa Schneider to Jeff Torres at VA re Athena subcontractors for Ceiling and Lighting Phase 2," attached as Exhibit 72.
[106] "Email dated Mar. 8, 2013 from David Garrett to Dustin Cook of Steel Service requesting Steel Service bid as a second-tier sub," attached as Exhibit 73.
[107] See Ex. 72.
[108] "Athena Subcontract with A1 Total Interiors," attached as Exhibit 74.
[109] "Email dated June 25, 2013 from Jeff Torres at VA to Melissa Schneider and Smith re Poor Performance of KMAC on other VA projects," attached as Exhibit 75.
[110] Id.

Garrett informed Athena that Barton Malow selected ColeBrack Demolition to replace KMAC.[111] Posing as the real decisionmaker, Athena notified the VA that Athena picked ColeBrack as the second-tier subcontractor, while concealing from the government the fact that Athena was merely carrying out Barton Malow's directive.[112]

282.   In exchange for serving as the pass-through prime contractor for this project, similar to the CPNH, Athena received a fee of approximately 2% of the subcontract.

F.   **CDM SMITH/COAKLEY WILLIAMS JV**
     **United States Marine Corps University**

283.   On September 25, 2012, Defendant CDM Smith/Coakley Williams JV was awarded an $80,548,000 contract for the design and construction of the Marine Corps University Research Center Addition and Marine Corps University Academic Instruction Facility located at Marine Corps Base Quantico ("Quantico Project").  The Quantico Project contract also contains two unexercised options, which could increase the contract value to $103,621,750.

284.   To meet its subcontracting goals, Defendant CDM Smith/Coakley Williams JV approached Athena to serve as the first-tier subcontractor, since it could meet all of the goals through the use of one subcontractor.

285.   On March 5, 2013, Defendant Athena was awarded a $9,700,000 subcontract to furnish and install the entire mechanical plumbing and fire protection system for the Quantico Project.[113]

---

[111] "Email dated June 25, 2013 from David Garrett to Relator selecting ColeBrack as the new subcontractor for Athena," attached as Exhibit 76.
[112] "Email dated June 25, 2013 from Relator to Jeff Torres at VA passing along Barton Malow's new choice of ColeBrack as Athena's selection," attached as Exhibit 77.
[113] "Subcontract Agreement between CDM Smith/Coakley Williams JV and Athena," attached as Exhibit 78.

286.     Defendant CDM Smith/Coakley Williams JV never expected Athena to do any work relating to this subcontract.  The entire scope of the mechanical plumbing subcontract ($7,066,473) was awarded to large business Southland Industries.[114]

287.     Southland Industries negotiated the terms of the subcontract directly with CDM Smith/Coakley JV.[115]

288.     On paper, it appeared that Athena was going to do $2,633,527 in self-performed work.[116]  However, Athena had no intention of doing any work on this project and did no work on this project.

289.     In exchange for carrying this subcontract, Defendant CDM Smith/Coakley Williams JV paid Athena a 2.62% fee totaling $243,000, as well as $75,000 for the salary of the Project Manager.[117]

290.     By the time this project was finished, Defendant Athena had been paid hundreds of thousands of dollars in fees and had performed no actual work or management of this subcontract.

G.     TURNER/GILBANE JV

Fort Belvoir VA Hospital

291.     Defendant Turner/Gilbane JV was awarded a $1.03 billion, 1.3 million square foot design and build contract relating to the construction of the new Fort Belvoir Community Hospital, which is located just south of Washington, D.C.  The Fort Belvoir Hospital replaced the old DeWitt Army Community Hospital and integrated various aspects of the former Walter Reed Army Medical Center.

---

[114] "Athena Spreadsheet for Marine Corps University Project with contacts," attached as Exhibit 79.
[115] *See* Ex. 78, at 45.
[116] *See* Ex. 79; *see also* "Athena Spreadsheet re Subcontract with Southland Industries," attached as Exhibit 80.
[117] *See* Ex. 79.

292.    To help meet the contract's subcontracting goals, Turner/Gilbane JV awarded Athena a $906,056 subcontract to install the carpet and flooring in the new hospital.  Through the issuance of change orders, Athena's scope increased to cover almost all of the carpeting and flooring in the new hospital.  Accordingly, by April 25, 2011, the value of the subcontract had ballooned to $9,219,500.[118]

293.    Relator was the only Athena on-site employee who was assigned to work on the Fort Belvoir Hospital.  Consistent with Defendant Athena's past practices, all of the work was passed through to a large, second-tier subcontractor.  For the Fort Belvoir project, that subcontractor was Commercial Carpets of America ("CCA"), which is located at 885A S. Pickett Street in Alexandria, Virginia.

294.    At all times material hereto, Gilbane/Turner JV was aware that Athena was acting as a pass-through.  For example, on February 2, 2011, Gilbane/Turner JV's Ms. Pinkard emailed Robert Todd of CCA directly regarding the need for a change order.  Mr. Todd emailed Athena and relayed the following message[119]:

---

[118] "Athena Monthly Reconciliation Statement dated 04.25.2011 and Waiver of Lien," attached as Exhibit 81.
[119] "Email dated Feb. 2, 2011 from Robert Todd of Commercial Carpets of America to Melissa Schneider, Amber Peebles, and Relator re communication with Lee Ann Pinkard of prime contractor Gilbane/Turner JV," attached as Exhibit 82.

Melissa, Amber, and Bill,

As usual, Lee Ann Pinkard called this afternoon (about 4:00pm) in a panic to receive a change order proposal from us by 5:00pm today. After I let her know that this is impossible, I let her know that I would work on this and try to get it to her 1st thing in the morning. Obviously, I forgot to mention that this would go through Athena, so I will let her know in the morning, but in the interim, could you apply your profit and forward this to her @ LPinkard@tcco.com ? Please let me know if you have any questions. Thank u.

Sincerely,
Robert Todd, LEED AP
Project Manager
Commercial Carpets of America
Office: (703) 212-6365
Cell: (571) 259-5713
Fax: (703) 823-8335
Email: rtodd@carpetcca.com
www.CommercialCarpetsofAmerica.com
"Making Your Vision a Reality"

295.    Ms. Pinkard emailed CCA because it was widely known that CCA was the only company on the job site and that CCA was performing all the flooring work.  The only task that Defendant Athena was performing was transferring CCA's documents to Athena's own letterhead and otherwise concealing the pass-through scheme from the government.

296.    In exchange for carrying the Fort Belvoir flooring subcontract, Defendant Athena was paid 3% of all the passed through work, in the amount of $276,585.[120]

297.    The Monthly Reconciliation Statement contains a box entitled "Small Business Fee," which reveals how Athena passed the money through to CCA.[121]  Within the box, there is a line for Athena's work, which is zeroed out because it did no work on this project.[122]  There is also a line for CCA's work that shows it was owed $362,073 for flooring work completed through

---

[120] *See* Ex. 81.
[121] *Id*.
[122] *Id*.

March 31, 2011.[123]   According to this document, Athena was owed 3%, or $10,862.19, as its "Small Business Fee."[124]

298.    To get its fee, Defendant Athena issued a check request and the required Affidavit, Partial Waiver of Lien and Release in the full amount $362,073 to Turner/Gilbane JV.[125] That same day, CCA issued a check request and the required Affidavit, Partial Waiver of Lien and Release in the amount $351,211 to Athena.[126] The difference between the two is the $10,862.19 that Athena pocketed as its impermissible "Small Business Fee."

### H.    ATHENA ACTED AS A PASS-THROUGH ADDING "LITTLE OR NO VALUE TO THE PROCUREMENT"

299.    The above arrangements represent an impermissible pass-through, according to the SBA:

> Q. A small business approached our company with an innovative idea. This consulting firm, which received various federal certifications, i.e. HUBZone, etc., has proposed to us that we issue subcontracts to his company and he in turn will forward the procurement to an appropriate member of his consortium for processing.  The prime contractor will then be able to take credit for doing business with a certified HUBZone small business.

> A.  This arrangement is merely a pass-through which adds little or no value to the procurement.  It does not comport with the spirit or intent of the subcontracting program.

U.S. Small Bus. Admin., *SBLO Handbook*, *supra*, at 77.

300.    Since at least 2011, Defendant Athena has made hundreds of thousands of dollars from selling its small business certifications while contributing nothing of value to these important government projects.

---

[123] *Id*.
[124] *Id*.
[125] *Id*. at 2, 3.
[126] *Id*.

301.    Similarly, Co-Defendants have gamed the system to gain preferential treatment from the government in order to make millions and in the process have done great harm to real small businesses that have been shut out from these contracts.

302.    From the outset, Co-Defendants had certified that Athena was a SB/HUBZone/WOSB/VOSB/SDVOSB subcontractor that (1) would self-performed valuable work on and/or (2) would supply equipment and materials for the above projects when Co-Defendants knew Athena would do neither.

303.    Co-Defendants knew Athena would only act as a pass-through for a downstream subcontractor, which would not itself qualify as a small business.  Co-Defendants knew the downstream subcontractors would perform this work and supply the materials and would receive the majority of the financial benefit.

304.    Co-Defendants knew that Athena would self-perform little work of value and would only collect a fee out of the subcontract amount as compensation for the fraudulent use of its SB/HUBZone/WOSB/VOSB/ SDVOSB status.

305.    Co-Defendants also falsely represented that Athena would add value to the projects by negotiating price and other terms of services when, in reality, the downstream subcontractor had negotiated such terms directly with the Co-Defendants and used Athena only as a pass-through.

306.    Co-Defendants knew that Athena would serve as a pass-through by collecting invoices from the downstream subcontractor, transferring the information from those invoices to Athena's own invoices, adding a markup, and passing the Athena marked-up invoices on to the Co-Defendants.

307.    Co-Defendants knew Athena would not manage the work that it contracted to perform.  Specifically, Co-Defendants knew and expected that Athena would fail to perform the management functions of scheduling work operations; preparing and submitting payrolls; hiring and firing employees; and ordering all equipment, materials, and supplies.

308.    Co-Defendants also knew that Athena would fail to own or lease all the equipment required to perform its contract.

309.    With regard to providing employees necessary to perform the subcontracts, Co-Defendants knew:

- o   Athena would fail to have its own regular workforce.  Instead, employees would be provided by the downstream subcontractor.

- o   Athena would not be responsible for the payroll and labor compliance requirements for all employees working on the subcontract.  Instead, these responsibilities would be handled by the downstream subcontractors.

310.    Co-Defendants knew Athena would not be responsible for material and supplies it used in performance of its contracts:

- o   Athena would not negotiate the price of all materials.  This would be handled by the downstream subcontractors.

- o   Athena would not determine the quality and quantity of all materials.  This would be handled by the downstream subcontractors.

- o   Athena would not order all necessary materials.  This would be handled by the downstream subcontractors.

- o   Athena would not process all invoices for materials.  This would be handled by the downstream subcontractors.

o Athena would not pay for all materials.  This would be handled by the downstream subcontractors.

311. With regard to subcontract performance, Co-Defendants knew:

o Athena would not be financially liable on the performance bond.  The downstream subcontractors were financially liable.

o Athena would not assume responsibility for the subcontract performance.  The downstream subcontractors assumed this responsibility.

o Athena would not control subcontract management.  The downstream subcontractor controlled subcontract management.

o Athena would fail to supervise any distinct element of work by assuming financial risks appropriate for amount of work performed.  All elements of the work would be supervised by the downstream subcontractors.

## VIII.  DEFENDANTS' FRAUDULENT SUBMISSION OF FALSE CLAIMS TO FEDERAL PROGRAMS

312. Businesses seeking to do business with the government must complete and sign a FAR Report that contains representations and certifications relating to the businesses' eligibility to participate in certain government programs.  This FAR Report, which is ultimately submitted in the SAM database, contains the following averment:

> I have read each of the FAR and DFARS provisions presented below.  By submitting this certification, I, [company representative], am attesting to the accuracy of the representations and certifications contained herein, including the entire NAICS table.  I understand that I may be subject to penalties if I misrepresent [the company] in any of the below representations or certifications to the government.

313. In addition, contractors (like Defendants) who do business with the government typically submit invoices for payment to the government using paper, email (less common), and electronic portals (most common).

314.    The process begins when a contractor completes an electronic invoice form, which requires certain information including the contract number, the contractor's code and the method for payment.  Also included on the invoice are fields indicating whether the contract is unrestricted or a set-aside acquisition.

315.    Defendants submitted numerous false claims to the government in the form of invoices on their unlawfully obtained contracts, which impliedly certified that Defendants were legitimate small business concerns when they were awarded subcontracts by Defendants.

316.    Also, Defendants made fraudulent representations to the United States each time it submitted their semi-annual ISRs or SSRs, in which they disclosed the details of each of the subcontracts purportedly awarded to small businesses, as well as the extent of their compliance with their Small Business Subcontracting plan.

317.    Defendants' fraudulent scheme served its intended purpose, as they induced the government to pay Defendants bonuses as well as other monies for services that involved work performed by ineligible small business subcontractors.

318.    The intentional misrepresentations regarding Athena's true size (when including average annual receipts from affiliated ostensible subcontractors) that were contained in their certifications submitted to the government, were false within the meaning of the FCA.

319.    Claims for payments submitted by Defendants to the government, in part or in whole, were based on their knowledge that Athena had misrepresented its size as small, and thus were false within the meaning of the FCA.

320.    Athena's misrepresentations regarding its size as small caused it to be awarded subcontracts that were void ab initio and ultimately caused the submission of claims for payment that were false when made.

321.     Athena's misrepresentations regarding its size status as small were made knowingly and with the intent to cause the submission of false claims to government Programs.

322.     Government Programs paid Defendants bonuses and made additional transfers, increasing revenue and profits, based on Defendants' false claims and certifications, and as a result have incurred and continue to incur significant damages due to Defendants' intentional misrepresentations regarding Athena's size and status as a small business.

323.     By falsely certifying their eligibility to receive monies on small business subcontracts, and causing subsequent claims for payment to be made that Defendants knew were ineligible for payment by government Programs, Defendants also made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as alleged herein.

324.     Defendants' unlawful conduct resulted in tens of millions of dollars in improper payments by government Programs.

## IX.  DEFENDANTS IMPROPERLY SOLICITED/PAID /RECEIVED KICKBACKS IN VIOLATION OF THE AKA

325.     Defendants regularly solicited, paid, and/or received kickbacks in violation of the AKA and the FCA.

326.     An AKA violation is a proper predicate for FCA liability on the grounds that:  1) Defendants expressly undertook to comply with the AKA as a condition of payment under the Prime Contracts and their flow down provisions, and thereafter certified (expressly and/or impliedly) that they had complied with the AKA as a condition of payment, thereby supporting liability for making false certifications (express and/or implied); and/or 2) violations of the AKA "taint" the claims submitted to the government and render the claims "factually false" and ineligible for payment because they violate a condition of payment.

327.   On numerous occasions, Defendants had reasonable grounds to believe that violations of the AKA were occurring, and yet failed to promptly report the possible violations in writing to the government.  These failures constituted further violations of the AKA.

328.   Defendants violated the FCA by expressly or impliedly making false statements, records, or certifications in response to the government requests for proposal that they were in compliance and would continue to comply with the AKA.

329.   Defendants committed additional violations of the FCA by presenting or causing to be presented to the government their claims to obtain payment in which they expressly or impliedly made false statements, records or certifications that they had complied with the AKA.

330.   The United States government, either directly or indirectly through its agencies or intermediaries, would not have contracted with Defendants due to conflict or other reasons and/or would have sought significant cost and/or price concessions had it known that the contracts/subcontracts, products, and/or services for which the contracts were proposed were subject to a scheme to violate the AKA provisions and pertinent FARs.

331.   The United States government, either directly or indirectly through its agencies or intermediaries, would not have honored Defendants' claims for payment, had it known that the contracts/subcontracts, products, and/or services for which the claims were made, were provided in a manner that violates the AKA provisions and pertinent FARs.

## X.   DEFENDANTS CONSPIRED WITH OTHER AFFILIATED ENTITIES TO DEFRAUD THE UNITED STATES

332.   One facet of Defendants' scheme involved one or more schemes with other entities to further the overall fraudulent representations of Defendants' size through a pattern and practice of false and misleading representations ("overt acts").

76

333.    The overt acts included the submission to government Programs by these affiliated entities of knowingly false certifications of compliance with laws that are conditions of government Program payments.  As a result of these false certifications, government Programs made payments to all Defendants under small business contracts that Defendants were ineligible to receive.  The Co-Conspirators include numerous other related entities through which Defendants have conducted their fraudulent scheme.

334.    Defendants and their co-conspirators shared in the conspiratorial objective to deceive the United States concerning their affiliated relationships with one another, and with other parties and further agreed and intended to each perform and to each benefit from these unlawful overt acts in furtherance of Defendants' scheme to target and financially injure government Programs.  Accordingly, Defendants and the co-conspirators entered into these unlawful financial relationships for the purpose of Defendants' planned scheme to target government Programs and submit or cause the submission of false or fraudulent claims and records.

335.    Defendants intentionally conspired amongst themselves and with one or more of these affiliated entities to get false or fraudulent claims reimbursed by the United States.  One or more of these conspirators performed one or more overt acts to effect the object of the conspiracy, and government Programs suffered damages as a result of these false or fraudulent claims.

336.    Through the acts and omissions alleged herein, and from at least 2011 to the present, Defendants, with each other and with affiliated entities known and unknown, knowingly agreed and conspired to defraud the government by having false or fraudulent statements, records, certifications, and invoices submitted to, paid and approved by government officials, their contractors, intermediaries and/or their agents.

337.    By virtue of their conspiratorial agreement, Defendants caused to be presented, made and/or used false or fraudulent invoices, and/or false records or statements, including size and status certifications to government, causing the United States to suffer significant damages.

338.    The United States is therefore entitled to recover from Defendants treble damages under the Federal FCA, in an amount to be proved at trial, plus a civil penalty for each violation, as well as double damages under the AKA, in an amount to be proved at trial, plus a civil penalty of at least $10,000 for each violation.

## XI.    DEFENDANT ATHENA'S UNLAWFUL RETALIATION AGAINST RELATOR

339.    On January 10, 2017, Relator filed a Complaint, under seal, in the Middle District of Pennsylvania, alleging that Defendant Athena violated the False Claims Act by engaging in the fraudulent conduct described herein.

340.    On September 12, 2017, the district court ordered that the Complaint be unsealed and served upon Defendant Athena by Relator.  On October 13, 2017, Relator effected service of the Complaint on Defendant Athena in the manner prescribed by Rule 4 of the Federal Rules of Civil Procedure.

341.    On October 18, 2017, counsel for Athena, via letter addressed to Relator's counsel, demanded that Relator's FCA Complaint be dismissed because it was frivolous, without good faith basis in law or in fact, and clearly designed to "harass" Athena.  Athena's counsel stated that if the Complaint was not withdrawn, Athena would "respond to [the] Complaint and [would] seek Rule 11 sanctions."

342.    Shortly thereafter, in reprisal for Relator having taken acts in furtherance of a *qui tam* suit under the False Claims Act, Defendant Athena filed a lawsuit against Relator in the Circuit Court for the County of Prince William in Virginia, Case No. 17-8365.

343.     To harass and intimidate Relator into withdrawing his pending *qui tam* Complaint, Defendant Athena sought damages of at least $106,153 for breach of contract.  Athena also asserted a claim for its attorney's fees incurred in bringing the state court action.

344.     Defendant Athena's state court lawsuit, which was successfully removed to federal court in the Eastern District of Virginia on December 7, 2017, was filed to retaliate against Relator for his reporting of fraud to the Government.

345.     Defendant Athena's lawsuit against Relator was dismissed on February 23, 2018.

346.     Athena's unlawful and retaliatory conduct toward Relator, which violates 31 U.S.C. § 3730(h) of the False Claims Act, was motivated because Athena knew that Relator was taking the above described lawful acts.

### COUNT I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))

347.     Relator realleges and incorporates by reference the allegations made in the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

348.     This is a claim for treble damages and forfeitures under the FCA, 31 U.S.C. §§ 3729–3733.

349.     Through the acts described above, Defendants and their agents and their employees knowingly misrepresented submitted or caused to be submitted to the United States government knowingly false or fraudulent claims for set-aside small business contracts.

350.     As alleged herein, Defendants' representations to the United States were knowingly false.  By engaging in the conduct alleged herein, Defendants knowingly submitted, or caused to be submitted, false claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

351.     Through the acts described above, Defendants and their agents and employees knowingly made, used or caused to be made or used false statements and records to get such false and fraudulent claims paid and approved by the United States government.

352.     The United States, unaware of the falsity of the records, statements and claims made by Defendants, paid Defendants for claims that would otherwise not have been allowed.

353.     By reason of Defendants' false records, statements and claims, the United States has been damaged and continues to be damaged in the amount of tens of millions of dollars.

<u>**COUNT II**</u>
<u>**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))**</u>

354.     Relator incorporates herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

355.     As alleged herein, Defendants knowingly made false representations to the United States.  Defendants thus knowingly used false records or statements to get false or fraudulent claims paid or approved by the United States in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B).

356.     Because of Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

357.     By reason of Defendants' false records, statements, and claims, the United States has been damaged and continues to be damaged in the amount of tens of millions of dollars.

<u>**COUNT III**</u>
<u>**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))**</u>

358.     Relator incorporates herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

359.    As detailed above, Defendants knowingly conspired, and may still be conspiring, with the various entities and/or persons alleged herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B).  Defendants and these entities and/or persons committed overt acts in furtherance of the conspiracy as described above.

360.    As a result of Defendants' actions as set forth above, the United States has been damaged and continues to be damaged in the amount of tens of millions of dollars.

## COUNT IV
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))

361.    Relator incorporates herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

362.    As alleged in detail above, Defendants knowingly avoided or decreased their obligation to pay or transmit money to the government.  Specifically, Defendants: (i) made, used, or caused to be made or used, records or statements to conceal, avoid, or decrease obligations to the United States; (ii) the records or statements were in fact false; and (iii) it knew that the records or statements were false.

363.    As a result of Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

364.    By reason of Defendants' false records, statements, and claims, the United States has been damaged and continues to be damaged in the amount of tens of millions of dollars.

## COUNT V
### (Violation of False Claims Act, 31 U.S.C. § 3730(h))

365.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

366.     Relator was threatened, harassed and discriminated against in the terms and conditions of his employment by Athena in retaliation for lawful acts taken by Relator to report violations of the FCA.

367.     Because of Relator's lawful acts in furtherance of protected activities investigating and reporting fraud, Defendant Athena retaliated against Relator by terminating his employment.

368.     Athena's unlawful termination of Relator has proximately caused Relator to suffer and to continue to suffer substantial damage, in an amount to be proven at trial.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants as follows:

A.     That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729–3733;

B.     That judgment be entered in Relator's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Relator, to be identified at trial after full discovery, resulting from Defendants' unlawful retaliation against Relator;

D.     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

E.      That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

F.      That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this suit; and

G.      That Relator be granted such other and further relief as the Court deems just and proper.

## XIII.   JURY TRIAL DEMAND

Relator demands a trial by jury of all issues so triable.

Respectfully submitted,

BARON & BUDD, P.C.
W. Scott Simmer, D.C. Bar #460726
Andrew M. Miller, D.C. Bar #499298
600 New Hampshire Avenue, NW, Suite 10-A
Washington, DC 20037
Telephone:  (202) 333-4562
Facsimile:  (202) 337-1039

FREIWALD LAW
Glenn A. Ellis (admitted *pro hac vice*)
1500 Walnut Street, 18th Floor
Philadelphia PA 19102
Telephone:  (215) 875-8000
Facsimile:  (215) 875-8575

*Counsel for Relator*

Dated: October 22, 2018