## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* WILLIAM "BILL" SMITH | **Civil Action No.** 1:18-cv-02080-APM |
| *Plaintiff,* | |
| v. | |
| Athena Construction Group, Inc., Balfour Beatty Construction Company, Inc., Barton Malow Company, Component Assembly Systems, Inc., Commonwealth Wall Systems, LLC and John Does #-50, Fictitious Names, | |
| *Defendants.* | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
## DEFENDANT ATHENA CONSTRUCTION GROUP, INC.'S
## MOTION TO DISMISS AND DEMAND FOR COST

Respectfully submitted,

**FREIWALD LAW**
Glenn A. Ellis (admitted pro hac vice)
Zachary S. Feinberg
1500 Walnut Street, 18th Floor
Philadelphia PA 19102
Telephone: (215) 875-8000
Facsimile: (215) 875-8575

**BARON & BUDD, P.C.**
W. Scott Simmer, D.C. Bar #460726
Andrew M. Miller, D.C. Bar #499298
600 New Hampshire Avenue,
NW, Suite 10-A Washington, DC 20037
Telephone: (202) 333-4562
Facsimile: (202) 337-1039

*Counsel for Relator William "Bill" Smith*

**TABLE OF CONTENTS**

| I. | | INTRODUCTION | 1 |
|---|---|---|---|
| II. | | PROCEDURAL BACKGROUND | 2 |
| III. | | FACTUAL BACKGROUND | 3 |
| IV. | | STANDARD OF REVIEW | 6 |
| V. | | ARGUMENT | 8 |

A.  The Relator's Third Amended Complaint is not time barred by the False Claims Act's statute of limitations.  8

    1.  The allegations of fraud against Defendant Athena contained within the Second and Third Amended Complaints relate back to the original Complaint filed on January 10, 2017.  11

    2.  This Court granted Relator leave to file the Second Amended Complaint on October 19, 2018 and it was filed on October 22, 2018.  15

    3.  The False Claim Act complaint filed, on July 20, 2016, in the Eastern District of Louisiana does not render Relator's claims untimely.  17

B.  The False Claims Act's Public Disclosure Bar does not bar Relator's claims as contained in the Second and Third Amended Complaints.  18

C.  The Third Amended Complaint sufficiently sets forth claims that Defendant Athena violated the False Claims Act.  22

    1.  Defendant Athena both submitted and caused false claims to be presented to the government.  23

    2.  The claims submitted and caused to be submitted by Defendant Athena were false and fraudulent.  25

        a.  Defendants' pass-through scheme is false under the fraud-in-the-inducement theory of liability.  25

    b. The claims submitted by Defendant Athena's HUBZone
     certification are false under the FCA pursuant to the implied false
     certification theory of liability. 27

  3. Defendant Athena knew the claims it submitted and caused to be
   submitted were false and fraudulent. 28

D. The Third Amended Complaint sufficiently pleads a conspiracy claim as
  to all of the Defendants. 29

E. Further, the allegations of fraud contained within the Third Amended Complaint
  satisfy the materiality requirements of the False Claims Act. 31

F. All of Defendant Athena's Rule 9(b) arguments fail since the Third Amended
  Complaint sufficiently details the fraud schemes Defendants engaged in with
  particularity. 33
  1. Identification of the relevant individuals involved in the
   scheme. 37

  2. Identification of the false claims made. 37

  3. The time period during which such claims were submitted. 37

  4. The details of how the scheme was structured. 38

    a. HUBZone Scheme 38

    b. Pass-Through Scheme 39

G. The Third Amended Complaint sets forth a valid retaliation claim under the
  Section 3730(h) of the False Claims Act, which protects current and former
  employees from retaliation for reporting fraud. 41

H. If the Court finds that the allegations or counts of the Third Amended Complaint
  do not meet the requirements of Rule 12(b)(6) or Rule 9(b), the Relator should be
  given an opportunity to amend the complaint to correct those deficiencies. 45

VI. CONCLUSION 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bell Atlantic Corp. v. Twombly,
127 S.Ct. 1955 (2007)                                                                 6

*Cimino v. International Business Machines Corporation,
2019 WL 4750259 (D.D.C. Sept. 30, 2019)                                          25, 35

Erickson v. Pardus,
127 S.Ct. 2197, 2200 (2007)                                                        6

E.E.O.C. v. St. Francis Xavier Parochial Sch.,
117 F.3d 621, 624 (D.C.Cir.1997)                                                   6

Firestone v. Firestone,
76 F.3d 1205, 1209 (D.C. Cir. 1996)                                               45

Foman v. Davis,
371 U.S. 178, 182, (1962)                                                         45

Fitzsimmons v. Cardiology Assocs. of Fredericksburg, Ltd.,
2015 WL 4937461, at *7 (E.D. Va. Aug. 18, 2015)                                   42

Glynn v. Impact Sci. & Tech., Inc.,
807 F.Supp.2d 391, 419 (D. Md. Aug. 25, 2011)                                     42

Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,
125 S.Ct. 2444 (2005)                                                            10

Haka v. Lincoln Cnty.,
533 F.Supp.2d 895, 917 (W.D. Wis. Feb. 4, 2008)                                   41

Kassem v. Wash. Hosp. Ctr.,
513 F.3d 251, 253 (D.C. Cir. 2008)                                                 6

U.S. ex rel. McCready v. Columbia/HCA Healthcare Corp.,
251 F. Supp. 2d 114, 120 (D.D.C. Mar. 7, 2003)                                    23

Miller v. Holzmann,
563 F. Supp. 2d 54, 119 n. 95 (D.D.C. June 23, 2008)                              23

*Newby v. Enron Corp.*,
623 F. Supp. 2d 798, 831 (S.D. Tex. June 1, 2009)                           30

*Ortino v. Sch. Bd. of Collier Cnty.*
2015 WL 1579460, at *3 (M.D. Fl. April 9, 2015)                            41

*Si v. Laogai Research Found.*,
71 F. Supp. 3d 73, 88 (D.D.C. 2014)                                        25

*Scollick ex rel. United States v. Narula*,
2020 WL 6544734, at *11 (D.D.C. Nov. 6, 2020)                     26, 27, 32

*Steven v. InPhonic, Inc.*,
662 F. Supp. 2d 105, 114 (S.D.C. Oct. 9, 2009)                            40

*Tang v. Vaxin, Inc.*,
2015 WL 1487063, at *5 (N.D. Ala. Mar. 31, 2015)                          42

*U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*,
393 F.3d 1321, 1326 (D.C. Cir. 2005)                                      25

*U.S. ex rel. Butler v. Magellan Health Services, Inc.*,
74 F. Supp.2d 1201, 1215-16 (M.D. Fla. Nov. 5, 1999)                      36

*U.S. ex rel. Feaster v. Dopps Chiropractic Clinic, LLC,*
2016 WL 3855560, at * 5 (D. Kan. July 15, 2016)                          42

*U.S. ex rel. Findley v. FPC–Boron Emps. Club,*
105 F.3d 675, 681 (D.C.Cir.1997)                                         19

*U.S. ex rel. Head v. Kane Co.*,
798 F. Supp. 2d 186, 203 (D.D.C. July 25, 2011)                         8, 22

*U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
498 F.Supp.2d 25, 69 n. 33 (D.D.C. July 17, 2007)                        25

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*,
647 F.3d 377, 395 (1st Cir. 2011)                                        23

*U.S. ex rel. Joseph v. Cannon*,
642 F.2d 1373 (D.C.Cir.1981)                                             19

*U.S. ex rel. Keaveney v. SRA Int'l, Inc.*,

219 F. Supp. 3d 129, 140 (D.D.C. Nov. 29, 2016)                                         13, 37

U.S. ex rel. Long v. SCS Bus. & Technical Inst.,
999 F. Supp. 78, 91 (D.D.C. Mar. 26, 1998)                                              24

U.S. ex rel. Long v. SCS Bus. & Technical Inst., Inc.,
173 F.3d 870, 335 U.S. App. D.C. 331 (D.C. Cir. 1999)                                   24

*U.S. ex rel. Lott v. Not-For-Profit-Hosp. Corp.,
296 F.Supp. 3d 143, 152 (D.D.C. Nov. 8, 2017)                                           7, 29, 42

U. S. ex rel. Marcus v. Hess,
317 U.S. 537, 544, 63 S. Ct. 379, 87 L. Ed. 443 (1943)                                  23

U.S. ex rel. Miller v. Bill Harbert Intern. Const., Inc.,
608 F.3d 871 (D.C.Cir. 2010)                                                            13, 15, 29

U.S. ex rel. Oliver v. Philip Morris USA Inc. ("Oliver I"),
763 F.3d 36, 39 (D.C.Cir. 2014)                                                         18

U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.,
474 F.Supp.2d 75, 82–89 (D.D.C. Feb. 7, 2007)                                           9, 10

US ex rel. Russell v. Epic Healthcare Management Group,
193 F.3d 304, 308 (5th Cir. 1999)                                                       36

*U.S. ex rel. Sansbury v. LB&B Assocs., Inc.,
58 F. Supp. 3d 37, 56 (D.D.C. July 16, 2014)                                            7

U.S. ex rel. Schmidt v. Zimmer, Inc.,
386 F.3d 235, 242 (3d Cir. 2004)                                                        23

U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah,
472 F.3d 702, 715 (10th Cir. 2006)                                                      24

U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn,
14 F.3d 645, 651 (D.C. Cir. 1994)                                                       19

US ex rel. Stinson, Lyons, Gerlin & Bustamente v. Blue Cross, Blue Shield of Georgia. Inc.,
755 F. Supp. 1040,1052 (S.D. Ga. Oct. 18, 1990)                                         35

*U.S. ex rel. Tran v. Comput. Scis. Corp.,

53 F. Supp. 3d 104, 122 (D.D.C. July 3, 2014)             8, 26, 34, 35, 40

*U.S. ex rel. Westrick v. Second Chance Body Armor Inc.*,
128 F.Supp. 3d 1, 18 (D.D.C. Sept. 4, 2015)             25

*U.S. ex rel. Yesudian v. Howard Univ.*,
153 F.3d 731, 736 (D.C. Cir. 1998)             42

*U.S. v. President & Fellows of Harvard Coll.*,
323 F. Supp. 2d 151, 187 (D. Mass. June 28, 2004)             24

*U.S. v. Raymond & Whitcomb Co.*,
53 F. Supp. 2d 436, 445 (S.D.N.Y. June 19, 1999)             23

*U.S. States v. Spudic*,
795 F.2d 1334, 1337 (7th Cir.1986)             30

*\*U.S. v. Strock*,
982 F.3d 51, 62 (2d. Cir. 2020)             32, 33

*U.S. v. Toyobo Co. Ltd.*,
811 F. Supp. 2d 37, 48 (D.D.C. Sept. 2, 2011)             23

*\*Universal Health Servs., Inc. v. U.S. ex. rel. Escobar*,
136 S.Ct. 1989, 2001 (2016)             26, 27, 28, 32, 34

Before the Court is Defendant Athena Construction Group, Inc.'s ("Athena") Motion to
Dismiss, pursuant to Rule 12(b)(6) and Rule 9(b), the Relator's Third Amended Complaint and
Demand for Costs.

## I.    INTRODUCTION

This is an action to recover damages and civil penalties on behalf of the United States
arising from false statements and claims that Defendants knowingly presented, or caused to be
presented, to the United States in violation of the False Claims Act ("FCA").  The Relator's
Third Amended Complaint alleges violations of the FCA concerning the submission of false
claims from at least 2011 and continuing through the present. The Third Amended Complaint
includes 5 separate counts alleging violations of False Claims Act, 31 U.S.C. § 3729(a)(1)(A),
(B), (C), (G), and § 3730(h).

The fraudulent conduct at issue arises from two schemes. First, Defendant Athena
fraudulently obtained HUBZone certification from the Small Business Administration ("SBA")
by falsely representing its eligibility to participate in that program, which limits competition for
certain government contracts to businesses in historically underutilized business zones. Athena
then used its fraudulently obtained HUBZone certification to obtain lucrative contracting
opportunities reserved for legitimate HUBZone businesses.

Second, Defendant Athena and Co-Defendants conspired to use Athena's SBA small
business classifications[1] as part of a fraudulent *pass-through* scheme. The *pass-through* scheme
allowed Co-Defendants to falsely claim credit for awarding millions of dollars in subcontracts to

---

[1] Athena's website and marketing materials claims that it is "The Nation's Premier 8(a), Service-Disabled
Veteran-Owned (SDVOSB), Woman-Owned (WOSB), DBE Certified, HUBZone and SWaM-Certified
Construction Company."

1

small business (Athena), that was, in fact, controlled by large business contractors, in violation of the ostensible subcontractor rule.

In perpetration of its fraudulent conduct, Defendants made numerous materially false statements and certifications to the government relating to the contracts awarded to Defendant Athena. Co-Defendants also paid Defendant Athena illegal "fees" (also referred to as "small business fees" or "administrative fees") for the use of Athena's various small business classifications. These unlawful payments also violated the terms of the Anti-Kickback Act.

Accordingly, Relator Smith, on behalf of the United States, pursuant to the FCA, seeks all applicable damages and penalties from Defendants for knowingly submitting false claims

## II.     PROCEDURAL BACKGROUND

Relator filed his original Complaint solely against Defendant Athena, on January 10, 2017, in the Middle District of Pennsylvania. [Doc. 1] The Relator's original Complaint alleged violations of False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B), stemming from Defendant Athena's fraudulently obtaining SBA certifications and using those certifications to get government contracts. [*Id.* at ¶¶ 58, 73, 97-104] The original Complaint also alleged that Defendant Athena used its certifications to *pass-through* government contracts for a fee to large contractors that did not qualify as a small business. [*Id.* at ¶¶ 81-84]

The Government investigated the matter until September 6, 2017 when it elected to decline to intervene. [Doc. 8] The original Complaint was unsealed on September 12, 2017. After service of the Complaint, on November 1, 2017, Defendant Athena filed a Motion to Dismiss for Lack of Jurisdiction. [Doc. 11] On November 21, 2017, Relator filed an Amended Complaint. [Doc. 15] On December 5, 2017, Defendant Athena again filed a Motion to Dismiss the

Amended Complaint. [Doc. 17] Relator filed his opposition to the Motion to Dismiss the Amended Complaint on December 19, 2017. [Doc. 19]

On August 29, 2018, the Middle District of Pennsylvania issued a Memorandum and Order transferring the case to this Court as case No. 1:18-cv-02080. [Doc. 25 and 26].

On September 28, 2018, the Court denied Defendant's request to establish a briefing schedule for a motion to dismiss. During the telephone conference, Relator was ordered to provide *ex parte* a copy of his proposed Second Amended Complaint to the Government no later than October 3, 2018. After reviewing the Second Amended Complaint the Government requested time to review and investigate. The Court ordered that the Second Amended Complaint be filed under seal. Relator filed his Second Amended Complaint under seal on October 22, 2018. [Doc. 41].

On January 18, 2021, since the Department of Justice again declined to intervene, the Court unsealed the Second Amended Complaint. [Doc. 61] On February 26, 2021, Relator filed a Third Amended Complaint. [Doc. 66].

## III.   FACTUAL BACKGROUND

Defendant Athena was established in 2003 as a residential remodeling contractor. Melissa Schneider co-owns Athena with Amber Peebles. Prior to joining Athena in 2008, Peebles had been a paralegal. [Doc. 66 at ¶¶147-148] In approximately 2010, Athena began to seek small business contracts either directly from the federal government or working with a large contractor under a small business subcontracting plan. Athena received its SDVOSB certification in 2010 and its HUBZone certification in 2011. [*Id.*] Mr. Smith was employed by Defendant Athena from 2011 to 2016 as the Director of Operations and Project Superintendent. [*Id.* at ¶17]

To meet the requirement that at least 35% of its employees reside in a HUBZone, Athena falsely included on its employee roster individuals who are either not employees under the relevant regulations and/or do not reside in a HUBZone. [*Id.* at ¶154] Once Athena became a HUBZone certified business, it received numerous benefits, including access to government contracts set aside specifically for HUBZone businesses. [*Id.* at ¶159]

As a HUBZone business, Athena also received a 10% price evaluation preference for government contracts. [*Id.*] In other words, the price offered by a qualified HUBZone business is deemed to be lower than the price offered by a non-HUBZone business if the price offered by the qualified HUBZone business is not more than 10% higher than the price offered by the otherwise lowest bidder. [*Id.*] Using its fraudulent HUBZone certification, Athena received at least 31 contracts totaling $87,646,677.06. [*Id.* at ¶164]

It should be noted that Defendant Athena was founded by two individuals who do not have a construction or engineering background. [*Id.* at ¶166] In fact, Athena has very little full-time staff, little expertise in construction or engineering, no real workforce, and virtually no heavy construction equipment. [*Id.*] Despite these limitations, Athena has generated millions of dollars in revenue from government issued construction contracts. [*Id.*]

Defendant Athena's business model is not construction or even construction management. [*Id.* at ¶¶167-168] Instead, Athena and its owners make money by selling its small business certifications to larger non-SBA companies that need to meet subcontracting goals and/or want to gain preferential treatment in the government contracting process. [*Id.*] Defendants' scheme works as follows:

4

(a)     Co-Defendants would approach Athena about a government project they wanted
        or needed Athena to be attached to in order to help meet the obligations under
        their subcontracting plans;

(b)     Athena would be paid[2] a so-called "small business fee" or "administrative fee" in
        exchange for Athena "carrying the contract" on its books;

(c)     Athena would assign a project manager ("PM"), who was usually an
        inexperienced recent college graduate, to the project. The PM's only job was to be
        present or to check in periodically;

(d)     Co-Defendants would cover all of Athena's costs, including the salary of the PM;
        and

(e)     It was understood by all the parties that Athena would not be doing any actual
        work on the project. Instead, all of the actual work would pass through to a
        second-tier subcontractor, which usually had already been selected by one of the
        Co-Defendants. The subcontractor would not qualify as a small business or any of
        the 8(a), HUBZone, SDVOSB or WOSB programs.

[*Id.* at 170-271]

Defendants engaged in the above *pass-through* scheme on several large and important

governmental projects, including, but not limited to, the St. Elizabeth Tunnel Project, the Walter

Reed National Military Medical Center, Social Security Administration – Woodlawn Maryland

("SSA"), BRAC 132, Camp Pendleton Naval Hospital ("CPNH"), Russell Knox Building - DSS

Facility Addition Project ("DSS"), Fort Belvoir Nolan Parking Garage—Fort Belvoir, Audie

Murphy VA Hospital, the United States Marine Corps University, and the Fort Belvoir VA

Hospital. [*Id.*]

_____

[2] On government projects, contractors typically add between 5% to 10% for profit and an additional 10% for overhead. An example of a traditional submittal is attached as Exhibit 83. Further, the profit and overhead are also always disclosed to the government. The fee being accepted by Defendant Athena is not a reference to profit and overhead and it is never disclosed to the government. Here, the profit and overhead passes through to the second-tier subcontractor. Obviously, the profit is being impacted by Athena taking a fee. However, if it was not for Athena serving as a pass-through the subcontractor would have received nothing and may not even have been allowed to serve as a first-tier subcontractor for the project.

## IV.    STANDARD OF REVIEW

Defendant Athena's Motion to Dismiss seeks to dismiss the Third Amended Complaint pursuant to Federal Rule of Civil Procedure No. 12(b)(6) and 9(b) for failure to state a claim. As a general matter, the Federal Rules require only that a plaintiff provide "a short and plain statement of the claim . . . [that will] give the defendant fair notice of what the [plaintiff's] claim is and the grounds upon which it rests." *See Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007) (*citing* Fed.R.Civ.Pro. 8(a)(2)). Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint where the plaintiff fails "to state a claim upon which relief may be granted." Fed.R.Civ.P. 12(b)(6).

In deciding a motion to dismiss the District Court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the District Court may take judicial notice[3], and matters of public record. *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C.Cir.1997). Further, the District Court "must accept as true all of the factual allegations contained in the complaint." *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 253 (D.C.Cir.2008).

In *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007), the United States Supreme Court discussed the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12(b)(6). The Supreme Court stated that the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," or must be sufficient "to state a claim for relief that is plausible on its face." *Id.* at 1965 and 1974. The Supreme Court referred to this as "the plausibility standard," but emphasized that it was not imposing a

---

[3] Defendant Athena's Motion to Dismiss seeks the Court take judicial notice on numerous occasions. The Court's ability to take judicial notice is governed by Federal Rule of Evidence No. 201.

6

heightened fact pleading of specifics or a probability requirement at the pleading stage. *Id.* at 1965 and 1973–74.

The Supreme Court noted that "[d]etailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, but a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 1964–65. Thus, under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and "nudge[ ] their claims across the line from conceivable to plausible." *Id.* at 1973.

In addition, False Claim Act cases, "like common law fraud claims, must satisfy the heightened pleading standard of Rule 9(b)." *U.S. ex rel. Lott v. Not-For-Profit Hosp. Corp.*, 296 F. Supp.3d 143, 151 (D.D.C.2017) (Mehta, J.) (internal citations omitted). Rule 9(b) provides that, "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." *Id.* As this Court noted in *Not-For-Profit Hosp. Corp.*, "the circumstances constituting fraud include the time, place, and contents of the false representations, as well as the identity of persons involved in the alleged fraudulent conduct." *Id.*

Accordingly, "in order to satisfy Rule 9(b), Relator must offer a 'detailed description of the specific falsehoods that are the basis for his suit.'" *Id.* However, this particularity requirement does not extend to "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

Further, "Rule 9(b)'s particularity requirement must be read in concert with Rule 8." *U.S. ex rel. Sansbury v. LB&B Assocs., Inc.*, 58 F. Supp. 3d 37, 56 (D.D.C. 2014) (Sullivan, J.). Therefore, "[w]hile 'some information on the false claims must be included[,]' Rule 9(b) does

not require a 'detailed allegation of all facts supporting each and every instance of submission of a false claim.'" *U.S. ex rel. Tran v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104, 122 (D.D.C. 2014) (Jackson, J.) (internal citation omitted). In fact, in the "context of federal FCA cases, the courts have recognized the impracticality of requiring the plaintiff to plead the facts of each individual claim, particularly where the claims are numerous and extend over the course of several years". *Id.*

The Relator's Third Amended Complaint brings claims against all Defendants alleging that they engaged in a fraudulent *pass-through* scheme to take advantage of Athena's SBA certifications. In such a case, "where an FCA claim is based on a fraudulent 'scheme,' Rule 9(b) mandates only that the details of that scheme be stated with particularity." *Id, quoting U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 203 (D.D.C. 2011) (Kessler, J.).

## IV.    ARGUMENT

### A.    The Relator's Third Amended Complaint is not time barred by the False Claims Act's statute of limitations.

Defendant Athena makes three baseless arguments as to why Relator's case is untimely: (1) Defendant Athena argues that Relator's claims do not relate back to claims in the original Complaint; (2) Defendant Athena argues that Relator's claims are deemed filed as of the date the Second Amended Complaint was unsealed, as opposed to when it was filed; and (3) Defendant Athena argues that a Complaint filed in July 2016 in the Eastern District of Louisiana bars any claims filed after July 2019 relating Defendant Athena's *pass-through* scheme. As detailed below, Defendant Athena's arguments are wrong and its representations of the facts and law verge on dishonesty.

8

According to the False Claims Act, a civil action under § 3730 may not be brought—

(1)     more than six years after the date on which the violation of section 3729 is
        committed, or

(2)     more than three years after the date when facts material to the right of action are
        known or reasonably should have been known by the official of the United States
        charged with responsibility to act in the circumstances, but in no event more than
        10 years after the date on which the violation is committed,

whichever occurs last.

31 U.S.C. § 3731(b).

While the plain text of § 3731(b)(2) appears to only relate to the Government, the Courts

in this District have held that even in cases where the Government does not intervene a relator

can take advantage of the tolling provision in § 3731(b)(2). *See U.S. ex rel. Sansbury,* 58 F.

Supp. 3d at 50 *citing U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.,* 474 F.Supp.2d

75, 82–89 (D.D.C.2007) (collecting cases evidencing a three-way split among jurisdictions about

whether and when relators may invoke the tolling provision, and holding that relators may take

advantage of the tolling provision even where the government does not intervene and that the

limitations period is measured by the knowledge of the relevant government official).

As explained by this Court in *U.S. ex rel. Sansbury*:

By its express terms, section 3731(b)(2) is silent as to whether it applies to
relators. However, subsection (b) of section 3731 begins by stating that it applies
to "civil action[s] under section 3730," which includes actions brought by both the
Government and relators. . . Section 3731(b) concludes with "whichever occurs
last." This language is not included in subsections (a) or (b), but rather is offset in
the same way as the introductory language. This indicates that the two subsections
are to be read together. *See Pogue*, 474 F.Supp.2d at 85.

Thus, looking at the language of section 3731(b) as a whole, it seems clear that it
includes relators, at least in actions in which the Government has intervened, and
there is nothing in section (b)(2) to suggest that relators are excluded. *See Pogue*,

9

474 F.Supp.2d at 84 . . . This reading of section 3731(b) is also consistent with *Graham*, in which the Supreme Court did not differentiate between relators and the government with respect to actions brought under section 3730(b). 545 U.S. at 415, 125 S.Ct. 2444.

The legislative history of section 3731(b) also supports this interpretation of the statute. The Senate report on the 1986 amendments to the FCA states that section 3731(b)(2)'s tolling provision means that the "statute of limitations does not begin to run until the material facts are known by an official within the Department of Justice with the authority to act in the circumstances." S.Rep. No. 345, 99th Cong., 2d Sess., 30 (July 28, 1986), reprinted in 1986 U.S.C.C.A.N. 5266. Similarly, the House report noted that fraud was often difficult to detect, thus the statute extended the statute of limitations. However, the House Report also explained that "the Committee did not intend to allow the Government to bring fraud actions *ad infintum* [sic], and therefore imposed the strict 10 year limit on False Claims Act cases." H. Rep. No. 660, 99th Cong., 2d Sess., 25 (June 26, 1986). This legislative history indicates that Congress intended the limitations period to run based on the knowledge of the government.

Following the reasoning of *Pogue*, which allows relators to take advantage of the tolling provision of section 3731(b)(2) if they file a complaint within three years of the relevant government official learning of the fraud, which they did here, the Court finds that the government's claims dating back to February 1, 1997 are timely. As the *Pogue* court noted, "[m]easuring (b)(2)'s limitations period by the government's knowledge, and never the relator's, makes sense because it means that ... the government will be able to recover upon the maximum amount of claims within the overall ten-year repose period." 474 F.Supp.2d at 88.

*U.S. ex rel. Sansbury,* 58 F. Supp. 3d at 51–52.

Here, Relator filed his original Complaint under seal on January 10, 2017.  Relator provided the Complaint to the Government on January 18, 2017 via certified mail.  Defendant Athena's fraudulent course of conduct set forth in the Third Amended Complaint started as early as 2011 and continues to present. [Doc. 66 at ¶7] Accordingly, since the original Complaint was filed within three years of the date when the Government first became aware of the claims the Relator can take advantage of the tolling provision of § 3731(b)(2). Following the reasoning of this Court in *U.S. ex rel Sansbury*, Relator's fraud claims should be deemed timely so long as

they relate to fraud that occurred after January 10, 2007, which would pre-date Athena's

HUBZone certification and first attempts to obtain Government contracting work.

Thus, all of Relator's fraud allegations are timely and not barred by the FCA's statute of

limitations.

    **1.**    **The allegations of fraud against Defendant Athena contained within the Second and Third Amended Complaints relate back to the original Complaint filed on January 10, 2017.**

Defendant Athena attempts to avoid the above conclusion that Relator's allegations are

timely by arguing that the Second Amended Complaint does not relate back to the original

Complaint. Therefore, since the Second Amended Complaint does not relate back, then the Third

Amended Complaint would also not relate back to the original complaint.

In support, Defendant Athena argues that the Court should take judicial notice "that

Relator represented to the Court that the claims asserted in the Second Amended Complaint were

'completely new claims' arising from the discovery of the mystery hard drive." [Doc. 69 at pg.

5] Defendant Athena also argues that the "Second Amended Complaint, by Relator's own

representation to this Court, contained new and substantially different allegations of fraud".

[Doc. 69 at pg. 6]

First, Defendant Athena's argument is premised on a flagrant misrepresentation not of the

Relator's statements but of Relator Counsel's statements to the Court on September 28, 2018.

Aside from the fact that Rule 15(c)(1)(B) requires the Court to look at the allegations in the

relevant complaints to determine whether they relate, Defendant Athena's representation of

Counsel's statement is false.

11

During the telephone conference, anticipating the issue of the requested amendment

relating back to the original Complaint, the Court asked Relator's Counsel the following:

> THE COURT: . . . I've done a little bit of looking and there are a couple of cases out there that address the posture in which we find ourselves, which is that a relator, wishing to file an amended complaint and whether that complaint ought to be filed under seal.
>
> And the question is, it seems to be under those cases, is whether the new allegations that are intended to be made really are, essentially, substantially similar to those that are already contained in the amended complaint -- excuse me, in the original complaint or, I guess, in this case, it's actually the amended complaint, you want to file a second amended complaint -- And whether you're bringing new claims; or you are simply essentially including new allegations, based upon additional evidence, to fortify the current claims that are in your amended complaint, that's the operative complaint.

[Doc. 42 at pg. 5 ln. 1-16]

> MR. MILLER: . . . And what we discovered is that there were hundreds, potentially thousands of documents that not only supported, in detail, the existing fraud that had been alleged in the original complaint and in the amended complaint, but also a whole new set of allegations that are in addition to, separate and apart from those allegations that previously existed but that are ultimately still related to the fraud.

[*Id.* at pg. 7 ln. 16-23]

> And so this is information that we've been evaluating, that we think is -- not only strengthens but also adds new allegations, and so we think it's materially different than what currently exists on the docket.
>
> THE COURT: Okay.

[*Id.* at pg. 8 ln. 13-17] Thus, contrary to Defendant Athena's representations, a review of Relator

Counsel's actual statements clearly demonstrates a belief that the detailed facts obtained from the

documents found in the hard drive that were added to the Second Amended Complaint related to

allegations in the earlier complaints. Finally, counsel for Defendant Athena was present on the

call and did object to allowing the Relator to amend the complaint. [*Id.* at pg. 11-12 ln. 19-3]

12

Second, under Rule 15(c)(1)(B) of the Federal Rules of Civil Procedure, "an amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction or occurrence set out — or attempted to be set out — in the original pleading."

In FCA cases, the D.C. Circuit has directed that "in making the determination of whether an amendment relates back to the date of the original complaint, courts should consider whether the allegations in the amended complaint relate to the same contract at issue in the original complaint." *U.S. ex rel. Keaveney v. SRA Int'l, Inc.*, 219 F. Supp. 3d 129, 140 (D.D.C. 2016) (Sullivan, J.), *citing U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, F.3d 871, 882 (D.C. Cir. 2010) (holding that amended claims related to two distinct contracts were not "fairly encompass[ed]" by the claims in original complaint, which were based on a third contract, were "unique and no two involved the same 'conduct, transaction[ ], or occurrence.'").

Here, other than misquoting undersigned Counsel's statement to the Court, Defendant Athena has failed to meet its burden of showing that the allegations and contracts referenced the Second Amended Complaint are different than those in the original Complaint.

As it relates to Defendant Athena, the original Complaint alleged violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B), stemming from Defendant Athena's fraudulently obtaining SBA certifications and using those certifications to get government contracts. [*Id.* at ¶¶ 58, 73, 97-104] The original Complaint also alleged that Defendant Athena used its certifications to *pass-through* government contracts to larger contractors for a fee that do not qualify as a small business. [*Id.* at ¶¶ 81-84]

13

The Second Amended Complaint differs from the original Complaint by adding additional facts and details relating to Defendant Athena's HUBZone and *pass-through* schemes, which were obtained from emails and documents taken from the newly discovered hard drive. The Second Amended Complaint also alleges violations of the FCA and retaliation for reporting Athena's fraud. [Doc. 41] In fact, Relator's amendment added more than 250 new paragraphs and nearly 65 pages. In addition, the Relator attached more than 80 internal documents relating to Defendant Athena's fraudulent schemes.

For example, with the benefit of the material from the hard drive, the Second Amended Complaint includes a detailed discussion between Defendant Athena and Robert Robidoux in February of 2011 discussing the specific of the *pass-through* scheme for the St. Elizabeth project. [Doc. 41 at ¶¶ 173-190] The Second Amended Complaint details how much of a fee Athena would get for as Ms. Schneider state "help[ing] with their small business goals" and carrying the contract without doing any actual work. [*Id.*] The Second Amended Complaint identified this St. Elizabeth Project as contract number GS11P10MKC0059, with Athena receiving a subcontract payment on September 12, 2011 for $1,279,888 under contract number 11076000. [*Id.* at ¶149 and ¶¶170-171] The original Complaint also identified Defendant Athena receiving a subcontract pursuant to a *pass-through* scheme on September 12, 2011 for $1,279,888 under contract number 11076000. [Doc. 1 at ¶89(d)]. This is just one example of the several amplified details added via the Second Amended Complaint to contracts already identified in the oiginal Complaint.

As noted by Relator's Counsel, the Second Amended Complaint merely amplified and added specificity to the existing fraud claims. *See* J.B. Helmer, *False Claims Act: Whistleblower*

14

*Litigation* at 618 (6th ed. 2012) (noting that a relator must often rush to file the original complaint and that amendment provides the "opportunity to craft the allegations of the complaint more carefully" and should be construed to relate back under Rule 15 as long as the amended allegations "arise out of the conduct or occurrences set forth or attempted to be set forth in the initial complaint."). Those emails and documents also implicated other companies, who were added as Defendants to the Second Amended Complaint, as having knowledge and participating in the *pass-through* scheme.

Thus, it is beyond dispute that the allegations of the Second Amended Complaint relate to the original Complaint.

### 2.   This Court granted Relator leave to file the Second Amended Complaint on October 19, 2018 and it was filed on October 22, 2018.

Defendant Athena also argues, without citation to any case law, that "the filing date for the Second Amended Complaint is the date it was ordered unsealed and served by this Court on January 18, 2021." Defendant Athena argues that the Relator should not be given the benefit of the earlier filing date because "no motion for leave to amend was ever filed . . . no Defendant was given an opportunity to be heard on whether leave should be granted." There is no merit to Defendant Athena's position.

In *U.S. ex rel. Miller v. Bill Harbert Intern. Const., Inc.*, the D.C. Circuit Court rejected Defendant Athena's "equitable doctrine of relation back" argument. 608 F.3d 871 (D.C. Cir. 2010). In rejecting defendant's argument, this Court in *U.S. ex rel. Miller* reasoned as follows:

> The defendants urge us to adopt an "equitable doctrine of relation back" and so not to allow the Government's claims to relate back in this case because it delayed filing its own complaint and unsealing Miller's complaint until several years after

the statute of limitations had run. We reject this argument because the statute, as amended, permits both relation back and—if good cause be shown—maintaining the relator's complaint under seal indefinitely beyond the sixty days.

*Id.* at 879.

Further, Defendant Athena's factual recitation is undermined by the docket and it's earlier filed Motion to Dismiss for Lack of Prosecution. [Doc. 54] According to Defendant Athena's earlier motion, on September 28, 2018, Relator's counsel made an oral motion for leave to file the Second Amended Complaint. [Doc. 54 at ¶ 8] The Court was aware of Defendant Athena's opposition to Relator's request to amend and its request to set forth a briefing schedule for its motion to dismiss. [Doc. 32 and 43 at pg. 11-12 ln. 19-3]

The Court ordered that the Relator should provide a copy of the proposed Second Amended Complaint to the Government, which was done on October 4, 2018. It was also ordered that the Government should inform the Court if they wanted the Second Amended Complaint filed under seal so that it could be reviewed and investigated. On October 19, 2018, at the request of the Government, the Court granted Relator's request to file a Second Amended Complaint under seal. [Doc. 40] The Second Amended Complaint was filed under seal on October 22, 2018. [Doc. 41]

In light of the above and contrary to its motion, Defendant Athena had an opportunity to object and did object. This Court properly considered the parties' and the Government's positions before granting leave to file Second Amended Complaint, Thus, the filing date of the Second Amended Complaint is October 22, 2018 and not January of 2021.

16

### 3.   The False Claim Act complaint filed, July 19, 2016, in the Eastern District of Louisiana does not render Relator's claims untimely.

Defendant Athena argues that the filing of an unrelated FCA complaint in the Eastern District of Louisiana ("VANO complaint") put "the Department of Justice [] on notice of the 'scheme' alleged since July 2016, well in excess of the three years provided in the False Claims Act." [Doc. 69 at pg. 7]

By way of background, the VANO complaint relates to the construction by Clark/ McCarthy Healthcare Partners – a Joint Venture ("CMHP") of the new New Orleans VA Hospital. The original New Orleans VA Medical Center was heavily damaged by Hurricane Katrina. *See* VANO complaint at ¶102. As alleged, the rebuilding efforts in post-Katrina New Orleans became a hot-bed for fraudulent conduct. *Id.* at ¶98. The relators in the VANO complaint alleged that thirteen different companies involved in the construction of the hospital had engaged in various fraudulent schemes to increase their profits. *Id.*

Even accepting that the VANO complaint was sufficient to put the government on notice of all the allegations and facts contained in the Second Amended Complaint, which it was not, Relator's claims would still not be time barred. As discussed above, the Second and Third Complaint relate back to the filing of the original Complaint on January 10, 2017. Since the Relator filed his original Complaint within three years of the VANO complaint 2016, the Second and Third Complaint, which relate back to the original Complaint, would not be time barred by the FCA's statute of limitations.

17

**B.     The False Claims Act's Public Disclosure Bar does not bar Relator's claims as contained in the Third Amended Complaint.**

Defendant Athena argues that the Third Amended Complaint should be dismissed,

pursuant to the FCA's Public Disclosure Bar, because the VANO complaint publicly disclosed

the alleged *pass-through* scheme. In support of its position, Defendant Athena argues that

"[w]hile the allegations of the Third Amended Complaint refer to a different project, the parties

(Component Assembly Systems (CAS) and Athena) are identical." [Doc. 69 at pg. 9] Defendant

Athena is wrong.

"The FCA encourages insiders to expose fraudulent conduct, but does not reward relators

who seek to profit by bringing suits to complain of fraud that has already been publicly

disclosed." *U.S. ex rel. Oliver v. Philip Morris USA Inc. ("Oliver I")*, 763 F.3d 36, 39 (D.C.Cir.

2014). Accordingly, the FCA contains a public disclosure bar, codified at 31 U.S.C. § 3730(e)(4)

(A), that "limits the ability of a private party to bring a *qui tam* suit where the fraud is already

publicly known," unless the claims are brought by the AG or an "original source" of the

information underlying the claims. *Id*.

It should be noted that the public disclosure bar was amended in 2010.  As amended,

section 3730(e)(4)(A) currently provides:

> (A)     The court shall dismiss an action or claim under this section, unless
> opposed by the Government, if substantially the same allegations or
> transactions as alleged in the action or claim were publicly disclosed--
>
> > (i)     in a Federal criminal, civil, or administrative hearing in
> > which the Government or its agent is a party;
> >
> > (ii)     in a congressional, Government Accountability Office, or
> > other Federal report, hearing, audit, or investigation; or

18

(iii)    from the news media, unless the action is brought by the
Attorney General or the person bringing the action is an
original source of the information."

31 U.S.C.A. § 3730(e)(4)(A).[4]

Thus, "[t]he FCA sets up a two-part test for determining jurisdiction." *U.S. ex rel. Findley*

*v. FPC–Boron Emps. Club,* 105 F.3d 675, 681 (D.C.Cir.1997). The court must first determine

whether the information underlying the allegations and transactions has been publicly disclosed

through the enumerated channels. *See U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d

645, 651 (D.C. Cir. 1994). "If—and only if—the answer to the first question is affirmative, will

the court then proceed to the original source inquiry." *Id.* It should not be forgotten that the FCA

bars suits based on publicly disclosed "allegations or transactions," not information. *See U.S. ex*

*rel. Springfield Terminal Ry. Co.*, 14 F.3d at 653.

As noted by this Court in *U.S. ex rel. Springfield Terminal Ry. Co.,* the cogent analysis in

*U.S. ex rel. Joseph v. Cannon*, 642 F.2d 1373 (D.C.Cir.1981), construing the pre – 1986 *qui tam*

provisions, is instructive in illuminating this tension:

> To require that the evidence and information possessed by the United States be a
> mirror image of that in the hands of the qui tam plaintiff would virtually eliminate
> the bar. On the other hand, to permit the bar to be invoked when the United States
> possesses only rumors while the qui tam plaintiff has evidence and information
> would be to permit the bar to repeal effectively much of the False Claims Act.
> Between these extremes lies the answer.

---

[4] Among the changes to the public disclosure bar resulting from the amendment is that while the pre–2010 public disclosure bar was expressly jurisdictional, the 2010 amendment omits the jurisdictional language and states only that a court must "dismiss" a case falling under the public disclosure bar. "Thus, when the amended version of § 3730(e)(4)(A) applies, public disclosure does not deprive the Court of subject matter jurisdiction, but merely deprives the plaintiff of his claim." *U.S. ex rel. Shea v. Verizon Commc'ns, Inc.,* 160 F.Supp.3d 16, 24 (D.D.C. 2015).

More precisely, the answer rests in that area where it is possible to say that the evidence and information in the possession of the United States at the time the False Claims Act suit was brought was sufficient to enable it adequately to investigate the case and to make a decision whether to prosecute.

The question, properly, then, is whether the information conveyed [to the government] could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing....

*Id.* at 654 (internal citations omitted) Thus, in order to prevail on its motion to dismiss, Defendant Athena must show that the disclosures contained within the VANO complaint would have been sufficient to meaningfully alert any government investigator of the fraud alleged in the Second and Third Complaints.

Here, Defendant Athena's cursory one sentence analysis of the VANO complaint and the Third Amended Complaint completely fails to meet its burden of showing that the allegations have been publicly disclosed.

The VANO complaint relates to one contract in one state. It does not disclose Defendant Athena's actives in any other states and it does not disclose the same allegations and transactions included in the Second and Third Amended Complaints. While it is true that the relators in VANO disclosed to the Government their observations and suspicions that Defendant Athena had engaged in a *pass-through* scheme with CMHP, they were not former or current employees of Defendant Athena. Thus, the Government was not and could not have been given any actionable information about Defendant Athena's business practices and actives in any other states or relating to any other Government contracting work.

Importantly, the VANO complaint does not allege that Defendant Athena's participation in a *pass-through* scheme in New Orleans extended to all or even a majority of its other

20

Government projects. Thus, the disclosures contained within the VANO complaint would not have been sufficient to meaningfully alert any government investigator to look beyond the hospital project in New Orleans where 13 different companies alleged engaged in some form of fraud within the context of Katrina disaster.

In contrast, Relator Smith was the Superintendent and Director of Operations for Defendant Athena from 2010 to 2016. By virtue of his position, Relator Smith had firsthand information relating to all of Defendant Athena's government contracting work and to documents relating to that work. Relator Smith was also in possession of a hard drive with hundreds of documents discussing and detailing various *pass-through* schemes, which were not available to the relators who brought the VANO complaint. Relator Smith provided the Government with firsthand information that Athena had falsified its SBA certifications and that its actual business model was to sell its certifications by regularly engaging in *pass-through* schemes with other prime contractors.

Thus, the VANO complaint should not be viewed as public disclosure of the fraud allegations and transactions contained in the Second and Third Amended Complaint.

Even if the Court were to agree that the VANO complaint constituted a public disclosure of Defendant Athena's schemes, the Relator and his trove of documents should be considered the original source[5] for any and all allegations of fraud that extend beyond New Orleans and that are contained within the Third Amended Complaint.

_____

[5]Defendant Athena states that the Relator is not the "original source", that "Carl Armstrong was the actual source for the alleged Athena 'pass-through' scheme." This is simply not true. Carl Armstrong was not a relator on the VANO project when it was filed in 2016.

21

An original source is defined as an individual who either (i) "prior to a public

disclosure . . . has voluntarily disclosed to the Government the information on which allegations

or transactions in a claim are based," or (ii) "who has knowledge that is independent of and

materially adds to the publicly disclosed allegations or transactions, and who has voluntarily

provided the information to the Government before filing an action under this section." 31

U.S.C.A. § 3730 (e)(4)(B).

Since the Relator's allegations and transactions, as contained the Second and Third

Amended Complaints, are independent and materially add to any public information that might

exist from the VANO complaint, the Court should not dismiss the Third Amended Complaint.

**C.     The Third Amended Complaint sufficiently states a Claim that Defendant Athena violated the False Claims Act.**

Counts I and II of the Third Amended Complaint state a claim for relief under 31 U.S.C.

§§ 3729(a)(1)(A), and (B). The presentment provision of the FCA, *inter alia*, forbids any person

from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for

payment or approval" to the federal government. *Id.* The elements of a presentation claim are as

follows:

(1) the defendant submitted [or caused to be submitted] a claim to the government,

(2) the claim was false, and

(3) the defendant knew the claim was false.

*U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 196 (D.D.C. 2011).

22

### 1. Defendant Athena both submitted and caused false claims to be presented to the government.

The first element of a presentment claim will differ slightly depending on whether the

defendant is alleged to have directly versus indirectly caused a false claim to be submitted to the

government. Here, Defendant Athena is alleged to have both submitted false claims and to have

caused false claims to be submitted.

The *Head* Court summarized the law regarding indirectly causing the submission of

claims as follows:

> For a plaintiff to allege a cause of action under § 3729(a)(1)'s 'causes to be
> Presented' prong, it must [also] allege that the defendant's conduct was 'at least a
> substantial factor in causing, if not the but-for cause of, submission of false
> claims.'" *United States v. Toyobo Co. Ltd.*, 811 F. Supp. 2d 37, 48 (D.D.C. 2011)
> (*quoting Miller v. Holzmann*, 563 F. Supp. 2d 54, 119 n. 95 (D.D.C. 2008)). Put
> differently, "[t]he False Claims Act extends beyond the person making a false
> claim to one who engages in a fraudulent course of conduct that induces payment
> by the government." *McCready*, 251 F. Supp. 2d at 120 (internal quotation marks
> and citations omitted); *see also U. S. ex rel. Marcus v. Hess*, 317 U.S. 537, 544,
> 63 S. Ct. 379, 87 L. Ed. 443 (1943) (noting that the "causes to be presented" and
> conspiracy provisions of the FCA "indicate a purpose to reach any person who
> knowingly assisted in causing the government to pay claims which were grounded
> in fraud").

> \* \* \*

> Courts have also credited allegations that a non-submitting party caused false
> claims to be submitted in a variety of contexts where the non-submitter was the
> driving force behind an allegedly fraudulent scheme. *See, e.g., Toyobo*, 811 F.
> Supp. 2d at 48 (bullet-proof material manufacturer's obfuscation of product
> defects caused vest manufacturers to submit false claims); *U.S. ex rel. Hutcheson
> v. Blackstone Med., Inc.*, 647 F.3d 377, 395 (1st Cir. 2011) (medical device
> manufacturer's kickback scheme caused doctors to submit false claims); *U.S. ex
> rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004) (medical device
> manufacturer's illegal marketing scheme caused medical service provider to
> submit false claims); *United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d
> 436, 445 (S.D.N.Y. 1999) (travel agency's illegal use of non-profit bulk mailing
> rate caused its mailing agent to submit false claims to the U.S. Postal Service).

Moreover, even where the non-submitting entity was not the prime mover of the

23

alleged fraud, courts have found such entities potentially liable on the theory that they caused the presentation of false claims where they had agreed to take certain critical actions in furtherance of the fraud. *See, e.g., U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 715 (10th Cir. 2006) (complaint adequately stated a claim against private Medicare provider for "agreeing to circumvent contractual and statutory requirements, and assuring [laboratory] that [it] would continue to accept" the allegedly false claims). In fact, some courts have concluded that even allegations that a non-submitter continued to do business with an entity upon becoming aware that that entity was submitting false claims were sufficient to show that the non-submitter had "caused" the Claims' submission. *See, e.g., U.S. ex rel. Long v. SCS Bus. & Technical Inst.*, 999 F. Supp. 78, 91 (D.D.C. 1998) rev'd on other grounds sub nom. *U.S. ex rel. Long v. SCS Bus. & Technical Inst., Inc.*, 173 F.3d 870, 335 U.S. App. D.C. 331 (D.C. Cir. 1999) (complaint adequately alleged that state officials caused false claims to be submitted by failing to act on knowledge of fraudulent conduct); *United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 187 (D. Mass. 2004) ("Where a defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes a course of conduct that allowed fraudulent claims to be presented to the government." (internal quotation marks and citations omitted)); but see *Sikkenga*, 472 F.3d at 714-15 (holding that liability under a causation theory "requir[es] more than mere passive acquiescence"). As a whole, these cases indicate that, in examining whether a non-submitting party has "caused" the submission of a false claim or false statement, a court must look at the degree to which that party was involved in the scheme that results in the actual submission.

*Id.* at 126-127.

Accordingly, a violation of the FCA occurs, *inter alia*, when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B).

Defendant Athena's conduct in establishing its *pass-through* scheme is sufficient to satisfy the standards of causing a claim to be submitted. [Doc. 66 at ¶149 and ¶¶166-271].

24

Further, Defendant Athena directly submitted claims through its falsified HUBZone certification.

[Doc. 66 at ¶165].

      **2.**     **The claims submitted and caused to be submitted by Defendant Athena were false and fraudulent.**

           **a.**     **Defendants'** *pass-through* **scheme is false under the fraud-in-the-inducement theory of liability.**

Relator's FCA claims relating to the allegations of Defendants' *pass-through* scheme are based on the fraud-in-the-inducement theory of liability. "Under a fraud-in-the-inducement theory, a defendant violates the FCA if it submits claims to the government 'under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves.'" *Cimino v. International Business Machines Corporation*, 2019 WL 4750259, at \*4 (D.D.C. Sept. 30, 2019) (Mehta, J.) *quoting U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005); *see also U.S. ex rel. Westrick v. Second Chance Body Armor Inc.*, 128 F.Supp. 3d 1, 18 (D.D.C. 2015). The fraud-in-the-inducement theory "turns on the defendant's 'eligibility' for payment by the government." *Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 88 (D.D.C. 2014), *citing U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F.Supp.2d 25, 69 n. 33 (D.D.C. 2007) ("had the government known about the fraud in the inducement, it never would have entered the contract, and no payments would have been made").

Here, Relator alleges a detailed *pass-through* scheme that created the appearance that Defendant Athena and the co-Defendants were eligible for preferred small business contracts when they were not in fact eligible for such contracts. [Doc. 66 at ¶¶36-125, ¶149 and ¶¶166-271]. The Third Amended Complaint identifies ten (10) specific contracts that were awarded on the basis of a Subcontracting Plan that was premised upon Defendant Athena doing

substantial work. [Doc. ¶¶166-271]. Consistent with the material goals of Congress and the Small Business Administration, the government awarded these ten (10) contracts so that a preferred small business concern could gain meaningful work. *Id.* However, unbeknownst to the government, Defendant Athena and the co-Defendants had no intention of Defendant Athena actually doing work, and the government money set aside for a preferred small business concern was simply sent to large national corporations. *Id.* As discussed below, the false appearance of eligibility is pleaded with particularity under Rule 9(b) and were material to the government's contracting decisions under *Escobar*.

The District of D.C. has previously found a very similar *pass-through* scheme to satisfy the fraud-in-the-inducement theory. *Tran*, 53 F.Supp.3d. at 130-131. In *Tran*, the general contractor, CSC, submitted a bid to the Federal government containing a "Small Business Subcontracting Plan" that called for a minimum of 40% of its subcontracting work to be performed by a small business. *Id.* When CSC submitted this plan, the submission was false because CSC and its prime subcontractor, Modis, had no intention of complying with its subcontracting plan because Modis had agreed to merely be a *pass-through* entity.

Relator's claim is also very similar to the claims recently considered by the District of D.C. in *Scollick ex rel. United States v. Narula*, 2020 WL 6544734, at \*11 (D.D.C. Nov. 6, 2020) (Lamberth, J.). In *Scollick*, the plaintiff alleged that certain defendants had falsely registered as a service-disabled veteran-owned small business and obtained government set-aside contracts on the basis of this false registration. *Id.* The SDVOSB registration was false because the person nominally registered as the veteran-owner, was not the owner and did not oversee the day-to-day

operations. *Id.* The District of D.C. thus held, at the 12(b)(6) stage, that the contracts awarded to the defendants were sufficient to state a claim for fraud-in-the-inducement under the FCA. *Id.*

Similar to the decisions in *Tran* and *Scollick*, the *pass-through* scheme detailed in the Third Amended Complaint is sufficient to establish false claims under the fraud-in-the-inducement theory of liability.

          **b.**    **The claims submitted by Defendant Athena's HUBZone certification are false under the FCA pursuant to the implied false certification theory of liability**

Relator's Third Amended Complaint also alleges that Defendant Athena falsely claimed that it qualified as a HUBZone company, in violation of the FCA under the implied false certification theory of liability. "To state an implied false certification claim, a plaintiff must allege that: (1) the defendant not only made a request for payment but also made specific representations about the goods or services provided, and (2) the defendant 'fail[ed] to disclose noncompliance with material statutory, regulatory, or contractual requirements [which made] those representations misleading half-truths.'" *U.S. ex rel. Lott*, 296 F. Supp. at 151 (D.D.C. 2017), *citing Universal Health Servs., Inc. v. U.S. ex. rel. Escobar*, 136 S.Ct. 1989, 2001 (2016).

The Third Amended Complaint alleges thirty-one (31) requests for payment that Defendant Athena made pursuant to its HUBZone certification. [Doc. 66 at ¶164]. In each of these requests for payment, Defendant Athena specifically represented itself as a HUBZone small busines concern pursuant to its HUBZone certification. *Id.*, at ¶163-165. However, in each of these requests for payment, Defendant Athena failed to disclosed that it did not actually qualify under the HUBZone requirements. *Id.*

27

The HUBZone program requires that at least 35% of a company's employees reside within a HUBZone. *Id.*, at ¶150-154.  To obtain this HUBZone certification, Defendant Athena certified to the government that it satisfied this 35% residency requirement. *Id.*, at ¶150-158. This certification was false because Defendant Athena misrepresented where certain employees resided and identified non-employees of Athena as employees. *Id.*, at ¶155-156.  In actuality, Defendant Athena never had more than 23% of its employees reside within a HUBZone, and frequently had less than 15% of its employees reside within a HUBZone. *Id.*, at ¶157.

However, because Defendant Athena "successfully" misrepresented itself when submitting its HUBZone application, it was granted the certification. *Id.*, at ¶150-165.  Defendant Athena then used this certification to submit at least thirty-one (31) claims for payment on the basis of being HUBZone certified. *Id.*  With each of these claims, Defendant Athena failed to disclose its non-compliance with the HUBZone requirements. *Id.*

These HUBZone claims are sufficient to sufficient to satisfy the false or fraudulent prong of the FCA under an implied false certification theory. As detailed below, these claims as stated with particularity in the Third Amended Complaint and were material under *Escobar* to the government's decision to award the contracts and pay the claims.

**3.      Defendant Athena knew the claims it submitted and caused to be submitted were false and fraudulent.**

Under the False Claims Act, a defendant acts "knowingly" if: (1) it had "actual knowledge of the information"; (2) acted in "deliberate ignorance of the truth or falsity of information"; or (3) acted "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). *United States ex rel. Hutchins v. DynCorp Int'l, Inc.*, 342 F. Supp. 3d 32,

Case 1:18-cv-02080-APM   Document 71   Filed 03/26/21   Page 36 of 53

47 (D.D.C. 2018), *quoting* 31 U.S.C. § 3729(b)(1)(A). Under Rule 9(b), questions of mental state, such as intent and knowledge, may be pleaded generally. *U.S. ex rel. Lott v. Not-For-Profit Hosp. Corp.*, 296 F. Supp.3d 143, 151 (D.D.C.2017).

Here, there can be no question that Defendant Athena acted knowingly under the FCA. The Third Amended Complaint cites to specific instances that Defendant Athena provided blatantly false information, such as the false residency data for its HUBZone certification. [Doc. 66 at ¶¶150-166]. The Third Amended Complaint also cites to several e-mails showing that Defendant Athena knew the intent, purpose, and details of the *pass-through* scheme. [*Id.*, at ¶¶166-271] Therefore, there can be no question that Relator sufficiently alleges that Defendant Athena acted knowingly.

## D.   The Third Amended Complaint sufficiently pleads a conspiracy claim as to all of the Defendants.

Count IV of the Third Amended Complaint sets forth a conspiracy claim under 31 U.S.C. §3729(a)(1)(C). The D.C. Circuit has identified three elements of a FCA conspiracy claim: "(1) that an agreement existed to have false or fraudulent claims allowed or paid by the United States; (2) that [the defendant] willfully joined that agreement, either at the conspiracy's inception or afterwards; and (3) that one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy." *U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.,* 391 608 F.3d 871, 899 (D.C.Cir.2010).

Agreements need only be inferred "from indirect evidence" alone. *Id.* at

901. As one District Court explained:

> [I]t is not necessary for each coconspirator even to agree to or actually participate in every step of the conspiracy. A coconspirator is bound by the overt acts of

29

other coconspirators furthering the conspiracy both before and after being enlisted
even though he may not participate in each overt act. A coconspirator need not be,
and often is not, aware of everything being done to further the conspiracy. . . .
[C]onspiracies involving elaborate arrangements generally are not born fullgrown,
but rather mature in successive stages as other parties are added who may not
know all that has gone before. Nonetheless, these new members assume the risk.
[citations omitted].

*Newby v. Enron Corp.*, 623 F. Supp. 2d 798, 831 (S.D. Tex. 2009) *quoting States v. Spudic*, 795

F.2d 1334, 1337 (7thCir.1986). The "basic principles of agency law" apply to FCA claims and so

"corporate defendants are charged with constructive knowledge of all material facts that their

agents and officers learn in the scope of their employment." *Miller,* 608 F.3d at 901.

There are several different conspiracy relationships alleged against Defendant Athena in

the Third Amended Complaint.  First, the Third Amended Complaint alleges a conspiracy

between Defendant Athena and Defendant Balfour Beatty in relation to the St. Elizabeth Tunnel

project and the Walter Reed national Military Center project. [Doc. No. 66, at ¶170-202]. The

allegations relating to this conspiracy assert that Defendant Balfour Beatty and Defendant Athena

agreed to submit a Subcontracting Plan that identified Defendant Athena as a subcontractor.

However, both Defendants knew that Athena would simply serve as *pass-through* to the second-

tier subcontractors who were not small business concerns. [*Id.*] One of the conspirators

knowingly committed an overt act in furtherance of the conspiracy when Defendant Balfour

Beatty submitted its Subcontracting Plan to the government. [*Id.* at ¶185]

Next, the Third Amended Complaint alleges a conspiracy among Defendant Athena,

Defendant Component Assembly Systems, Inc. ("CAS"), and Defendant Commonwealth Wall

Systems, LLC ("CWS"). [*Id.* at ¶203-224]  Defendant CWS is a subsidiary of CAS that

specializes in lightweight steel framing (metal stud) installation. [*Id.* at ¶26]  The Third Amended

Complaint alleges that Defendants Athena, CAS, and CSW agreed that Athena would submit bids on a government project as a first-tier subcontractor, and then pass along all of the work to CAS for an administrative fee and a profit sharing arrangement. [*Id.* at ¶203]  In furtherance of this goal, Defendant Athena submitted several bids, including on the Social Security Administration – Woodlawn Maryland project, BRAC 132 project, Camp Pendleton naval Hospital project on behalf of CAS and CWS. [*Id.* at ¶203-224]

Finally, the Third Amended Complaint alleges a conspiracy between Defendant Athena and Defendant Barton Malow. [*Id.* at ¶246-255] Defendants Athena and Barton Malow agreed that Athena would submit prime contractor bids on projects that Defendant Athena would pass the work onto Barton Malow in exchange for an administrative fee. [*Id.*] In an attempt to appear qualified for the contract, Defendants Athena and Barton Malow agreed that Athena would list two of Barton Malow's senior project executives as Athena employees, despite the fact that they were not.  [*Id.*]  In furtherance of this goal, Defendant Athena submitted the prime contractor bid for the Audie Murphy VA Hospital project. [*Id.*] It should be noted that the Audie Murphy VA Hospital is in Texas and Defendant Athena had no personal and no equipment in Texas to actually do the work on that project.

**E.      Further, the allegations of fraud contained within the Third Amended Complaint satisfy the materiality requirements of the False Claims Act.**

The Defendant Athena argues that "there are no factual allegations in the Third Amended Complaint that the *pass-through* scheme or the associated statements or representation were material to the payment of any claim against the U.S. Government." [Doc. 69 at page 17] In so arguing, Defendant Athena ignores the detailed allegations relating to the government's

31

expectations relating to small business concerns and also ignores the case law that have found similar *pass-through* schemes to be material in the context of the FCA.

The D.C. Circuit has not yet considered whether the *Escobar* materiality standard is read into fraud-in-the-inducement claims, or is limited to implied false certification theory claims. This Court has held that the *Escobar* materiality standard does apply in fraud-in-the-inducement claims. *See Cimino*,2019 WL 4750259, at *5 (Mehta, J.). Other courts in this District have held that the *Escobar* materiality standard is not a component of fraud-in-the-inducement claims, because a fraud-in-the-inducement claim necessarily contains a causation element that incorporates a materiality standard. *See Scollick ex rel. United States v. Narula*, 2020 WL 6544734, at *9-10 (D.D.C. Nov. 6, 2020) (Lamberth, J.) ("So while a contractor's undisclosed noncompliance with a statutory, regulatory, or contractual requirement [as in an implied false certification case] could be immaterial to the government's decision to pay that contractor . . . a fraudulent statement that secures a government contract *will always be material* to the government's decision to pay the contractor under that agreement"). Regardless of whether materiality is seen as a separate standard under *Escobar* or as a standard element of the causation analysis, Relator's Third Amended Complaint sufficiently pleads that the *pass-through* scheme and other fraudulent conduct were material and caused the Federal government to grant awards to Defendants.

The Second Circuit, which has analyzed *Escobar* on fraud-in-the-inducement claims, has held that the violation of a condition of eligibility for being granted a contract is sufficient to satisfy the materiality requirement. *United States v. Strock*, 982 F.3d 51, 62 (2d. Cir. 2020) ("Because the government alleges that it expressly designated SDVOSB compliance a condition

of contract eligibility, we thus find that this factor weighs in favor of a finding of materiality").

The Second Circuit found pre-contract award certification requirements to be material to the

government's decision to enter a contract in the first place. As stated in *Strock*:

> "The complaint outlines the numerous steps the government takes
> to ensure an applicant is an SDVOSB before awarding a contract
> and it identifies multiple contracting officers or specialist who
> allegedly would not have awarded contracts to VECO had they
> been aware it was not an SDVOSB. Taken together, these
> allegations lead to a reasonable inference that, in general, the
> government does not award contracts to companies that it knows
> not to have complied with SDVOSB requirements. This suggests
> that defendants' misrepresentations were material to the
> government's decision to enter the contract in the first instance."

*United States v. Strock*, 982 F.3d 51, 64 (2d. Cir. 2020).

The federal government has a government-wide prime contracting goal that at least 23%

of all federal government contracting dollars should be awarded to small and disadvantaged

businesses. [Doc. 66, at ¶33] The government has also set targeted sub-goals for WOSBs (5%),

small disadvantaged businesses (5%), firms located in HUBZones (3%), and SDVOSBs (3%).

[*Id.*, at ¶34] Achieving these goals are so important to the government, that the government will

frequently award contract bids featuring small business concerns, even where such contract bids

are not the lowest priced of qualified bids. [*Id.*, at ¶39]

To aid the government in achieving these goals, the Small Business Administration has

established an elaborate system to prevent the type of fraud committed by Defendant Athena. [*Id.*

at ¶40-116] First, by statute, Congress requires that to be considered a small business, an entity

must be independently owned and operated and not dominant in its field. [*Id.*, at ¶40-41]; 15

U.S.C. § 632(a)(1). Congress also granted the SBA the authorization to set more specific

33

standards to qualify a business as a small business. [*Id.*, at ¶42] The SBA took advantage of this authorization and did, in fact, set additional, specific requirements to satisfy this important government priority. [*Id.*]

The Third Amended Complaint discusses in the detail the requirements and process that the SBA has established in an attempt to ensure that only qualified businesses become certified and are awarded contracts on the basis of being a preferred small business concern. [*Id.*, ¶40-116] For instance, the SBA requires companies to submit extensive financial paperwork proving their status as a small business, requires certification and re-certification under penalties of perjury, and requires the satisfaction of onerous requirements. [*Id.*] The government is not doing this just to create more paperwork; rather, the SBA set up this process because incentivizing small business concerns and the various sub-categories of small concerns is a significant priority and material consideration in the government's contracting process.

One of the regulations that the SBA has enacted is that prime contractors must submit a Subcontracting Plan. [*Id.*, at ¶91]; 13 C.F.R. § 125.3. These regulations state that the failure to comply in good faith with its Subcontracting Plan is in material breach of its contract. [*Id.*]; 15 U.S.C. § 637(d)(8); FAR § 19.702(c). The Third Amended Complaint details the full requirements that the SBA has implemented in relation to submitting truthful Subcontracting Plans. [*Id.*, ¶91-116] What these regulations show is that not only is rewarding small business concerns a material consideration to obtain a contract, but a material condition throughout the process of carrying out the work.

The District of D.C. has found C.F.R. § 52.219-9(k) to be sufficient to satisfy the *Escobar* materiality standard. *Tran*, 53 F.Supp.3d 104, 125 ("In light of these statements and the express

34

contractual language attesting to the materiality of the Small Business Subcontracting Plan, the Court concludes that Relator has adequately alleged the materiality of the provisions at issue based both on the language of the contract itself and the understanding of the parties that entered into it"). The *Tran* Court further stated, "the applicable statutes make clear that having a Small Business Subcontracting Plan was a significant requirement of bidding on the government contracts at issue, *see* 15 U.S.C. § 637(d)(4), and at this early stage of the case, this Court will not assume that Congress actually intended otherwise." *Id.*, at 125 fn. 10. Similar to *Tran*, the Small Business Subcontracting Plan that created Athena's *pass-through* schemes were material conditions of the contracts at issue here.

## F.  All of Defendant Athena's Rule 9(b) arguments fail since the Third Amended Complaint sufficiently details the fraud schemes Defendants engaged in with particularity.

Defendant Athena argues that the Third Amended Complaint does not plead the who, what, when, where, and how of the alleged fraud. Defendant Athena is wrong on the law and on the contents of the Third Amended Complaint.

Courts examining *qui tam* complaints "should be sensitive to situations in which sophisticated defrauders may successfully conceal the details of their alleged fraud." *Id.* For this reason, while the complaint must allege the circumstances of the fraud, it need not plead all of the evidence or facts supporting it. *See* 5 C. Wright & A. Miller, Federal Practice & Procedure, §1298 at625-26 (2nd ed. 1990).

In addition, Rule 9(b) is relaxed where the specific facts underlying the fraud "would be peculiarly within the defendants' control." *See US ex rel. Stinson, Lyons, Gerlin & Bustamente v.*

35

*Blue Cross, Blue Shield of Georgia. lnc.*,755 F. Supp. 1040,1052 (S.D. Ga. 1990) ("[w]here ...

factual information is peculiarly within the defendant's knowledge or control, rule 9(b)'s

requirement is relaxed somewhat"); *US ex rel. Russell v. Epic Healthcare Management*

*Group*,193 F.3d 304, 308 (5th Cir. 1999) ("when the facts relating to the alleged fraud are

peculiarly within the perpetrator's knowledge, the Rule 9(b) standard is relaxed, and fraud may

be pled on information and belief'); *US ex rel. Butler v. Magellan Health Services, Inc.,*74 F.

Supp.2d I20l,1215-16 (M.D. Fla. 1999) ("[A] relaxed requirement is applied where strict

application of Rule 9(b) could result in substantial unfairness to private litigants who could not

possibly have detailed knowledge of all circumstances surrounding the alleged fraud. A strict

enforcement of Rule 9 would frustrate the purpose of the FCA, so courts allow an exception

whereby a plaintiff can plead information that may be available only through discovery.").

    As detailed below, the claims and circumstances pertaining to Defendant Athena's

conduct is clearly set out in the Third Amended Complaint. A fraud scheme is pled with

sufficient particularity in satisfaction of Rule 9(b) if the complaint: (1) identifies "the relevant

individuals involved in the scheme," (2) identifies "the specific claims [] that were allegedly

false," (3) identifies "the time period during which such claims were submitted," (4) provides

"the details of how the scheme was structured," and (5) "why it constituted non-compliance with

[government] requirements." *Id.* at 122-123.

36

As discussed below, the Third Amended Complaint satisfies each of the above five factors:

## 1.  Identification of the relevant individuals involved in the scheme.

The Third Amended Complaint adequately identifies the individuals involved in the fraud scheme. Thought the Third Amended Complaint, the individuals involved in discussing and agreeing to engage Defendant Athena as a *pass-through* are identified.  For example, the relevant individuals at Defendant Balfour Beatty were Bob Robidoux and Brian Clark.  [Doc. 66 at ¶¶ 173-195]  The relevant individuals at Defendants CAS and CWS were Dave Prosida, Ali Khosravi, and Richard Unger. [*Id*. at ¶¶ 203-209]  The relevant individuals at Defendant Barton Malow were David Garrett and David Moody.  [*Id.* at ¶¶ 246-255]

## 2.  Identification of the false claims made.

The Third Amended Complaint expressly identifies ten (10) contracts wherein Defendant Athena serve as a *pass-through*.  [Doc. 66 at ¶¶170 to 271]  The Third Amended Complaint also identifies 31 contracts allegedly fraudulently obtained from the government through its falsified HUBZone certification. [*Id.* at ¶164]  Furthermore, the Third Amended Complaint identifies the solicitation number and the contract number for each of the contracts, the date each of the contracts was awarded, the amount of the contract awarded and the amount the government ultimately paid. [*Id.*]

## 3.  The time period during which such claims were submitted.

The Third Amended Complaint identifies that the false claims submitted in the name of Defendant Athena resulted in an initial contract being award on 2011 and that the fraud remained

ongoing and continuous, at least until the Complaint was filed in 2017. [Doc. 66 at ¶ 7]  The

Third Amended Complaint also contains detailed tables with all of the relevant contracts with the

relevant contract dates. [*Id.* at ¶¶ 149 and 164]  In addition, the ten contacts that discussed in

Section VII contain and refer to the relevant time period.  [*Id.* at ¶¶ 166-271]

## 4.    The details of how the scheme was structured.

The fraudulent conduct at issue arises from two schemes. First, Defendant Athena

fraudulently obtained HUBZone certification from the Small Business Administration ("SBA")

by falsely representing its eligibility to participate in that program, which limits competition for

certain government contracts to businesses in historically underutilized business zones. Athena

then used its fraudulently obtained HUBZone certification to obtain lucrative contracting

opportunities reserved for legitimate HUBZone businesses.  Second, Defendant Athena and Co-

Defendants conspired to use Athena's SBA small business classifications[6] as part of a fraudulent

*pass-through* scheme. The *pass-through* scheme allowed Co-Defendants to falsely claim credit

for awarding millions of dollars in subcontracts to small business (Athena), that was, in fact,

controlled by large business contractors, in violation of the ostensible subcontractor rule.

### a.    HUBZone Scheme

The manner by which Defendant Athena falsified its HUBZone certification is detailed

within the Third Amended Complaint. [Doc. 66 at ¶¶ 150-163] The Third Amended Complaint,

as detailed in Section VI, alleges that Defendant Athena falsely certified that it was a HUBZone

company. In order to meet the 35 percent HUBZone employee threshold, Athena paid

---

[6] Athena's website and marketing materials claims that it is "The Nation's Premier 8(a), Service-Disabled
Veteran-Owned (SDVOSB), Woman-Owned (WOSB), DBE Certified, HUBZone and SWaM-Certified
Construction Company."

individuals, such as Mary Frezza, nominals sums of money so that they could be identified on fake employee rosters as working for Athena. [*Id.* at ¶154-157] These alleged employees did not actually do any work for Athena, but rather were paid solely so that Athena can meet the 35 percent threshold. [*Id.*]

In addition, Defendant Athena used fraud to paper over its HUBZone deficiency by adding people who were not employees. For example, the Athena "Employee List" identifies Amber Peebles and Melissa Schneider's residence as being in a HUBZone in Lynchburg, Virginia—160 miles from Athena's headquarters in Dumfries, Virginia. [*Id.* at ¶ 155] In fact, at all times material hereto, Peebles and Schneider's actual residence has been located at 3201 Riverview Drive in Triangle, Virginia—which is not in a HUBZone and is located approximately one mile from the company's headquarters. [*Id.*]

For example, falsely certified that Mary Frezza and Sarah Anderson were "employees" of the company when, in fact, they were not. [*Id.* at ¶ 156] Mary Frezza was the manager for the office park where Athena had its Dumfries offices, but at no time did she serve as a full-time Athena employee working at least 40 hours a month as required by the SBA. [*Id.*] Sarah Anderson at various times has lived in Lynchburg, Virginia (some 160 miles from Athena's offices in Dumfries, Virginia) and in Tampa, Florida, but at no time did she serve as a full-time Athena employee working at least 40 hours a month. [*Id.*]

### b.   *Pass-Through* Scheme

The details of Defendant Athena's and its co-Defedants' *pass-through* scheme is detailed in Section VII of the Third Amended Complaint. [Doc. 66 at ¶¶ 166-271] The *pass-through* scheme worked as follows:

(a)     Co-Defendants would approach Athena about a government project they wanted or needed Athena to be attached to in order to help meet the obligations under their subcontracting plans;

(b)     Athena would be paid[7] a so-called "small business fee" or "administrative fee" in exchange for Athena "carrying the contract" on its books;

(c)     Athena would assign a project manager ("PM"), who was usually an inexperienced recent college graduate, to the project. The PM's only job was to be present or to check in periodically;

(d)     Co-Defendants would cover all of Athena's costs, including the salary of the PM; and

(e)     It was understood by all the parties that Athena would not be doing any actual work on the project. Instead, all of the actual work would *pass-through* to a second-tier subcontractor, which usually had already been selected by one of the Co-Defendants. The subcontractor would not qualify as a small business or any of the 8(a), HUBZone, SDVOSB or WOSB programs.

[*Id.* at ¶ 167]

As detailed above, the Relator has satisfied the requirements of Rule 9(b) since the Third

Amended Complaint provided Defendant Athena adequate "notice of the who, what, when,

where, and how with respect to the circumstances of the fraud" *Tran*, *supra*, *quoting Steven v.*

*InPhonic, Inc.*, 662 F. Supp. 2d 105, 114 (S.D.C. 2009).

---

[7] On government projects, contractors typically add between 5% to 10% for profit and an additional 10% for overhead. An example of a traditional submittal is attached as Exhibit 83. Further, the profit and overhead are also always disclosed to the government. The fee being accepted by Defendant Athena is not a reference to profit and overhead and it is never disclosed to the government. Here, the profit and overhead passes through to the second-tier subcontractor. Obviously, the profit is being impacted by Athena taking a fee. However, if it was not for Athena serving as a *pass-through* the subcontractor would have received nothing and may not even have been allowed to serve as a first-tier subcontractor for the project.

## G.   The Third Amended Complaint sets forth a valid retaliation claim under the Section 3730(h) of the False Claims Act, which protects current and former employees from retaliation for reporting fraud.

Defendant Athena argues that its retaliation against Relator is not protected by 31 U.S.C.

§3730(h) because he is a former employee. Moving Defendant is wrong.

In 2009, Congress amended the "[r]elief from retaliatory actions" provision codified in 31

U.S.C. § 3730(h) to exclude language that limited relief to retaliatory actions "by [an] employer."

Fraud Enforcement and Recovery Act of 2009, Pub.L. No. 111–21, § 4(d), 123 Stat. 1617, 1624–

25. The current version of the statute states that:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section.

31 U.S.C. § 3730(h) (2012). The congressional intent for the amendment was to "correct[ ]

loophole[s]" and "assist individuals who are not technically employees . . ., but nonetheless have

a contractual or agency relationship with an employer." False Claims Act Correction Act of 2008,

S.Rep. No. 110–507, at 26–27 (2008); *see also* False Claims Act Correction Act of 2009,

H.R.Rep. No. 111–97, at 14 (2009) (explaining that the statute was amended to protect "contract

workers and others who are not technically 'employees'").

Several courts that have interpreted the protections of §3730(h) have found that it applies

to former employees who are retaliated against by their former employer for reporting fraud or

abuse. *See Ortino v. Sch. Bd. of Collier Cnty.,* 2015 WL 1579460, at \*3 (M.D. Fl. 2015)

(declining to dismiss a post-employment retaliation claim); *Haka v. Lincoln Cnty.*, 533 F.Supp.2d

41

895, 917 (W.D. Wis. 2008) (recognizing a claim for post-employment retaliation in the decision not to rehire the plaintiff, reasoning that such hiring choices concern "the terms and conditions of employment"); *U.S. ex rel. Feaster v. Dopps Chiropractic Clinic, LLC,* 2016 WL 3855560, at * 5 (D. Kan. 2016) (allowing plaintiff to add a "post-termination retaliation" claim to his amended complaint); *Fitzsimmons v. Cardiology Assocs. of Fredericksburg, Ltd.,* 2015 WL 4937461, at *7 (E.D. Va. 2015) ("The Court will not, at this early pleading stage, find that the anti-retaliation provision of the FCA cannot cover Fitzsimmons's claims for post-termination" retaliation); *Tang v. Vaxin, Inc.,* 2015 WL 1487063, at *5 (N.D. Ala. 2015) (writing that "[o]ne could characterize a frivolous post-termination counterclaim as harassment under 31 U.S.C. § 3730(h)(1)," but then dismissing this claim for failure to comply with Rule 8 of the Federal Rules of Civil Procedure); *Glynn v. Impact Sci. & Tech., Inc.,* 807 F.Supp.2d 391, 419 (D. Md. 2011) (dismissing a post-employment retaliation claim on summary judgment, but allowing that such a claim may survive on different facts).

A retaliation claim under 31 U.S.C. § 3730(h)(1) requires a showing that the Relator (1) engaged in protected activity and (2) was discriminated against because of that activity. *U.S. ex rel. Lott v. Not-For-Profit-Hosp. Corp.*, 296 F.Supp. 3d 143, 152 (D.D.C. 2017), *quoting U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998). The second element requires a showing that the retaliating entity had knowledge of the protected activity and the retaliatory action was motivated, at least in part, by the protected activity. *Id.*

There can be no question that Relator engaged in protected activity by filing his FCA case under seal and reporting the alleged fraudulent conduct to the U.S. Department of Justice.

Relator engaged in this protected activity on January 10, 2017 when he filed his original Complaint under seal and mailed a copy to the Government. [Doc. 66, at ¶312]

Defendant Athena became aware of Relator's protected activity, on October 13, 2017, after the Relator effected service of the Complaint on Defendant Athena in the manner prescribed by Rule 4 of the Federal Rules of Civil Procedure. [*Id.* at ¶313] Almost immediately after the Complaint was served, Defendant Athena began threatening and harassing the Relator.

First, on October 18, 2017, counsel for Athena, via letter addressed to Relator's counsel, demanded that Relator's FCA Complaint be dismissed because it was frivolous, without good faith basis in law or in fact, and clearly designed to "harass" Athena. [*Id.* at ¶314] Defendant Athena's counsel threatened that he would seek Rule 11 sanctions if the Complaint was not withdrawn (he never did). [*Id.*] On November 1, 2017, counsel for Relator informed Athena that the FCA Complaint would not be withdrawn.

Second, in reprisal for Relator having taken acts in furtherance of a *qui tam* suit under the FCA, on November 6, 2017, Defendant Athena filed a lawsuit against Relator in the Prince William Circuit Court in Virginia, Case No. 17-8365. [*Id.* at ¶315] Defendant Athena alleged that Relator breached his severance agreement by filing the FCA Complaint, and sought to recover the payments Defendant Athena made to the Relator for his unpaid PTO allotment, as well as additional consequential damages of at least $106,153.84. [*Id.* at ¶315-316]

Relator removed the case to the Eastern District of Virginia and filed a motion to dismiss citing to Virginia's long established judicial proceeding privilege since the allegedly offensive states were made in a Complaint. *See Lindeman v. Lesnick,* 268 Va. 532 (2004) *citing Penick v.*

*Ratcliffe*, 149 Va. 618 (1927). The District Court dismissed Defendant Athena's complaint from
the bench on February 23, 2018. [*Id.* at ¶¶317-318]

Defendant Athena and its counsel, which was also Milton Johns, knew that there was a
long-established absolute privilege for statements made in a complaint or judicial proceeding.
Despite this knowledge they proceeded with the lawsuit, causing the Relator to incur legal
expenses and emotional distress.

Defendant Athena's first retaliatory complaint, which was filed 5 days after the Relator
refused to withdraw the FCA Complaint, was a clear attempt to harass and intimate the Relator
into silence and withdrawing his case.

It should be noted that Defendant Athena's harassment of the Relator continues to the
present. After the Relator decided to proceed with the case and file the Third Amended
Complaint, on March 1, 2021, Defendant Athena filed another harassing and frivolous lawsuit
against him. This new retaliatory lawsuit by Defendant Athena was again filed in the Prince
William Circuit Court in Virginia, Case No 21-2013.

Through this lawsuit, Defendant Athena is alleging claims of computer trespass,
computer invasion of privacy, business conspiracy, and common law conspiracy and is seeking
damages in excess of $66,000. The claims in Defendant Athena's new retaliatory lawsuit arise
from the fact that Relator found the hard drive containing additional facts and evidence relating
to Defendant Athena's fraudulent conduct.

Defendant Athena's new retaliatory lawsuit is another collateral attack on the Relator's
reporting of fraud and another clear attempt to intimate and harass him. If Defendant Athena
truly believed that the Relator had done something wrong in obtaining the hard drive and

44

reporting its contents to the Government, they could have brought a cross-claim against.

Defendant Athena and its counsel choose to sue him in Virginia state court to harass the Relator

with additional litigation and because they know that the Relator's actions are a protected

activity under the FCA.

**H.     If the Court finds that the allegations or counts of the Third Amended Complaint do not meet the requirements of Rule 12(b)(6) or Rule 9(b), the Relator should be given an opportunity to amend the complaint to correct those deficiencies.**

Rule 15(a) states that "a party may amend its pleading only with the opposing party's

written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave

when justice so requires." *Id.* "In the absence of any apparent or declared reason – such as undue

delay, bad faith or dilatory motive on the part of the movant . . . – the leave sought should, as the

rules require, be 'freely given.'" *Foman v. Davis,* 371 U.S. 178, 182, (1962); *see e.g., Firestone v.

Firestone,* 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("Failure to plead fraud with particularity . . .

does not support a dismissal with prejudice. To the contrary, leave to amend is almost always

allowed to cure deficiencies in pleading fraud."). Relator asks for leave to amend his complaint

and be permitted to plead additional facts with respect to any deficiency identified by the Court,

if any of the motion to dismiss are granted in whole or in part.

## VI.     CONCLUSION

Based on the above, Relator respectfully requests that the Court deny Defendant's Motion to

Dismiss and Demand for Costs. In addition, Relator requests oral argument on Defendant's Motion.

Respectfully submitted,

**FREIWALD LAW**
Glenn A. Ellis (admitted pro hac vice)
Zachary S. Feinberg (*pro hac vice* pending)
1500 Walnut Street, 18th Floor
Philadelphia PA 19102
Telephone: (215) 875-8000
Facsimile: (215) 875-8575

**BARON & BUDD, P.C.**
W. Scott Simmer, D.C. Bar #460726
Andrew M. Miller, D.C. Bar #499298
600 New Hampshire Avenue,
NW, Suite 10-A Washington, DC 20037
Telephone: (202) 333-4562
Facsimile: (202) 337-1039

*Counsel for Relator William "Bill" Smith*

Dated: 3/26/21