**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILLIAM "BILL" SMITH, | ) |
| | ) |
| Plaintiff-Relator, | ) |
| | ) |
| v. | )   Case No. 18-cv-2080 (APM) |
| | ) |
| ATHENA CONSTRUCTION | ) |
| GROUP, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

### I.      INTRODUCTION

Defendant Athena Construction Group, Inc. ("Athena") is a construction company located in Triangle, Virginia.  Over the years, Athena has secured various preferential contracting certifications from the Small Business Administration.  They include designations as (1) a woman-owned small business, (2) a small business owned by a service-disabled veteran, and (3) a Historically Underutilized Business Zone ("HUBZone") small business.  The last of these, the HUBZone program, grants preferential access to government contracts to small businesses located in and employing individuals living in historically underutilized urban and rural communities. These certifications have afforded Athena preferences in bidding for government contracts and in serving as a subcontractor for large government projects.

Plaintiff-Relator William "Bill" Smith ("Relator") served as Athena's Director of Operations and as a Project Superintendent from 2011 to 2016.  He brings this case under the False Claims Act, alleging that Athena engaged in two fraudulent schemes.  First, he contends that Athena obtained and maintained its HUBZone certification through materially false

representations about its eligibility for the program, enabling it to secure various government contracts. Second, he claims that Athena and various prime contractors conspired to use Athena's small-business certifications to create a pass-through scheme whereby the prime contractors would "contract" with Athena to meet certain small-business set-aside requirements in exchange for a fee to Athena. Athena, in fact, would do little or no work, and the work was actually performed by large subcontractors. Relator also claims that Athena retaliated against him for filing this action.

Relator brought suit against Athena and some of the prime contractors with whom Athena allegedly conspired in the pass-through scheme: Balfour Beatty Construction Company, Inc. ("Balfour Beatty"); Barton Malow Company ("Barton Malow"); Component Assembly Systems, Inc. ("CAS"); and Commonwealth Wall Systems, Inc. ("Commonwealth"). After two distinct investigations, the United States declined to intervene. Relator nevertheless opted to prosecute the action. All Defendants, other than CAS, have moved to dismiss Relator's Third Amended Complaint.

For the reasons below, the court grants Commonwealth's, Balfour Beatty's, and Barton Malow's motions to dismiss and grants Athena's motion with respect to the alleged pass-through scheme but not the HUBZone scheme. The court also grants Athena's motion as to Relator's reverse-false-claim theory but denies the motion as to his retaliation claim. The court also denies Relator leave to amend the Third Amended Complaint.

## II.    BACKGROUND

The court begins by summarizing the facts alleged. The court accepts these allegations as true for purposes of evaluating the motions to dismiss. *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 345 (D.C. Cir. 2018).

### A.      Factual Background

"The [United States] government is the world's largest buyer of services and goods. Purchases by military and civilian agencies amount to nearly $600 billion a year and include everything from complex space vehicles to the paving of parking lots."  Third Am. Compl., ECF No. 66 [hereinafter TAC], ¶ 31.  The Small Business Act expresses the policy of the United States that certain "small business concerns" "shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency."  15 U.S.C. § 637(d)(1). Such concerns include those owned or operated by women or service-disabled veterans, as well as those located in historically underutilized geographic areas.  *Id.*  The federal government seeks to accomplish the Act's policy aims by, among other things, requiring subcontracting plans for contracts in excess of $1.5 million, TAC ¶ 38; setting aside a certain percentage of prime contracts and subcontracts for various small-business concerns, *id.* ¶ 61 (service-disabled-veteran owned); *id.* ¶ 64 (women owned); and certifying firms as meeting the criteria for such concerns, *id.* ¶ 51 (HUBZone certification), ¶¶ 68–69 (describing self-certification process).

The federal government has enacted a government-wide prime-contracting goal of awarding at least 23% of government contracting dollars to "small and disadvantaged businesses." *Id.* ¶ 33.  The government has also set sub-goals for awarding contracts to women-owned small businesses ("WOSBs") (5%), small disadvantaged businesses (5%), firms located in HUBZones (3%), and service-disabled veteran-owned small businesses ("SDVOSBs") (3%).  *Id.* ¶ 34.  One of the Small Business Administration's missions is to ensure these contracting goals are met.  *Id.* ¶ 35.

1.    *Athena and the Fraudulent HUBZone Certification*

Defendant Athena is a Virginia corporation that initially functioned as a residential remodeling contractor.  *Id.* ¶ 147.  Its founders have no construction or engineering background, and the company has "very little full-time staff, little expertise in construction or engineering, no real workforce, and virtually no heavy construction equipment."  *Id.* ¶ 166.

Athena became HUBZone certified in 2011.  *Id.* ¶ 148.  Relator alleges that Athena fraudulently secured and maintained that designation.  The SBA's requirements for a business to qualify for HUBZone certification include that its principal office be located in a HUBZone and that "at least 35% of [its] employees must reside in a HUBZone."  13 C.F.R. § 126.200(c)–(d) (2021).  Relator alleges that at no point starting with Athena's initial certification in 2011 and continuing with its annual recertifications through 2017 did it actually meet the 35% requirement.  *Id.* ¶¶ 157–158.  Instead, Athena "fraudulently included on its employee roster individuals who are either not employees under the relevant regulations and/or do not reside in a HUBZone."  *Id.* ¶¶ 154–156.  From 2014 to 2018, Athena used its fraudulently obtained HUBZone certification to secure at least thirty-one contracts worth a combined total of over $87 million.  *Id.* ¶ 164.

2.    *Codefendants and Respective Pass-Through Schemes*

Athena's other principal means of generating revenue was by "selling" its status as a certified small business to prime contractors.  *Id.* ¶ 167.  These prime contractors used Athena "to meet subcontracting goals" or, through their affiliation with Athena, "gain preferential treatment in the government contracting process."  *Id.*

The alleged scheme worked as follows.  Larger companies approached Athena "about a government project they wanted or needed Athena to be attached to in order to help meet the obligations under their subcontracting plans."  *Id.* ¶ 168(a).  For an undisclosed "administrative

fee" Athena would, in turn, "'carry[] the contract' on its books." *Id.* ¶ 168(b).  Athena assigned a project manager to the contract, "who was usually an inexperienced college graduate," whose "only job was to be present or to check in periodically." *Id.* ¶ 168(c).  The larger contractor company covered all of Athena's costs, including the project manager's salary. *Id.* ¶ 168(d).  All parties understood "that Athena would not be doing any actual work on the project," and that the true substantive work would "pass through to a [pre-selected] second-tier subcontractor" that did not qualify for one of the SBA certifications. *Id.* ¶ 168(e).  Along the way, the schemers would represent to the government that Athena was personally performing the small business–eligible services, when in fact they were being performed by large contractors. *Id.* ¶ 169.

Relator alleges that Athena carried out the scheme over years with multiple large contractors.  Some of the large contractors are named as codefendants—Balfour Beatty; Barton Malow; CAS; and Commonwealth—while others are not.  The scheme involved the following government contracts:

*Athena, Balfour Beatty, and St. Elizabeths Tunnel Project.*  Defendant Balfour Beatty won a $24.6 million government contract for a Department of Homeland Security tunneling project in Washington, D.C., in September of 2010. *Id.* ¶ 170.  The contract's Subcontracting Plan required that 30% of the subcontracted dollars go to small businesses, with specific set-asides for WOSB-, HUBZone-, and SDVOSB-certified firms. *Id.* ¶¶ 171–172.  Balfour Beatty's Purchasing Director approached Athena in February 2011 because subcontracting through Athena would allow Balfour Beatty to meet multiple small-business requirements simultaneously. *Id.* ¶ 173.  Balfour Beatty awarded Athena a $1.28 million contract for fire-extinguisher cabinets, painting, caulking, and concrete work, while directing the actual caulking and concrete work to larger firms handpicked by Balfour Beatty that did not qualify for any of the SBA designations. *Id.* ¶¶ 177–178, 182, 184;

*see also* TAC, Ex. 10, ECF No. 66-1 [hereinafter Exs. Set One], at 128 (subcontract cover page). In exchange, Athena received a 6% fee for carrying the contract and passing the work through to these larger firms. *See* TAC ¶¶ 179, 186, 193. Per Balfour Beatty's expectation, Athena performed practically none of the contracted-for work and received approximately $100,000. *Id.* ¶ 188.

<u>Athena, Balfour Beatty, and Walter Reed National Military Medical Center.</u> Athena and Balfour Beatty operated a similar scheme two years earlier. A Balfour Beatty joint venture won a $640 million contract to design and build the Walter Reed Medical Center. *Id.* ¶¶ 196–197. The joint venture awarded Athena a $2.2 million "subcontract to provide doors, frames, hardware, and numerous medical suites." *Id.* ¶ 198. Athena was paid a 3% fee for passing the work through to downstream contractors. *Id.* ¶¶ 199–202.

<u>Athena, CAS, and BRAC 132 on Fort Belvoir.</u> In a variation on the pass-through scheme, Athena occasionally bid directly on government contracts or first-tier subcontracts at the direction of a larger company who hoped to secure some of Athena's work. *Id.* ¶¶ 203, 211. Such was the case on the BRAC 132 project on Fort Belvoir in 2011, where CAS Vice President Richard Unger allegedly directed Athena to bid on a portion of the $24.8 million Administration Building project. *Id.* ¶¶ 210–212. Athena was subsequently awarded a "$907,000 subcontract for carpentry and drywall." *Id.* The subcontract was awarded subject to a Mentor/Protégé Agreement between Athena and CAS, but both firms understood and intended that Athena would not complete any of the promised substantive tasks. *Id.* ¶¶ 212–213. Relator served as the project manager for Athena and saw that Athena "did not do any work on the BRAC 132 project." *Id.* ¶ 214.

<u>Athena, CAS, and Social Security Administration Headquarters.</u> In 2013, CAS executives Unger and Assistant Vice President Ali Khosravi asked Athena to bid on a $2 million contract for work on the Social Security Administration's headquarters in Maryland. *Id.* ¶¶ 203–205. In

exchange, Athena worked to negotiate a nearly $10,000 annual fee. *Id.* ¶ 206. The Third Amended Complaint does not make clear whether Athena actually bid on the contract or, if so, whether it won the award.

*Athena, CAS, and Camp Pendleton Naval Hospital.*   Athena worked at the direction of CAS's west coast subsidiary in securing a $17.8 million subcontract "to perform framing, drywall and acoustical tile work." *Id.* ¶¶ 221–222. Per their usual agreement, the entire subcontract was passed along to CAS, and Athena received almost $250,000 in fees for carrying it. *Id.* ¶¶ 223–224.

*Athena and Russell Knox Building.*   Athena served as a first-tier subcontractor for a nondefendant major prime contractor working on a $32.5 million Marine Corps building contract. *Id.* ¶¶ 225, 228–229. In the months after the prime contract was awarded, Athena received nearly $8 million of work across various subcontracts. *Id.* ¶¶ 225, 229–230. Athena turned around and subcontracted the fire-protection, mechanical, and electrical subcontracts to more capable firms while pocketing various fees. *Id.* ¶¶ 232–238.

*Athena and Nolan Parking Garage.*   Athena worked with the same nondefendant major prime contractor on a parking garage and was awarded over $5.5 million in subcontracts. *Id.* ¶¶ 239–242. Instead of actually performing the agreed-upon mechanical and electrical work, Athena pushed it to lower-tier subcontractors and earned hundreds of thousands of dollars in fees along the way. *Id.* ¶¶ 243–245.

*Athena, Barton Malow, and Audie Murphy VA Hospital.*   In the same variation as the BRAC 132 contract, Athena bid directly to be a prime contractor and won work on a Veterans Administration ("VA") Hospital for ceiling and lighting work valued at $2.2 million. *Id.* ¶¶ 246–251. Unbeknownst to the VA, Athena already had selected codefendant Barton Malow as

7

subcontractor, who in turn parceled out the work to third-tier subcontractors. *Id.* ¶¶ 251–255. Athena received a 2% fee for acting as the pass-through on this project. *Id.* ¶ 255.

*Athena and Marine Corps University.* In March 2013, a nondefendant joint venture, which had won an $80 million contract for the design and construction of the Marine Corps University, approached Athena to meet its subcontracting goals. ¶¶ 256–257. The joint venture awarded Athena a $9.7 million subcontract to complete mechanical-plumbing and fire-protection work. *Id.* ¶258. Athena did none of it; a large subcontractor selected by the joint venture completed the tasks instead. *Id.* ¶¶ 258–261.

*Athena and Fort Belvoir VA Hospital.* Finally, another nondefendant joint venture awarded Athena a $9.2 million subcontract to install carpet and flooring in a new VA hospital, but Athena passed along the actual work to a large, second-tier subcontractor. *Id.* ¶¶ 265–266. Athena's representatives were not meaningfully present on the job site, and "[t]he only task[s] that Defendant Athena [performed were] transferring [the lower-tier subcontractor]'s documents to Athena's own letterhead and otherwise concealing the pass-through scheme from the government." *Id.* ¶ 268.

## B.    Procedural Background

This matter has spanned five years, four complaints, two districts, and a rotating cast of codefendants. Relator initiated this suit in the Middle District of Pennsylvania on January 10, 2017, raising claims under the False Claims Act ("FCA") against Athena and its co-owners Amber Peebles and Melissa Schneider. *See generally* Compl., ECF No. 1 [hereinafter Compl.]. As required by the FCA, *see* 31 U.S.C. § 3730(b)(2), Relator filed the Complaint under seal to provide the United States the opportunity to investigate the claims and decide whether to intervene. The United States declined to intervene. Gov't's Notice of Election to Decline Intervention, ECF No.

8.   The United States District Court for the Middle District of Pennsylvania then ordered the Complaint unsealed.  Order, ECF No. 9.  Defendants Athena, Peebles, and Schneider filed a joint motion to dismiss, Defs.' Mot. to Dismiss, ECF No. 11, which Relator mooted by filing his first Amended Complaint as of right, Am. Compl., ECF No. 15.  The Amended Complaint dropped Peebles and Schneider as defendants, leaving only Athena.  *Id.* at 1.  Athena then moved again to dismiss the Amended Complaint.  Def.'s Mot. to Dismiss Am. Compl., ECF No. 17, and the District Court for the Middle District of Pennsylvania denied the motion and ordered the case transferred to this District, Order, ECF No. 26.

Once the case was in this District, Relator filed his Second Amended Complaint ("SAC") under seal on October 22, 2018.  Second Am. Compl., ECF No. 41 [hereinafter SAC].  The United States investigated the complaint's new allegations, Gov't's Notice Re: Relator's Proposed Second Am. Compl., ECF No. 38, and after conducting a 14-month review, declined once more to intervene, Gov't's Notice of Election to Decline Intervention, ECF No. 60.[1]  The court then ordered the SAC unsealed on January 18, 2021.  Order, ECF No. 61.  The SAC named thirteen new defendants, including current codefendants Barton Malow, Balfour Beatty, CAS, and Commonwealth.  *See* SAC at 1.  Following a hearing, Athena consented to Relator amending his complaint for a third time.  Joint Status Report, ECF No. 65, at 1.  On February 26, 2021, Relator filed his Third Amended Complaint ("TAC"), which is now the operative pleading.  The TAC dropped eight of the previously named defendants but maintained the allegations relating to their federal contracts against Athena.  TAC ¶¶ 225–245, 256–271.

The TAC advances five claims against Athena under the FCA.  Relator alleges that Athena (1) knowingly presented or caused to be presented a fraudulent claim for payment, 31 U.S.C.

---

[1] During the government's review period, Athena filed a motion to dismiss for lack of prosecution, Mot. to Dismiss for Lack of Prosec., ECF No. 54, which the court denied, Minute Order, Jan. 18, 2021.

§ 3729(a)(1)(A) (Count I); (2) made, used, or caused to be made or used a false record or statement, *see id.* § 3729(a)(1)(B) (Count II); (3) conspired to commit violations of §§ 3729(a)(1)(A) and (1)(B), *see id.* § 3729(a)(1)(C) (Count III); (4) made, used, or caused to be made or used a false record to avoid or decrease a financial obligation to the United States, *see id.* § 3729(a)(1)(G) (Count IV); and (5) retaliated against Relator for investigating and reporting fraud, *see id.* § 3730(h) (Count V).

While not a model of clarity, the TAC appears to charge the four large contractor codefendants—Balfour Beaty, Barton Marlow, CAS, and Commonwealth—with the same first four Counts as Athena.  All Defendants moved to dismiss except CAS, which answered the complaint. Relator then dismissed the Count IV claims for "reverse" false claims against Commonwealth, Balfour Beatty, and Barton Malow.  This left the five original counts against Athena and the first three counts against each of the three moving codefendant contractors.  The four motions to dismiss are now ripe.

## II.    LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), the court must find that the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "[N]aked assertion[s] devoid of further factual enhancement" are not sufficient to support a complaint.  *Id.* (alteration in original) (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 557).  Factual allegations are not required to be "detailed," but pursuant to the Federal

Rules, they must be more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief," and the case can be dismissed. *Id.* at 679 (cleaned up) (citing FED. R. CIV. P. 8(a)(2)).

When, as here, a complaint contains allegations of fraud, Rule 9(b) requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "Together, Rules 8 and 9(b) require a plaintiff to plead the time, place, and content of the fraud and to identify the individuals allegedly involved." *United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 936 (D.C. Cir. 2017) (citing *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004)). Further, the complaint must identify "the fact misrepresented and what was retained or given up as a consequence of the fraud." *Williams*, 389 F.3d at 1256 (internal quotation marks omitted).

Rule 9(b)'s particularity requirement "safeguards potential defendants from frivolous accusations of moral turpitude . . . [and] guarantee[s] all defendants sufficient information to allow for preparation of a response." *Id.* (internal quotation marks omitted). A court should only dismiss a complaint with prejudice for failure to plead fraud with particularity, however, "if it determines the plaintiff could not possibly cure the deficiency by alleging new or additional facts." *Shea*, 863 F.3d at 936 (internal quotation marks omitted) (finding district court did not abuse discretion by granting leave to amend where relator "outlined the basic mechanics" of the fraud and "could potentially provide more detail about the 'who,' 'what,' 'where,' and 'when' of the fraud as to each individual contract").

### III.    DISCUSSION

The FCA was born of Congress's desire to stop the "plundering of the public treasury" in the wake of sensational reports of fraud against the government as it purchased necessities for the Civil War. *United States v. McNinch*, 356 U.S. 595, 599 (1958). The FCA allows private parties, known as "relators," to bring a qui tam action—that is, an action on behalf of the United States—to recover civil penalties and damages for fraud. *See* 31 U.S.C. §§ 3729(a), 3730(b). The United States may elect to intervene in the qui tam action and prosecute the case. *See United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 217 (D.C. Cir. 2003) (stating that "the Government may intervene or bring a related action based on the facts underlying the [*qui tam*] action" (citing 31 U.S.C. § 3730(b)(5)). Even if does not, the relator still may proceed with the case. That is what occurred here.

While the TAC alleges classic false-presentment theories of liability,[2] in Relator's opposition to Athena's motion to dismiss, he pivots to arguing that the TAC actually rests on two distinct theories of legal liability:  implied false certification and fraud in the inducement. The court accepts Relator's characterization of his own complaint. In detailing these theories, Relator makes no effort to tie either to any of the TAC's specific counts. *See* Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss & Demand for Cost, ECF No. 71 [hereinafter Relator's Athena Opp'n], at 25–28. The court assumes for present purposes that both theories apply to Counts I–IV against Athena and that only fraud in the inducement applies to Counts I–III as to the other defendants.

Relator's implied-false-certification theory rests on Athena's alleged securing of contracts with its fraudulently obtained and maintained HUBZone certification. Relator's Athena Opp'n at

---

[2] *See*, *e.g.*, TAC ¶ 310 ("Defendants caused to be presented, made and/or used false or fraudulent invoices, and/or false records or statements, including size and status certifications to [the] government, causing the United States to suffer significant damages.").

27–28.  To make out such an implied-false-certification claim, a relator "must allege that: (1) the defendant not only made a request for payment but also made specific representations about the goods or services provided, and (2) the defendant failed to disclose noncompliance with material statutory, regulatory, or contractual requirements [that] made those representations misleading half-truths." *United States ex rel. Lott v. Not-For-Profit-Hosp. Corp.*, 296 F. Supp. 3d 143, 151 (D.D.C. 2017) (internal quotation marks and alterations omitted).

Relator's fraud-in-the-inducement theory is premised on the alleged pass-through scheme between Athena and its codefendants.  Relator's Athena Opp'n at 25–27.  Fraud in the inducement requires a showing that a defendant made a claim "under a contract which was procured by fraud." *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005).  It is immaterial whether "the claims were fraudulent in themselves." *Id.* Any claim made under a contract that was fraudulently induced gives rise to liability. *United States ex rel. Cimino v. IBM Corp.*, 3 F.4th 412, 417 (D.C. Cir. 2021).

The court begins its analysis by considering two threshold challenges made by Athena regarding the pass-through scheme allegations: (1) those claims are untimely and (2) they are barred by the FCA's public-disclosure bar.  The court rejects the first of these arguments but agrees with the second.  The court then proceeds to substantively analyze the pass-through scheme as to all Defendants and finds that Relator fails to adequately plead causation.  Turning next to the HUBZone scheme, the court rejects Athena's materiality and particularity challenges, allowing claims based on the HUBZone scheme to move forward.  The court then quickly dismisses Relator's reverse false claim count against Athena.  Finally, the court concludes by rejecting Athena's challenge to Relator's retaliation claim.

A.       **Threshold Challenges**

1.    *Statute of Limitations Challenge*

Athena contends that all claims relating to the alleged pass-through scheme must be dismissed as untimely under the FCA's statute of limitations.  Def. Athena's Mem. in Supp. of Mot. to Dismiss & for Costs, ECF No. 69 [hereinafter Athena's Mem.], at 4–6.  The FCA's limitations provision reads:

> A civil action under section 3730 may not be brought—
>
> (1) more than 6 years after the date on which the violation of section 3729 is committed, or
>
> (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
>
> whichever occurs last.

31 U.S.C. § 3731(b).  This case is governed by subsection (b)(2) because it supplies a longer limitations period for Relator.  *See Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1510 (2019) (holding that subsection (b)(2) applies regardless of whether the government intervenes).  So, the court analyzes Athena's limitations challenge under § 3731(b)(2).

The key question for purposes of that provision is at what point did the "facts material to the right of action" become "known or reasonably should have [become] known" by an "official of the United States with responsibility to act."  According to Relator, that date is July 19, 2016, when a different relator filed an FCA action in the Eastern District of Louisiana.  *See* Athena's Mem. at 7–8 (citing Compl., *United States ex rel. Ming/TM, LLP, v. Clark/McCarthy Healthcare Partners – A Joint Venture*, No. 2:16-cv-12950-BWA-JVM (E.D. La. July 19, 2016) [hereinafter *Ming/TM* Compl.]).  In that case, the relator, represented by the same counsel as Relator in this

case, alleged Athena (among others) had participated in a similar pass-through scheme in connection with a Hurricane Katrina-related construction project. *Ming/TM* Compl. ¶ 282. Athena argues that, because "the Department of Justice has been on notice of the 'scheme' alleged since July 2016, well in excess of the three years provided by the False Claims Act," "any claims related to the 'pass-through scheme' must be dismissed as time-barred." Athena Mem. at 8.

The court will assume for present purposes that the limitations period on the pass-through scheme allegations made in this case began to run in July 2016, but applying that assumption does not make the claims here untimely. Three years after July 19, 2016, is July 19, 2019. Relator filed the Second Amended Complaint, in which the pass-through allegations first appeared, on October 22, 2018. SAC at 1. Thus, Relator filed the SAC within the three-year window provided under § 3731(b)(2), making the pass-through claims timely.[3]

In an attempt to move the SAC outside the three-year window, Athena argues that the SAC's filing date is "the date it was ordered unsealed and served by this Court on January 18, 2021." Athena's Mem. at 7. But Athena cites no support for this proposition, and the law is to the contrary. The FCA provides that a "civil action under section 3730 may not be brought" after the time periods set forth in § 3731(b). An action is not "brought" when the court orders it to be unsealed; it is "brought" when the relator files it. Courts in other Circuits consistently have so held. *See, e.g.*, *Hayes v. Dep't of Educ. of City of New York*, 20 F. Supp. 3d 438, 445 (S.D.N.Y. 2014) ("The FCA makes clear that a relator 'bring[s]' a complaint when she files a qui tam complaint, not when that complaint is unsealed."); *United States ex rel. Downy v. Corning, Inc.*, 118 F. Supp. 2d 1160, 1171 (D.N.M. 2000) ("[T]he limitations provisions of Section 3731 are referring to the relator's initial act of filing the civil action, not to the later date when the complaint

---

[3] Athena does not argue that any of the alleged pass-through violations fall outside the 10-year window set forth in § 3131(b)(2).

is unsealed. . . . [Choosing the unsealing date] is contrary to the language, structure, and purposes of the FCA."). The court therefore rejects Athena's attempt to recharacterize the SAC's filing date so that it falls outside the three-year window.[4]

### 2.    The FCA's Public-Disclosure Bar

Athena next argues that the FCA's public-disclosure bar forecloses claims based on the pass-through theory because similar allegations were made against Athena in a prior action and because Relator does not qualify as an "original source." Athena's Mem. at 8–11. As detailed below, the court agrees.

As part of an effort "to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior," Congress enacted the FCA's public-disclosure bar. *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994). The bar requires courts to "dismiss an action" if the core "allegations or transactions . . . were publicly disclosed" including, as relevant here, in "a Federal . . . civil . . . hearing in which the Government or its agent is a party." 31 U.S.C. § 3730(e)(4)(A)(i). If the action is maintained by a relator (as opposed to the Attorney General), it can be rescued from the public-disclosure bar if "the person bringing the action is an original source of the information." *Id.* § 3730(e)(4)(A). The FCA's public-disclosure bar was once jurisdictional, but as amended in 2010, it now "merely deprives the plaintiff of his claim." *United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 160 F. Supp. 3d 16, 24 (D.D.C. 2015); *see also United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 300 (3d Cir. 2016) ("[W]e conclude that the amended bar is not

---

[4] For this same reason, the court rejects Athena's contention that the pass-through scheme claims are untimely because the alleged violations occurred more than six years before the date of unsealing. *See* Athena Mem. at 7. In any event, as discussed, the three-year post-filing date under § 3731(b)(2) supplies the longer limitations period, so the six-year period under § 3731(b)(1) does not apply. Additionally, the parties have spent a considerable amount of time discussing whether the pass-through scheme claims can be saved under the relation-back doctrine under Rule 15(c)(1)(B). But no resort to that doctrine is necessary because the pass-through claims that appear for the first time in the SAC are timely.

jurisdictional."); *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810 (11th Cir. 2015) (same); *United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 916 (4th Cir. 2013) (same).

"The FCA sets up a two-part test for determining" whether the bar applies. *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 681 (D.C. Cir. 1997). The court first determines "whether the information underlying the allegations and transactions has been publicly disclosed." *United States ex rel. Scutellaro v. Capitol Supply, Inc.*, No. 10-cv-1094 (BAH), 2017 WL 1422364, at *12 (D.D.C. Apr. 19, 2017). "[I]f—and only if—the answer to the first question is affirmative, will the court then proceed to the original source inquiry." *Id.* (internal quotation marks omitted).

_Public disclosure._   The court holds that the pass-through-scheme allegations were publicly disclosed in the *Ming/TM* action filed in the Eastern District of Louisiana. The public-disclosure "inquiry focuses not on the additional incriminating information a relator supplies, but instead on whether the quantum of information already in the public sphere was sufficient to set government investigators on the trail of fraud." *United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 87 (D.C. Cir. 2014) (internal quotation marks omitted). The critical question is "whether the publicly disclosed information could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing." *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999).

A recent decision from this District illustrates how the "quantum of information" inquiry operates. In *United States ex rel. Scott v. Pacific Architects and Engineers, Inc.*, the relators alleged that the defendant had engaged in fraudulent billing practices pursuant to an overseas State Department police-training contract. No. 13-cv-1844 (CKK), 2020 WL 224504, at *1 (D.D.C.

Jan. 15, 2020).   The *Scott* relators had included in a prior complaint allegations of a State Department audit of some of the time sheets at issue.  *Id.* at *3.  The text of the FCA specifically identifies a "Federal report, hearing, audit, or investigation" as one means by which allegations may be publicly disclosed.  31 U.S.C. § 3730(e)(4)(A)(ii).  Despite the relators' inclusion of additional instances of fraud in the operative complaint, the court held that "alleg[ing] specific instances of . . . fraud about which the government may not have already been aware is of no consequence." *Scott,* 2020 WL 224504, at *6.  The allegations were publicly disclosed.  *Id.*

Here, to support its public-disclosure defense, Athena points to the *Ming/TM* action, discussed above.  Athena's Mem. at 7–8 (citing *Ming/TM* Compl.).  Relator's counsel is the same in both cases, and they appear to have copied some allegations nearly verbatim from the earlier *Ming/TM* complaint and pasted them into the TAC here.  *Id.*  Namely, in both actions the relators alleged that Athena perpetrated "fraud by falsely representing to [the government] that it was performing small business eligible services when, in fact, it acted as a pass-through organization utilized by large contractors to circumvent the regulations and the law in order to obtain and keep the [prime contract] that required small business" involvement.  *See* TAC ¶ 169; *Ming/TM* Compl. ¶ 282.  The *Ming/TM* complaint further alleges that "Athena was a first-tier subcontractor . . . on three . . . subcontracts proving [sic] drywall, acoustical tile, and external sheathing construction services worth some $40 million" but operated as "merely a pass-through for larger subcontractors . . . and did nothing more than administrative duties."  *Ming/TM* Compl. ¶¶ 46–47.

If investigated, these allegations "could have formed the basis for a governmental decision on prosecution," *Settlemire*, 198 F.3d at 918, and would minimally have alerted authorities to the possibility of pass-through fraud.  Just as in *Scott*, Relator's inclusion of ten additional, specific instances of pass-through fraud in the TAC, *see* TAC ¶¶ 170–271, does not change the calculus.

The government already had enough information in the public domain to set its "investigators on the trail of fraud." *Staples*, 773 F.3d at 87.

Relator's counterarguments are unavailing.  Relator maintains that the Louisiana complaint is limited to a single contract in a single state and fails to "meaningfully alert any government investigator to look beyond the hospital project in New Orleans where 13 different companies alleged[ly] engaged in some form of fraud."  Relator's Athena Opp'n at 20–21.  And, though conceding that the Louisiana complaint disclosed Athena's involvement "in a pass-through scheme," Relator further urges that the *Ming/TM* complaint did not disclose the specific subcontracts put in issue by the SAC and TAC.  *Id.*  These contentions do not avoid the public-disclosure bar.  For one, the *Ming/TM* complaint says more than Relator contends.  It references "numerous [unnamed] prior subcontracts" between Athena and another Louisiana codefendant, *Ming/TM* Compl. ¶ 242, and accuses Athena's on-the-ground employees of lacking the requisite experience, *id.* ¶¶ 286–289.  Moreover, as already discussed, a complaint that "merely provid[es] more specific details about" previously disclosed allegations or "specific instances of fraud where the general practice has already been publicly disclosed" does not overcome the public-disclosure bar.  *United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 472–73 (D.C. Cir. 2016) (internal quotation marks and citations omitted).  Here, although the face of the *Ming/TM* complaint did not give the government notice of *all* potential instances of pass-through fraud by Athena, it provided the government sufficient notice of that scheme such that further investigation likely would have revealed similar instances of fraud.  The court therefore finds that the pass-through-scheme allegations as to Athena have been publicly disclosed.

<u>*Original source.*</u>  The court now proceeds to the second step of the public-disclosure inquiry: whether Relator served as an original source.  He did not.

The analysis starts with the question of burden.  When the public-disclosure bar was deemed jurisdictional prior to the 2010 amendments, the burden of proving a relator's original-source status fell on the relator.  *See*, *e.g.*, *United States ex rel. Ervin & Assoc's, Inc. v. Hamilton Securities Grp., Inc.*, 370 F. Supp. 2d 18, 35 (D.D.C. 2005) ("[A] relator must sustain its burden of proving . . . [they are] the original source.").  The court has found no case addressing whether the burden has shifted post-amendment.  Ordinarily, under Rule 12(b)(6), the burden rests on the moving party to show that no plausible claim for relief exists.  *See Cohen v. Bd. of Trustees of the Univ. of the D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016).  But that rule is not absolute.  For example, on a motion to dismiss, once an official claiming qualified immunity satisfies the burden of raising the defense, the burden shifts to the plaintiff to show the defendant is not entitled to qualified immunity.  *See Simmons v. Skelonc*, No. 20-cv-2845 (CKK), 2021 WL 3207042, at *3 (D.D.C. July 29, 2021).  The court thinks a similar rule applies here.  The FCA commands a court to "dismiss an action" that has been publicly disclosed "*unless* . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (emphasis added).  The original-source inquiry therefore is framed as an exception to the public-disclosure affirmative defense.  *See United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 40 (4th Cir. 2016) ("Post-amendment, the public-disclosure bar is a grounds for dismissal—effectively, an affirmative defense—rather than a jurisdictional bar.").  Placing the burden on the relator, who uniquely knows whether he is an original source, is therefore appropriate.  *See Smith v. United States*, 568 U.S. 106, 112 (2013) ("Where the facts with regard to an issue lie peculiarly in the knowledge of a party, that party is best situated to bear the burden of proof." (cleaned up)).  Thus, with Athena having raised and established the applicability of the public-disclosure bar, the burden shifts to Relator to demonstrate that he is an original source.

20

Under the statute, there are two ways for a relator to qualify as an original source.  First, the relator "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" prior to the information being revealed to the public in one of the nearly dozen ways the statute recognizes a public disclosure.  31 U.S.C. § 3730(e)(4)(B). Alternatively, the relator must both have "knowledge that is independent of and materially adds to the publicly disclosed allegations" and have "voluntarily provided the information to the Government before filing an action under this section."  *Id.* § 3730(e)(4)(B).  Either avenue overcomes the public-disclosure bar.  *See United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 839 n.4 (D.C. Cir. 2012) (stating that the 2010 FCA amendments now require a relator claiming original-source status to meet either the "pre-public disclosure requirement, *or* . . . provide[] the information to the Government prior to filing suit").

Neither party seriously contends that the first definition of "original source" applies, so the court focuses on the second.  Athena argues in a conclusory fashion that Relator cannot be an original source when the relator in Louisiana beat him to the punch; Athena also cites the SAC's reference to an "informant" with knowledge to argue that Relator is not an original source. Athena's Mem. at 9, 10 (citing SAC ¶ 230).  However, this argument ignores that, despite the existence of some public information, a relator still can be an original source if he possesses "knowledge that is independent of and materially adds to the publicly disclosed allegations." 31 U.S.C. § 3730(e)(4)(B).  Relator arguably meets this criterion.  *See* Relator's Athena Opp'n at 21 (arguing that, as Athena's Superintendent and Director of Operations, Relator "had firsthand information relating to all of Defendant Athena's government contracting work[,]" and Relator "was also in possession of a hard drive with hundreds of documents discussing and detailing various pass-through schemes, which [was] not available to the" Louisiana relator).

21

But Relator's proffer suffers in a critical way, as to which he is silent. Recall, a relator claiming public-source status under § 3730(e)(4)(B) must establish that he "voluntarily provided the information to the Government *before* filing an action under this section." 31 U.S.C. § 3730(e)(4)(B) (emphasis added). Relator here, however, fails to make any representation whatsoever about government notification, either prior to the public disclosure or before initiating this suit. *See* Relator's Athena Opp'n at 22 (arguing only that "Relator's allegations and transactions . . . are independent and materially add to any public information that might exist from the [*Ming/TM*] complaint, [so] the Court should not dismiss the Third Amended Complaint"). Relator therefore fails to carry his burden to establish that he is an "original source" under the FCA. Relator's claims against Athena relating to the pass-through scheme therefore are barred by their prior public disclosure.

### B.      Pass-Through Scheme and Athena's Codefendants

Having dismissed the pass-through-scheme claims against Athena, the court now considers these same claims as to Athena's codefendants, none of whom raised the public-disclosure bar as a defense. The court finds that across the ten subcontracts at issue, Relator nowhere pleads the requisite but-for causation to make out a plausible fraud-in-the-inducement claim against Athena's codefendants. This same failure of pleading is an alternative ground for dismissal as to Athena.

To allege a plausible fraud-in-the-inducement theory under the FCA, a relator must "plead actual causation under a but-for standard." *Cimino*, 3 F.4th at 420. "Because the fraud must be in the inducement, liability under the FCA for fraudulent inducement must turn on whether the fraud caused the government to contract." *Id.* at 418–19; *see also Paroline v. United States*, 572 U.S. 434, 449–50 (2014) ("The traditional way to prove that one event was a factual cause of another is to show that the latter would not have occurred 'but for' the former."). In *Cimino*, that meant

the relator "would have to provide sufficient facts for the court to draw a reasonable inference that [the defendant's] false audit caused the [agency] to enter the license agreement." 3 F.4th at 421. By analogy, to make out a fraud-in-the-inducement claim here, Relator must plead sufficient factual matter for the court to reasonably draw the inference that the alleged pass-through scheme caused the government to enter into the various contracts at issue.

On that score, Relator falls hopelessly short. For each of the ten contracts, he fails to plead that the alleged pass-through arrangement between the large contractor and Athena was in place *before* the government awarded the contract. If the pass-through scheme did not yet exist, it logically could not have induced the government to make any of the contract awards. A brief discussion of each of the ten contracts at issue shows the temporal impossibility of a causal link.

### 1.   Claims Against Balfour Beatty and Athena

<u>St. Elizabeths Tunnel Project.</u>   Coordination between Athena and Balfour Beatty is alleged to have occurred months *after* the initial contract award. As pleaded by Relator, Balfour Betty was awarded the St. Elizabeths tunnel project on September 23, 2010. TAC ¶ 170. Some five months later, Balfour Betty "approached Athena in early February of 2011 about serving as a first-tier subcontractor." *Id.* ¶ 173. Not until May 2011, eight months after Balfour Beatty's original award, did Athena sign the subcontract. *Id.* ¶ 184. This timeline negates Relator's theory that the alleged pass-through scheme induced the prime contract award to Balfour Beatty.

To avoid this conclusion, Relator submits hundreds of pages of unsigned and undated exhibits. The only exhibit potentially relevant to this contract is Balfour Beatty's signed Small Business Subcontracting Plan. TAC, Exs. Set One, at 61–75. But that Subcontracting Plan

nowhere mentions Athena or alleges that Athena had any involvement in the Plan's creation.  It therefore does not move the needle for Relator.

_Walter Reed National Military Medical Center._   The allegations with respect to Walter Reed National Military Medical Center suffer from the same temporal problem.  According to Relator, the Navy awarded the $640 million Walter Reed prime contract to a joint venture involving Balfour Beatty in May 2008.  TAC ¶¶ 196–197.  Relator goes on to allege that the joint venture "awarded Defendant Athena a $2,200,000 subcontract to provide doors, frames, hardware, and numerous medical suites."  _Id._ ¶ 198.   The TAC does not identify when the award occurred, but it likely was no earlier than February 23, 2011.  _See_ TAC, Exs. Set One, at 219–23 (including what appears to be an initial email from Balfour Beatty to Athena about the project on that date). The alleged agreement to pass through the subcontract therefore could not have induced the government to award the Walter Reed project to the Balfour Beatty joint venture.

### 2. Claim Against Barton Malow and Athena

_Audie Murphy VA Hospital._  With respect to the Audie Murphy contract, in late March 2013, Athena is alleged to have directly won an award as the prime contractor for certain ceiling and light work but conspired to pass the contract through to Barton Marlow.  TAC ¶¶ 246, 251. According to Relator, this arrangement was "[u]nbeknownst to the government."  _Id_.  But Relator does not allege that Athena's agreement with Barton Malow _preceded_ Athena's winning bid, thereby failing to establish a but-for causal connection between the alleged nondisclosure and the contract award.  Even if the TAC could be construed to assert that Athena and Barton Malow struck their agreement before the bid, Relator makes no allegation as to how, if at all, Athena's small-business certifications were at all relevant to the VA's award decision.  _See id._ ¶¶ 246–255. And, finally, even if Athena's small-business certifications played some role in Athena's bid, the

complaint does not plausibly support that Athena hid from the VA that Barton Malow served as its subcontractor. For example, Relator suggests that, "to achieve [their] deception," Athena "claimed that two of Defendant Barton Malow's senior project executives, David Garrett and David Moody, worked for Athena." *Id.* ¶ 251. For that proposition it cites Exhibit 70 to its pleading, which appears to be a standard government "Statement and Acknowledgement" form. *Id.* ¶ 251 n.82 (citing TAC, ECF No. 66-3 [hereinafter Exs. Set Three], at 65). That form does not, however, represent Garrett to be an employee of Athena; rather, Garret signed the form under the section titled "Acknowledgement of Subcontractor," which is clearly identified on line 5 as "Barton Malow." *Id.* It also is dated June 21, 2013, nearly three months *after* the contract award. So, even if the VA received the form (which Relator has not alleged), it would have understood Garrett to work for Barton Malow as subcontractor, not Athena as prime contractor.

Relator cites two other exhibits, but neither help his cause. He attaches an "Athena Construction Site Specific Safety Manual," which states, "It is the responsibility of David Moody, Athena Construction Group/Safety Officer to implement this Fall Protection Plan for this project." *Id.* ¶ 251 (citing TAC, Exs. Set Three, at 100). Relator asserts that Moody was an employee of Barton Malow, not Athena. *Id.* But Relator nowhere alleges that this document, even if misleading, was submitted to the VA in connection with Athena's bid. Relator also cites a June 21, 2013, email from Athena to the VA that identifies "David Moody [as] our Superintendent." *Id.* ¶ 252 (citing TAC, Exs. Set Three, at 120). That email, of course, post-dates the contract award by three months and therefore could not have fraudulently induced the award.

Accordingly, neither the complaint's allegations nor the exhibits attached to it support a plausible claim of fraud in the inducement with respect to the Audie Murphy VA Hospital contract.[5]

### 3. *Claims Solely Against Athena*

The seven remaining contracts allege pass-through schemes as to Athena, nonmovant Defendant CAS, and other corporate entities that were defendants in the SAC but dropped for purposes of the TAC. The only operative motion as to these allegations is Athena's. Although the court already has dismissed the pass-through claims against Athena based on the public-disclosure bar, and CAS has not moved to dismiss, the court briefly analyzes each of these contracts. The allegations as to each project fail to state a fraud-in-the-inducement claim.

<u>Social Security Administration.</u>  For this project, Relator cites as evidence of a pass-through agreement between Athena and Defendant CAS an email dated February 11, 2013. TAC ¶ 205. In the email, Athena promises to "carry [a] contract for you guys," which Relator takes to mean that Athena "would trade its small business certifications for an administrative fee." *Id.* ¶ 206. Yet, Relator elsewhere alleges that major general contractor Hensel Phelps Construction Company ("Hensel Phelps") (a named defendant in the SAC but not the TAC), not CAS, won the prime contract on January 13, 2012. TAC ¶ 149 n.5. Nowhere does Relator connect the dots as to how this alleged Athena-CAS agreement induced the government to award the prime contract to Hensel Phelps over a year prior. If what Relator means to say is that the Athena-CAS pass-through agreement induced *Hensel Phelps* to award the subcontract to Athena, then it is unclear how such a scheme perpetrated a fraud on the *United States*.

---

[5] Because the court grants Barton Malow's motion on causation grounds, the court need not rule on Barton Malow's particularity, Def. Barton Malow Company's Mot. to Dismiss Relator's TAC, ECF No. 94, at 11–15, knowledge, *id.* at 18–19, or materiality arguments, *id.* at 19–24.

*BRAC 132.*  The BRAC 132 project suffers from the same defect.  According to Relator, Hensel Phelps won the prime-contract award in September 2010, *id.* ¶ 149, and months later, CAS engaged Athena about bidding on and passing through first-tier subcontractor work.  *Id.* ¶¶ 211–213.  Athena successfully did so.  *Id.*  Athena and CAS used a pass-through scheme to secure another subcontract in March 2011.  *Id.* ¶ 215.  The problem with this theory is that the alleged pass-through scheme arose months *after* the government's prime-contract award.  And, to the extent that Relator's theory is that the scheme induced the award of the subcontract, it seems that Hensel Phelps was the target of the alleged fraud, not the United States.  Indeed, Relator expressly contends that Hensel Phelps was *not* aware of the pass-through scheme.  *See id.* ¶ 216 ("Hensel Phelps's Office Engineer for this project . . . was unaware that Athena was serving just as a pass-through.").  These allegations do not state an FCA claim.

*Camp Pendleton Naval Hospital.*  Relator's Camp Pendleton Naval Hospital project allegations are the thinnest of all.  In a mere four paragraphs, Relator claims that Athena won a $17.8 million subcontract for the Naval Hospital, which it then passed through to CAS's subsidiary Component West Inc., in exchange for a fee.  *Id.* ¶¶ 221–224.  But Relator pleads not much else.  It is therefore impossible for the court to infer that Athena induced the award of the Camp Pendleton project through fraud.

*Russell Knox Building.*  Relator better frames this pass-through scheme as to the Russell Knox project but still neglects to plead the critical timing.  According to Relator, Hensel Phelps won the prime award and approached Athena to serve as a first-tier subcontractor to meet the variety of subcontracting goals.  *Id.* ¶¶ 225–227.  Relator alleges that "Hensel Phelps approached Athena about serving as the first-tier subcontractor" but does not say when this occurred.  *Id.* ¶ 228.  Of the nearly $8 million worth of subcontracts Hensel Phelps awarded Athena, Relator specifies

27

only one dated July 2, 2013, which is months after the prime-contract award on March 29, 2013. *Id.* ¶ 149; *id.* ¶¶ 229–230; TAC, ECF No. 66-2, at 79–87.  Absent some allegation that the pass-through scheme predated Hensel Phelps's bid for the Russell Knox project, and that Hensel Phelps was in on such scheme, the subcontracts do not support a pre-award fraudulent-inducement claim.

 *Fort Belvoir Nolan Parking Garage.*  Relator alleges that Hensel Phelps again sought out Athena for the Nolan Garage project, but Relator fails to develop the allegations much beyond that.  Hensel Phelps won the prime award in July 2013, TAC ¶ 149, and awarded Athena over $5.5 million worth of subcontracts, *id.* ¶ 242.  But Relator does not allege the critical *when* for these subcontracts, so this cannot state a plausible claim for fraudulent inducement.

 *Marine Corps University.*  Relator alleges that Athena was awarded a subcontract for work on the Marine Corps University nearly six months after the prime award.  *See id.* ¶¶ 256, 258 (specifying date of prime award as September 25, 2012, and date of subcontract as March 5, 2013). A subcontract made after the prime award cannot fraudulently induce the prime award where there is no allegation tying together the two agreements.

 *Fort Belvoir VA Hospital.*  The prime contract for the Fort Belvoir VA Hospital was awarded in 2007. *Id.* ¶ 149.  Relator does not specify when Athena and the prime contractor came to their alleged agreement, but it must have been sometime between 2010, when Athena first became certified by the SBA, and March 2011, when Athena billed the prime contractor for work performed under the subcontract, TAC, ECF No. 66-4, at 83.  That is too late to support fraud in the inducement.

*  *  *

 To recap, none of the pass-through agreements involving Athena predate the government's contract award to either the prime contractor or Athena (as prime contractor).  The failure to

28

disclose such agreement therefore could not have induced the government to award the contract in question.  Relator's fraud-in-the-inducement theory fails.

> 4.    *Commonwealth*

Relator's claims against Commonwealth are easily disposed of because Relator fails to meaningfully plead any.  As Commonwealth points out, "Relator identifies contract after contract involving other defendants[,]" yet "none of them specifically concern Commonwealth[]."  Def. Commonwealth's Mot. to Dismiss Relator's TAC, ECF No. 86, Def. Commonwealth's Mem. in Supp. of Mot. to Dismiss Relator's TAC, ECF No. 86-1, at 2, 5.  In Relator's opposition to Commonwealth's motion, he attempts to rope the company into allegations Relator initially made against Commonwealth's parent company, CAS.  *See* Relator's Resp. in Opp'n to Def. Commonwealth's Mot. to Dismiss Relator's TAC, ECF No. 89, Relator's Mem. & Points of Authorities in Opp'n to Def. Commonwealth's Mot. to Dismiss Relator's TAC, ECF No. 89-1 [hereinafter Relator's Commonwealth Opp'n], at 4.  Relator alleges that Athena and CAS operated the pass-through scheme before "CAS created Commonwealth," and reassigned several members of CAS's management team to the new corporate entity.  *Id.* at 6.  After this point, Relator asserts, the pass-through scheme continued to operate "now through the new CAS subsidiary Commonwealth."  *Id.*  But the paragraphs in the TAC that Relator cites as support for this claim, TAC ¶¶ 205–209, say nothing of the sort.  They instead focus on Athena's relationship with CAS alone respecting the Social Security Administration contract.  *See id.*

To the extent Relator attempts to establish alter ego liability, Relator's Commonwealth Opp'n at 10–11, he fails, and he cannot amend his complaint "by the briefs in opposition to a motion to dismiss."  *Friends of Animals v. Ashe*, 51 F. Supp. 3d 77, 85 n.2 (D.D.C 2014) (internal quotation marks omitted).  Because the TAC "makes almost no mention of Commonwealth

whatsoever" and fails to "allege any contracts that Commonwealth entered into with the U.S. Government, or any false claims or false statements Commonwealth presented or made to the U.S. Government," Def. Commonwealth's Reply Mem. in Supp. of Mot. to Dismiss Relator's TAC, ECF No. 95, at 2, the court grants Commonwealth's motion to dismiss.

5.     *Leave to Amend*

The court denies Relator leave to amend and dismisses the pass-through scheme allegations against all moving Defendants with prejudice.  While the Federal Rules direct the court to "freely give leave" to amend, FED. R. CIV. P. 15(a)(2), the Supreme Court has clarified that denying leave to amend is within a district court's discretion and may be done properly when there are "repeated failure[s] to cure deficiencies by amendments previously allowed" or amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962).  While this opinion marks the first occasion a court has had to test these allegations,[6] this is Relator's fourth complaint.  And despite the years preceding this round of briefing and Relator's access to "a hard drive with hundreds of documents," Relator's Athena Opp'n at 21, he is still unable to plead a pass-through scheme that is in any way logically coherent.  And the court is dubious that Relator would be able to plead facts to rescue the allegations against Athena from the public-disclosure bar.

Furthermore, Relator does not provide the court with any grounds for why he should be allowed to bring these allegations forward a fifth time or how an amended complaint would meaningfully differ.  "A bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion to amend."  *City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1304 (D.C. Cir. 2009)

---

[6] The Middle District of Pennsylvania court previously denied Athena's motion to dismiss the First Amended Complaint, Mem., ECF No. 25, but the court did so solely on the basis of Athena's personal jurisdiction and venue challenges.  See *id.* at 16 ("[T]his court has personal jurisdiction over Defendant, and venue is proper under the FCA.").

(internal quotation marks and alteration omitted).  Here, Relator spends a mere four sentences in his opposition to Athena's motion asking the court for leave to amend.  Relator's Athena Opp'n at 45.  And only the final sentence speaks to what Relator would seek to accomplish through amendment, but even then, it lacks any factual specificity.  *Id.* ("Relator asks for leave to amend his complaint and be permitted to plead additional facts with respect to any deficiency identified by the Court, if any of the motion[s] to dismiss are granted in whole or in part.").  This falls far short of a meaningful motion to amend.

Relator contends that the D.C. Circuit has directed that "leave to amend is almost always allowed to cure deficiencies in pleading fraud."  *Id.* (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (internal quotation marks omitted)).  But the court made that statement in the context of a dismissal based on the failure to plead with particularity.  Here, in contrast, the pass-through-scheme allegations are dismissed on public-disclosure and causation grounds.  The court is convinced that this is a case "where the pleader has had the opportunity to cure any deficiencies but either has not or cannot do so."  *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004) (internal quotation marks omitted).  Relator's pass-through claims are therefore dismissed with prejudice.

### C.   Athena's HUBZone Direct Contracting Fraud Allegations

Having now dismissed all claims against all moving defendants related to the pass-through scheme, the court returns to Relator's other FCA theory: that Athena fraudulently procured HUBZone certifications and used them to win contract awards.  Relator frames these claims under an implied-false-certification theory of liability.  As discussed *supra*, this theory of liability arises "where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's

failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Universal Health Servs., Inc. v. United States ex rel. Escobar* (*Escobar*), 579 U.S. 176, 190 (2016). Relator claims that Athena made thirty-one payment requests "pursuant to its HUBZone certification." Relator's Athena Opp'n at 27. In each request, Athena held itself out as a HUBZone small business but failed to disclose the fact that it was not actually in compliance with the relevant HUBZone regulations. *Id.*

Athena counters that Relator has failed to state a claim because he has failed to adequately plead materiality, which is essential to a false-certification theory, and he has not pleaded his claims with sufficient particularity, as required by Rule 9(b). The court finds that the well-pleaded allegations suffice to survive Athena's motion to dismiss.

### 1. Materiality

The court begins with materiality. The Supreme Court in *Escobar* emphasized that the standard for materiality is "demanding" under the FCA because the FCA is "not an all-purpose antifraud statute." 579 U.S. at 194 (internal quotation marks omitted). Nor is the FCA intended to punish each "garden variety breach[] of contract or regulatory violation[]." *Id.* The Court clarified that materiality should be evaluated according to at least three factors: (1) whether the provision at issue was expressly deemed to be a condition of payment; (2) whether the defendant knows that the government generally refuses to honor claims for payment "in the mine run of cases" based on noncompliance with the specific requirement; and (3) whether the defendant's failure to comply with the requirement "was minor or insubstantial." *Id.* at 194–95.

A recent Second Circuit decision sheds light on the materiality analysis in the context of claimed small-business-certification fraud. In *United States v. Strock*, the government pursued an FCA case against a contractor who it alleged had fraudulently used an SDVOSB certification to

receive "millions of dollars of federal government contracts." 982 F.3d 51, 56 (2d Cir. 2020). As a threshold issue, the Second Circuit determined the relevant "payment decision" at issue. *See Escobar*, 579 U.S. at 181 (stating that the alleged violation of law must be "material to the Government's payment decision"). The court rejected both the government's argument that "payment decision" should focus on the government's decision to initially award the contracts and the defendants' call for the court to cabin it to individual claims paid out under those contracts. *Strock*, 982 F.3d at 59. The Second Circuit instead found "payment decision" to encompass both. *Id.* at 60–62 (relying on *Escobar* in its analysis).

The *Strock* court then turned to the *Escobar* factors. First, the court found that the defendant's representation of its SDVOSB eligibility was an express condition of payment. *Id.* at 62. The government alleged that it had expressly conditioned the initial contract-award eligibility on SDVOSB compliance. *Id.* Citing *Escobar*'s observation that "misrepresenting compliance with a condition of eligibility to even participate in a federal program" supports a finding of materiality, the Second Circuit found that the defendant's alleged misrepresentation of its SDVOSB status weighed in favor of its materiality. *Id.* at 62 (quoting *Escobar*, 579 U.S. at 192). The court so held even though the government had not expressly conditioned actual *payment* under the contract on compliance with the SDVOSB certification requirements. *Id.* It was sufficient that the government had "expressly designated SDVOSB compliance as a condition of contract eligibility." *Id*.

As to the second *Escobar* factor—whether the defendant knows the government refuses payment in ordinary cases based on noncompliance with the specific requirement—the *Strock* court found a more mixed picture. The Second Circuit divided the analysis into the government's conduct pre- and post-award. Starting with post-award response, the court found the fact that the

33

government had criminally prosecuted parties who had fraudulently obtained SDVOSB set-aside contracts to be of little weight.  "[A]llegations of post hoc prosecutions or other enforcement actions do not carry the same probative weight as allegations of nonpayment." *Id.* at 63.  "The government's allegations that it prosecutes those who fraudulently obtain SDVOSB set-aside contracts," the court said, "thus are at best only neutral with regard to a finding of materiality, particularly in light of the complaint's failure to allege even a single instance in which the government actually refused to pay a claim or terminated an existing contract based on a false SDVOSB representation." *Id.* at 64.  The court, however, found some evidence to support materiality in the government's pre-award conduct. *Id.*  The court noted the complaint's detailing of the many steps the government takes to confirm SDVOSB status before a contract award and the "multiple contracting officers or specialists" involved. *Id.*  "Taken together," the court reasoned, "these allegations lead to a reasonable inference that, in general, the government does not award contracts to companies that it knows not to have complied with SDVOSB requirements. This suggests that defendants' misrepresentations were material to the government's decision to enter the contract in the first instance." *Id.*  In the end, the government's pre- and post-award response to noncompliance provided weaker support than the first factor for a finding of materiality. *Id.* at 65.

The final *Escobar* factor evaluates the substantiality of the defendant's noncompliance. The Second Circuit found this factor to weigh heavily in favor of materiality. *Id.* at 65.  According to the government, "performance by an SDVOSB is at the very heart of the SDVOSB statutory and regulatory regime." *Id.*  Through their SBA certification fraud, the defendants had "undercut this express congressional purpose," which rendered their noncompliance substantial from the

moment the contracts were awarded to when they were completed. *Id.* (internal quotation marks and alteration omitted).

Taken together, the Second Circuit found that the first and third factors' heavy weight in favor of materiality and the middle factor's more limited support were enough for the complaint to plausibly allege materiality on a motion to dismiss. *Id.* at 65; *see also United States ex rel. Savage v. CH2M Hill Plateau Remediation Co.*, No. 4:14-cv-05002-SMJ, 2020 WL 8678016, at *6–8 (E.D. Wash. Dec. 30, 2020) (relying on the same three *Escobar* materiality factors in a case alleging violations involving HUBZone certification and subcontracting awards). Despite the plain similarity of *Strock* to this case, Athena oddly does not even acknowledge the case in its reply, let alone attempt to distinguish it. *See generally* Athena's Reply, ECF No. 72 [hereinafter Athena's Reply]. The court finds *Strock* persuasive and proceeds now to evaluate the three *Escobar* factors in a similar manner.

<u>*Whether the requirement was an express condition of payment.*</u> Here, Relator effectively makes the same allegation as in *Strock*, stating that "Defendant Athena sought certification as a HUBZone contractor to . . . compete for federal contracts set aside for HUBZone companies[.]" TAC ¶ 150. And Relator also alleges, as discussed *supra*, that Athena succeeded, obtaining over $87 million worth of government contracts. *Id.* ¶¶ 163–164.

In response, the most Athena is able to argue is that there is an incongruity between the "31 [set-aside] contracts" Relator claims Athena won and the actual thirty *transactions* from "only 7 discreet [sic] contracts" Relator lists in a table contained in the TAC. Athena's Reply at 13–14. *Compare* TAC ¶ 164 (alleging "Athena received at least 31 contracts"), *with id.* (listing only seven different contract numbers in the table, among other incongruities). These inconsistencies do not, however, undercut Relator's general allegation. Whether it was seven different contracts or thirty-

one unique ones, Relator has alleged that the contracts Athena won and pursuant to which it received payments were set aside for HUBZone businesses, and Athena was not one. This is the sort of precondition for contract eligibility that the Second Circuit found sufficient to qualify as an "express[] . . . condition of payment." *Escobar*, 579 U.S. at 194–95. The court finds similarly here.

   *The government's response to similar misrepresentations.* As in *Strock*, the second *Escobar* factor lends weaker support for a finding of materiality. Relator alleges neither an enforcement action nor failure to pay here, so there is no post-award response that supports a materiality finding. *See generally* TAC; Relator's Athena Opp'n at 31–35. The pre-award conduct is similar to *Strock*. In the TAC, Relator alleges that Athena "used its fraudulently obtained HUBZone certification to obtain lucrative contracting opportunities reserved for legitimate HUBZone businesses." TAC ¶ 3. He contends that "a subcontract set aside for a HUBZone small business can be awarded only to a contractor who [so] qualifies." *Id.* ¶ 46 (citing 13 C.F.R. § 126.200 (2021)). The TAC lays out in detail the rigorous process required to first acquire and later maintain HUBZone certification. TAC ¶¶ 46–60. Also, the court can take judicial notice of the HUBZone regulations, which detail how the SBA's staff works to review a business's eligibility for the program, 13 C.F.R. §§ 126.400–126.404 (2021), and how the SBA plans to examine each HUBZone business "at least once every three years," *id.* § 126.500(b). This pre-award scrutiny supports a plausible inference that the government would "not award contracts to entities it knows not to be" HUBZone businesses. *Strock*, 982 F.3d at 64. Thus, when these pre-award-conduct allegations are taken together with the absent post-award-conduct allegations, this factor weakly supports a finding of materiality.

*Whether noncompliance was minor or insubstantial.*   As in *Strock*, the court finds that the third *Escobar* factor—the substantiality of HUBZone noncompliance—counsels strongly in favor of a finding of materiality.   Relator details how Congress created "the HUBZone program to encourage small businesses to locate in [underserved] areas of the country" and "to spur investment and job growth" in the same.   TAC ¶¶ 47–48; *see also* 13 C.F.R. § 126.100 (2021).   To further these goals, Congress set aside specific contracts for HUBZone businesses and gave HUBZone firms like Athena a favorable 10% bid-price discount on general government contracting.   TAC ¶ 159; 13 C.F.R. § 126.600 (2021) (detailing the five ways HUBZone businesses are awarded HUBZone contracts, including through both specific set-aside awards and "full and open competition" after a price-preference discount is applied).   In light of these well-pleaded program purposes and benefits, "performance by a[] [qualified HUBZONE business] is at the very heart of the [HUBZone] statutory and regulatory regime,"  and "noncompliance deprived the government of the intended benefits of" the program.   *Strock*, 982 F. 3d at 65 (internal quotation marks omitted).   Athena's alleged fraudulent certification thus was substantial.

Taken together, the three *Escobar* factors include two strong findings in favor of materiality and one weaker finding.   These showings are sufficient to find that Relator has plausibly pleaded materiality.   *See id.*   The court now turns to Athena's Rule 9(b) particularity challenge.

### 2.   *Particularity*

Rule 9(b) requires a relator to plead the who, what, where, and when of a fraud claim. *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 124 (D.C. Cir. 2015).   Courts in this district are directed to evaluate complaints in light of "the Rule on a case by case basis" rather than "rigidly apply[ing] [its] requirements."   *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d

186, 193 (D.D.C. 2011).  "[I]dentifying specific time periods during which the alleged fraud occurred and describing specific invoices containing the alleged misrepresentations" meets Rule 9(b)'s "time, place, and content" requirements.  *United States ex rel. Keaveney v. SRA Int'l, Inc.*, 219 F. Supp. 3d 129, 148 (D.D.C. 2016).  That said, the complaint need not allege the existence of a request for payment with particularity, only the circumstances constituting fraud.  *See Heath*, 791 F.3d at 126 ("[R]equir[ing] relators to plead representative samples of claims actually submitted to the government would require relators, before discovery, to prove more than the law requires to be established at trial. . . . We decline to . . . require[e] more factual proof at the pleading stage than is required to win on the merits.").  So long as the court can satisfy itself that both (1) the defense possesses awareness of the particular claims it will need to counter at trial and (2) the plaintiff has "substantial prediscovery evidence of" the facts alleged, the court must "hesitate to dismiss a complaint under Rule 9(b)."  *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 34 (D.D.C. 2003).

With these principles in mind, the court finds that Relator has sufficiently outlined "the basic mechanics" of the HUBZone fraud scheme to beat back Athena's particularity challenge. *Shea*, 863 F.3d at 936.  Relator explains that the fraudulent scheme rested on Athena's original and annual misrepresentations of the number of its employees who actually live within the HUBZone.  The FAC alleges that, to originally qualify as a HUBZone business, at least 35% of a small concern's employees must reside within the HUBZone.  TAC ¶ 154.  Athena, however, annually misrepresented this percentage from 2010 to 2017.  The TAC specifically identifies four individuals who Athena claimed lived within the HUBZone but did not: Amber Peebles, Melissa Schneider, Mary Frezza, and Sarah Anderson.  *Id.* ¶¶ 155–156.  It also spells out for each year from 2011 to 2017 the actual number and overall percentage of Athena's employees that resided

in the HUBZone.  *Id.* ¶ 157.  For example, the TAC alleges that in 2011 only one, or 14%, of Athena's seven employees actually lived in the HUBZone.  Similarly, in 2012, only one, or 7%, of its fourteen employees did so.  And so on through 2017.  *Id.*  As a result of these misrepresentations, the government believed Athena to be a qualified HUBZone small concern and awarded multiple contracts to Athena based on that understanding.  *Id.* ¶¶ 159–163.  In a chart, the TAC specifies these contracts by multiple identifiers:  contract number, contracting title, contract start date, contracting agency, contracting bureau, contracting office level, transaction value, and sum of contractor's transaction.  *Id.* ¶ 164.  The aggregate value of these contracts was over $87 million.  *Id.* ¶ 165.  These allegations are more than sufficient to satisfy Rule 9(b)'s particularity requirement.

Athena's attempts to avoid this conclusion are ineffective.  Athena initially focuses on the hundreds of paragraphs preceding the counts in the TAC and Relator's purported failure to pinpoint "which paragraphs and allegations constitute the allegations necessary to state a claim." Athena's Mem. at 11–14.  While the court agrees that Relator has pled far more than necessary, his verbosity does not negate the particularity of the HUBZone scheme pleading.  Athena also attacks Relator's failure to plead "when Athena first applied" for certification, "when the company headcounts it alleges were taken," whether Athena attempted to maintain the threshold HUBZone percentage, and "which claims for payment" Athena made.  Athena's Mem. at 14–16.  In so arguing, Athena asks more of Relator than the Rule does.  *See United States ex rel. Groat v. Bos. Heart Diagnostics Corp.*, 255 F. Supp. 3d 13, 18–22 (D.D.C. 2017) (finding complaint sufficiently pleaded under Rule 9(b) where the relator alleged a "concrete example of a portion of the representative claims submitted" and offered the defendant "factual specificity concerning the type of fraud, how it was implemented, and the training materials used" (internal quotation marks

omitted)).  And Athena's arguments about the minutiae of any specific employee headcount misses the point.  Athena's Reply at 14, 16.  Relator's allegation is not about a false employee roster.  It is that Athena falsely certified itself as a HUBZone business.  Relator's allegations are substantial enough to give Athena notice of what it stands accused of and the allegations as to which it will have to prepare a defense.

In conclusion, the TAC adequately identifies the who, what, when, where, and how of the fraud charged.  Athena (who) fraudulently misrepresented its HUBZone status (what) from 2011 to 2017 (when), as to specifically identified contracts (where) by falsely overstating the percentage of its employees that actually lived within the HUBZone (how).  That is enough to state a claim of fraud under the FCA.  The court therefore denies Athena's motion to dismiss as to Counts I and II.

### 3.    *Relator's "Reverse False Claim" Against Athena*

Relator fails to state a reverse false claim, TAC ¶¶ 334–337, so the court grants Athena's motion to dismiss Count IV.  The FCA's "reverse" false-claims provision hinges liability on a defendant falsifying records or statements to "avoid[] or decrease[] an obligation to . . . the Government."  31 U.S.C. § 3729(a)(1)(G).  Central to this provision, and distinct from a more typical false-claim action, is the fact that the defendant owes or would owe some sum to the government absent the false claim.  *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 88 (D.D.C. 2014).  The obligation must be distinct from otherwise fraudulent conduct that risks incurring financial liability.  "[A] reverse false claim may not rest . . . on the argument that an obligation arose out of the defendants' concealment of their alleged fraudulent activity, because by this logic, just about any traditional false statement or presentment action would give rise to a reverse false claim action."  *United States ex rel. Riedel v. Bos. Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 82–83 (D.D.C. 2018) (internal quotation marks and alteration omitted).  Relator fails

to plead any monetary obligation owed by Athena to the United States apart from the concealment of its allegedly fraudulent activity. *See id.* The reverse false claim count against Athena must therefore be dismissed.

### D.     Relator's FCA Retaliation Claim

Finally, the court reaches Relator's retaliation claim. The FCA's anti-retaliation provision protects "[a]ny employee, contractor, or agent" who is in any way discriminated against in response to protected activity "in the terms and conditions of employment." 31 U.S.C. § 3730(h). To make out a retaliation claim under the FCA, a relator must show that they engaged in protected activity under the statute and that they were discriminated against because of the same. *Lott*, 296 F. Supp. 3d at 152. Proving that the protected activity caused the retaliation further requires a relator to demonstrate that the employer both had knowledge of that activity and was motivated, at least partially, by it. *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998).

Athena makes two arguments to support dismissal. First, it contends that "[p]ost-employment retaliation is not protected under the False Claims Act." Athena's Mem. at 22. Because both of the alleged retaliatory acts occurred after Relator's employment with Athena ended in 2016, *see* TAC ¶¶ 315–317, Athena maintains the retaliation claim must fail. There is some support for this argument. At the time Athena moved to dismiss, the only Circuit to decide the issue had ruled that the FCA's anti-retaliation provision does not apply to post-employment acts. Athena's Mem. at 21–22 (citing *Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 908 F.3d 610, 618 (10th Cir. 2018) ("[T]he False Claims Act's anti-retaliation provision unambiguously excludes relief for retaliatory acts occurring after the employee has left employment. So, our inquiry ends there. Because Potts alleges that the Center retaliated against her after she resigned

her employment, she cannot have a cognizable claim under the statute.")).  Since that time, however, a Circuit split has arisen.  Last year, a split panel of the Sixth Circuit held that "the FCA's anti-retaliation provision protects former employees alleging post-termination retaliation." *United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 430–35 (6th Cir. 2021).  The court relied on the Supreme Court's decision in *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997), which held that the term "employee" under Title VII could be read to refer to both current and former employees.  The Sixth Circuit found the term "employee" in the FCA's anti-retaliation provision to be ambiguous and, as the Court held in *Robinson* with respect to Title VII, the provision's broader context and its primary purpose compelled the conclusion that the term "employee" reached former employees.  *Id.* at 432–35.  This court finds the Sixth Circuit's interpretation to be more persuasive than the Tenth Circuit's.  It therefore rejects Athena's contention that Relator's retaliation claim must be dismissed merely because the alleged retaliation occurred after he left Athena's employment.[7]

Second, Athena contends that the TAC fails to allege that Athena was aware of his protected activity.  Athena's Mem. at 22.  But that argument fails.  Athena became aware of Relator's protected activity on October 13, 2017, when it was served with the original complaint.  TAC ¶ 313.  The alleged retaliatory conduct then followed on October 18, 2017, *id.* ¶ 314 (threatened sanctions letter from counsel), and November 6, 2017, *id.* ¶¶ 315–316 (filing of

---

[7] Notably, Relator does not make a related argument:  that the alleged retaliation—(1) a letter from Athena's counsel demanding dismissal of the FCA action and threatening sanctions, and (2) the filing of a lawsuit against Relator alleging a breach of his severance agreement, TAC ¶¶ 314–317—does not constitute "discrimination in the terms and conditions of employment."  31 U.S.C. § 3730(h).  Because Relator does not make that argument, the court does not consider it.

breach-of-contract claim against Relator).  Accordingly, Relator has pleaded facts establishing that Athena's knowledge of his protected activity preceded its retaliatory acts.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, the court grants Defendants Commonwealth's, Balfour Beatty's, and Barton Malow's Motions to Dismiss, ECF No. 86; ECF No. 90; ECF No. 94, and grants in part and denies in part Defendant Athena's Motion to Dismiss, ECF No. 68.

Counts I, II, and III, pursuant to Relator's fraudulent-inducement theory of liability for the pass-through scheme, are hereby dismissed as to Defendants Commonwealth, Barton Malow, and Balfour Beatty with prejudice.  All claims against Athena for the pass-through scheme, namely Counts I, II, III, and IV, are similarly dismissed with prejudice.

Counts I and II for FCA violations under an implied-false-certification theory for Athena's HUBZone scheme survive against Athena, as does Count V for Athena's retaliation.  And all counts survive against nonmovant Defendant CAS.

Dated:  March 25, 2022

_____
Amit P. Mehta
United States District Court Judge