**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel* ) | |
| WILLIAM "BILL" SMITH ) | |
| ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. 1:18-cv-02080-APM |
| ATHENA CONSTRUCTION GROUP, ) | |
| INC, *et al* ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

<u>**DEFENDANT ATHENA CONSTRUCTION GROUP, INC'S. MEMORANDUM IN SUPPORT OF ITS MOTION FOR SANCTIONS PURSUANT TO FRCP 11(B) OR IN THE ALTERNATIVE FOR ATTORNEYS' FEES PURSUANT TO FALSE CLAIMS ACT**</u>

COMES NOW Defendant Athena Construction Group, Inc., ("Athena") by counsel and in support of its Motion for Sanctions against Plaintiff William Smith and counsel jointly and severally for filing in violation of FRCP 11(b). In the alternative, Defendant Athena requests attorneys' fees and costs states as follows:

Pursuant to Rule 11(b) of the Federal Rules of Civil Procedure, Defendant Athena, respectfully moves this Court for an Order imposing sanctions against Plaintiff William Smith and counsel jointly and severally for violation of the provisions of Rule 11(b) in filing and pursuing this action against Athena, specifically, dismissal of Plaintiff's remaining claims against Athena and an award of reasonable attorneys' fees.

Under Rule 11(b), the signing of pleadings and other documents is a representation by an attorney that to the best of the person's "knowledge, information and belief formed after a reasonable inquiry" that the claims are: 1. not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; 2. the claims, defenses, and other legal contentions are warranted by existing law; and 3. the factual contentions have evidentiary support or, if specifically, so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.  *See* Rule 11(b)  In the alternative, Athena is seeking an order for attorneys' fees expended by Athena in the defense of this matter pursuant to the False Claims Act.

## INTRODUCTION

> I think the greatest assets are the relationships Athena has developed with some of the large partners that have helped the company grow and still maintained the small business/HUBZONE status and independence. Athena's reputation as a legitimate and reliable contractor is also a huge factor since it takes more than credentials to maintain these relationships.

**William "Bill" Smith, Relator,  January 26, 2015 Ex. A**

After six years, four motions to dismiss, three law firms representing Relator and two judicial districts, all Relator has produced to support his business-ending allegation of $87,646,677.06 in fraud alleged against Athena is three pieces of paper.  Under the right circumstances, three pieces of paper could cement  Relator's case and prove to the world that his allegations are not just based on personal animus for the Defendant.  Three pieces of paper could clearly demonstrate that Athena committed fraud and is deserving of the consequences attendant with that behavior.  Unfortunately for Relator, these three pieces of paper are nothing more than

three separate "recall rosters" [1] all from 2015 that contain the names and phone numbers of some, but not necessarily all, of Athena's employees as of the date of each list.  These records provide no evidence of fraud, and no support for the allegations of the Second and Third Amended Complaints.  Rather, these three pages illustrate that Relator never had any good faith factual or legal basis for his allegations.

These records further illustrate that Plaintiff's various counsels never conducted any type of reasonable inquiry into the basis of Mr. Smith's allegations or his information about the HUBZone program;  or perhaps it is illustrative of Plaintiffs' counsels ignoring of the results of their "investigation".  Either way, Plaintiff and his counsel have put forth unsubstantiated, unsupported and wholly fictitious allegations of fraud against Athena in violation of FRCP 11(b). Such actions should not be permitted to stand unacknowledged and require sanctions.

This action has been a concerted effort to decimate a federally certified disabled veteran and woman owned socially and economically disadvantaged business based on nothing more than personal animus against Athena, based on the familial relationships among the Relator - Mr. Smith,  Glenn Ellis – one of the Relator's attorneys and Ralph Ellis – the Relator's son-in-law, the brother of Glenn Ellis. The factual foundation for this case appears now to comprise only three pages of recall rosters and Athena's "admission" that they hired employees to maintain their HUBZone compliance.

---

[1] A "recall roster" is basically a central database of telephone numbers which must be contacted in case of a military recall, no-notice military mission requirements, and similar activities. Athena adopted a  "best practice" based on Athena VP Melissa Schneider's time as a U.S. Marine corps officer to maintain "recall rosters" which were basically a list of employee names and telephone numbers used to contact the principal office and key employees. These lists were also referred to as "employee rosters" and "employee lists" interchangeably.  *See* also Ex B. P190L2-P191L3

Mr. Smith is not a "Relator".  He is not the "original source" of non-public information alleged in the complaints. He is not the source of *any* facts supporting the claims of $87,646,677.06 in fraud. He is nothing more than a pass-through, a front, for his attorneys' concerted effort to destroy Athena, or at a minimum, leverage some type of settlement from Athena to bring itself out from under the crushing weight of an $87,646,677.06 fraud allegation. Mr. Smith knew nothing, did nothing, and contributed nothing to this matter other than provide his attorneys with a plausible connection to Athena.   As will be discussed in detail *infra*, Mr. Smith lacks the knowledge of any material facts to support his allegations, understands next to nothing about the business of Athena or the HUBZone certification program and remains generally unaware of the proceedings and allegations in this case.

Asked, "What's you're understanding of the nature of this lawsuit?" Mr. Smith inexplicably replied, "Well, basically, they filed a retaliation suit against me so this is – so I countersued for that reason for harassment."  Ex. B P10L12-22  Mr. Smith testified that he reviewed the complaint prior to his deposition, but when shown each of the four complaints filed in this matter, he indicated that none of those were what he reviewed.  Ex. B P14L13 – P17L22 He was also unable to identify the current complaint at issue in the court, responding, "I wouldn't have that information." Ex. B P19L21 – P20L3

The Third Amended Complaint asserts that "Mr. Smith has direct knowledge of the conduct alleged" in the complaint and "conducted an independent investigation based on his experience and knowledge to uncover and report the fraud alleged herein." ECF No. 66 ¶18 During deposition, Mr. Smith stated that his "independent investigation" was "just basically reading over the sheets" [the recall rosters]. He explained that he would read the sheets two or

three times a day during the course of his employment and that was the extent of any

investigation. Ex. B P168L11-P169L12  In other words, there was no investigation.

The recent deposition of Plaintiff William Smith finally revealed what Athena has known

for the last five plus years - neither Mr. Smith nor his counsel had any good faith factual or legal

basis for bringing this suit, no evidentiary support of any facts in their knowledge or possession

and no reason to pursue this matter other than for an improper purpose. The discovery to date

demonstrates that no "reasonable inquiry" was conducted prior to filing the suit as such would

have easily revealed that there was no basis for the claims put forth.  The factual claims are not

just speculation but rather complete fictions, masquerading as factual allegations, which have

perpetuated this matter unjustly for six years.

For these reasons, as explained in detail below, Defendant Athena seeks sanctions against

Plaintiff and Plaintiff's counsel, jointly and severally, for filing and pursuing this matter without

a good faith factual basis and without reasonable inquiry to support any of the claims raised in

the four different versions of the complaint.  In the alternative, Athena seeks reimbursement for

all attorneys' fees and costs incurred since the inception of this matter in accordance with 31

U.S. Code § 3730(d)(4).

## LEGAL AUTHORITY

"The central purpose of Rule 11 is to deter baseless filings in district court and thus,

consistent with the Rules Enabling Act's grant of authority, streamline the administration and

procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp*., 496 U.S. 384, 393, 110 S. Ct.

2447, 2454, 110 L. Ed. 2d 359 (1990).  "Rule 11 imposes a duty on attorneys to certify that they

have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and 'not interposed for any improper purpose.' An attorney who signs the paper without such a substantiated belief 'shall' be penalized by 'an appropriate sanction.'" Id.

In situations where a party has violated Rule 11, sanctions are appropriate.

Under Rule 11, sanctions may be imposed if a reasonable inquiry discloses the pleading, motion, or paper is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay. In determining whether factual (1) or dilatory or bad faith (3) reasons exist which may give rise to invocation of Rule 11 sanctions, the district court is accorded wide discretion. For the district court has tasted the flavor of the litigation and is in the best position to make these kinds of determinations. However, once the court finds that these factors exist, Rule 11 *requires* that sanctions of some sort be imposed.

*Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1174–75 (D.C. Cir. 1985)

The court has found that "Rule 11 serves a dual purpose: punishment and deterrence.   When groundless pleadings are permitted, the integrity of the judicial process is impaired." *Id* at 1180.

Rule 11 sanctions are mandatory "when an attorney fails to make reasonable efforts to ensure that the pleading he signs is grounded in fact." *Figueroa-Ruiz v Alegria*, 905 F.2d 545, 548 (1st Cir. 1990).  Courts "exercise 'virtually untrammeled' discretion in fixing the amount of sanctions to be imposed on the plaintiff and his counsel for their Rule 11 violations, provided that 'sanctions are appropriate to the facts of the case.'" *Carswell v. Air Line Pilots Ass'n, Int'l*, 248 F.R.D. 325 (D.D.C.2008)

**RELEVANT FACTS**

This qui tam action was initiated with the filing of the original complaint on January 10, 2017 by Relator William Smith in the U.S. District Court of the Middle District of Pennsylvania (M.D. Pa).   Relator is a former employee of Defendant, a construction superintendent, terminated for substandard performance by Defendant in January 2016. Ex. C  ¶2.

The original complaint, filed under seal, sought $66 million in damages from Defendants Athena, Athena's President Amber Peebles and Athena's founder and Vice-President Melissa Schneider, for knowingly submitting false claims in the amount of approximately $22 million to the government.  ECF No. 1, ¶2-4 The claims were based on alleged violations of the False Claims Act, 31 U.S.C. §§3729 (a)(1)(A) and (B), violation of the Financial Institution Reform, Recovery and Enforcement Act of 1989 (12 U.S.C. §§1833a(a), (c)(3)), breach of contract and unjust enrichment.   Relator alleged that Athena falsified information to obtain various Small Business Administration certifications "including, but not limited to the Historically Underutilized Business Zone program ("HUBZone"), Service-Disabled Veteran Owned Small Business Program ("SDVOSB") and the Woman-Owned Small Business Federal Contracting Program ("WOSB")."  *Id* at ¶¶98, 101, 106.

The Department of Justice at that time declined to intervene and Relator served the Complaint on Defendants on October 13, 2017.  ECF No. 10. Defendants filed a Motion to Dismiss on November 1, 2017. ECF No. 11. To avoid a hearing on the Motion to Dismiss, Plaintiff filed an Amended Complaint on November 21, 2017. ECF No. 15.

The Amended Complaint put forth two counts – Violation of the False Claims Act (31 U.S.C. §3729) and Retaliation.  Count I alleged that Athena "engaged in a scheme to fraudulently obtain numerous SBA certifications to help it secure lucrative Government

contracts".  ECF No. 15. However, the count only addressed allegations of fraud involved with Athena's HUBZone certification (omitting the previously raised claims related to WOSB and SDVOSB certifications) and the use of that certification to fraudulently obtain contracts with the Government.  Relator also alleged that Athena violated the limitations on subcontracting of set asides by generally subcontracting 100% of its contracts to other companies. ECF No. 15 ¶109.

Defendant filed a new Motion to Dismiss for lack of jurisdiction and for failure to state a claim in response to the First Amended Complaint on December 5, 2017. ECF No. 17. Relator filed his opposition on December 19, 2017. ECF No. 19.  In May of 2018, Andrew Miller and W. Scott Simmer of Baron & Budd entered their appearance as co-counsel on behalf of Relator.[2] ECF No. 20, 21. Senior Judge Rambo of the M.D.Pa denied the Motion to Dismiss for lack of jurisdiction but granted, in the alternative, the motion to transfer venue to this court on August 29, 2018.  There was no ruling on the remaining substantive merits of the Motion to Dismiss. ECF No. 25.

The case was assigned to Judge Amit Mehta on September 5, 2018 requiring Plaintiff's counsel, Glenn Ellis to seek admission on a pro hac vice basis. ECF No. 36.  Judge Mehta requested that the parties re-brief the Motion to Dismiss the Amended Complaint on September 19, 2018.  Relator, through counsel, instead asked for leave to file a second amended complaint on the basis of newly discovered information.

---

[2] This court can take judicial notice of the fact that Mr. Miller and Mr. Simmer brought a prior qui tam action against Athena and other defendants (some of whom were also named in this suit) for work performed in New Orleans,  U.S. ex rel Ming/TM, LLP v. Clark/McCarthy Healthcare Partners et al. 2:16-cv-12950-BWA-JVM (EDLA 2016)  alleged pass-through violations against Athena.  Significantly, portions of the New Orleans complaint appeared verbatim in the Second Amended Complaint. Glenn Ellis and Aaron Freiwald also represented Relator in that matter. Ex. C. ¶¶10-13, Ex. I.

Specifically, on September 28, 2018, Andrew Miller, counsel for Relator, represented to the court that the Relator had found a hard drive in his son-in-law's home (also Relator's residence) with information relevant to the case that would potentially create new claims. Counsel for Relator represented to this Court that Relator, not knowing what was on the hard drive, immediately gave it to his counsel. Counsel for Relator represented to the court:

> "…the plaintiff discovered the hard drive as part of a cleaning out of certain parts of his home, and came across the hard drive, not realizing what it was, and hadn't known what was on that hard drive.  And only after providing it to his counsel were we able to determine that it contained, in fact, information that was directly relevant to this case.  And that hard drive contained information that he was provided by Athena while he was employed there during a backing up of information that the company was doing on its computers.  And so that information *was discovered in April of this year*, while – after the briefing on the motion to dismiss had been completed but before Judge Rambo had issued her decision on the motion to dismiss had been completed but before Judge Rambo had issued her decision on the motion.  And so as soon as we were made aware of that material, we endeavored to evaluate it and assess what was on that hard drive. *And what we discovered is that there were hundreds, potentially thousands of documents that not only supported, in detail, the existing fraud that had been alleged in the original complaint and in the amended complaint, but also a whole new set of allegations that are in addition to, separate and apart from those allegations that previously existed but that are ultimately still related to the fraud*." ECF No. 42, P6L24-P7L23 (emphasis added)[3]

This Court proposed that the Second Amended Complaint ("SAC") be filed under seal to allow the Department of Justice to evaluate the new allegations and documents and determine if they would investigate.  On October 22, 2018, the SAC was filed under seal for Department of Justice review. ECF No. 41.

---

[3] Mr. Smith contradicted this story during his deposition.  He testified that he was aware that he was in possession of the hard drive within several days of leaving Athena and knew that it was the backup of his computer.  He claimed that he put the hard drive in the home office where, he maintains, it remained until he remembered it a few years later and provided to his counsel.  He claimed that someone from RE Construction used the hard drive at some point after he left it in the office.  Ex B. P102/L7-P107L14.

The SAC complete with 83 Exhibits, alleged violations of 31 U.S.C. §§3729 (a)(1)(A), (B), (C), (G) and §3730(h), participation in a pass-through scheme, violations of the Anti-Kickback Statute and conspiracy with other entities to defraud the government. In addition to Athena, this version of the complaint identified thirteen new defendant businesses all accused of engaging in fraudulent behavior in conspiracy with Athena against the government. Most notable in this version of the complaint was Relator's allegation that Athena defrauded the government in the amount of $87,646.677.06.  That number is shocking, but also, mathematically false on its face. This number has yet to be corrected by Relator.

Frustrated with the multiple requests by the government to extend the review time, Defendant Athena insisted on a meeting with Department of Justice ("DOJ") investigators to discuss these allegations.  This meeting took place on August 8, 2019 with representatives of the DOJ, the Small Business Administration, the Defense Contract Audit Agency, U.S. Army Criminal Investigations Division, Department of Veterans Affairs and the General Services Administration.   Ms. Peebles, Athena's President, answered questions from a panel of nine different investigators from at least seven different government agencies and provided thousands of pages of documents, emails and spreadsheets during the time period of August 2019 through February 26, 2020. Ex. C  ¶¶15-18.

The government, after access to the "newly discovered" documents on the Athena hard drive documenting Athena's alleged fraud – represented by counsel in court as supporting the HUBZone allegations -  and after access to thousands of pages of relevant documents provided to the government directly by Athena, once again declined to intervene on behalf of Relator on January 8 2021. ECF No. 60. The Court ordered that the SAC be unsealed.  Relator, again,

requested leave to amend its complaint and the request to file a third amended complaint was granted on January 28, 2021.  ECF No. 64. The Third Amended Complaint ("TAC") removed seven of the thirteen Defendants first identified in the SAC but otherwise remained unchanged from the SAC. The TAC contains the same mathematically erroneous claim that Athena had committed $87,646,677.06 of fraud in connection with HUBZone contracts.

Subsequent to learning of the existence of a hard drive that purportedly belonged to Athena, Athena made demands of Relator's counsel to return the drive to Athena (as it was represented to the Court that Relator was in possession of the information during and as part of his employment at Athena).  When Relator's counsel failed to respond for over a month, Athena instituted suit for conversion and detinue following the unsealing.  Athena initiated action in Prince William County (Virginia) Circuit Court to recover the hard drive that Relator's counsel had represented to this Court, on September 28, 2018, that Relator had "found" in his son-in-law's residence in April of 2018.

Relator removed the case to the U.S. District Court for the Eastern District of Virginia. In pleadings to the E.D. Va., Relator's counsel in that matter represented a different story as to how the hard drive was "discovered":  that the hard drive in question had been delivered by Athena to Relator after his termination in January of 2016. "…Athena cleared out Mr. Smith's workspace and delivered a package to Mr. Smith containing personal belongings and the hard drive at issue in this case.  Mr. Smith did not immediately realize that hard drive was in the package and did not become aware of the hard drive's contents until approximately two years later." *Memorandum of Law in Support of the Defendant's Motion to Dismiss, or, in the*

*Alternative, to Transfer to the United States District Court of the District of Columbia, Case No.:*
*1:20-cv-00073 filed January 30, 2020, page 2.[4]*

 After briefings were filed, Relator agreed to return the hard drive to Athena in order to settle the lawsuit.  Athena agreed to dismiss its suit, which it did on February 18, 2020.  Counsel for Athena received the drive from Relator's counsel on February 14, 2020. Athena immediately thereafter commissioned, through counsel, a forensic analysis of the hard drive in February of 2020. Among the findings of the forensic analysis were the following:

i.     that the hard drive contained confidential information and trade secrets of Athena;

ii.     that files were copied onto the hard drive from an external source in the days and weeks after Athena terminated Mr. Smith's employment;

iii.     that the hard drive contained evidence that it once stored a QuickBooks database named "RE Construction LLC 3-15-2018.qbw. (RE Construction is owned by Ralph Ellis, the son-in-law of Mr. Smith);

iv.     that the hard drive had been repeatedly accessed throughout 2016, 2017 and 2018

      Ex. D. Transperfect Report

 As mentioned above, the principal owner of RE Construction is Ralph Ellis, the son-in-law of Relator Bill Smith, and brother of one of the counsels for Relator, Glenn Ellis.  At the time the initial Qui Tam action was filed in January 2017, RE Construction was engaged in

---

[4] Athena v. William Smith, III, RE Construction, LLC 1:21-cv-00396-AJT-TLD.

arbitrating a dispute against Athena initiated in March 2016.  RE Construction believed it was

due money, beyond what Athena could substantiate on RE Construction's behalf, for a claim on

a U.S. Department of Defense project.  Ex. C ¶¶6-9.  Counsel for RE Construction in that

proceeding was Glenn Ellis, Esq. and Bill Smith was identified as both an employee of RE

Construction[5] and a fact witness for RE Construction against Athena.[6]

On April 2, 2020, Athena provided a detailed presentation, along with forensic results, of

the hard drive analysis to the DOJ and the Small Business Administration investigators as well as

the other investigators that were present during the August 8, 2019 interview of Ms. Peebles.

Athena also provided an affidavit of the forensic results to the Department of Justice on April 10,

2020.

On April 28, 2020, Athena provided a letter to the Department of Justice putting them on

notice of the unauthorized access of Athena's computer network and information systems, and

the unauthorized copying of Athena's confidential and proprietary system.  On June 19, 2020,

the Department of Justice sent another request letter to Athena seeking documents related to

Athena's self-performance on its prime contracts.  Athena agreed to accept this request in lieu of

formal Civil Investigative Demand (CID) process.  In addition to the thousands of pages of

documents already provided, Athena answered the June 19, 2020 request three days later, on

June 22, 2020, by providing additional documents. Ex. C ¶¶15-18.

---

[5] In email of June 12, 2017 Glenn Ellis, then counsel for RE Construction, represented to
opposing counsel that Mr. Smith was an employee of RE Construction.  Ex. E  In this litigation,
Mr. Smith has denied ever working for RE Construction.
[6] In arbitration, RE Construction settled for $50,000, just slightly above the $42,500 offered by
Athena at the start of the dispute and well below the $117,560.48 demanded by RE Construction
during arbitration.

As previously discussed, on January 8, 2021, the DOJ again declined to intervene. ECF No. 60.  On January 18, 2021, this Court ordered the SAC unsealed, and ordered Relator to serve it on all of the Defendants.  ECF No. 61. During a status conference on January 29, 2021, Relator indicated through counsel that he intended to file a third amended complaint.  The TAC was filed on February 26, 2021 and Athena agreed to accept service by electronic filing on that date. ECF. No. 66.

On March 12, 2021, Defendant Athena filed a Motion to Dismiss. ECF No. 68, 69. The arguments in that motion were based on a Statute of Limitations argument as well as the argument that Relator Smith did not qualify as an "original source" as required under the False Claims Act.  The hearing on this motion would be delayed for more than a year because of Plaintiff's delay in serving the newly named additional defendants.

On March 25, 2022, Defendants' motions to dismiss were decided and granted in part and denied in part.  This Court denied Plaintiff's request to file a fourth amended complaint to address any perceived shortfalls in the pleading in the TAC and dismissed all claims against Athena for the alleged pass-through scheme, specifically Counts I, II, III, and IV, with prejudice. The Court also dismissed the claims in Counts I, II, and III as to Defendants Commonwealth, Barton Malow and Balfour Beatty, with prejudice.  Counts I and II for FCA violations under an implied-false-certification theory for Athena's HUBZone scheme survive against Athena as does Count V for Athena's retaliation. ECF No. 107. Defendant CAS did not file or join in these motions and all causes of action remain against them.[7]

---

[7] Based on an agreement involving counsel for Plaintiff-Relator and CAS, CAS has not been actively participating in discovery pending the future of claims against the currently dismissed defendants which, again, are similarly situated as CAS. If claims against similarly situated

Subsequent to the March 25, 2022 hearing on the Motion to Dismiss, the matter finally proceeded to discovery on the remaining counts. On May 20, 2022, the parties participated in a Status Conference which resulted in the entry of a scheduling order. ECF No. 120. Pursuant to that Order, Initial Disclosures were exchanged. Plaintiff's Initial Disclosures were supposed to identify the documents "in [Plaintiff's] possession, custody or control" that may be used to support its claims or defenses. In response, Plaintiff listed a significant number of documents and witnesses. Ex. F Initial Disclosures.

On May 23, 2022, a Request for Interrogatories and Request for Production of Documents on behalf of Defendant Athena were served on Plaintiff.  Although responses were due on June 22, 2022, they were not received until July 10, 2022.  Part of the reason for the delay in response was the result of Plaintiff's counsel Glenn Ellis' email notification on June 25, 2022 at 4:51 p.m.that he "recently and unexpectedly" left his firm (Friewald Law).

Despite Plaintiff's counsels representation to the court during the September 28, 2018 conference that they had discovered "*hundreds, potentially thousands of documents that not only supported, in detail, the existing fraud* that had been alleged in the original complaint. . .*"* (ECF No. 42, P6L24-P7L23 )(emphasis added) and the further representation that "we've spent a considerable amount of time going through these hundreds of thousands of pages of documents to cull out the things that create the new allegations and *fortify the existing allegations*," (*Id* at P14L14-17) no documents supporting the HUBZone allegations were produced with the response to request for production.  Instead, Athena was directed to the hard drive.  Three pages

---

defendants are reinstated then discovery involving CAS may proceed, but, if claims against the similarly situated defendants are not reinstated, then CAS will move to dismiss claims against it (assuming Relator-Plaintiff does not voluntarily dismiss CAS). ECF No. 127 FN1.

of documents (three recall rosters) were produced in a supplemental interrogatory response.  Ex. G Recall Rosters

Further, despite counsels' assertions that there were "hundreds if not thousands" of documents supporting the existing fraud in the original complaint, none of the eighty three exhibits to the SAC or TAC related to the HUBZone allegations.

In connection with Defendant's efforts to secure more specific responses to several discovery requests, including the production of any documents in Plaintiff's possession that supported either the HUBZone fraud claims or the retaliation claims, the parties participated in a status call with Judge Mehta on August 25, 2022. At that time counsel for Relator was directed to provide responses to Requests for Production 5 and 6 and information responsive to several interrogatories seeking information related to the compilation of the information in Paragraph 157 of the TAC. Counsel was to identify the categories of documents on the hard drive that represented the documents that supported the HUBZone allegations against Athena, provide the attorney's invoices supporting the claim for damages on the retaliation claim and identify by name the specific employees of Athena for each year listed in Paragraph 157 of the TAC and identify the individuals that Athena identified as HUBZone employees. [8] Although Counsel represented in the Joint Status Report of August 30, 2022 that he would have responses to opposing counsel by September 2, 2022, (ECF No. 127) nothing has been received as of September 20, 2022 (the date this motion was forwarded to counsel pursuant to the 21 day rule under FRCP 11).

---

[8] It is notable that Paragraph 157 first appeared in the SAC that was filed on October 22, 2018 under seal.

On August 23, 2022, the deposition of Plaintiff William Smith was conducted. Although pushed for answers as to the basis for his claim that Athena defrauded the government in an amount of at least $87,646,677.06 in connection with its fraudulent HUBZone certification, Mr. Smith was not able to provide ANY factual support for these claims.

Mr. Smith admitted that he was not an employee of Athena at the time of its original HUBZone certification in 2010 and had never seen any paperwork related to that submission nor was he aware of who was identified by Athena as an employee, or a HUBZone resident on that submission. Ex B P34L3-11, P45L1-10.   Mr. Smith also admitted that he never had access to, or involvement with, Athena's recertification process. Ex. B P29L4-7.  Mr. Smith was unable to testify to any evidence he had prior to filing the original complaint, and subsequent three amendments, besides identifying an alleged conversation where Ms. Peebles purportedly stated that Ms. Frezza was hired as an employee of Athena in order to satisfy Athena's HUBZone requirements.  Not only is this statement not evidence of fraud, it is actual evidence that Athena was actively hiring employees to satisfy its HUBZone requirements and that Ms. Frezza was an Athena employee.

Mr. Smith was likewise unable to identify any of the underlying facts that formed the basis for his allegations in Paragraph 157 of the TAC, which played a significant role in this Court's overruling Athena's 12(b)(6) motion to dismiss. ECF No. 107, P.38-40.  Mr. Smith alternately testified that he didn't know anything about the facts in the paragraph because it had been compiled by his attorneys, then later claimed that he came up with the numbers based on his knowledge of who worked in the Washington, D.C. area. Ex. B P40L11–P41L11. Mr. Smith identified the three produced recall rosters, all dated 2015, as the basis for his knowledge. Id.

These rosters, in fact, patently contradict the allegations in Paragraph 157 and have been in

possession of Plaintiff and his counsel since the case was filed in January 2017.[9]

At the conclusion of the deposition, Mr. Smith was asked if there was "any other non-

public information about the HUBZone fraud that you have not disclosed . . . in this complaint?"

Mr. Smith responded "No.". Ex. B P214L1-8.

## ARGUMENT

"The central purpose of Rule 11 is to deter baseless filings in district court and thus,

consistent with the Rules Enabling Act's grant of authority, streamline the administration and

procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S. Ct.

2447, 2454, 110 L. Ed. 2d 359 (1990).  "Rule 11 imposes a duty on attorneys to certify that they

have conducted a reasonable inquiry and have determined that any papers filed with the court are

well grounded in fact, legally tenable, and 'not interposed for any improper purpose.' An

attorney who signs the paper without such a substantiated belief 'shall' be penalized by 'an

appropriate sanction.'" Id.   In situations where a party has violated Rule 11, sanctions are

appropriate.

The court has found that "Rule 11 serves a dual purpose: punishment and

deterrence.   When groundless pleadings are permitted, the integrity of the judicial

process is impaired." *Westmoreland* at 1180

Plaintiff has filed, to date, four different versions of the complaint and none of

those versions were based on a reasonable inquiry that would have confirmed an

---

[9] As discussed in detail *infra* the three recall rosters are all from 2015 and identify very different
numbers of employees than is represented in Paragraph 157, and refer to job sites outside of
Washington, D.C. where not every employee is listed.

evidentiary foundation for the claims put forth. The imposition of sanctions as to all versions of the complaint are appropriate as "the filing of a subsequent complaint did not relieve Plaintiff or counsel from the imposition of sanctions related to an earlier superseded pleading should a violation of Rule 11 be found."  See *Carswell v Air Line Pilots Ass'n., Int'l*, 248 F.R.D. 325 (D.D.C. 2008).

In this instance, it would be reasonable for the court to determine that no reasonable inquiry was performed prior to filing any of the versions of the complaint.  Based on the contents of the four versions of the complaint and most recently, the deposition testimony of Plaintiff William Smith, it is clear that there was never any basis for these claims other than a misguided intent to destroy Athena, an employer that terminated Mr. Smith and was at legal odds with Mr. Smith's son-in-law's business, RE Construction. While one expects counsel to initially weigh the information provided by his client with the legal elements necessary to establish the claims along with the legal duties required of a party to such a suit as well as reassess the claims as additional information becomes available, this simply was not done in this matter. In this instance, the fact that one of Plaintiff's counsel, Glenn Ellis is the brother of Mr. Smith's son-on-law, with whom Mr. Smith lives, may have clouded the judgment of those involved.  Even after the Government declined to intervene first after review of the initial complaint, and then again after review of the SAC, Plaintiff carried on, repeatedly amending the complaint and narrowly avoiding argument on multiple motions to dismiss. Plaintiff's decision to move forward was made also in the face of the knowledge that during the second government review, the government had access to the "Athena hard drive" documents and also met Athena's President Ms. Peebles who answered questions and provided copious amounts of documents to the government to satisfy their

questions as to the propriety of Athena's actions. ECF No. 54. Despite this, Plaintiff and his counsel continued with this crusade against Athena.

Throughout the four versions of the complaint, Plaintiff has maintained that Athena falsely certified to secure various SBA certifications and as a result, received financial benefits from those false certifications.  The true basis of Plaintiff's allegations was summed up during his deposition:

> Q:"What facts did you have before the complaint was filed about any misconduct Athena Construction was engaged in?"
>
> A:  "Just the information I received from looking at documents such as the recall rosters and learning what the HUBZone requirements were and then knowing just the conversations in the office of who was compliant and who wasn't." Ex. B P58L14-21.

The limits of Plaintiff's "facts" become apparent through his deposition testimony related to his position at Athena, his lack of access to Athena's records and his general knowledge (or lack thereof) of how HUBZone certification worked.

**LACK OF GENERAL KNOWLEDGE**

Various statements in the complaints as well as testimony provided by Mr. Smith during his deposition illustrate why Mr. Smith cannot be a reliable source of information, nor did he or his counsel have facts or conduct a reasonable inquiry, to support allegations of fraud against Athena related to its HUBZone certification.  Mr. Smith exhibited a complete lack of knowledge about the business of Athena as well as the requirements of the HUBZone program.  Without that basic knowledge, he was never in a position to determine that Athena was not meeting its

obligations, nor could his counsel have any factual basis to support the allegations of the four

versions of the complaint.

Some of the gaps in Mr. Smith's knowledge include:

-Although Mr. Smith had been in the construction industry since 1974, Athena was the
first company he worked for that was involved with government contracting. Ex B
P25L4-9.

-Mr. Smith's job responsibilities with Athena involved running jobs in the field/providing
on-site supervision and directing the workforce for those jobs.  Ex. B P25L11-20.

-Although the initial complaint alleges that Athena falsely certified to secure both
Women Owned Small Business ("WOSB") certification and Service-Disabled Veteran
Owned Business ("SDVOSB") certifications, Mr. Smith confirmed that he had no facts to
indicate that Athena had violated SDVOSB or WOSB set asides. Ex. B P60L20-22.

**HUBZONE KNOWLEDGE**

With regard to the HUBZone program, Mr. Smith admitted that he was not sure how it

works.  Ex. B P35L9-13.  Given that response, he was asked what evidence he had that Athena

was violating the certification process.  He explained "[i]t was just talk in the office about what

the minimum requirements were for HUBZone and how we had to maintain it to stay qualified."

He continued to explain that there were "constant reminders that we need to have certain people

in the HUBZone on the payroll, you know, working on the jobs or in some kind of support role

for a project or projects so they maintain their HUBZone qualification." Ex. B P37L10 – P39L4.

Athena made an effort to hire people to meet the HUBZone requirements. Ex. B P47L6-9.  When

asked how those conversations lead him to believe that there was some non-compliance with

certification, he responded that "they could rarely, if ever, meet the requirement."  This

conclusion was based on his knowledge of how many people worked there.  "I had a list of all

the employees and…knowledge of which ones lived in a HUBZone , which ones didn't." Ex. B

P39L14 – P40L6.

When pressed, Mr. Smith admitted that his "knowledge is from which employees were on which jobs and which ones were HUBZone and which ones were not." Ex. B P74-L5-10. There are multiple issues with this statement.  HUBZone certification did not require all HUBZone employees to be working on a specific project, only that they be employed by the company.[10]  Further, Mr. Smith admitted that he only worked certain projects and had no knowledge of the employees that worked on major projects in California and New Orleans from 2011 through at least 2014, the majority of his time with Athena. Ex. B P83L21 – P85L8.

Although Mr. Smith was not able to testify to whether Athena had a HUBZone contract in a particular year, he indicated that "most of the jobs they got were HUBZone." Ex. B P44L4 – P45L1.  In fact, HUBZone contracts comprised a very small minority of the contracts secured by Athena during Mr. Smith's employment.  Ex. C ¶38.  His lack of knowledge (public and non-public) about Athena business operations raises serious questions not just about the validity of his allegations across four complaints but notably for this motion whether there ever was any good faith factual basis to initiate this lawsuit and maintain it for six years.

**ROSTERS/EMPLOYEES**

As a general proposition, Mr. Smith testified that at any given time, Athena maintained a a low of 6-8 employees and a high period of maybe a dozen employees. Ex. B P83L3-16.  This statement, however, was directly contradicted by the three employee recall rosters produced by Mr. Smith in this litigation and discussed during this deposition.  Those rosters showed 30 employees which is not in any way consistent with Mr. Smith's memory, and they contradict the crucial allegations in TAC Paragraphs 154-158. Ex. G.  It also raises the question of how these

---

[10] The Court can take judicial notice of the fact that HUBZone employees are required to be employed by the company, not required to all work on a specific project at a specific time.

law firms in possession of these documents could, in any way, allow the SAC and TAC to be signed by counsel with direct knowledge that that HUBZone allegations were factually false.

In his response as to the basis for the first complaint, Mr. Smith referenced the "recall rosters". Only three of these rosters were produced in discovery by Mr. Smith and as confirmed by Mr. Smith, none of these rosters, nor any provided during his employment, ever contained employee addresses or HUBZone status. Ex. B P41L5-9. Mr. Smith claimed there were people on the rosters that he didn't know and that he was told by management that they were put there to help meet the HUBZone requirements. Ex. B P79L19 - P80L9. However, since Mr. Smith only supervised jobs in the DC area, not the work in New Orleans, California, or San Antonio, (Ex B. 73L20 - P74L22), it would be logical and reasonable that there would be people on the list that he did not know. He confirmed that he did not know how many employees worked in New Orleans or in California but conceded that those employees would rightfully be included in Athena's HUBZone count. He had no knowledge of how many employees were on those projects or how many of them lived in HUBZones. Ex. B P83/3 – P85L8. Mr. Smith dismissed the potential impact of these unknown out of area employees on his opinion that Athena was not meeting its HUBZone obligations. He stated that "most of the time, there was only work in the Washington, D.C. area." Ex. B P43L17-20. However, as Athena's superintendent or Director of Operations, Mr. Smith would have been aware that the California project spanned from January 2011 through January 2014 and employed more than 100 craft workers and that the New Orleans project spanned from 2013 to beyond his termination date and employed more than 80 management and craft workers. Ex. C¶¶40, 41. Ignoring these employees in Mr. Smith's internal calculations as well as the preparation of Paragraph 157 of the TAC, renders his "opinion" of Athena's compliance without a reasonable basis in fact or in law.

### RULE 26 WITNESSES

Rule 26 Disclosures are required to inform counsel as to potential witnesses and documents that may be relevant to the opposing party's case and are signed by counsel for the party. When asked what was represented by the list under "I. Witnesses", Mr. Smith indicated that "it's a list of employees who would have or should have knowledge of how things were performed at the administrative side." Ex. B P136L18-P137L13. The list identified Mr. Smith, Ms. Peebles and Ms. Schneider as the first three witnesses. The fourth witness listed was Karen Nelson, identified as the "CHO and Senior VP of Athena." This individual was identified as having information related to Athena's HUBZone submissions to the government as well as "information concerning the creation and accuracy of Defendant Athena's records and submissions to the government showing compliance with the SBA's HUBZone requirements." Ex. F. When asked, "Who is Karen Nelson?", Mr. Smith responded "No idea." He further indicated that he had no idea of what knowledge she might have. Ex. B P138L19-P139L1.

Plaintiff provided "Attachment A" as part of the Initial Disclosures, section "I. Witnesses," that listed 73 purported former and current employees of Athena. Mr. Smith responded that he had no idea of the identity of dozens of these individuals and, with few exceptions, had no idea of what relevant information most of them possessed. Ex. B P143-P160.

Upon service of the Initial Disclosures, representatives of Athena reviewed the list and identified a number of people on the list who had never worked for Athena. Based on brief internet searches, Athena was able to identify a number of these individuals as being associated with other entities named "Athena Construction" located in various locations throughout the country that have no association or connection with Defendant Athena. Ex. C ¶¶31-34. Mr. Smith testified that he did not put the list together but thought he may have seen it but probably

didn't read the whole thing. Ex B P134L18-P136L9.  Further, upon information and belief, based

on conversations with Mr. Ellis, Attachment A was prepared by him based on an internet search

and was then utilized to create the statistics provided in Paragraph 157 of the SAC and TAC.

Given that the list contains a significant number of individuals who never worked at Athena and

also fails to identify the time periods that the actual Athena employees worked at Athena or their

residence while employed, this information has little to no evidentiary value to support claims

that Athena falsified its HUBZone certification and is clearly not information provided by the

Relator. More importantly though, the signature (and service) of the Rule 26 Initial Disclosures

(including Attachment A) by Relator's counsel was not only without a reasonable basis in fact,

but it was fabricated from whole cloth to perpetuate this baseless litigation. The information

presented in Paragraph 157 and its significance are discussed in greater detail *infra*.

### SBA CERTIFICATION

Mr. Smith explained that Athena falsely certified to secure its initial HUBZone

certification prior to his employment with Athena.  He claimed that the factual basis for his

allegation that Athena failed to meet the initial certification requirements was contained within

the employee rosters, but then admitted that he never saw rosters from before he was employed

(Ex. B P45L2-P46L20) and had no idea of how many employees Athena had at the time they

first certified. Ex. B. P49L3-5.  When pressed what facts he had that lead him to the conclusion

that Athena failed to meet its certification requirements for the initial certification, he responded,

"None", (Ex. B. P45L21-P46L3) and admitted that he had no facts or knowledge of who Athena

identified as a HUBZone employee in their initial certification. Ex. B P47L10-13.  Mr. Smith

further admitted that he was uncertain as to what percentage HUBZone employees were required

at the time of Athena's initial certification and was not aware of the SBA definition of "employee" at that time. Ex. B. P46L6-19.

### RECERTIFICATION

Despite allegations that Athena's "recertifications each year from 2012 through 2017 were knowingly false," (ECF No. 66 ¶158), Mr. Smith admitted that he didn't know when Athena was required to recertify, how many times they recertified nor the requirements for recertification. Ex. B. P47L14-P48L12, Ex. C ¶20.

### ONGOING DAMAGES

Despite claims in the individual Count paragraphs of the TAC that the government continues to be damaged by the actions of Athena, Mr. Smith admitted that he has "no idea" if the noncompliance is continuing to this day. Ex. B P52L6-16.

### BASIS FOR FILING CLAIM

As stated above, when asked what facts he had before the complaint was filed about any misconduct that Athena was engaged in, Mr. Smith responded that "it was just the information I received from looking at documents such as the employee rosters and learning what HUBZone requirements were and then just conversations in the office as to who was and wasn't a HUBZone employee." Ex. B. P58L14-21.  This response is important to consider when the operative factual allegations of the TAC are reviewed.

Paragraphs 150 – 165 of the TAC are the operative paragraphs that identify and explain the alleged fraudulent behavior of Athena with regard to HUBZone certification. Only a few of the paragraphs contain what could be considered  actual "facts" as opposed to generalized and conclusory allegations.  When examined in light of his deposition testimony, it is obvious that

whatever motivated this Qui Tam action, it wasn't the personal knowledge of Mr. Smith, or for that matter, any actual facts.

> **Paragraph 154**:  **To meet the requirement that at least 35% of its employees reside in a HUBZone, Athena fraudulently included on its employee roster individuals who are either not employees under the relevant regulations and/or do not reside in a HUBZone.**

> **Paragraph 155: For example, the Athena "Employee List" identifies Amber Peebles and Melissa Schneider's residence as being in a HUBZone in Lynchburg, Virginia  - 160 miles from Athena's headquarters in Dumfries, Virginia.  In fact, at all times material hereto, Peebles and Schneider's actual residence has been located at 3201 Riverview Drive in Triangle, Virginia – which is not in a HUBZone and is located approximately one mile from the company's headquarters.**

In support of his assertion that Athena failed to meet the 35% requirement for HUBZone employees, Mr. Smith provided the example in Paragraph 155.  However, when pressed during his deposition, Mr. Smith confirmed that the assertions in Paragraph 155 are simply not true. When questioned, "So the employee list would have their Lynchburg address?", Mr. Smith responded that "they don't have addresses on the list" and confirmed that the employee roster did not identify residences, "it was counsel found that out, where they were listed as a residence." Ex. B. P94L9 – P95L10.

Mr. Smith went on to state that he had no knowledge of where either Ms. Peebles or Ms. Schneider was registered to vote, insured their vehicles or paid property taxes and did not know who owned either the Lynchburg or Triangle property. Ex. B P97L20 – P99L2.

As mentioned *supra*,  Mr. Smith produced only three different recall rosters in response to discovery requests.  He confirmed during his deposition that he had these documents in his possession at the time he left Athena in 2016 so they were available to his counsel at the time the SAC and TAC, which both contain Paragraph 155, were drafted. Ex. B. P196L22-P197L10.

There was no good faith factual basis for either Mr. Smith or counsel to allege the information presented in these paragraphs at the time they were drafted or any time subsequent to that.  In fact, Mr. Smith's deposition testimony and discovery responses indicate that the facts in the possession of Mr. Smith and his counsel since January 2016 directly contradict the allegations of the SAC and TAC.

> **Paragraph 156.  In addition, Athena falsely certified that Mary Frezza and Sarah Anderson were "employees" of the company when, in fact, they were not.  Rather:**
>
> > **-Mary Frezza [identified in the AC as Mary Dumfries] was the manager for the office park where Athena had its Dumfries office, but at no time did she serve as a full-time Athena employee working at least 40 hours a month as required by the SBA**
> >
> > **-Sarah Anderson at various times has lived in Lynchburg, VA and in Tampa, Florida, but at no time did she serve as a full-time Athena employee working at least 40 hours a month.**

As stated above, Mr. Smith testified that he never saw any of Athena's HUBZone paperwork, so any allegation that Athena "falsely certified" anything about Ms. Frezza or Ms. Anderson is without any factual basis.  Realtor simply has no idea if that is a true statement. Further, Mr. Smith played no role in personnel management at Athena, never saw Athena's personnel or payroll records and therefore had no good faith factual basis to allege who Athena may or may not have had on their payroll at any given time.  Mr. Smith admitted that there were individuals who worked outside the DC area that were not necessarily listed on employee rosters and whom he had never met.  Ex. B P196L6-13.

Mr. Smith's position that Ms. Frezza "did not serve as a full-time Athena employee working at least 40 hours a month as required by the SBA" is a baseless assumption on his part. He testified that he never discussed Ms. Frezza's employment with anyone including Ms. Frezza.

28

Ex. B P139L18 – P141L3. This was simply his assumption (or the assumption of his counsel) made without any factual basis.

With regard to Sarah Anderson, Mr. Smith testified that "she only worked, that I know of, two days on a job in D.C…. At no other time, before or after, did she work on any of our jobs," (Ex B. P98L10-20) but he was forced to acknowledge that he did not have personal knowledge of every jobsite where Athena operated. Ex. B P96L21-P97L9. Mr. Smith therefore had to be aware that there would be employees of Athena that he might not meet or be aware of when or where they worked. Relator's counsel also had to be on notice of these facts because Relator has been in possession of the three recall rosters that directly contradict the allegations of the SAC and TAC.

In an effort to assist Athena with the identification of the individual Mr. Smith referred to as Ms. Anderson, he was asked to describe her. He responded that she was "black, kind of manly". Ex. B P142/L11-15. The Sarah Anderson who was actually employed by Athena is a Caucasian female who did not work on the construction projects. Ex. C ¶37.

**PARAGRAPH 157: Accordingly, when accurately represented Athena did not satisfy the HUBZone 35% residency requirement at any time from 2011 through 2017.**

**-2011: of its seven employees, only one resided in a HUBZone = 14%**

**-2012: of its fourteen employees, only one resided in a HUBZone – 7%**

**-2013: of its twenty-two employees, only [sic] resided in a HUBZone – 14%**

**-2014: of its twenty-one employees, only four resided in a HUBZone – 19%**

**-2015: of its seventeen employees, only four resided in a HUBZone – 23%**

**-2016: of its thirteen employees, only two resided in a HUBZone – 12%**

**-2017: of its nine employees, only one resided in a HUBZone – 11%**

Paragraph 157 was pivotal in the court's denial of Athena's motion to dismiss the TAC. In an effort to determine the source of Plaintiff's information for this paragraph, Athena sought the factual basis through interrogatories to Relator.  Interrogatory #7 requested Plaintiff to "identify the time period and the process through which you compiled the information put forth in Paragraph 157 of the Third Amended Complaint that purports to provide the Athena employee count by year.  The "process" is to include, but not be limited to, how you secured the information related to each individual you counted as an employee (name, address, status with Athena) and how your job responsibilities required or provide you access to the personal identifying information of these employees."  In response, Relator responded:  "Plaintiff did not compile the information set forth in paragraph 157 of the Third Amended Complaint.  That information was compiled by his attorneys from various paid and public information sites and as such constitutes privileged attorney work product.  By way of further response, the Plaintiff has requested rosters, employee files and payroll records for Athena's HUBZone qualified employees." Ex. 7 Smith Response to Interrogatories.  Subsequent to receipt of this response, Defendant took steps to secure a more specific response which resulted in the scheduling of a conference with Judge Mehta.

Before the conference could take place, the deposition of Mr. Smith took place.  When asked about the genesis of Paragraph 157, Mr. Smith initially stated that he came up with the calculations based on the roster sheets, (Ex. B. P4011-19) and that the information was based only on employees in the Washington, D.C. area. Ex. B P43L17-20. He later testified that "this [Paragraph 157] was done by counsel.  I gave him the list, and they ran with it from there. Ex. B. P109L3 – P110L2.  Mr. Smith confirmed that the "lists" [employee lists] were provided to him as part of his job. Ex. B. P110L5-7.

At Defendant's request, a discovery conference was held with Judge Mehta on August 25, 2022 in an effort to compel a more specific response from Relator's counsel concerning the factual basis of the information presented in Paragraph 157. After discussion with counsel, the Court ordered Relator to provide the names of the employees that comprised the employee/HUBZone employee numbers for each year represented in that paragraph.  As of the filing of this motion, Plaintiff has not responded. It is important to note that this paragraph dates back to the filing of the SAC on October 22, 2018 – therefore it is troubling that Plaintiff does not have the requested information readily at hand to produce.

There are additional problems with the information presented in  Paragraph 157.  As stated *supra*, Mr. Smith has provided a total of three employee lists, all from 2015, that identify 30 individual employees. Yet the Paragraph 157 chart alleges a total of only 17 employees for 2015.  To add to the inconsistency, as mentioned *supra*, Mr. Smith testified that Athena averaged a low of five employees and a high of roughly 12 employees in any given year. That testimony is directly contradicted by both the employee lists he produced and by the employee numbers that he alleges in Paragraph157.

While the chart purports to provide employee numbers for 2011 through 2017, Mr. Smith testified that he has NO knowledge of employees of Athena beyond his termination in January of 2016 and did not know where the figures for 2016 and 2017 came from. Ex. B P110L9-16.

While Plaintiff has access to a hard drive that contained records from his time with Athena, which Mr. Smith maintains he has never accessed, other than employee rosters, there is nothing on that hard drive to provide information related to employee numbers or the identity of HUBZone employees. Ex. C ¶14.

As discussed *supra*, based on meet and confer conversations with Mr. Ellis, Attachment A from the Initial Disclosures was utilized to prepare Paragraph 157.  That is troublesome inasmuch as Attachment A identified a number of individuals as employees who never worked for Defendant Athena. Attachment A also identified employees that did not work for Athena until after Paragraph 157 first appeared in the SAC. Ex. C ¶¶31-34.  Mr. Smith admitted that the list did not identify all Athena employees.  Ex. B P161L8-16. Attachment A does not identify the addresses that Plaintiff assigned to these individuals or the time period of that address.

Realtor and his counsel have identified no factual basis or reasonable inquiry that could have resulted in the allegations of  Paragraph 157 or "disclosures" in Attachment A. It appears Attachment A was fabricated out of whole cloth well after the filing of the SAC and TAC by Relator's counsel, potentially by reviewing public sources such as Linked In, ZoomInfo and FaceBook and cannot be considered a reasonable inquiry to obtain a good faith factual basis into how Athena managed their HUBZone compliance at any point in time. Nothing in Paragrpah157 was derived from information provided by the Relator, whether public or nonpublic, nor was the information used to prepare this chart subjected to any type of reasonable inquiry as evidenced by the inclusion of individuals who never worked for Defendant Athena.

It is important to note that the court gave significant weight and consideration to the allegations in this "chart" in denying Defendant's FRCP 12(b)(6) motion to dismiss and referred to the allegations in this chart as a factor in the court's decision to not dismiss the HUBZone claim. Further, the court pointed out that even with this information, Plaintiff barely met the specificity requirement to survive.  Now it is clear that none of the information in this chart came from Plaintiff, nor did it come from any records maintained by Athena.  It was created out of

internet searches conducted by Plaintiff's counsel without regard for the accuracy of the information presented. This is sanctionable behavior.

**Paragraph 158:  As a direct result of Athena's false representations that at least 35% of its employees resided in a HUBZone, it was granted HUBZone certification in 2011. Athena's certification in 2011 and re-certification each year from 2012 through 2018 were knowingly false.**

Presumably, the allegation that Athena failed to meet its 35% requirements is based on the calculations provided in Paragraph 157.  When this allegation is viewed in context with the questionable source of the information provided in Paragraph 157 and the entirety of the basis for Plaintiff's allegations, *supra*, this statement was made without a good faith basis in fact and further demonstrates the baseless nature of these claims.

When asked what facts he had to indicate that Athena recertified every year, Relator responded "I don't have that information" (Ex. B. P110L21-P111L5) and indicated that the statement in the complaint did not originate from his personal knowledge. Ex. B. P112/L2 – 4. In fact, Athena was not subject to "yearly" recertifications and was only required to recertify on one occasion while Mr. Smith was employed by Athena. Ex. C ¶20.  The allegations in Paragraph 158 are without any basis in fact or law.

**Paragraph 159: Once Athena became a HUBZone certified business, it received numerous benefits, including access to government contracts set aside specifically for HUBZone businesses.  As a HUBZone business, Athena also received a 10% price evaluation preference for government contracts. In other words, the price offered by a qualified HUBZone business is deemed to be lower than the price offered by a non-HUBZone business if the price offered by the qualified HUBZone business is not more than 10% higher than the price offered by the otherwise lowest bidder.**

When asked to describe the 10% price evaluation program, Mr. Smith was cautioned by counsel not to divulge anything told to him by counsel.  Mr. Smith then stated some contracts offered a 10% discount to "HUBZone. . . businesses they're trying to help." Ex. B. P112L5-P113/L3.  Despite the assertion in the TAC that Athena benefited from the 10% price evaluation, Mr. Smith admitted that he had no knowledge if Athena actually ever received a 10% price evaluation preference for any of the contracts listed in the table in Paragraph 164 (this table was alleged as a list of the HUBZone contracts that Athena secured from 2010 through 2017).

There is no public or nonpublic information that supports this allegation. In fact, Athena never received the benefit of a HUBZone price preference on any contracts. Ex. C ¶35.

> **Paragraph 160: Defendant Athena certified in its Online Representations and Certifications Application ("ORCA") that it was a qualified HUBZone business, and then represented as part of its bids on government contracts that this certification  was current and accurate. [Paragraph 161 further discusses ORCA certification]**

In fact, neither Mr. Smith nor any of his counsel have any personal knowledge of what Athena may or may not have certified in ORCA, as Relator admitted that he played no role in entering or updating Athena's information in the ORCA system. Ex. B. P116L11 – 15. Paragraph 160 is made without any factual basis.

> **Paragraph 164:  Using its fraudulent HUBZone certifications, Athena received at least 31 contracts totaling $87,646,677.06  [**The accompanying chart contains 30 entries that purport to show 31 HUBZone contracts awarded to Athena from 2012 – 2018].

When asked if it was his "testimony today that from 2012 to 2018 Athena received $87 million in HUBZone set-aside contracts?", Mr. Smith responded that he didn't know and had no personal knowledge about 2017 or 2018. Ex. B. P114L13-22.  He further stated that he did not

compile the table. Ex. B P113L5-12. He was then asked if it was his understanding that each of

the items listed in the charts was a HUBZone contract.  He responded, "I'm not sure." Ex. B.

P115L4-7.  So despite the allegation, repeated in the SAC and TAC, that Athena received

$87,646,677.06 through fraudulent HUBZone contracts, Mr. Smith admitted that he didn't know

if the contracts listed were actually HUBZone contracts.  He did admit, however, that he read the

complaint prior to it being filed (Ex. B P115L15-17) but apparently didn't question anything put

forth in his name.

During the deposition, Mr. Smith was provided with a copy of one of the contracts that

was listed in the Paragraph 164 chart.  He admitted that despite this contract being identified as a

HUBZone contract in the Paragraph 164 chart, based on the contract document, the procuring

agency did not identify the contract as a HUBZone set aside. Ex. B. P130L1 – P134L4.

While the parties disagree as to whether this table identifies 31 individual contracts or

only four actual contracts, the total revenue attributed to Athena is grossly and maliciously

misrepresented.

As prepared by Plaintiff, the chart contains only four distinct contracts with total revenue

values as follows:

| | |
|---|---|
| 140G0118D0003 | $25,000 |
| DOCSA1130114BU0004 | $392,539 |
| HQ003414D0005 | $6,360,013 |
| INP16PX02649 | $96,407 |

Instead of adding the total value of each of the four specific contracts one time, Plaintiff

attributed the total contract value to each modification or work order of that contract, thereby

grossly and inexcusably inflating the total "fraud" value by an excess of $80 million.
Mathematically, the total value of the contracts listed by Plaintiff is only $6,873,959.  This
includes the $392,539 for the contract that Mr. Smith admitted was not actually a HUBZone
contract.  As stated, he has no knowledge of what transpired at Athena either before or after his
employment period.

Athena recognizes that there is no dollar threshold for a violation of the False Claims Act,
but the use of the $87,646,677.06 number is further evidence that reasonable inquiry was not
conducted.  Using Plaintiff's numbers, Athena would have executed nearly $82,680,169 in
contract revenue for HUBZone contracts on March 30, 2014.  That is an impossible number and
that fact should have been evident to Mr. Smith after his years of experience with Athena, and
his counsels.  Again, while Defendant recognizes that the False Claims Act does not have a
minimum dollar threshold,  the fact that this $87,646,677.06 damage number has been
perpetuated since the SAC to date when simple math indicates its falsehood is yet another
indication that this action is based on malice, for improper purposes, and does not have a good
faith basis in fact.

The $87,646,677.06 number is even more egregious when faced with the fact that for the
duration of Athena's time as a prime contractor performing on federal contracts, Athena has yet
to be awarded contracts totaling near the value alleged by Plaintiff  for all contracts, regardless of
socio-economic set asides.  Despite Mr. Smith's assertion to the contrary, HUBZone set asides
accounted for a very small percentage of Athena's revenue for the duration of his employment.
Ex. C. ¶¶38, 39.

36

## SANCTIONS

It is clear that Relator had no good faith factual basis beyond  broad, generalized allegations and guesses at the start of this litigation in 2017. It is further evident that despite access to "thousands" of Athena documents through the hard drive, Plaintiff still has no facts to support his allegations.  To compound the absurdity of Plaintiff's inexorable campaign against Athena, Plaintiff is aware that Athena met with the government while the SAC was under review and provided answers to their questions along with hundreds if not thousands of pages of documents supporting Athena's business practices. The government, after nearly a two year investigation, declined to intervene in what is a purported $87,646,677.06 of fraud.  Surely Relator has not withheld the smoking gun evidence nor failed to reveal the full support for his allegations during deposition.  Yet, Relator and his counsel insisted on moving forward with a case that they know, or would know if they had taken the time to make a reasonable inquiry into the claims, has no basis in fact.

> Under Rule 11, sanctions may be imposed if a reasonable inquiry discloses the pleading, motion, or paper is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay. In determining whether factual (1) or dilatory or bad faith (3) reasons exist which may give rise to invocation of Rule 11 sanctions, the district court is accorded wide discretion.

> *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1174–75 (D.C. Cir. 1985)

Rule 11 Sanctions are mandatory "when an attorney fails to make reasonable efforts to ensure that the pleading he signs is grounded in fact." *Figueroa-Ruiz v Alegria*, 905 F.2d 545, 548 (1st Cir. 1990).  Courts "exercise 'virtually untrammeled' discretion in fixing the amount of sanctions to be imposed on the plaintiff and his counsel for their Rule 11 violations, provided

that 'sanctions are appropriate to the facts of the case.'" *Carswell v. Air Line Pilots Ass'n, Int'l*, 248 F.R.D. 325 (D.D.C.2008)

The facts set forth above clearly demonstrate a complete lack of inquiry on the part of counsel as well as the Relator in connection with the advancement of their claims of fraud against Athena. A few direct questions to Relator prior to filing the initial complaint would have revealed that he lacked the base information to support his fraud allegation. Further, the only "non-public" information he presented, a conversation with Athena principles where they admitted that they hired employees to satisfy the HUBZone requirements, only served as further evidence that Athena took its HUBZone responsibilities seriously and took steps to ensure compliance. The actions of Plaintiff and his counsel did not comply with the obligations for Rule 11. They must be held accountable for the abuse of the system, the harassment of Athena and the violation of the rules.

## ATTORNEY FEES

Athena was forced to retain counsel in September 2017 with the unsealing of the original complaint in this matter. Since that time, significant efforts were undertaken in an effort to force a dismissal or resolution of this matter. Athena took extraordinary steps to short-circuit the process by reaching out to the government and insisting on meeting with them to provide support for their business practices. The government found no reason to continue with this suit, despite the tantalizing claim of fraud amounting to more than $87,646,677.06.

As a result of the need for counsel, Athena has expended a sum in the amount of $284,052.60 for attorney's fees. As set forth in the accompanying affidavit, these fees are reasonable for the work performed. Ex. J Attorney Invoices, Ex. K Fee Attorney Fee Affidavit.

In the event the Court does not see fit to award sanctions in the form of dismissal and fees, Athena respectfully requests that the court award Athena attorneys' fees in the amount of $284,052.60 for defense of this matter pursuant to the False Claims Act.

## CONCLUSION

The original complaint was filed under seal in January 2017.  Nearly six years later, as this matter proceeds through the first year of discovery, it has become patently and painfully apparent that whatever fueled the original and subsequent complaints, it was not Plaintiff's knowledge of any actual facts that supported the claims of fraud.  Nor were the Complaint and subsequent amendments supported by "reasonable inquiry." These complaints were motivated by retaliation by Mr. Smith, a former employee of a company that was at odds with his son-in-law, and by counsel, including one attorney related to Plaintiff's son-in-law.  Additionally, Ellis, Freiwald, Simmer and Miller all served as relator's counsel in a qui tam action filed against Athena in Louisiana that was declined by the government (discussed *supra*). The allegations are at best fictitious guessing, and at worse, outright prevarication.

It is clear from the ever changing allegations that Plaintiff and counsel were throwing claims against the wall with the hope that one or more would eventually stick.  Perhaps the intent was to embarrass and hamstring the business of Athena to force a settlement.  Both Plaintiff and counsel would be well aware of the impact that a pending False Claims Act would have on a business engaged in government contracting.  The weight of this case was further exacerbated by Plaintiff and counsels false assertion of $87,646,677.06 in fraud when accurate addition would have revealed contract values of no more than $6,873,959. There never were "factual contentions" with evidentiary support, claims warranted by existing law and certainly no "reasonable inquiry" to verify anything that was alleged against Athena. Athena has lived with

the burden of an $87,646,677.06 fraud claim over its head for nearly six years.  Lesser companies would have succumbed to the negative effects of this situation.  The purpose of Rule 11 is to punish and deter such behavior.  Athena has suffered harm for years because of these baseless and unfounded claims and had been forced to expend extraordinary efforts to defend this matter and maintain its business. Athena respectfully suggests that this court impose sanctions in the form of dismissal of the Third Amended Complaint and attorneys' fees.

In the alternative, Athena requests that this court award attorneys' fees for all costs and fees expended by Athena in the defense of this matter pursuant to the False Claims Act.

For the reasons set forth above, Defendant respectfully requests that the Court enter an Order for Sanctions against  Plaintiff William Smith and all counsel for Relator, jointly and severally.   Defendant respectfully requests that this matter be set for hearing.

/s/ Milton C. Johns
Milton C. Johns, VSB # 42305
D.D.C. Attorney No. VA072
Executive Law Partners, PLLC
11130 Fairfax Blvd, Suite, 303
Fairfax, Virginia 22030
(571) 500-1010
(571) 408-8102 Facsimile
mjohns@xlppllc.com
*Counsel for Defendant*
*Athena Construction Group, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 20, 2022, a true copy of the foregoing was

served via electronic mail on the following:

Glenn Andrew Ellis
GLENN ELLIS LAW, PLLC
2301 Bryn Mawr Ave.
Philadelphia, PA 19131
GAE@glennellislaw.com
*Counsel for William Smith*
*Pro hac*

Ambika J. Biggs, DC Bar 501255
HIRSCHLER FLEISCHER
8270 Greensboro Drive, Suite 700
Tysons, VA 22102
abiggs@hirschlerlaw.com
*Counsel for Balfour Beatty*
*Construction, LLC*

W. Scott Simmer
Andrew Michael Miller
BARON & BUDD, PC
600 New Hampshire Ave., NW, Suite 10-A
Washington, DC 20037
ssimmer@baronbudd.com
amiller@baronbudd.com
*Counsel for William Smith*

Aaron F. Freiwald
Freiwald Law
1500 Walnut Street, 18th Floor
Philadelphia, PA 19102
ajf@freiwaldlaw.com
*Counsel for William Smith*

Matthew A. Lipman
McELROY, DEUTSCH MULVANEY &
CARPENTER, LLP
1617 John F. Kennedy Boulevard, Suite 1500
Philadelphia, PA 19102
Mlipman@mdmc-law.com
*Counsel for Component Assembly Systems, Inc.*

Damon W Taaffe
John Cuong Troung
U.S. Attorney's Office for the
District of Columbia
555 Fourth Street, NW
Washington, DC 20530
damon.taaffe@usdoj.gov
John.truong@usdoj.gov

/s/ Milton C. Johns
Milton C. Johns, VSB # 42305
D.D.C. Attorney No. VA072
Executive Law Partners, PLLC
11130 Fairfax Blvd, Suite, 303
Fairfax, Virginia 22030
(571) 500-1010
(571) 408-8102 Facsimile
mjohns@xlppllc.com
*Counsel for Defendant*
*Athena Construction Group, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 12, 2022, the foregoing was filed via the CM/ECF

system and an electronic copy was served on the following via a notice of electronic filing

(NEF):

Glenn Andrew Ellis
GLENN ELLIS LAW, PLLC
2301 Bryn Mawr Ave.
Philadelphia, PA 19131
GAE@glennellislaw.com
*Counsel for William Smith*
*Pro hac*

Ambika J. Biggs, DC Bar 501255
HIRSCHLER FLEISCHER
8270 Greensboro Drive, Suite 700
Tysons, VA 22102
abiggs@hirschlerlaw.com
*Counsel for Balfour Beatty*
*Construction, LLC*

W. Scott Simmer
Andrew Michael Miller
BARON & BUDD, PC
600 New Hampshire Ave., NW, Suite 10-A
Washington, DC 20037
*ssimmer@baronbudd.com*
*amiller@baronbudd.com*
*Counsel for William Smith*

Aaron F. Freiwald
Freiwald Law
1500 Walnut Street, 18th Floor
Philadelphia, PA 19102
ajf@freiwaldlaw.com
*Counsel for William Smith*

Matthew A. Lipman
McELROY, DEUTSCH MULVANEY &
CARPENTER, LLP
1617 John F. Kennedy Boulevard, Suite 1500
Philadelphia, PA 19102
Mlipman@mdmc-law.com
*Counsel for Component Assembly Systems, Inc.*

Damon W. Taaffe
John Cuong Troung
U.S. Attorney's Office for the
District of Columbia
555 Fourth Street, NW
Washington, DC 20530
*damon.taaffe@usdoj.gov*
*John.truong@usdoj.gov*

 /s/  Jill F. Helwig
Jill F. Helwig, VSB Attorney No. 83202
**Executive Law Partners, PLLC**