IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *ex rel*     )
WILLIAM "BILL" SMITH                          )
                                                            )
      Plaintiff                                   )
                                                            )
v.                                                         )
                                                            ) Civil Action No. 1:18-cv-02080-APM
ATHENA CONSTRUCTION GROUP,        )
INC, *et al*                                          )
                                                            )
      Defendant.                               )


**DEFENDANT ATHENA CONSTRUCTION GROUP, INC'S. MEMORANDUM
IN SUPPORT OF MOTION FOR  PARTIAL SUMMARY JUDGEMENT**

Relator/Plaintiff William Smith ("Plaintiff", "Relator" or "Smith") initiated suit against

Defendant Athena Construction Group, Inc. ("Defendant" or "Athena") in 2017, initially alleging

various violations of the Small Business Administration ("SBA") small business certification

programs. Over time, causes of actions were removed and added, the case was removed from the

U.S. District Court of Pennsylvania to the U.S. District Court for the District of Columbia and

multiple motions to dismiss were filed and argued. Ultimately, the Third Amended Complaint

("TAC") was filed and partially survived a Motion to Dismiss leaving Defendant Athena as the only

defendant with claims of fraud related to its HUBZone status and retaliation.  At this time, Defendant

Athena moves for Partial Summary Judgment on the HUBZone issues of Counts I and II.


**I. FACTUAL BACKGROUND**

      This qui tam action was initiated with the filing of the original complaint on January 10, 2017

by Plaintiff William Smith in the U.S. District Court for the Middle District of Pennsylvania (M.D.

Pa). Dkt. 1 Plaintiff is a former employee of Athena, a construction superintendent, terminated by

Athena in January 2016. Dkt. 1, ¶2 Mr. Smith was terminated for substandard performance. Ex. H

P42L21-25.

The original complaint, filed under seal, sought $66 million in damages from Defendants

Athena, Athena's President Amber Peebles ("Peebles") and Athena's founder and Vice-President

Melissa Schneider (Schneider"), for allegedly knowingly submitting false claims in the amount of

approximately $22 million to the government. Dkt. 1,¶2-4. The claims were based on alleged

violations of the False Claims Act ("FCA"), 31 U.S.C. §§3729 (a)(1)(A) and (B), violation of the

Financial Institution Reform, Recovery and Enforcement Act of 1989 (12 U.S.C. §§1833a(a), (c)(3)),

breach of contract and unjust enrichment.  Plaintiff alleged that Athena falsified information to

obtain various Small Business Administration certifications "including, but not limited to" the

Historically Underutilized Business Zone program ("HUBZone"), Service-Disabled Veteran Owned

Small Business Program ("SDVOSB"), 8(a) Business Development Program ("8a") and the Woman-

Owned Small Business Federal Contracting Program ("WOSB")." *Id* at ¶¶98, 101, 106.

The Third Amended Complaint was filed on February 26, 2021. Dkt. 66  On March 12, 2021,

Defendant Athena filed a Motion to Dismiss. Dkt. 68, Dkt. 69. This motion sought dismissal of the

HUBZone allegations, the pass through allegations and the retaliation claim. The hearing on this

motion would be delayed for more than a year because of Plaintiff's delay in serving the newly

named defendants[1] and their joinder of the Motion to Dismiss.

On March 25, 2022, Defendants' Motions to Dismiss were decided and granted in part and

---

[1] On May 11, 2021, this Court entered an Order to Show Cause related to Plaintiff's delinquent efforts to serve all parties.  Dkt. 80

denied in part. In relevant part, Counts I and II related to HUBZone allegations against Athena survived as well as Count V for Retaliation. Dkt. 107. The Retaliation claims are the subject of a previously filed and currently pending Motion for Partial Summary Judgment and will not be considered in this motion.

To borrow from this Court's earlier ruling on the Motion to Dismiss, this case has spanned seven years, four versions of a complaint, two government investigations and declinations to intervene, and one motion for sanctions during which time Plaintiff has identified no evidence of fraud on the part of Defendant. While the Plaintiff has alleged $87 million dollars in fraud supported by the chart of 31 individual contracts (Dkt. 66 ¶164) and doggedly pursued this matter, Plaintiff has identified no material facts to prove that Athena committed any fraud.  Athena's failure to meet its HUBZone percentages each year from 2011 through 2017 (*Id.* ¶157), as alleged by Plaintiff in the TAC boil down to nothing more than the speculations of an uninformed Plaintiff and the unsupported personal opinions of the expert hired on his behalf.  The representation that the information presented in Paragraph 157 was made in good faith and based on legitimate evidence, and that such evidence would dispositively prove Athena's fraud fell by the wayside without so much as a glance by Plaintiff's expert in rendering his opinion. Likewise, the chart of contracts from the TAC purportedly demonstrating $87 million in fraud was whittled down to four relevant contracts with a potential value of only $142,389 per the report of Plaintiff's expert and that conclusion was based on "evidence" that was never produced or identified in this matter or that is otherwise before this Court. Ex. S, Att. HUBZone Set aside[2]

Seven years of efforts by Defendant to force Plaintiff to reveal the basis for his everchanging allegations has finally confirmed what was apparent from the beginning – these claims are now and always have been – nothing more than a theory in search of a violation. Throughout the protracted

---

[2] The total number of relevant contracts and dollar amount is adjusted to reflect only the time period that Plaintiff's expert maintains Athena was not compliant with HUBZone certification requirements.

course of this litigation, Plaintiff has not been candid with this court[3] and has repeatedly alleged to having significant documentary evidence to support these allegations.[4]  At the conclusion of discovery, Plaintiff's case is merely a difference of opinion as to the definition of two words, not otherwise defined, contained within the SBA HUBZone regulations as the basis for their "$87 million dollar" fraud claim. As will be discussed *infra*, even that number is concocted.

This case was brought on behalf of Plaintiff William Smith, a former employee of Athena who maintains that he determined that Athena was committing fraud in connection with their HUBZone program. When explaining how he reached that conclusion, Mr. Smith stated:

> Well, I didn't have any experience with government contracting whatsoever, so it took me a little bit of time to figure out what was going on, but just from conversation with them I knew they were trying to remedy it but they never did; or if they did, it was seldom met.

Ex. M P175L14-P176L4

He added that he had no personal knowledge of when they met or failed to meet the requirements (*Id.*) but nonetheless alleged that he reached this conclusion that Athena had obtained its HUBZone certification fraudulently within the first three to four months of employment. *Id.* at P52L17-P53L7. Despite that conclusion, he never raised any concerns to anyone at Athena or the federal government at any point during his five and a half years of employment with Athena. *Id* at P53L8-14

 Despite no material personal  knowledge of the requirements of the HUBZone program (*Id.* at P25L7-9), no access to Athena's certifications to the SBA (*Id* at P34L3-11), no access to Athena's

---

[3] To this day, Defendant cannot confirm if Mr. Smith was employed post-termination from Athena.  In this litigation, he testified to no further employment Ex. M P22L12-16.  In a companion matter, counsel for Mr. Smith affirmed to that court and represented to opposing counsel that Mr. Smith was employed by RE Construction subsequent to his termination from Athena. Ex. W.

[4] When requesting leave to file the Second Amended Complaint, Plaintiff represented to this court that he had identified "hundreds if not thousands of documents…… supporting the HUBZone claims".  Dkt. 42 Despite this representation and the Court's indulgence to allow the filing of a Second Amended Complaint followed by a second review by the DOJ, none of the documents allegedly on that hard drive were identified or produced in support of the allegations presently before this court.

payroll or personnel records or any other documentation related to HUBZone status (*Id.* at P76L8-15),

Mr. Smith was able to determine within a few months of walking in Athena's door that Athena was

committing fraud.   Mr. Smith was asked "what facts did you have before the complaint was filed about

any misconduct Athena Construction was engaged in?"  Mr. Smith responded: "Just the information I

received from looking at documents such as the recall rosters and learning what the HUBZone

requirements were and then knowing just the conversations in the office of who was compliant and who

wasn't." *Id.* at P58L14-21. The "recall rosters" upon which Mr. Smith based his allegations of $87

million of fraud were three pieces of paper – individual employee lists containing only names and phone

numbers from 2015. [5]  Ex X They never included home addresses or identified an employee's HUBZone

status. Ex. A at  P63L14-20

      Contained within the multiple versions of complaints were a myriad of allegations against

Athena that were discarded at various points along the way, seemingly lodged against Athena without

any basis in fact at the time each was made. The Complaint and Amended Complaint, in addition to

allegations related to Athena's HUBZone certification, also accused Athena of fraudulently securing

SBA certifications as a Woman Owned Small Business ("WOSB"), a Service Disabled Veteran Owned

Small  Business  ("SDVOSB"), and as an 8(a) disadvantaged small business ("8a"). These claims were

wholly baseless and brought in bad faith as established when Mr. Smith testified that he never had any

evidence or reason to believe that Athena's WOSB, SDVOSB or 8(a) certifications were not

legitimately secured. Ex. M at P60L6-22, P67L4-13

      In September 2018, after removal from the U.S. District Court, Middle District of

---

[5] The Athena "recall rosters" (also identified as "employee rosters") were prepared on an approximate
monthly basis and contained the names and phone numbers of some/most of the Athena employees.  Mr.
Smith had three of these reports (two were identical) all from 2015. Ex. M at  P196L15-19, Ex. X  These
three documents were the only evidence in the possession of Plaintiff that were identified or produced
by Plaintiff relevant to the HUBZone claims.

Pennsylvania and assignment of this case to Judge Amit Mehta, in lieu of proceeding on the previously filed Motion to Dismiss the Amended Complaint, Plaintiff sought leave to file a Second Amended Complaint ("SAC") on the basis of newly discovered information. Dkt. 42 In seeking to amend, Plaintiff represented to this Court that the request to file a Second Amended Complaint was based on "newly" discovered evidence, located "only in April of this year" by Plaintiff in the form of a hard drive. The Court was told that the hard drive contained hundreds, potentially thousands of documents that **not only supported, in detail, the existing fraud that had been alleged in the original complaint and in the amended complaint,** but also a whole new set of allegations that are in addition to, separate and apart from those allegations that previously existed but that are ultimately still related to the fraud." Dkt. 42, P6L24-P7L23 (emphasis added) Based on that representation, this Court permitted the filing of the Second Amended Complaint.  Dkt. 41 During discovery it was disclosed that Plaintiff had actually been aware of the hard drive and its contents from the time of his termination from Athena and had simply not provided it to his counsel. Ex. M P102L7-P105L16  Further, despite representations to this Court that the drive contained a significant amount of documents related to "the existing fraud that had been alleged in the original complaint and in the amended complaint"(i.e. The false certification claims related to HUBZone)*, (Dkt. 42) no documents related to that claim were ever produced as evidence in this matter nor were any of those documents provided to Plaintiff's expert in connection with his review of this matter.[6]

---

[6] In connection with the production of his expert report, Plaintiff provided a full list of all documents provided to, and reviewed by, Arthur E. Collins, Jr. ("Collins") his expert, to reach his opinions in this matter.  All of the documents are identified with Bates designations of documents produced by Athena. (Ex. S Doc list) None of the listed documents carried Bates numbers denoting documents produced by Plaintiff.

When the Second Amended Complaint was filed, despite counsel's explicit representation to this Court that the hard drive contained "hundreds, potentially thousands of documents that not only supported, in detail, the existing fraud that had been alleged in the original complaint and in the amended complaint," none of the 83 exhibits attached to the SAC provided any basis for the information provided in Paragraphs 157 or 164[7] nor provided any insight into the original HUBZone certification claims that appeared in the initial and Amended Complaints and which are the surviving HUBZone claims in this matter.

The HUBZone claims in the Second Amended Complaint (Paragraphs 150 – 165)[8] were different from those set forth in the original and Amended Complaint with several of the "substantive" paragraphs debunked by Plaintiff or his fact witness during his deposition.

Plaintiff alleged that Athena, "fraudulently included on its employee roster individuals who are either not employees under the relevant regulations and/or do not reside in a HUBZone." Dkt. 41,Dkt. 66 ¶154 During her deposition, Athena's former Office Administrator and HUBZone Program Manager Karen Papa testified that she did not believe that statement to be true; that she did not believe that Athena committed fraud during the time she worked there. Ex. A at P54L7-13

The SAC further claimed in part that "the Athena 'Employee List[9]' identifies Amber Peebles and Melissa Schneider's residence as being in a HUBZone in Lynchburg, Virginia – 160 miles from Athena's headquarters in Dumfries, Virginia." Dkt. 41, ¶155. Mr. Smith testified that to his knowledge, Ms. Schneider was included as a HUBZone employee every year that he

---

[7] Paragraphs 157 and 164 are the same in the Second and Third Amended Complaints.  Dkt. 41 and Dkt. 66
[8] The HUBZone claims are identical in the Third Amended Complaint as in the Second Amended Complaint and appear in the same numbered paragraphs, specifically, Paragraphs 150-165.
[9] Employee lists are referred to as "recall roster" and "employee rosters".

worked at Athena; this despite his admission that he never saw any documentation of Athena's that identified their HUBZone employees. Ex. M at P34L3-11, P49L3-15

Testimony of both Mr. Smith and Ms. Papa along with a review of the actual "employee rosters" produced by Plaintiff during discovery clearly established that that allegation could not be true as the employee rosters contained only the employee name and phone number.  No addresses were ever included and HUBZone status was not revealed on those rosters. Ex. M at P94L9-P95/19; Ex. A at P63L14-20, Ex. X  Further, Ms. Papa confirmed that Ms. Schneider was NEVER identified as a HUBZone resident at any time during her course of employment with Athena despite Mr. Smith's baseless assertions.  Ex. A at P52L21  There is no documentation produced by Athena or evidence produced by Plaintiff that contradicts Ms. Papa's recollection with regard to Ms. Schneider never being identified as a HUBZone employee.

The SAC continues with  claims that "Athena falsely certified that Mary Frezza and Sarah Anderson were 'employees' of the company when, in fact, they were not." Dkt. 41 and 66 at ¶156 Mr. Smith, however, admitted that he never saw Athena payroll records and that there were employees that he never met. Ex. M at P76L8-11; P95L22-P97L17   Athena payroll records reveal that both Ms. Frezza and Ms. Anderson were employed by Athena on a part time basis during Mr. Smith's tenure with Athena.[10]  Ex. S, P13-18  They were included on the Employee Rosters, included on the payroll and taxes were paid on their behalf.  *Id*, Ex. X. Mr. Smith further illustrated his poor grasp of Athena personnel when he described Ms. Anderson as "black, kind of manly".  Ex. M at P142L11-15.  Ms. Anderson is a petite Caucasian woman.  Ex. V ¶37, Ex. EE   There was never a basis for Plaintiff to claim that these individuals were not "employees" of

---

[10] Athena produced complete payroll records for the years 2011 through 2017.  A full listing of those records by bate number was produced by Plaintiff identifying the materials reviewed by their expert. Ex. S – Bates Number Summary  Mr. Collins confirmed that Ms. Frezza and Ms. Anderson were included on those records, demonstrating payment for work over an extended period of time. Ex. S P13-18

Athena as he clearly misidentified Ms. Anderson and the fact that he never saw Ms. Frezza, who

cleaned the office at nights and on the weekends (Ex. H at P115L15-P116L10), when he

admitted he did not know all the employees, demonstrates a complete lack of concern for the

validity of the allegations.

The SAC alleges that Athena provided knowingly false information to secure its initial

certification in 2010 and continued to do so for each yearly recertification through 2017.  Dkt. 41

and 66 at ¶157 This statement is specifically contradicted by Plaintiff's expert who agrees with

Athena's certification application in 2010 and maintains that certification at that time was

appropriate. Ex. S, P24L4 Further, regulations during the pertinent time period required

recertification every three years, not on an annual basis. Ex. I This point is illustrative of

Plaintiff's willful ignorance and reckless disregard for the HUBZone regulations that he

frivolously accused Athena of violating. Mr. Smith testified that he had absolutely no knowledge

to make that allegation regarding "yearly" certification (Ex. M at P110L21-P111L5) and clearly

counsel made no effort to research the requirements imposed upon Athena by the SBA during

the relevant time period prior to launching this destructive lawsuit.

Key among the additions to the SAC was Paragraph 157, a listing purporting to show by

year – 2011- 2017-  the total number of Athena employees and the number of those employees

that were HUBZone. While the source of these numbers was not identified, the list allegedly

showed that Athena was NEVER compliant with the HUBZone regulations.  The existence of

this chart and what it allegedly demonstrated was a key factor in this Court's denial of Athena's

Motion to Dismiss.  Discovery subsequent to that date revealed that Relator did not prepare that

chart nor could he discuss or explain the information contained within that chart. Ex. M at

P109L3-P110L2.  Mr. Smith testified that he provided the three employee rosters to his attorney

and "he took it from there." *Id*. He confirmed that he could not speak to anything beyond January 2016, the time of his termination from Athena, despite the chart covering an additional two year time period through the end of 2017. *Id*. at P110L9-16 When asked who could testify to the information contained within the chart, he indicated he had no idea. *Id*. at P187L21-P189L1[11]

Late in discovery, at the insistence of Defendant, this Court ordered Plaintiff to produce a version of Paragraph 157 with names of actual employees, not just numbers and also required Plaintiff to produce to Defendant the Bates stamped documents from the hard drive from which he derived the information to attach names to the numbers. Plaintiff ultimately produced a version of the chart with employee names, but the numbers of employees/HUBZone employees did not match the numbers in the original chart. Dkt. 66 P157, Ex. Y  Further, although Plaintiff attached several documents or portions of documents to the revised chart, no actual document production was provided. *Id.* While Plaintiff has previously produced the three rosters that he testified counsel used to prepare the chart, the numbers in

---

[11] Ultimately it was determined that the only individual who could testify to the information depicted in Paragraph 157 was Plaintiff's counsel, Glenn Ellis. Dkt. 136 In discussions with this Court, Plaintiff's Counsel Glenn Ellis stated that he utilized the three employee rosters along with public and private data banks to compile the information in that chart. Dkt. 136, P5 However, he never explained how he identified individuals that comprised the employee numbers, identified the address that a specific individual identified at the time of their employment with Athena nor how he confirmed that that address was identified as HUBZone at the time of employment. The HUBZone designations undergo examination and are on a five year cycle for adjustment based on current census data and historical HUBZone data for specific addresses is not publicly available. https://maps.certify.sba.gov/hubzone/map/help  Even when forced to put names to the numbers, his data did not comport with known employee information – i.e. specifically the names in the employee rosters produced by Plaintiff.  Further, months prior to filing the Second Amended Complaint with Paragraph 157, Plaintiff knew that the public/private data upon which he relied to draft that paragraph was unreliable. The report related to Mr. Smith failed to identify him as a former employee of Athena, despite the fact that Mr. Smith was employed by Defendant from 2010 through January 2016. Despite Mr. Smith's testimony under oath that he never worked for RE Construction, the report does identify RE Construction as a former employer. Ex. DD  Plaintiff knew that the bases for his claims were unreliable yet pushed forth with the Second Amended Complaint and another five years of litigation.

those rosters did not match the number on either version of the chart.[12] [13]

Subsequent to the production of this new chart, with no witness to depose as to the contents, the Court directed Plaintiff to produce the documents relied upon to create this chart including the "35,000 emails" discussed by Plaintiff's counsel during the October 26, 2022 conference. Dkt. 136, P12 Ultimately, Plaintiff produced 2,000 documents all dated during 2011-2013.  There was not a single email in the production nor were any of the "sample" documents provided with the "revised" table included in that production. None of the produced documents support the names/numbers in the revised chart. Given that the documents ranged only from 2011 – 2013, there was clearly no basis for any of the information for years outside that range. As suspected and argued by Defendant from the beginning, the chart was created out of whole cloth simply to keep this case alive. Of note, despite its importance in saving this matter from dismissal during the Motion to Dismiss, Paragraph 157 played absolutely no role in Plaintiff's expert's review. Ex. S

The allegations in the TAC are at best, incorrect, at worst, a fabrication by Relator to mislead this Court concerning the basis for the claims put forth. It is clear that neither Plaintiff nor counsel were familiar with HUBZone regulations or bothered to educate themselves as to the regulations pertinent to

---

[12] Specifically, the Roster dated 1 2 2015 identifies 31 employees while the Roster dated 8 6 2015 lists 30 employees.  Paragraph 157 claims 17 employees for 2015 while the "revised" paragraph 157 identifies the names of 16 individuals.  (Dkt. 66, Ex. Y)  It is important to note that these three Rosters were in Plaintiff's possession from the time of his departure from Athena in 2016 (Ex. M at P196/22-P197L10) and were available to his counsel at the time of the preparation of each version of the complaints in this matter.

[13] It should also be noted that one of the "sample" documents identified in connection with the revised Paragraph 157 is ATHENA0090439 – Plaintiff provided only a single page of what is identified as a 19 page document. (Ex. Y) Athena was able to locate the complete document (Ex. Z) and determined that Plaintiff omitted all but three (3) of the nineteen (19) employees listed on this "wage detail" sheet in his listings for that year (2013). This appears contrary to Plaintiff's counsel's representation that they utilized the documents on the hard drive, identified the names of employees that appeared and noted which names appear for which year. Dkt 136, P9 There is no explanation why Plaintiff discarded a significant number of names identified on both the sample documents as well as the employee rosters when compiling their statistics in Paragraph 157.

the time period involved and allegations of wrongdoing were based on an erroneous presentation of those regulations to this Court. There are no disputed material facts available to Plaintiff to establish any ability to prove the elements of their claims at trial and this matter is ripe for summary judgment.

## II. THE SUMMARY JUDGMENT STANDARD

Under Rule 56 of the FRCP, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FRCP 56(a); *see Agelli v. Burwell*, 164 F. Supp. 3d 69, 74 (D.D.C. 2016) In ruling on a motion for summary judgment, a court is required to resolve all doubt over factual issues and draw all reasonable inferences in favor of the nonmoving party. *See Scollick ex rel. United States v. Narula*, No. 1:14-CV- 01339-RCL, 2022 WL 3020936, at *5 (D.D.C. July 29, 2022), *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"The Court's role when deciding summary judgment motions is only to determine if there is a genuine dispute of material fact, not to make credibility determinations or weigh the evidence. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.
>
> *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)

## III. ARGUMENT

### A.  BASIS OF CLAIMS UNDER 31 USC 3729(A)(1)(A) AND (A)(1)(B)

At the conclusion of argument on the Motion to Dismiss, this Court dismissed all claims against Defendant Athena based on the fraudulent inducement theory of liability. Dkt 107  The only remaining claims related to the HUBZone certification are an implied-false-certification theory set forth in Counts I and II of the Third Amended Complaint purportedly based on allegations of violations of 31 USC 3729(a)(1)(A)and (a)(1)(B) .  *Id.*

The False Claims Act ("FCA") "provides a cause of action for private parties, known as 'relators,' to bring suits on behalf of the federal government for false or fraudulent statements made to the government." 31 USC 3729(a)(1)(A)and (a)(1)(B) *United States ex. rel. Tran v. Computer Sciences Corp.,* No. 11–CV–0852 (KBJ), 53 F.Supp.3d 104, 116, 2014 WL 2989948, at *7 (D.D.C.2014). *Pencheng Si v. Laogai Rsch. Found.,* 71 F. Supp. 3d 73, 86 (D.D.C. 2014).

Liability under 31 USC 3729(a)(1)(A) accrues to any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C.A. 3729.  Liability under subpart (B) arises when a person "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 USCA 3729.

 "A lawsuit alleging that a defendant made a false claim for payment in violation of section 3729(a)(1)(A) is commonly known as a "presentment" action. In such actions, the relator maintains that the defendant made a material "presentment claim"—*i.e.,* an "explicitly false or fraudulent demand[ ] for payment[.]" *Pencheng* at 87.  "A count brought under 31 U.S.C. § 3729(a)(1)(A) has three elements: " '(1) the defendant submitted a claim [for payment] to the government, (2) the claim was false, and (3) the defendant knew the claim was false.' " *Id*.  "To establish knowledge under an implied certification theory, a relator must allege both 'that the defendant knows (1) that it violated a contractual obligation,

and (2) that its compliance with that obligation was material to the government's decision to pay.'"
*United State ex rel. Adams v. Dell Computer Corp.*, 496 F. Supp. 3d 91, 100-01 (D.D.C. 2020)

"The FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation..[or] reasonable but erroneous interpretations of a defendant's legal obligations." Purcell, 807 F.3d at 287-88."  *United States ex rel. Morsell v. NortonLifeLock, Inc*., No. CV 12-800 (RC), 2023 WL 314506 at 51 (D.D.C. Jan. 19, 2023)  Further, "the FCA's scienter element refers to respondent's knowledge and subjective beliefs – not to what an objectively reasonable person may have known or believed.  *United States ex rel. Shutte v. SuperValu Inc*, 143 S. Ct. 1391, 1399, 216 L. Ed. 2e 1 (2023)

Plaintiff alleges that Athena knowingly submitted false or fraudulent certifications and recertifications to the SBA in violation of the regulations.  These allegations are based on Plaintiff's uninformed perceptions and his expert's unsupported interpretations of certain SBA regulations, not any material facts in dispute.  Most specifically, the allegations of fraud hinge on a difference of opinion as to the meaning of undefined words contained within the SBA regulations, specifically the words "works" and "residence".  Plaintiff is unable to point to any evidence, let alone a material fact in dispute, that provides clarity or direction as to the SBA's intent with regard to the definitions of these words nor is there a material fact in dispute that would serve to establish or even hint, that Athena "knowingly" provided false or fraudulent information to the SBA in connection with its certifications.

## B. PLAINTIFF CANNOT ESTABLISH FRAUD OR FALSITY

The "requisite intent" for a claim under the False Claims Act (FCA) is "knowing presentation of what is known to be false, as opposed to innocent mistake or mere negligence." *U.S. ex rel. Rueter v. Sparks*, 939 F. Supp. 636, 638 (C.D. Ill. 1996), aff'd sub nom. *U.S. ex rel. Ruetter v. Sparks*, 111 F.3d 133 (7th Cir. 1997)

14

"The FCA is largely a fraud statute" *United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391, 1400, 216 L. Ed. 2d 1 (2023)  "To this day, the FCA refers to 'false or fraudulent'' claims, pointing directly to 'common-law meaning of fraud.'" *Schutte* at 1400   "The essential elements of fraud are: (1) a false representation (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action taken in reliance upon the representation." *Frese v. City Segway Tours of Washington, DC, LLC*, 249 F. Supp. 3d 230, 236 (D.D.C. 2017)  "[F]raud is proved when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false." *Shutte* at 1400.

Plaintiff alleges that Athena provided false and/or fraudulent information to the U.S. Government related to its HUBZone certifications but can cite to no material fact in dispute that supports this contention.

As discussed *supra*, Plaintiff's claim of "false or fraudulent" information is based not on material facts or the specific  language of the regulations but rather Plaintiff's expert's interpretation of those regulations and specific words contained therein.  Most specifically, an interpretation of the meaning of the word "works" as it appears in the SBA definition of "employee" and the interpretation of the definition of "reside" as it appears in the HUBZone regulations, are the sole basis for the opinion that Athena defrauded the government.

1**. "Works"**

From May 2010 through 2017, the SBA defined an employee as "all individuals employed on a full-time, part-time, **or other basis,** so long as that individual works a minimum of 40 hours per month…   SBA will consider the totality of the circumstances… in determining whether individuals

are employees of a concern. 13 C.F.R. § 126.103 (emphasis added)[14]

The SBA relied on payroll records to determine if those requirements were met by the employer. 13 CFR §126.103, Ex. AA at P57L1-6, Ex. B During the relevant time period from 2010 through 2017 Athena employed more than sixty-eight individual HUBZone employees.[15] There are no material facts identified to cast doubt on whether any of these individuals were "employees" of Athena.[16]  Plaintiff's expert has taken exception to seven of these individuals (specifically Mary Frezza, Lynn Nelson, Gay Dameron, Rose Robinson, Yvette Robinson, Sarah Anderson and Frank Randolph). Ex. S P13 Each of these individuals was employed by Athena at times from 2010-2017[17].  Per Ms. Peebles, the terms of their employment guaranteed them pay for 10 hours per week/40 hours per month. Ex. H at P115/L20-23  Plaintiff's Expert Collins confirmed that the payroll records document the arrangement. Ex. S, PP15-18(footnotes)

These individuals performed cleaning and various administrative duties and also provided on-call services that Athena determined to be relevant and necessary to the ongoing function of its business. Ex. H at P113L21-P115/23, P118L11-P119/L1, P121L6-P122L24, P124L19-22 These individuals were included on the regular payroll logs with all appropriate taxes withheld. These employees were identified on the Employee Rosters and included in company events such as

---

[14] It is important to note, and fatal to Plaintiff's theory, that the SBA looks to the "totality of the circumstances" to determine whether an individual is an employee of a concern, not whether the employee "works." Plaintiff has identified no facts, material or otherwise, to indicate that any individual was not an employee of Athena under the regulations. 13 C.F.R. § 126.103

[15] Athena produced the HUBZone maps and identification of these employees in documents marked as ACG18086-18348 on February 4, 2023.

[16] In fact, Plaintiff produced no evidence of any type that Athena submitted rosters of fake employees, despite Plaintiff's allegation in Paragraph 154 of the Third Amended Complaint, "To meet the requirement that at least 35% of its employees reside in a HUBZone, Athena fraudulently included on its employee roster individuals who are either not employees under the relevant regulations and/or do not reside in a HUBZone."

[17] Plaintiff's expert reviewed Athena payroll records for these individuals and confirmed that each of these individuals was represented on payroll records. Ex S, PP15-18 Footnotes

Christmas parties. Ex. P, Ex. X   As stated *supra*, Athena produced  payroll records for each of these

individuals and documentation of their HUBZone address including a copy of the HUBZone map

downloaded at the time of their employment.  There is no allegation that any of these seven

individuals did not reside within a legitimate HUBZone area. The dispute of Plaintiff is that these

individuals did not meet their definition of "works" as contained within the SBA employee

definition. [18]

 Of course, the court can take judicial notice that there is no definition within the SBA HUBZone

regulations – from 2010 to the present - for the term "works".  Mr. Collins simply asserts that the SBA

use of that word means "work actually performed" but cites to absolutely no authority, case, statute or

regulation to support this contention. Ex. S[19]  He also fails to address the term "other basis" in the

definition that is distinguished from other types of employment, specifically "full time" and "part time".

Courts should give effect to every word of a statute and this case at bar is no exception. See *Sault Ste.*

*Marie Tribe of Chippewa Indians v. Haaland*, No. 1:18-CV-02035 (TNM), 2023 WL 2384443, at 6

(D.D.C. Mar. 6, 2023)  Certainly enumeration of "full time, part time or other basis" in the definition of

"employee" opened the possibility of non-traditional work arrangements. Most importantly, Relator has

---

[18] In fact, there is no allegation anywhere in the Third Amended Complaint that Athena knowingly
violated the definition of "works" in the SBA regulation. The introduction of such an allegation
essentially amending the pleadings at this stage in the litigation falls under Fed. R. Civ. P 15(a)(1)(B)
which allows amendment of the pleadings "only with the opposing party's written consent or the court's
leave. The court should freely give leave when justice so requires."
"Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies
between litigants. They should not raise barriers which prevent the achievement of that end. The original
complaint in this cause and the amended complaint were not based upon different causes of action."
*Maty v. Grasselli Chem. Co*., 303 U.S. 197, 200, 58 S. Ct. 507, 509, 82 L. Ed. 745 (1938) However,
Plaintiff has had four opportunities to fully plead his case (this Court having denied Plaintiff's request to
file a Fourth Amended Complaint Dkt. 107) and further amendments at this point in this protracted
litigation would be unfair and prejudicial to the rights of the Defendant.
[19] On Page 15, Mr. Collins states that Ms. Frezza should not have been counted as a HUBZone
employee as "she was not paid for work actually performed as required by HUBZone regulations."
However, as established, the definition of "works" is absent from those regulations.

identified no evidence to show otherwise.

The SBA definition of "employee" also states that "[t]o determine if an individual is an employee, SBA reviews the totality of the circumstances, including criteria used by the Internal Revenue Service (IRS) for Federal income tax purposes…", 13 CFR 126.103.  While not specifically addressed by Mr. Collins, the discussion of "employee" in the IRS regulations is for the purpose of distinguishing between an "employee" and an "independent contractor" for tax purposes.[20]   That distinction is of no moment with regard to determining if these individuals qualified as "employees" for Athena under the relevant HUBZone regulations. Mr. Collins then turns to the IRS definition of "ordinary" (common and accepted in your industry) and "necessary" (helpful and appropriate for your trade or business) to conclude that the work performed by these individuals for Athena did not qualify as work. Ex. S, P23 #2 Mr. Collins provided no basis for his expertise to speak on behalf of the IRS or on behalf of the construction industry, nor identify the authority underlying his averment. He clearly was not speaking on behalf of the SBA because the SBA never defined any of these terms nor directed potential HUBZone companies to refer to the IRS for guidance in complying with SBA regulations. Regardless, there are no material facts – in dispute, or otherwise - to support his allegations. Collins' opinions are simply that – opinions – and legal opinions of experts are not binding on the court.  "Whether expert opinion testimony is 'otherwise admissible' depends, in part, on whether it will 'assist the trier of fact' in either 'understand[ing] the evidence or ... determin[ing] a fact in issue.' *See* Fed.R.Evid. 702. Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect, and thus it is not 'otherwise admissible.'"  *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997)  "In other words, an expert may offer his opinion as to facts that, if found, would

---

[20]IRS Tax Tip 2022-117, August 2, 2022:  "It is critical for business owners to correctly determine whether the people providing services are employees or independent contractors." https://www.irs.gov/newsroom/worker-classification-101-employee-or-independent-contractor

support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Id* at 1212–13 Further problematic is that Collins is his own source of authority for his opinion that certain Athena employees did not met the definition of "works" in the regulation. He points to no regulation, case law or statute to support his pronouncements.[2122]

Even if this Court finds there are material facts in dispute regarding the falsity or fraud of the information certified to by Athena, there are simply no material facts – agreed or disputed – to show, or even allude to, the possibility that Athena "knew" that the employ of these individuals on a part-time/on-call hybrid basis was contrary to the HUBZone definition of "works".

## 2. "Resides"

The second basis for Relator's claim of false and fraudulent submission is related to the interpretation of the definition of "resides". During the pertinent time period, the court can take judicial notice that "reside" was defined as "to live in a primary residence at a place for at least 180 days, **or** as a currently registered voter, **and** with intent to live there indefinitely.  13 C.F.R. § 126.103 (emphasis added)  Broken down, there are two requirements in this definition.  The first is that an employee must either reside in a HUBZone residence for "at least 180 days" **or** be a currently registered voter at that address. The second is that the individual has the intent to remain in that residence "indefinitely."  The

---

[21] It is curious that Plaintiff's Expert Collins spends a significant amount of his report discussing how the SBA needs to revise, refine and clarify the various regulations to ensure they properly align with the intent of the HUBZone program.  Mr. Collins identifies himself as "a drafter of the initial HUBZone Program certification regulations and subsequent revisions, standard operating procedures, and policies", (Ex.S P2) yet can site to nothing in the regulations themselves to support his opinions as to the meaning of the disputed terms upon which all of Relator's FCA violation claims are based.

[22] In responding to the opinions of Mr. Collins, Shirley Bailey, Athena's Expert noted that Mr. Collin's devoted a substantial amount of his report discussing irrelevant changes or considered improvements to the language of the SBA regulations that occurred subsequent to the time period in question. Ms. Bailey disagreed with Mr. Collin's insertion of unassociated regulations and unsupported definitions into the SBA regulations and is of the opinion that the actions of Athena with regard to the identification of HUBZone employees was within both the letter and intent of the SBA HUBZone program throughout the time period in question. Ex. FF

term "indefinitely" is not defined in the regulation nor does Plaintiff attempt to define this term.   There are no qualifiers provided for the "at least 180 days" requirement,  such as that the days must be sequential or immediately prior to the certification date or within a specific year.

This allegation by Relator related to the definition of "reside" is specific to Amber Peebles, Athena's president and HUBZone employee.  At the time of certification in 2010, Athena identified Ms. Peebles as a HUBZone resident based on her residence in Lynchburg, Virginia. Ex. C Ms. Peebles purchased that home in 2004, invested substantial time money and sweat equity to fully renovate, decorate and landscape the property as evidenced by the purchase/sale records maintained by the City of Lynchburg.[23]  It was purchased with the intent that it was her residence and she considered it that until it was sold in 2017. Ex. H P12L24-P13L8, P17L17-19, P18L4-7 She was solely financially responsible for the home and, more importantly, did not have any financial responsibilities related to any other property during that time period. *Id* at  P19/L20-25)

At the time of original certification in 2010, Ms. Peebles had spent more than 180 days at the property and had the intention to live there indefinitely. *Id.* at P122L7-15  In support of its HUBZone status application, Athena provided a copy of Ms. Peebles' then-current driver's license showing an address in Triangle, Virginia, a copy of a utility bill for the Lynchburg residence and her personal tax returns for 2009, showing the Triangle location. She was identified in the application as working in the Triangle, Virginia primary office location, roughly 160 miles from the Lynchburg address. Ex. C, Ex. D There is no allegation or evidence identified by Relator that any of the documentation submitted by Athena was false or fraudulent or that any document was withheld that the SBA requested or required.

---

[23] This court can take judicial notice of the purchase date and price and sale date and price related to Ms. Peebles' association with the property as available on the City of Lynchburg Property Records website - https://mapviewer.lynchburgva.gov/ParcelViewer/   The home as pictured on the website depicts the US and Marine Corps flag proudly displayed by its then owner, Amber Peebles. Ex. BB

The is no disagreement between Plaintiff and Defendant that Athena's application for HUBZone certification contained documents that showed Ms. Peebles residing at the Lynchburg address, and Ms. Peebles also having a legal presence at the Triangle address.  There can be no false certification when the evidence Plaintiff identifies as creating a question about residence was submitted to the SBA as part of the application and the SBA approved the application nonetheless.[24]

Neither party identified any evidence that, at any time subsequent to the submission of these documents, the SBA made any inquiries related to Ms. Peebles' claimed residence, nor that the SBA ever advised Athena that Ms. Peebles was not properly qualified as a HUBZone employee. Ex. H P156L4-17 Athena was certified and reasonably relied on that certification to treat each individual identified as a HUBZone employee as acceptable to the SBA.

Relator, however, substituting his judgment for that of the SBA, claims that Ms. Peebles could not be a HUBZone resident as she didn't stay at the Lynchburg property 100% of the time and did not maintain her voter's registration at the Lynchburg address.  This opinion is just that – an opinion – and ignores the language of the definition.  The fact that Ms. Peebles' voter registration was not maintained at that address is not a disqualifier as long as she had lived at the property more than 180 days, which she had.  Plaintiff's expert appears to add the qualifier that the 180 days must be "in a year" or "continuous" but cannot cite to any authority, case, statute or regulation – SBA or otherwise - that adds those three words to the definition. Ex. S P12  There is no evidence to the contrary that Ms. Peebles had

---

[24] It is undisputed that neither party has any evidence whether the SBA did or did not count Ms. Peebles as a HUBZone employee toward the total number required to meet the certification threshold. Plaintiff has identified no evidence, material or otherwise, that SBA relied on Ms. Peebles' representation that she resided in a HUBZone to make its HUBZone certification determination. It is an undisputed material fact that the SBA approved Athena's HUBZone application, which identified Ms. Peebles as a HUBZone resident, and contained documentary information about Ms. Peebles' legal presence at both her Lynchburg home and the Triangle, Virginia address.

owned the home for six years at the time of certification and she testified that from 2011 through 2017 she resided in her home on at least a weekly basis barring travel or other such interruptions to her schedule. Ex. H at P122L7-15.  She clearly satisfied the requirement of living "more than 180 days" at the address during that time.  There are no material facts in dispute that can establish otherwise.

The second requirement is that the HUBZone resident must intend to stay indefinitely. Plaintiff has not addressed this element and has identified no evidence to show a lack of intent to stay indefinitely. Ms. Peebles maintained ownership of, and residence in, the home, until she sold the property in January of 2017 when she purchased a new residence, also in a designated HUBZone at the time of purchase. Ex. H, P8L12-17

Plaintiff's opinions regarding Ms. Peebles' compliance with the definition of "employee" is simply wrong.  It ignores the language of the definition, assumes facts not before this Court and are not supported by reference to any instructional source.  Neither Plaintiff's nor his expert's opinion is a substitute for either Ms. Peebles' belief and consideration of the Lynchburg property as her home and primary residence or the SBA's certification on that basis. The SBA was provided with full and complete information about addresses utilized by Ms. Peebles as well as copies of a driver's license and tax returns and had every opportunity to ask questions, seek further documentation and advise Athena that Ms. Peebles did not qualify for the program.  They did not do that and Athena had every reason to believe that the materials they submitted were full and complete and provided the SBA with information to allow them to determine that Ms. Peebles was, in fact, a HUBZone resident. Based on the SBA's apparent acceptance of Ms. Peebles as a HUBZone resident after having full access to all documentation setting forth both addresses, Athena had every reason to believe that Ms. Peebles continued to be an acceptable HUBZone employee. Plaintiff has determined, on the same information made available to the SBA and accepted by the SBA, that Ms. Peebles was not a valid HUBZone employee because of his

expert's interpretation of SBA regulations. These determinations are counter to the results of the two investigations undertaken by the DOJ in connection with the filing of this *qui tam* action as well as the SBA unannounced site visits and program audits conducted related to Athena's compliance since 2010. Ex. V, ¶15-18, Ex. H P128L6-P129L20  Surely the SBA was in a better position to interpret and apply their own regulations at the time of the certification/recertifications than Plaintiff is thirteen years  later.

What Plaintiff is trying to do is simply second guess the SBA's decision, which is inappropriate for an FCA claim. "Though the court must interpret the meaning of the relevant regulations, '[t]he reviewing court does not have much leeway in undertaking this interpretation ... because the agency is entitled to interpret its own regulations, and the agency's interpretation is 'controlling unless plainly erroneous or inconsistent with the regulation.' "  *Metro Mach. Corp. v. U.S. Small Bus. Admin*., 305 F. Supp. 2d 614, 622 (E.D. Va.), aff'd sub nom. *Metro Mach. Corp. v. Small Bus. Admin*., 102 F. App'x 352 (4th Cir. 2004)

### C.  PLAINTIFF HAS IDENTIFIED NO MATERIAL FACTS TO ESTABLISH DEFENDANT *KNOWINGLY* PRESENTED FALSE OR FRAUDULENT INFORMATION

"The FCA imposes civil liability on 'any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.' §3729(a)(1)(A)."  *Universal Health Servs., Inc. v. United States*, 579 US. 176, 187, 136 S. Ct. 1989, 1999 (2016)  Liability under subpart (b) arises when a person "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 USCA §3729(a)(1)(B).

The FCA has defined "knowing" and "knowingly" to mean that (A) …a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. ¶3729(b)(1)"  *Adams,* 496 F. Supp 3d  at 100.

The Supreme Court has held that the "FCA's scienter element refers to the defendant's knowledge and subjective beliefs, not what an objectively reasonable person might have known or believed. *See Schutte*. The *Schutte* court explained that scienter is not based on what the Defendant now knows or later learned about their submission but rather what they believed when they submitted a claim. *Schutte* at 1401.

Plaintiff alleges that Athena knowingly submitted false information to the SBA related to the status of certain employees Athena identified as HUBZone as well as Athena's assertion that their president, Amber Peebles, resided in a HUBZone.

To establish knowledge under an implied certification theory, a Plaintiff must allege both "that the defendant knows (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay." *Adams,* 496 F. Supp 3d at 100-01

To evaluate if there is any evidence in dispute related to the establishment of "knowing" intent, it is important to understand the allegations as well as the actual actions of both Athena and the SBA in connection with the original 2010 certification as well as the 2013 and 2016 recertifications.

Plaintiff's own expert contradicts Plaintiff's allegation, perpetuated since Plaintiff's filing of the Second Amended Complaint, that Athena was not properly certified as a HUBZone business in 2010.  Plaintiff's own expert opined, based on a review of the documents Athena submitted for its 2010 certification, that Athena was, in fact, appropriately certified in 2010 and correctly identified itself as a HUBZone certified business from 2010 until the time of their recertification in 2013.[25] Ex. S, P24#4 Plaintiff has identified no material facts to the contrary.

---

[25] While Plaintiff's expert has offered only an opinion and not identified a material fact, it is important for the Court to take note that Plaintiff has maintained this, and other, frivolous allegations since the filing of the Second Amended Complaint, and that Plaintiff's own expert rebuts Plaintiff's frivolous allegations at paragraph 157, on which this Court relied in denying in part Athena's Motion to Dismiss.

The original certification was accomplished through the submission of documentation and information related to Athena and its employees.  As discussed *supra*, Athena submitted all required documentation to the SBA that identified both the Lynchburg residence as well as the Triangle address for Ms. Peebles.  The SBA had the opportunity to inquire regarding that information and/or to seek additional information and documentation to clarify Athena's application.  There is no dispute that Athena submitted all materials requested. There is no allegation that Athena hid any documentation or altered any documentation that was required.

There is no evidence to even suggest that the SBA declined or even had any concerns about any of the identified HUBZone employees, other than the inquiry about Mr. Perla's position within the company (his foreign passport raised concerns in the event he had any ownership interest in the company). Ex. F  There were no questions raised about any documentation submitted nor any questions related to the addresses identified on the paperwork submitted. Certification was granted. Ex. G

Unlike original certification, recertification did not require the submission of any documents. Ex. I The affiant simply certifies that the company continues to meet the requirements of the program.  From the time of the original submission in 2010 to the time of recertification, Athena did not relocate its primary office outside that HUBZone.  Plaintiff has identified no material evidence that Athena objectively or subjectively believed that its representations to the SBA in 2010 were false.  In fact the material evidence is undisputed that Athena continued to employ the same practices and approaches in place when their 2010 application was approved by SBA.  They had no reason to think otherwise, and Plaintiff has identified no material facts to the contrary.  The fact that Athena continued to handle their HUBZone compliance in the same manner after the 2010 certification is a material inference that Athena subjectively believed that they were, and remained,

compliant throughout the relevant time periods of Plaintiff's allegations.

> The FCA requires that the false claim at issue have been made "knowingly." 31 U.S.C. § 3729(a)(1)(A); *United States ex rel. Purcell v. MWI Corp. ("Purcell")*, 807 F.3d 281, 287 (D.C. Cir. 2015). "Knowingly" is defined for purposes of the FCA to mean that the defendant has "actual knowledge of the information;" "acts in deliberate ignorance of the truth or falsity of the information;" or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). "[T]he FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation ... [or] reasonable but erroneous interpretations of a defendant's legal obligations. *Purcell*, 807 F.3d at 287–88.

> *Morsell*, 2023 WL 314506 *at* 51.

Undisputed evidence supports the contention that Athena acted with due diligence and with every intent to meet or exceed their obligations to be considered HUBZone certified. There is no evidence to even suggest that Athena "knowingly" took actions or submitted information to the SBA related to is HUBZone compliance that was "false" or "fraudulent".  Testimony established that Athena diligently tracked its HUBZone compliance on a week to week basis to ensure they were meeting their HUBZone numbers. Ex. A P25L22-P26L6, Ex. H P67L2-20, Ex. Q[26]  Karen Papa, Athena's Office Administrator at the time of the original certification (and a witness for Plaintiff)[27], testified that she believed Athena to be an ethical employer and that they were honest with regard to their SBA certifications. Ex. A P83L17 – P84L2  Ms. Papa, as Office Administrator, "created a tracking system and maintained the necessary documentation on a monthly basis to validate the company's HUBZone compliance. *Id*. at P25L22-P26L6  She advised Ms. Peebles that she believed the greatest asset of Athena was its integrity. Ex. T

Plaintiff himself offered no information to suggest that Athena understood or had reason to

---

[26] During discovery, Athena produced monthly internal worksheets demonstrating ongoing monitoring of HUBZone compliance as listed on Ex. S Bates Documents, specifically ACG403-406, 11839, 20001-20065

[27] Ms. Papa was represented by Relator's counsel, Glenn Ellis, for her deposition.

know, that their practices were "false" or "fraudulent".  He confirmed that Athena was always seeking HUBZone employees Ex. M, P38L20-P39L4, P47L3-5

To be clear, neither Ms. Papa, Plaintiff, nor Plaintiff's expert opine nor provide any evidence that Athena "knew" or should have known, that they were submitting "false" or "fraudulent" information.  Only Plaintiff's expert provides an unsubstantiated opinion that information submitted by Athena was "inappropriate", a claim that Athena denies and evidence fails to support.

As discussed *supra*, Plaintiff's apparent claims of "falsity" or "fraud" relate to words contained within definitions related to the HUBZone regulations – specifically, "works" and "resides".  While Plaintiff's expert provided his definition of "works", he was not able to cite to any source, SBA or otherwise, that Athena should have or could have consulted to ascertain such definition.  Further, there is no evidence provided to date, let alone during the relevant time period ending in January 2018, that the SBA utilized Collin's definition of "works" in connection with their definition of "employee".

The second basis for claiming "knowledge" rests with the definition of "resides" as it relates to Athena's President, Amber Peebles.  As discussed *supra*, Athena identified Ms. Peebles as a HUBZone resident based on her Lynchburg address.  This residence had been her home for a number of years prior to the 2010 certification.  The fact that she did not spend every night there for convenience purposes did not negate the fact that she had and continued to consider the Lynchburg house her official residence and had been in that home more than 180 days at the time of certification. Ex. H at P122L7-15.

Athena was upfront in its application to the SBA about the two addresses. The application identified the Lynchburg address as her home and the basis for her being claimed as a HUBZone employee.  Her driver's license with the Triangle address, was part of the supplied documents.

Athena also provide a utility bill for the Lynchburg address (an accepted proof of residency). Personal tax returns for 2009 were part of the submission packet and Ms. Peebles had utilized the Triangle address for that return. Ex. E The SBA had all the information at their fingertips related to Ms. Peebles and if the two addresses raised any concerns, the SBA could have and should have sought clarification from Athena.  They did not and Athena therefore had no reason to consider that the inclusion of Ms. Peebles in their HUBZone count was in any way "false or fraudulent" as it had been affirmatively accepted by the SBA.  Further, testimony established that Ms. Peebles considered that residence to be her home and she treated it as such.  It met the terms of the SBA definition and Athena had no information to dispute that.  Relator had identified no evidence to the contrary.

Athena argues that it was in compliance at the time of certification/recertifications and that no false or fraudulent information was presented to the SBA in connection with those filings. However, even if this Court were to determine that Athena's reading, understanding or interpretation of any of the SBA's regulations was not in compliance, at worse, this Court might find that Athena made an innocent mistake. It bears repeating that "the FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation…[or] reasonable but erroneous interpretations of a defendant's legal obligations."  *Morsell* at 51 (Internal citations omitted).

Without the ability to identify any evidence that Athena "knowingly" submitted "false or fraudulent" information, Relator is unable to prove a violation of the FCA.

## D.  PLAINTIFF CAN NOT ESTABLISH ANY FALSE  CLAIMS SUBMITTED TO THE GOVERNMENT

The March 25, 2022 decision on Defendant's Motion to Dismiss stated that the only remaining HUBZone claims against Defendant Athena were those set forth in Counts I and II for "FCA violations under an implied-false-certification theory." Dkt. 107. To prevail under an implied false claims theory,

Plaintiff must be able to demonstrate, with particularity, the elements of fraud related to the submission of the claims.

"A count brought under 31 U.S.C. § 3729(a)(1)(A) has three elements: " '(1) the defendant submitted a claim [for payment] to the government, (2) the claim was false, and (3) the defendant knew the claim was false.' " *United States ex rel. Folliard v. CDW Tech. Servs., Inc.,* 722 F.Supp.2d 20, 26 (D.D.C.2010)  "To establish knowledge under an implied certification theory, a Plaintiff must allege both 'that the defendant knows (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay.'" *Adams* at 100-01 (Internal citations omitted)

Plaintiff has not identified any evidence to support the submission of specific claims to the government and cannot meet his burden on this issue.  Under a "false certification theory", a claim for payment is "false when it rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term."  *Univ'l Health Servs., Inc. at 177*

Plaintiff's Third Amended Complaint contained what purported to be a table of all HUBZone contracts awarded to Athena and for which Athena secured payments based on false certifications. Dkt. 66 ¶164 The source of the information in the table is unidentified and as such would be inadmissible as unauthenticated hearsay.  The TAC alleges that the table identifies 31 distinct contracts totaling more than $87 million dollars of fraudulent payments.

A review of the chart reveals only seven (7), not thirty-one (31), distinct contracts and that multiple contracts have been repeated up to 13 times in this chart with the total value of the contract counted each time (i.e. HQ003414D0005 with a sum of contract's transactions totaling $6,360,013.00 appears 13 times). Since the filing of the Second Amended Complaint, this error has been pointed out to

Plaintiff on multiple occasions without response despite alerting Plaintiff to the fact that the removal of the addition error reduced the $87 million dollar figure to the range of under $7 million. For reasons that can only be seen to cause further harm to Athena, Plaintiff has never corrected that aspect of Plaintiff's SAC/TAC.

The validity (and value) of that chart was further eroded by Plaintiff's expert who created his own chart which identified only four contracts for the time period on which he opines Athena was not properly certified – specifically November 12, 2013 through December 31, 2017 – totaling $142,389. Ex. S Att B. The intentional and continued allegation of a damage figure that Relator knows is factually incorrect and inflammatory and can only be seen as an attempt to cause reputational harm, destroy contracting opportunities with the US Government and coerce Defendant into a resolution in favor of Plaintiff.

During discovery, in response to discovery requests, Athena located and produced several HUBZone contracts. Plaintiff did not seek documentation related to the submission of claims for payment, nor was Athena requested to produce any proof of payment by the Government for work on the HUBZone contracts. Plaintiff also failed to seek any documents via FRCP Rule 45 (subpoena duces tecum) from any government agency, most especially the SBA. Relator has not identified any evidence to establish how much, if anything, Athena submitted in claims for payment to the U.S. Government, or even that Athena submitted claims.

Based on discovery, Plaintiff understood the need to identify the specific contracts involved as well as requests for payment as, even prior to the filing of the original Complaint, Plaintiff submitted a number of Freedom of Information Act ("FOIA") requests for documentation related to Athena's contracts with the government. Based on Plaintiff's response to Defendant's discovery request for all

documents received in response to FOIA requests, Plaintiff did not receive anything substantive in response to those requests. Ex. O At this point, there are no documents in evidence that can establish that Athena submitted any claims for payment to the government – false or otherwise.

Claims under the FCA are essentially fraud claims and require specific proof of the who, what, where, when and how elements to succeed.  In deciding the March 2022 Motion to Dismiss, this court determined that Plaintiff had "sufficiently outlined 'the basic mechanics' of the HUBZone fraud scheme" to survive the Motion to Dismiss Dkt. 107 P38 - "Athena (who) fraudulently misrepresented its HUBZone status (what) from 2011 to 2017 (when) as to specifically identified contract (where) by falsely overstating the percentage of its employee that actually lived within the HUBZone (how)." Dkt. 107

While Plaintiff's allegations in the TAC were deemed to have satisfied the pleading requirements for fraud, Plaintiff failed to flesh out those allegations with actual evidence throughout the course of this seven-plus year litigation and is now unable to establish those elements with the specificity required to prove fraud.  Plaintiff's own expert dispelled a portion of the "when" aspect of the alleged fraud with regard to the time period that it is alleged Defendant was out of compliance as well as the "where" aspect with regard to the "specifically identified contracts".

With regard to the "when" allegations, the TAC alleges that Athena's "fraud" spanned from its initial certification in 2010 through the present.  Plaintiff's expert, however, opined that Athena was, in fact, properly and rightfully certified as a HUBZone in 2010 and remained in compliance until the time of their recertification in November 2013.  Ex. S, P24 #4 That opinion, alone, causes significant damage to the allegations both in scope in time as well as alleged damages not to mention seriously weakens the overall credibility of the allegations.

31

"'The theory of implied false certification must involve particularized allegations about the claims themselves, not the original award of the contract. Otherwise, the implied certification theory collapses into fraudulent inducement.'" *See Univ'l Health Servs., Inc.*, 136 S. Ct. at 2001 (stating that the implied theory of certification involves a claim for payment that 'makes specific representations about the goods or services provided')." *United States ex rel. Bid Solve, Inc. v. CWS Mktg. Grp., Inc.,* 567 F. Supp. 3d 59, 69–70 (D.D.C. 2021)

Plaintiff is unable to specifically identify the contracts allegedly involved in the fraud, let alone identify a single claim for payment made by Athena or confirm any payments received by Athena for work on HUBZone contracts from the government.  The evidence simply does not exist and without that, Plaintiff cannot prove his claims.

**CONCLUSION**

There are no material facts in dispute identified or produced by Relator that could tend to show that Athena "knowingly" submitted "false" or "fraudulent" information to the SBA in violation of the FCA.  Without the ability to prove those elements, Plaintiff is unable to prove a violation of the FCA.

During the deposition of Defendant Amber Peebles, counsel for Plaintiff asked "Would it be fair to say that Athena was always in compliance with the letter of the law but maybe not the intent of the law? Ex. H P124L23-P125L5  This is an interesting question in that it seems to preface the question on Plaintiff's assertion that Athena did, in fact, comply with the letter of the law – that which is required of a HUBZone certified company.  At the time of the deposition, Ms. Peebles responded that she did not agree with that statement.  In completing her errata sheet, she clarified her response asserting that "Athena was always in compliance with both the spirit and letter of the HUBZone regulations." *Id* at Errata

The undisputed material facts confirm Plaintiff's inability to establish the minimal required

elements to move this matter forward and therefore, Defendant Athena Construction Group, Inc.

respectfully requests that this court enter Partial Summary Judgment on the remaining HUBZone

causes of action of Counts I and II of the Third Amended Complaint.

September 11, 2023

Respectfully submitted
Athena Construction Group, Inc,
By counsel,


/s/ Milton C. Johns,

Milton C. Johns, VSB # 42305
D.D.C. Attorney No. VA072
Jill F. Helwig, VSB #83202
D.D.C. Attorney No. VA145
Executive Law Partners, PLLC
11130 Fairfax Blvd, Suite 303
Fairfax, VA 22030
T:  571 500 1010
F: 571 408 8102
mjohns@xlppllc.com
jhelwig@xlppllc.com